1   STEPHENS FRIEDLAND LLP
    John B. Stephens, Bar No. 142718
2   4695 MacArthur Court, Suite 310
    Newport Beach, CA 92660
3   Telephone: (949) 468-3200 / Facsimile (949) 468-3201
    Email: john@sf-lawyers.com
4

5   Attorney for Defendants and Counterclaimants
    ROBERT E. FORD, JULIA A. FORD,
6   BRUCE H. ROTH, NANCY A. ROTH,
    DIANNA N. THOMPSON and JASON FISHER

7   MIXON JOLLY LLP
8   Cameron M. Jolly, Bar No. 132541
    575 Anton Boulevard, Suite 670
9   Costa Mesa, CA 92626
    Telephone: (714) 885-7000 / Facsimile (714) 885-7001
10   Email: CJolly@mixonjollylaw.com

11   Attorney for Defendants and Counterclaimants
    JEFF ORR and KATHY ORR
12

13            IN THE UNITED STATE DISTRICT COURT

14      FOR THE CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

15

16   HERBALIFE INTERNATIONAL OF     CASE NO.: CV 07 2529 GAF (FMOx)
    AMERICA, INC., a Nevada Corporation,
17                                    HON. GARY A. FEESS
               Plaintiff,
18                                    **AMENDED COUNTERCLAIM OF**
                                   **ROBERT AND JULIA FORD,**
19                                    **BRUCE AND NANCY ROTH,**
                                   **DIANNA N. THOMPSON, JASON**
20   vs.                              **FISHER, AND JEFF AND KATHY**
                                 **ORR FOR: (A) INTENTIONAL**
21                                    **INTERFERENCE WITH**
                                   **PROSPECTIVE ECONOMIC**
22   ROBERT E. FORD and JULIA A. FORD,   **ADVANTAGE; (B) NEGLIGENT**
    husband and wife; BRUCE H. ROTH and     **INTERFERENCE WITH**
23   NANCY A. ROTH, husband and wife; JEFF   **PROSPECTIVE ECONOMIC**
    ORR and KATHY ORR, husband and wife;   **ADVANTAGE; (C) VIOLATION OF**
24   DIANNA N. THOMPSON; and JASON     **CAL. BUSINESS & PROFESSIONS**
    FISHER,                            **CODE § 17200; (D) VIOLATION OF**
25                                    **ENDLESS CHAIN SCHEME LAW**
               Defendants.          **(CAL PENAL CODE § 327); AND**
26                                    **(E) FALSE ADVERTISING (CAL.**
                                   **BUSINESS & PROFESSIONS**
27                                    **CODE § 17500)**

28

ROBERT E. FORD and JULIA A. FORD, husband and wife; BRUCE H. ROTH and NANCY A. ROTH, husband and wife; JEFF ORR and KATHY ORR, husband and wife; DIANNA N. THOMPSON; and JASON FISHER,

**(DEMAND FOR JURY TRIAL)**

Counterclaimants

vs.

HERBALIFE INTERNATIONAL OF AMERICA, INC., a Nevada Corporation,

Counterdefendant.

## I.  SUMMARY OF CLAIMS FOR RELIEF

1. These claims are brought by counterclaimants, Robert and Julia Ford, Bruce and Nancy Roth, Jason Fisher, Dianna Thompson, and Jeff and Kathy Orr ("Counterclaimants") against Herbalife International of America, Inc., ("Herbalife"). The claims for relief herein, are based upon Herbalife's violations of California laws, including, without limitation, Business and Professions Code Section 16600, and the California Unfair Competition Law (Business & Professions Code Section 17200, et seq.), False Advertising (Business & Professions Code Section 17500) and the California Endless Chain Scheme law (California Endless Chain Scheme law, Cal. Penal Code § 327)).

2. Herbalife sells and promotes a multi-level marketing system in which individuals, known as independent Herbalife distributors, pay money for (1) the right to sell products; and (2) the right to receive, in return for recruiting other participants into the program, rewards that are unrelated to the sale of the product to ultimate users. Independent Herbalife distributors expend the effort and money necessary to build their own business. They purchase leads. They establish and maintain their own customer and distributor relationships. They build their own independent Herbalife distribution organizations. They conduct

1  training. They gather business cards and contact data of potential customers and
2  distributors.  They attend Herbalife Opportunity Meetings at their own expense.
3  They pay for their own advertising through the Internet, the phone book, and
4  direct mail marketing.  They pay for their own overhead, including rent,
5  utilities, computer equipment, office supplies, phone equipment, insurance and
6  professional fees.  Herbalife induces its independent distributors to create their
7  own "independent business," but then takes the position that Herbalife owns all
8  of its "independent" distributors' customers and that the independent
9  distributors may not use "directly or indirectly" for any purpose without
10  limitation any "business information and literature" acquired by the independent
11  distributor while owning and operating his or her own independent Herbalife
12  distribution business.

13       3.     In order to avoid being an endless chain scheme, a multi-level
14  marketing system must have effective provisions to ensure that most products
15  are actually sold to *bona fide* consumers.  Herbalife does not employ or enforce
16  such provisions.  Hence, Herbalife's system is an illegal endless chain scheme.
17  Herbalife's marketing plan constitutes an endless chain scheme because
18  Herbalife fails to ensure adequate retail selling and consciously intends to
19  facilitate and foster its distributors to pay consideration for the right to receive
20  compensation when new distributors join or make purchases, which
21  compensation is unrelated to actual retail sales made to persons who are not
22  participants in the scheme.

23       4.     Herbalife makes false and misleading claims about the nature of
24  the Herbalife "business opportunity," and fraudulently omits material facts
25  about the Herbalife "business opportunity," for instance, that a vast majority of
26  Herbalife distributors do not make anywhere near the earnings referenced in
27  Herbalife's promotional materials, including its videos on Herbalife's website,
28  and, in fact, the vast majority of the participants in Herbalife's endless chain

1  scheme drop out within one year of becoming Herbalife distributors and have

2  usually lost most, if not all, of their investment as well as thousands of dollars

3  expended to build their "independent" businesses.

4       5.     Herbalife breaches the very rules and agreements it seeks to

5  enforce by, among other things, encouraging and allowing its distributors to

6  front-load their purchases in order to qualify for certain bonuses and overrides

7  and to then dump the product on EBay and in other manners, making it

8  impossible for distributors to earn a profit on retail sales.

9       6.     To make matters worse, Herbalife includes in its distributorship

10  agreements and its "rules" and regulations, non-compete and non-solicitation

11  provisions that violate California Business and Professions Code Section

12  16600.  These illegal restraints of trade have no legitimate purpose, but instead

13  are designed to stifle competition by preventing Herbalife distributors from

14  joining any other direct sales company if they choose to leave the servitude of

15  Herbalife.

16       7.     These violations of the law have the dual deleterious effect of

17  fraudulently inducing individuals to become Herbalife distributors during which

18  they typically will lose substantial money before they drop out of Herbalife, and

19  then preventing these very same victims from earning a living by competing

20  with Herbalife.  These violations of California law have damaged

21  Counterclaimants because Herbalife has used its illegal tactics and practices to

22  compete unfairly, fraudulently and unlawfully with Counterclaimants.

23

24  **II.    PARTIES**

25       8.     Counterclaimants Robert and Julia Ford (the "Fords") are residents

26  of the State of Georgia.  From May 1995 until September 2006, they were

27  Herbalife distributors.  After leaving Herbalife, they became Marketing

28  Executives with Melaleuca and remain so as of present.

1    9.    Counterclaimants Bruce and Nancy Roth (the "Roths") are
2    residents of the State of Ohio.  From September 1995 until February 2007, they
3    were Herbalife distributors.  After leaving Herbalife, they became Marketing
4    Executives with Melaleuca and remain so as of present.

5    10.    Counterclaimants Jeff and Kathy Orr (the "Orrs") are residents of
6    the State of Oregon.  From 1994 until November 2006, they were Herbalife
7    distributors.  After leaving Herbalife, they became Marketing Executives with
8    Melaleuca and remain so as of present.

9    11.    Counterclaimant Jason Fisher ("Fisher) is a resident of the State of
10    New York. From April 1995 until January 2006, he was a Herbalife distributor.
11    After leaving Herbalife, he became a Marketing Executive with Melaleuca and
12    remains so as of present.

13    12.    Counterclaimant Dianna Thompson ("Thompson") is a resident of
14    the State of Georgia.  From December 1989 until December 2006, she was a
15    Herbalife distributor.  After leaving Herbalife, she became a Marketing
16    Executive with Melaleuca and remains so as of present.

17    13.    At all relevant times, counter-defendant Herbalife International of
18    America, Inc. was a corporation organized and existing under the laws of the
19    State of Nevada, having its principal place of business at 1800 Century Park
20    East, Los Angeles, California 90067.

21    14.    At all relevant times, Counterclaimants operated their own
22    independent businesses and expended the substantial effort and money
23    necessary to build their own businesses.  Herbalife represented to
24    Counterclamants that they owned their own business and were not Herbalife
25    employees, agents, or representatives.

26    15.    While operating their businesses, Counterclaimants purchased
27    leads.  They established and maintained their own customer and distributor
28    relationships.  They built their own independent Herbalife distribution

1  organizations.  They conducted training. They gathered business cards and
2  contact data of potential customers and distributors.  They attended Herbalife
3  Opportunity Meetings.  They paid for their own advertising through the
4  Internet, the phone book, and direct mail marketing.  They paid for their own
5  overhead, including rent, utilities, computer equipment, office supplies, phone
6  equipment, insurance and professional fees.  Counterclaimants generated their
7  own customers and distributors.  While operating their independent businesses,
8  Counterclaimants gathered business information and literature from sources
9  other than Herbalife.

10       16.    This is not a class action or a representative action on behalf of the
11  general public.  Through this counterclaim, Counterclaimants seek to stop
12  several unlawful practices in which Herbalife is engaged and to recover
13  damages caused by such illegal practices.

14

15  **III.    JURISDICTION AND VENUE**

16       17.    This Court has subject matter jurisdiction over these counterclaims
17  based on diversity of citizenship and an amount in controversy that exceeds
18  $75,000.  *See* 28 U.S.C. 1332(a) (1).  This Court is an appropriate venue for this
19  action because Herbalife has its principal place of business within this judicial
20  district.

21

22  **IV.    FACTS COMMON TO ALL CLAIMS FOR RELIEF.**

23       18.    Herbalife began operations in 1980.  Herbalife is a multi-level or
24  "network" marketing company that sells a wide variety of weight-management
25  products, nutritional supplements and personal-care products throughout the
26  United States and in approximately 65 countries.  Herbalife bases the retail sales
27  figures that it reports to investors and the Securities and Exchange Commission
28  on "suggested retail prices."  Herbalife claims it does not monitor the actual

retail sales made or the prices charged by its distributors for their product. However, as Herbalife is subjectively aware, Herbalife's distributors consume or stockpile Herbalife products, give the products away as promotions, and sell the products at or below cost, including on E-bay auctions with the result that the retail sales reported by Herbalife are substantially less than the actual retail sales of Herbalife product.

19.   Herbalife pays its distributors pursuant to the "Herbalife Sales and Marketing Plan" (the "Herbalife Plan"). The entry level in the Herbalife Plan is the distributor level. To become a distributor, a person must be "sponsored" by an existing distributor and must purchase a "distributor kit." Distributors are only entitled to purchase and sell Herbalife products. An indpendent distributor who wishes to earn royalties and bonuses on the purchases of distributors they sponsor must become a "Supervisor." In order to qualify as a Supervisor, an independent distributor must purchase from Herbalife or an upline distributor, Herbalife products representing 4,000 volume points in one month, or 2,500 in volume points in two consecutive months. One "volume point" is equivalent to approximately one dollar (US) at Herbalife's suggested retail prices. A Supervisor must re-qualify once each year in order to maintain his or her "Supervisor" status and continue receiving royalties and bonuses.

20.   Supervisors who maintain their purchase requirements are paid "royalty overrides" and various production bonuses on purchases of Herbalife products by their "downline organizations," but independent distributors do not qualify for royalty payments unless they meet Herbalife's purchase "quotas." By meeting various volume and recruitment targets, Supervisors can ascend in the Herbalife hierarchy from "World Team," "Global Expansion Team," "Millionaire Team" to "President's Team." The President's Team includes an additional five levels, the highest being the "Chairman's Club," the requirements for which include having at least five recruits who meet the

1   volume requirements for the President's Team.  Distributors who reach the
2   higher levels of the Herbalife Plan and recruit large downline organizations can
3   earn royalties and bonuses far in excess of any retail profits they might earn by
4   selling Herbalife products to consumers.  However the number of distributors
5   who reach the higher levels is quite small.  For example, in 1997, there were
6   only 00.20% President's Team distributors out of a total of 115,000
7   Supervisors.  In 1998, there were 00.28% President's Team distributors out of a
8   total of 139,000 Supervisors.  In 2006, only 00.10% of Herbalife distributors
9   were President's Team members.  Moreover, approximately 90% of all non-
10  supervisor distributors drop out in any given year.  One distributor, by himself,
11  lost between 50,000 and 60,000 distributors in a five-year period.  That
12  distributor is touted by Herbalife as one of the most "successful" distributors
13  within Herbalife.
14       21.    Herbalife makes false and misleading income claims.  For instance,
15  Herbalife reports the average payments to distributors, but fails to disclose that
16  in order to obtain these payments Supervisors must spend thousands of dollars
17  purchasing Herbalife products, marketing materials, sales leads, and other
18  marketing aids, which payment substantially reduces the income to the
19  distributor and, in many cases, result in a net loss to the distributor rather than
20  any positive income.  More than half of Herbalife Supervisors earn no
21  commissions whatsoever, a fact that is not disclosed to prospects.  Instead of
22  telling the truth about its distributors' income, Herbalife, in its marketing and
23  promotional materials, including on its web site, includes "testimonial" earnings
24  claims by "successful" distributors, claiming five figure monthly incomes.
25  Herbalife does not disclose the statistics on the average monthly income of its
26  distributors, or the number of the distributors who drop out of Herbalife within
27  one year, after losing most of their investment as well as thousands of dollars
28  that they have spent to develop their independent businesses.  Instead, Herbalife

1  shows pictures of expensive automobiles and homes that are purportedly
2  purchased with the large income made by distributing Herbalife's products.  In
3  addition, Herbalife falsely advertises that its President's Team members earn on
4  average $611,000 annually.  Such false advertisements are made in several
5  media, including, without limitation, its website, its annual report, and its SEC
6  filings.

7       22.    The practice of representing by implication, the use of hypothetical
8  examples, or otherwise, that distributors in multi-level marketing programs earn
9  or achieve any stated amounts of profits, earnings or sales in excess of the
10  average profits, earnings, or sales of all distributors, is an unfair or deceptive act
11  or practice unless the average profits, earnings or sales or the percent of all
12  distributors who actually achieved the stated profits, earnings or sales is clearly
13  and conspicuously disclosed.  Herbalife however, merely provides a disclaimer,
14  in small, inconspicuous print, stating, "The income testimonials presented are
15  applicable to individuals depicted and are not a guarantee of your income nor
16  are they typical."  These disclaimers are woefully inadequate to advise
17  prospective distributors that their chance of achieving the incomes portrayed in
18  the testimonials is infinitesimally small.

19       23.    Herbalife's compensation structure lends itself to the opportunity
20  and motive for abuse.  Distributors have the incentive to focus their attention
21  primarily on recruiting new distributors rather than selling products on a retail
22  basis.  These new "distributors" are then encouraged distributors to purchase
23  more products as "inventory" than they or anyone else could possibly sell to
24  *bona fide* retail customers in order to meet Herbalife's volume requirements.
25  This is a practice known as "inventory loading" and it is characteristic of an
26  endless chain scheme, the definition of which is a sales organization in which
27  members obtain monetary benefits primarily from recruitment of new members
28  into the scheme rather than by selling goods to *bona fide* retail customers who

1 are not participants in the scheme. Endless chain schemes are inherently

2 deceptive and fraudulent because most of the participants in the scheme are

3 doomed to failure. Because of this excess inventory, they further have the

4 incentive to dump the Herbalife product they were required to buy at below cost

5 on E-Bay, making it impossible for Herbalife distributors to earn a retail profit,

6 or sell at a price approaching the suggested retail price.

7        24.     Herbalife's compensation structure is readily subject to these

8 abuses because the potential payout for distributors who sponsor large downline

9 organizations far exceeds the "retail profits" a distributor could earn simply by

10 retailing Herbalife products. Accordingly, the Herbalife Plan creates a built-in

11 incentive for distributors to spend most of their time and energy recruiting new

12 distributors as opposed to selling of Herbalife products to retail consumers.

13 This practice, coupled with the requirement for a person seeking to be a

14 supervisor to pay a large sum of money as an up-front fee, is known as "head

15 hunting" and (like "inventory loading") is characteristic of an endless chain

16 scheme. Herbalife has failed to properly monitor and police its distributors and

17 has failed to ensure that most Herbalife products are actually sold to *bona fide*

18 retail consumers who are not Herbalife distributors.

19        25.     Hebalife pays lip service to its retail sales rules, but it has entirely

20 failed to adequately enforce these rules to ensure that the majority of its

21 products are actually retailed to *bona fide* consumers. Herbalife employs no

22 effective and enforceable requirement that Herbalife distributors actually make

23 retail sales of Herbalife products. Herbalife purports to require distributors to

24 "certify" that they have complied with the retail sales requirements. However,

25 such "certification" is accomplished by merely "clicking" on a box on an order

26 form, and upline distributors, with Herbalife's knowledge and encouragement,

27 routinely instruct new participants that actual compliance with Herbalife's retail

28 sales "rules" is not necessary. Likewise, Herbalife's 10-customer rule and so-

1  called "random audit" procedure is easily circumvented with Herbalife's full
2  knowledge and is little more than more window dressing.  Herbalife's failure to
3  monitor and enforce its retail sales "rules" has lead to an unlawful endless chain
4  scheme.

5        26.    In addition to these unlawful, unfair and fraudulent practices as
6  described above, Herbalife also attempts to improperly restrain competition by
7  its former distributors through the use of illegal restraints of trade.  For instance,
8  in its Distributorship Agreement at paragraph 4, Herbalife includes a blanket 3-
9  year covenant not to compete as follows:

10       For a period of three (3) years after termination of this agreement
11       Distributor will hold in confidence any trade secrets, formulas, sales and
12       distribution systems, business information, and literature which
13       Distributor acquired during the term of this agreement and will not use
14       directly or indirectly such items.  For such period [i.e., 3 years]
15       Distributor also agrees not to enter or participate in a competing business
16       or business activity.

17  Likewise, Herbalife's "rules" contain a 1-year non-solicitation provision, Rule
18  8-A:

19       During the course of a Distributorship and for one year thereafter, neither
20       the Distributor nor their spouse, or any other person assisting the
21       Distributorship will, directly or indirectly . . . solicit, promote, sponsor, or
22       recruit any Herbalife Distributor or any Herbalife customer they become
23       aware of in the course of their Herbalife Distributorship, to join, promote,
24       sell or purchase products of, or participate in as a salesperson or
25       otherwise, any multi-level marketing or direct sales company, nor will
26       they encourage others to do what is prohibited under this rule.

27        27.    These provisions, collectively and individually, violate California
28  Business and Professions Code Section 16600's prohibition against restraints of

lawful business activities in any contract.  For instance, the first sentence of paragraph 4 of the Distributorship Agreement prohibits not only the use of trade secret information, but also "sales and distribution systems, business information, and literature" that was acquired by Herbalife's independent distributors while they were Herbalife independent distributors, whether or not such information even originated from Herbalife.  This is an illegal restraint on lawful business activity and therefore violates California Business and Professions Code Secton 16600.  The second sentence of paragraph 4 of the Distributorship Agreement is a blanket 3-year covenant not to compete. Herbalife has admitted that this is an illegal provision under Section 16600; however, Counterclaimants are informed and believe, and on that basis allege, that Herbalife has not eliminated this sentence from its Distributorship Agreements, has not notified its independent distributors that such provision is unlawful, and has demanded that its independent distributors comply with this provision.  Rule 8-A's ban on direct or indirect solicitation, promotion, sponsorship or recruiting of any Herbalife independent distributor within one year after termination violates Section 16600.  None of these broad, sweeping provisions is necessary to protect Herbalife's trade secrets.

28.     Accordingly, all of these provisions constitute unfair and unlawful competition under the Unfair Competition Law (California Business and Professions Code Section 17200 et seq.)  Herbalife includes these illegal provisions in its contracts and "rules" in order to stifle competition by intimidating its independent distributors.  Herbalife distributors who fear reprisal from Herbalife are far less likely to leave Herbalife for one of its competitors.  For instance, on April 20, 2007, in order to further fuel the fear of its distributors, Herbalife's CEO, Michael O. Johnson and its President and Chief Operating Officer, Greg Probert, sent an "important message" to its President's Team Members, stating that Herbalife had filed the instant lawsuit

1   for unfair competition against Counterclaimants. Nowhere in its "important
2   message" does Herbalife disclose that its covenant not to compete and other
3   restrictions are illegal and unenforceable. Therefore, Herbalife, through the use
4   of these illegal restraints of trade, is able to intimidate individuals who simply
5   wish to pursue their livelihood with another company. Counterclaimants have
6   suffered damages as a proximate result of these unlawful, unfair and fraudulent
7   practices because, among other things, they have lost income that they would
8   have earned as Melaleuca Marketing Executives if Herbalife would not have
9   engaged in the misconduct alleged herein.

10      29.    Moreover, Herbalife fraudulently induces individuals to become
11  distributors with the promise that they are creating their own "independent"
12  business. Herbalife does not disclose, however, that if Herbalife discontinues
13  its independent business, Herbalife will take the position that the distributor's
14  business, including, without limitation, the independent distributor's goodwill,
15  and everything he or she learned while a Herbalife independent distributor and
16  everyone in the independent distributor's downline belongs to Herbalife, and
17  that the independent distributor is not entitled to call on his or her own
18  customers.

19      30.    An injunction is needed to prevent further misconduct by
20  Herbalife. Herbalife has demonstrated every inclination to continue engage in
21  unfair competition through the actions set forth herein. Herbalife also continues
22  to maintain illegal restraints of trade in its contracts and rules and has made no
23  effort to disavow such illegal restraints of trade. To the contrary, Herbalife has
24  sued Counterclaimants, alleging that they have breached their contracts with
25  Herbalife by soliciting Herbalife independent distributors. Injunctive relief is
26  required to prevent further harm to Counterclaimants.

27

28

V.    **CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

**(INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE)**

31.    Counterclaimants repeat and incorporate each allegation contained in the preceding paragraphs as though fully set forth herein.

32.    As allege above, Counterclaimants are Melaleuca Marketing Executives and have been so since the termination of their Herbalife independent distributorships.   As Melaleuca Marketing Executives, Counterclaimants compete with Herbalife and Herbalife's independent distributors for prospective customers.  Herbalife's customers and independent distributors are prospective customers of Counterclaimants.  While they were Herbalife independent distributors, Counterclaimants incurred substantial expense and expended significant effort to develop relationships with prospective and actual customers as well as Herbalife independent distributors who were recruited by Counterclaimants and/or placed in their "downline." Counterclaimants have an economic relationship with their prospective and actual customers, including, without limitation, former and current Herbalife customers and independent distributors that would have resulted in an economic benefit to Counterclaimants, but for Herbalife's wrongful interference.

33.    Counterclaimants are informed and believe, and on that basis allege, that Herbalife knew of these relationships.

34.    Counterclaimants are informed and believe, and on that basis allege, that Herbalife intended to disrupt these relationships.

35.    Counterclaimants are informed and believe, and on that basis allege, that Herbalife engaged in the wrongful conduct alleged herein (*e.g.*, violations of Business & Professions Code Sections 16600, 17200, 17500, and

14

1   Penal Code Section 327) with the intention to disrupt Counterclaimants'
2   economic relationships.

3       36.    Counterclaimants are informed and believe, and on that basis
4   allege, that these relationships were disrupted as a proximate result of
5   Herbalife's wrongful conduct as alleged herein.

6       37.    Counterclaimants are informed and believe, and on that basis
7   allege that as a proximate result of the disruption in their economic relationships
8   due to Herbalife's wrongful conduct they have suffered, and will continue to
9   suffer, actual damages in an amount to be proven at trial.

10      38.    Because Herbalife has acted and will continue to act maliciously
11  and oppressively, despicably, fraudulently and in callous disregard of the rights
12  and interests of Counterclaimants, they are not only entitled to compensatory
13  damages in a sum to be proven at trial, but also punitive damages in an amount
14  necessary to appropriately punish Herbalife and deter further misconduct of
15  Herbalife and others.

16

17              **SECOND CLAIM FOR RELIEF**
18  **(NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC**
19                      **ADVANTAGE)**

20      39.    Counterclaimants repeat and incorporate each allegation contained
21  in the preceding paragraphs as though fully set forth herein.

22      40.    As allege above, Counterclaimants are Melaleuca Marketing
23  Executives and have been so since the termination of their Herbalife
24  independent distributorships.   As Melaleuca Marketing Executives,
25  Counterclaimants compete with Herbalife and Herbalife's independent
26  distributors for prospective customers.  Herbalife's customers and independent
27  distributors are prospective customers of Counterclaimants.  While they were
28  Herbalife independent distributors, Counterclaimants incurred substantial

1   expense and expended significant effort to develop relationships with

2   prospective and actual customers as well as Herbalife independent distributors

3   who were recruited by Counterclaimants and/or placed in their "downline."

4   Counterclaimants have an economic relationship with their prospective and

5   actual customers, including, without limitation, former and current Herbalife

6   customers and independent distributors that would have resulted in an economic

7   benefit to Counterclaimants, but for Herbalife's wrongful interference.

8       41.    Counterclaimants are informed and believe, and on that basis

9   allege, that Herbalife knew or should have known of these relationships.

10       42.    Counterclaimants are informed and believe, and on that basis

11   allege, that Herbalife knew or should have known that these relationships would

12   be disrupted if Herbalife failed to act with reasonable care.

13       43.    Counterclaimants are informed and believe, and on that basis

14   allege, that Herbalife engaged in the wrongful conduct alleged herein (e.g.,

15   violations of Business & Professions Code Sections 16600, 17200, 17500, and

16   Penal Code Section 327), and that Herbalife knew or should have known that

17   such wrongful conduct would disrupt Counterclaimants' economic

18   relationships.

19       44.    Counterclaimants are informed and believe, and on that basis

20   allege, that these relationships were disrupted as a proximate result of

21   Herbalife's wrongful conduct as alleged herein.

22       45.    Counterclaimants are informed and believe, and on that basis

23   allege that as a proximate result of the disruption in their economic relationships

24   due to Herbalife's wrongful conduct they have suffered, and will continue to

25   suffer, actual damages in an amount to be proven at trial.

26

27

28

## THIRD CLAIM FOR RELIEF
## (UNLAWFUL, UNFAIR AND DECEPTIVE BUSINESS
## PRACTICES IN VIOLATION OF CALIFORNIA BUSINESS AND
## PROFESSIONS CODE SECTION 17200)

46.     Counterclaimants repeat and incorporate each allegation contained in the preceding paragraphs as though fully set forth herein.

47.     Herbalife has engaged in unlawful, deceptive and unfair business practices and unfair competition within the meaning of California Business and Professions Code Section 17200, et seq., including, without limitation:  (a) making false or misleading statements in promoting and advertising its "business opportunity" violation of California Business and Professions Code Section 17500; (b) operating an endless chain scheme in violation of California Penal Code Section 327; and (c) including illegal restraints of trade in its distributorship agreements and "rules" in violation of California Business and Professions Code Section 16600.

48.     The above-described unlawful, unfair, fraudulent and deceptive business practices conducted by Herbalife present a threat and likelihood of unfair competition in that Herbalife has systematically used of false and misleading promotional materials, operated an endless chain scheme, and illegally included unlawful restraints in its Distributorship Agreement and its rules.  This unfair, fraudulent and unlawful conduct will continue to stifle competition as distributors are fraudulently induced to become Herbalife distributors and invest substantial sums of money in their "independent businesses" and then dissuaded from competing with Herbalife due to fear of reprisal based upon the illegal restraints of trade contained in Herbalife's agreements and "rules."  As a result of Herbalife's misconduct, Counterclaimants have suffered injury in fact and have lost money in that, among other things, they have lost the benefits of the sums invested in building

1  their "independent business" due to Herbalife's insistence that Herbalife owns

2  their businesses, they have been unable to compete fairly for business with

3  Herbalife due to the restraints of trade included in Herbalife's Distributorship

4  Agreement and rules, due to Herbalife's illegal operation of an endless chain

5  scheme, and due to Herbalife's false advertising.   For instance,

6  Counterclaimants have been suffered actual economic injury in that they have

7  lost income as Melaleuca Marketing Executives due to the above-referenced

8  unfair, unlawful and fraudulent practices of Herbalife.

9      49.    Pursuant to California Business and Professions Code Sections

10  17200 and 17203, Counterclaimants seek an injunction against the unlawful

11  acts alleged herein, and attorneys' fees and costs pursuant to California Code of

12  Civil Procedure Section 1021.5.

13     50.    Herbalife's unfair competition presents a continuing threat and

14  likelihood of causing further harm to Counterclaimants such that injunctive

15  relief would be appropriate in the form of an order: (a) preliminarily and

16  permanently enjoining Herbalife from selling, promoting its "business

17  opportunity" in a manner that is deceptive, fraudulent or in violation of the

18  California statutory and common law; and (b) preliminarily and permanently

19  enjoining Herbalife from enforcing the illegal restraints of trade included in its

20  Distributorship Agreement and its "rules," and notifying all of its distributors in

21  writing that all such restraints of trade are invalid and unenforceable.

22

23                    **FOURTH CLAIM FOR RELIEF**

24  **(ENDLESS CHAIN SCHEME IN VIOLATION OF CALIFORNIA**

25                **PENAL CODE SECTION 327)**

26     51.    Counterclaimants repeat and incorporate each allegation contained

27  in the preceding paragraphs as though fully set forth herein.

28

52.     Herbalife's marketing plan as alleged above constitutes an endless chain scheme within the meaning of California Penal Code Section 327.

53.     Counterclaimants are entitled to rescission of any of their contract with Herbalife, including, without limitation, the Distributorship Agreements pursuant to California Civil Code Section 1689.2.

54.     Counterclaimants are also entitled to an injunction prohibiting Herbalife from engaging in an endless chain scheme in violation of California Penal Code Section 327, and attorneys' pursuant to California Civil Code Section 1689.2.

## FIFTH CLAIM FOR RELIEF
### (FALSE ADVERTISING IN VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17500, *et seq.*)

55.     Counterclaimants repeat and incorporate each allegation contained in the preceding paragraphs as though fully set forth herein.

56.     Counterclaimants are informed and believe, and on that basis allege, that Herbalife has engaged in false advertising, including, without limitation, as follows: (a) making false claims about its independent distributors' income and lifestyles on its website, www.Herbalife.com (including through videos of Herbalife independent distributors) and in Herbalife publications, its annual report, and in its SEC filings; (b) representing to current or prospective independent distributors that, as Herbalife independent distributors, they are building their own independent business even though Herbalife will take the position that it owns the fruits of the Herbalife independent distributors' efforts and expense and is empowered to restrain them from competing after the independent distributor terminates his or her distributorship.  These statements, among others, are either false, misleading, or have the tendency to deceive or confuse the general public.

57.　　In making and disseminating the advertising herein alleged, Herbalife knew or should have known that the statements were untrue, misleading or had the tendency to confuse or deceive and therefore acted in violation of California Business and Professions Code Section 17500.

58.　　Unless restrained by this Court, Herbalife will continue to engage in untrue, misleading or deceptive advertising in violation of law.

## VI.　PRAYER FOR RELIEF

WHEREFORE, Counterclaimants pray:

1.　　For rescission of Counterclaimants' contracts with Herbalife;

2.　　For compensatory damages for their economic losses, together with interest thereon at the legal rate, plus additional general and incidental damages, according to proof;

3.　　For exemplary and punitive damages for Herbalife's malice, oppression or fraud in an amount to be shown at trial;

4.　　For injunctive relieve as requested above and the cessation of all conduct in violation of applicable laws;

5.　　For costs incurred herein, including attorneys' fees to the extent allowable by law;

6. For such other and further legal and equitable relieve as this Court may deem proper.

Dated: February 15, 2008    STEPHENS FRIEDLAND LLP

By: _____
   John B. Stephens, Attorney for Defendants
   and Counterclaimants ROBERT E.
   FORD, JULIA A. FORD, BRUCE H.
   ROTH, NANCY A. ROTH, DIANNA N.
   THOMPSON and JASON FISHER

Dated: February 15, 2008    MIXON JOLLY LLP

By: _____
   Cameron M. Jolly, Attorney for
   Defendants and Counterclaimants JEFF
   ORR and KATHY ORR

1 | **VII.   DEMAND FOR JURY TRIAL**

2      Counterclaimants demand a trial by jury as to all issues so triable both

3 with respect to these counterclaims and Herbalife's complaint.

4

5 Dated:  February 15, 2008           STEPHENS FRIEDLAND LLP

6

7

8           By: _____

9             John B. Stephens, Attorney for Defendants

and Counterclaimants ROBERT E.

10             FORD, JULIA A. FORD, BRUCE H.

11             ROTH, NANCY A. ROTH, DIANNA N.

THOMPSON and JASON FISHER

12

13

14 Dated:  February 15, 2008           MIXON JOLLY LLP

15

16

17           By: _____

18             Cameron M. Jolly, Attorney for

Defendants and Counterclaimants JEFF

19             ORR and KATHY ORR

20

21

22

23

24

25

26

27

28

# CERTIFICATE OF SERVICE

1

2     I hereby certify that (1) I am an attorney admitted to appear before this

3   Court and (2) I caused a true and correct copy of **AMENDED**

4
5   **COUNTERCLAIM OF ROBERT AND JULIA FORD, BRUCE AND NANCY**

6   **ROTH, DIANNA N. THOMPSON, JASON FISHER, AND JEFF AND KATHY**

7
8   **ORR FOR: (A) INTENTIONAL INTERFERENCE WITH PROSPECTIVE**

9   **ECONOMIC ADVANTAGE; (B) NEGLIGENT INTERFERENCE WITH**

10  **PROSPECTIVE ECONOMIC ADVANTAGE; (C) VIOLATION OF CAL.**

11  **BUSINESS & PROFESSIONS CODE § 17200; (D) VIOLATION OF ENDLESS**

12
13  **CHAIN SCHEME LAW (CAL PENAL CODE § 327); AND (E) FALSE**

14  **ADVERTISING (CAL. BUSINESS & PROFESSIONS CODE § 17500)** to be sent

15  via email to all counsel listed below on the 15 day of February 2008.

16

17  Charles Patterson, Esq.
    Morrison & Foerster LLP
18  555 West Fifth Street
19  Los Angeles, CA  90013
    Telephone:  (213) 892-5200
20  Facsimile:  (213) 892-5454

21

22

23

24
    _____
25  John B. Stephens

26

27
                              i
28  _____
                   **CERTIFICATE OF SERVICE**