1 | STEPHENS FRIEDLAND LLP
John B. Stephens, Bar No. 142718
2 | 4695 MacArthur Court, Suite 310
Newport Beach, CA  92660
3 | Telephone: (949) 468-3200 / Facsimile (949) 468-3201
Email:  john@sf-lawyers.com
4 |
Attorney for Defendants and Counterclaimants
5 | ROBERT E. FORD, JULIA A. FORD,
BRUCE H. ROTH, NANCY A. ROTH,
6 | DIANNA N. THOMPSON and JASON FISHER
7 |
MIXON JOLLY LLP
8 | Cameron M. Jolly, Bar No. 132541
575 Anton Boulevard, Suite 670
9 | Costa Mesa, CA  92626
Telephone: (714) 885-7000 / Facsimile (714) 885-7001
10 | Email:  CJolly@mixonjollylaw.com
11 | Attorney for Defendants and Counterclaimants
JEFF ORR and KATHY ORR
12 |

13 | IN THE UNITED STATES DISTRICT COURT

14 | FOR THE CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

15 |

16 | HERBALIFE INTERNATIONAL OF AMERICA, INC., a Nevada corporation,

17 | Plaintiff,

18 |

19 |

20 |

21 | v.

22 |

23 |

24 | ROBERT E. FORD and JULIA A. FORD, husband and wife; BRUCE H.
25 | ROTH and NANCY A. ROTH, husband and wife; JEFF ORR and KATHY ORR,
26 | husband and wife; DIANNA N. THOMPSON; and JASON FISHER,
27 |
28 | Defendants.

Case No.:  CV 07 2529 GAF (FMOx)

**DEFENDANTS AND COUNTERCLAIMANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTIONS FOR PARTIAL SUMMARY JUDGMENT ON HERBALIFE'S COMPLAINT AND FOR PARTIAL SUMMARY JUDGMENT ON THE DEFENDANTS' COUNTERCLAIMS**

**[Fed. R. Civ. Proc. 56]**

**[Notice of Motion and Motions For Partial Summary Judgment, Statement of Uncontroverted Facts and Conclusions of Law; and Declarations in Support Thereof filed herewith]**

Hearing Date:     March 23, 2009
Time:                 9:30 a.m.
Courtroom:         740 – Roybal Crthse

1
2
3

## TABLE OF CONTENTS

**Page**

I.   SUMMARY OF MOTION.................................................................. 1

   A.   Summary of Motion Grounds Regarding Herbalife's
        Counts ...................................................................... 1

   B.   Summary of Motion Grounds Regarding
        Counterclaimants' Claims ................................................. 3

II.  FACTUAL SUMMARY ................................................................. 3

   A.   Brief Summary of Undisputed Facts ...................................... 3

   B.   The "*Business Opportunity*" .............................................. 4

   C.   The Herbalife Agreement of Distributorship............................ 4

   D.   Counterclaimants Compete at Melaleuca ............................... 6

III. HERBALIFE'S COUNTS 1, 2, 3, 4, 5 AND 7 SHOULD BE
     SUMMARILY DISMISSED ......................................................... 7

   A.   Herbalife's Count 1 for Breach of Contract Should Be
        Dismissed ................................................................... 7

        1.   Herbalife has not identified its trade secrets ................... 7

        2.   Herbalife's rules are illegal restraints of trade
             and cannot form the basis for a breach of
             contract ..................................................................... 8

             a.   California Business & Professions Code
                  16600 prohibits unlawful restraints on
                  trade ............................................................... 8

1

<p style="text-align:center"><u>TABLE OF CONTENTS (Con't)</u></p>

2

<p style="text-align:right"><u>**Page**</u></p>

3

4        b.    Herbalife's rules violate California law ..................... 10

5        c.    Rule 8-A was not in effect until
6    September 1, 2006 – after Fisher and the
7    Fords had left Herbalife ............................... 11

8    3.    Herbalife has produced no evidence that
9    Counterclaimants executed the Confidentiality
10   and Non-Disclosure Agreement ........................... 11

11   4.    Herbalife has produced no evidence of
12   violations of other rules ........................ 11

13   B.    Herbalife Cannot Prove Misappropriation of Trade
14   Secrets ................................................ 12

15   C.    Herbalife's Claims For IIPEA, IWC, and Unfair
16   Competition Should Be Summarily Dismissed ............................ 13

17   D.    Herbalife's Claim For Fraud Fails Because Herbalife
18   Did Not Rely On Nancy Roth's January 30, 2007
19   Email And Suffered No Damages ................................... 14

20   IV.    HERBALIFE'S COUNTS 1, 2, 3, 4, 5 AND 7 SHOULD BE
21   SUMMARILY DISMISSED ........................................... 14

22   A.    Counterclaimants Are Entitled To Partial Summary
23   Judgment On Their Fourth Claim for Violation of
24   California's Endless Chain Scheme Law........................................ 14

25   1.    Endless Chain Schemes are illegal *per se* ............................ 14

26   2.    Herbalife is Omnitrition........................................... 15
27

28

1

<u>TABLE OF CONTENTS (Con't)</u>

2

<u>Page</u>

3

4       3.      Herbalife's policies are not effective to separate
5               it from Omnitrition ................................................................ 17

6               a.      Herbalife's 10-Customer Rule is not
7                       effective ...................................................................... 18

8               b.      Herbalife's 70% rule is confusing and
9                       ineffective .................................................................. 19

10              c.      Herbalife's Buyback Policy is not
11                      effective ...................................................................... 21

12      4.      Herbalife's focus is on recruiting – not retail ....................... 22
13

14   B.  Herbalife Has Engaged In False Advertising ................................. 22

15   C.  Counterclaimants Are Entitled To Partial Summary
16       Judgment On Their Third Claim For Unfair
         Competition In Violation of Cal. Bus. & Prof. Code
17       § 17200 ............................................................................................ 24

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF AUTHORITIES**

## **Cases**                                                                        **Page(s)**

*Advanced Modular Sputtering, Inc. v. Superior Court*,
    132 Cal. App. 4th 826 (2005) ....................................................... 12

*Alliance Mortgage Co. v. Rothwell*,
    10 Cal. 4th 1226 (1995) .............................................................. 14

*Edwards v. Arthur Anderson LLP*, 44 Cal. 4th 937 (2008)............................... 1, 9

*People v. Bestline Products, Inc.*,
    61 Cal. App. 3d 879 (1976)......................................................... 24

*VFD Consulting, Inc. v. 21st Services*,
    425 F. Supp. 2d 1037 (N.D. Cal. 2006) .................................................. 13

*Webster v. Omnitrition Int'l, Inc.*,
    79 F.3d 776 (9th Cir. 1996) ......................................................*passim*

## **Statutes**                                                                     **Page(s)**

Business & Professions Code, § 16600 .......................................................*passim*

Business & Professions Code, § 16601 ............................................................ 9

Business & Professions Code, § 16602 ............................................................ 9

Business & Professions Code, § 17200 ........................................................ 3, 24

Business & Professions Code, § 17500 ......................................................3, 23-24

California Code of Civil Procedure § 2019.210 ............................................... 7, 12

California Code of Civil Procedure § 3426.1(d) ................................................ 12

California Penal Code § 327 ....................................................................3, 14-15

1    **I.      SUMMARY OF MOTION**

2          Herbalife has sued Counterclaimants and Defendants[1] alleging, among other

3    things, that they have engaged in unfair competition by violating one of Herbalife's

4    "rules" (8-A) that was enacted on September 1, 2006.  Rule 8-A, however, itself

5    constitutes unfair competition by Herbalife because it is an illegal restraint of trade in

6    violation of Cal. Bus. & Prof. Code §16600 as was recently clarified by the California

7    Supreme Court in *Edwards v. Arthur Anderson LLP*, 44 Cal. 4th 937 (2008).  In

8    addition, Herbalife's business practices render it an illegal endless chain (pyramid)

9    scheme in violation of California Penal Code § 327, and *Webster v. Omnitrition Int'l,*

10   *Inc.*, 79 F.3d 776 (9th Cir. 1996).  For this and many other reasons explained below,

11   this Court should grant partial summary judgment as requested by Counterclaimants.

12         **A.      Summary of Motion Grounds Regarding Herbalife's Counts**

13                **1.      Herbalife's Count 1**:  Summary judgment should be granted on

14   Herbalife's Count 1 for Breach of Contract because:

15   •    Herbalife contends that Counterclaimants violated a provision in their

16        distributorship agreements prohibiting the use of certain trade secret information,

17        but Herbalife has not produced the documents it contends are trade secrets in the

18        course of discovery.

19   •    Herbalife contends that Counterclaimants violated an Herbalife rule known as

20        Rule 8-A, but Rule 8-A is an unlawful restraint of trade under Cal. Bus. & Prof.

21        Code § 16600.

22   •    Herbalife contends that Counterclaimants violated Rule 8-A, but Rule 8-A was

23        not in effect until September 1, 2006, by which time three of the Defendants and

24        Counterclaimants – Jason Fisher, Robert Ford and Julia Ford – had already

25        resigned from Herbalife, thereby rendering Rule 8-A inapplicable to them.

26   •    Herbalife contends that Counterclaimants violated Herbalife Rules 8-B, 8-D, 8-

27   _____

28   [1] Counterclaimants and Defendants are Robert and Julia Ford, Jeff and Kathy Orr,
     Bruce and Nancy Roth, Jason Fisher and Dianna Thompson.

1    G, and 8-H, but Herbalife has produced no evidence to support any violation of

2    these rules.

3    •    Herbalife contends that Counterclaimants and Defendants breached a

4    Confidentiality and Non-Disclosure Agreement, but they have not produced any

5    documents or admissible evidence to establish that Counterclaimants and

6    Defendants assented to its terms.

7    **2.    Herbalife's Count 2**:  Summary judgment should be granted on

8    Herbalife's Count 2 for misappropriation of trade secrets because Herbalife has not

9    produced the allegedly misappropriated trade secrets during discovery.

10   **3.    Herbalife's Count 3**:  Summary judgment should be granted on

11   Herbalife's Count 3 for Intentional Interference with Prospective Economic Advantage

12   ("IIPEA") because: (a) Herbalife's Rule 8-A violates Cal. Bus & Prof. Code § 16600;

13   (b) Herbalife has not produced any trade secrets in the course of discovery; and (c)

14   Herbalife has produced no admissible evidence that Melaleuca's products are unsafe or

15   toxic.

16   **4.    Herbalife's Count 4**:  Summary judgment should be granted

17   on Herbalife's Count 4 for Intentional Interference With Contract because it is

18   based upon Rule 8-A, which violates Cal. Bus. & Prof. Code § 16600 and is

19   therefore unenforceable.

20   **5.    Herbalife's Count 5**:  Summary judgment should be granted on

21   Herbalife's Count 5 for Unfair Competition because: (a) Herbalife has not produced the

22   allegedly misappropriated trade secrets in the course of discovery; (b) Herbalife's Rule

23   8-A violates Cal. Bus. & Prof. Code § 16600 and therefore is unenforceable.

24   **6.    Herbalife's Count 7**:  Summary judgment should be granted on

25   Herbalife's Count 7 for Fraud because Herbalife cannot establish the essential element

26   of "reliance" as to the January 30, 2007 e-mail from Nancy Roth to Bob Bogard upon

27   which Herbalife's entire fraud claim is based.  It is undisputed that Herbalife did not

28   take any actions in reliance on the statements in the e-mail.

**B.     Summary of Motion Grounds Regarding Counterclaimants' Claims**

        **1.     Counterclaimants' Third Claim For Relief**:  Summary judgment should be granted on Counterclaimants' Third Claim For Relief For Unfair Competition, Cal. Bus. & Prof. Code § 17200 because: (a) Herbalife's Rule 8-A, its covenant not to compete, and its other restraints on the use of non-trade secret information in Herbalife's distributorship agreement violate Bus. & Prof. Code § 16600; (b) Herbalife is an illegal Endless Chain (Pyramid) Scheme.  *See* Omnitrition, 79 F.3d at 781.

        **2.     Counterclaimants' Fourth Claim For Relief**:  Summary judgment should be granted on Counterclaimants' Fourth Claim For Relief For Violation of the Endless Chain Scheme Law and *Omnitrition,* because based upon the undisputed facts, Herbalife focuses primarily on promoting its program (the "business opportunity") as opposed to selling products to retail customers who are not Herbalife distributors, which is the *sine qua non* of an endless chain (pyramid) scheme.

        **3.     Counterclaimants' Fifth Claim For Relief**:  Summary judgment should be granted on Counterclaimants' fifth claim for relief for false advertising in violation of Cal. Bus. & Prof. Code § 17500 because (a) Herbalife falsely advertised that in 2006 it had over $3 billion in retail sales and paid out $2.2 billion in commissions, royalties and bonuses; (b)Herbalife falsely advertises that its "business opportunity" is recession proof; and (c) Herbalife is operating an endless chain (pyramid) scheme in violation of *Omnitrition* and Cal. Penal Code § 327, which is inherently false and misleading.  *See Omnitrition*, 79 F.3d at 788.

**II.     FACTUAL SUMMARY**

**A.     Brief Summary of Undisputed Facts**

      Herbalife is one of the largest multi-level marketing firms in the world and sells nutritional supplements, vitamins, and skin care products.  (SUF ¶ 1.)  Herbalife focuses primarily on promoting its "*Business Opportunity*" program as opposed to selling products to retail customers outside of Herbalife.  It is no surprise that

1    Herbalife's published "Marketing Plan," which is tellingly in the shape of a pyramid,

2    does not mention customers or retail sales.  (SUF ¶ 2.)  Indeed, the Herbalife

3    "Marketing Plan" provides that royalties, bonuses and advancement at Herbalife are

4    based exclusively on purchases from Herbalife.  (SUF ¶ 3.)  Herbalife does not even

5    keep records of retail sales.  (SUF ¶ 4.)

6    **B.     The *Business Opportunity*"**

7         Herbalife's sales force is composed of "independent contractors" and the first

8    level of independent contractors who are referred to as "distributors."  (SUF ¶ 5.)

9    Distributors, who are not agents, employees or legal representatives of Herbalife, have

10   the right to buy products at a discount for use or resale and to recruit others into the

11   program.  (SUF ¶¶ 6-7.)  Distributors can qualify to become a "supervisor" by ordering

12   from Herbalife a minimum amount in product in one or two (consecutive) months for

13   thousands of dollars.  (SUF ¶ 8.)  Supervisors must meet certain order quotas each year

14   to retain their supervisor status.  (SUF ¶ 9.)  Supervisors are entitled to receive a

15   "Royalty Override" on up to three generations of "downline" supervisors, *i.e.*, people

16   that supervise recruits who themselves also meet the supervisor requirements.  (SUF ¶

17   10.)  The Royalty Override gives the supervisor a 1% to 5% commission on orders

18   placed by downline supervisors.  (SUF ¶ 11.)  Supervisors and those they recruit must

19   continue to purchase a minimum amount of product each month from Herbalife to

20   qualify the supervisor for the Royalty Override.  (SUF ¶ 12.)  Herbalife supervisors

21   receive the right to sell the products and earn royalties based on product orders made

22   by the supervisor's recruits.  (SUF ¶ 13.)  Herbalife's entire advancement, royalty, and

23   bonus system is based exclusively upon purchases from Herbalife as opposed to retail

24   sales.   Advancement "is not based on retail.  It's based on volume purchased from the

25   company."  (SUF ¶ 14, [Deposition of Mike McKee ("McKee Depo.") 90:22 – 91:15].)

26   **C.     The Herbalife Agreement of Distributorship**

27        Counterclaimants signed Herbalife's Agreement of Distributorship (the

28   "Agreement").  (SUF ¶ 15.)  The Agreement contains a broad prohibition against post-

termination use of "information" and a blanket 3-year non-compete:

> 4. For a period of three (3) years after termination of this agreement
> Distributor shall hold in confidence any trade secrets, formulas, sales
> and distribution systems, *business information, and literature which*
> *Distributor acquired* during the term of this agreement and will not use
> directly or indirectly such items. ***For such period Distributor also***
> ***agrees not to enter or participate in a competing business or business***
> ***activity***. (SUF ¶ 16.) (emphasis added.)

Despite the covenant's violation of section 16600, Herbalife has not made any
announcement to its independent distributors that the covenant was abandoned. (SUF ¶
17, [Deposition of Paul Greenberg ("Greenberg Depo.") 104:14-20].) Specifically,
Herbalife's in-house counsel maintains that the non-compete is enforceable: "I don't
think the covenant not to compete is unenforceable, and I've already told you we made
no announcement in a publication about – about it." (SUF ¶ 18, [Greenberg Depo.
106:4-9].) Herbalife's Vice President of Business Development (Sales) agreed:

> Q.    Do you believe Jason Fisher calling people trying to get them to go to
> Melaleuca violated a rule or policy of Herbalife?
> A.    Yes. I believe . . . ***So according to our rules, he's not allowed to have***
> ***contact with any of that for three years*** . . . . (SUF ¶ 19, [McKee Depo. 28:17-
> 29:5].) (emphasis added.)

McKee further testified that the three year non-compete prevents Counterclaimants
from putting flyers on cars. (SUF ¶ 20, [*Id.* at 35:16-36:6].) He still believes the non-
compete provision is "in full force and effect." (SUF ¶ 21, [*Id.* at 158:2-10].)
Jacqueline Miller, Herbalife's top rules official, thinks that for 3 years after termination
Herbalife distributors are "not allowed to participate in a competing business." (SUF ¶
22, [Deposition of Jacqueline Miller ("Miller Depo.") 54:1-24].)

The Agreement also provides that distributors must follow Herbalife's rules,
policies, and procedures. (SUF ¶ 23.) Herbalife enacted Rule 8-A, its restraint against

1   post-termination solicitation, in September 2006—after Counterclaimants Robert and

2   Julia Ford and Jason Fisher had resigned from Herbalife.  (SUF ¶ 24.)  Rule 8-A is a

3   blanket non-solicitation restraint that does not reference the use of trade secrets:

> During the course of a distributorship and for one year thereafter,
> neither the Distributor nor their spouse, or any other person assisting in
> a Distributorship will, directly or indirectly (through or by means of any
> person, entity or artifice), ***solicit, promote, sponsor or recruit*** any
> Herbalife Distributor or any Herbalife customer they became aware of in
> the course of their Herbalife Distributorship, to join, promote, sell or
> purchase products of, or participate in as a salesperson or otherwise, any
> multi-level marketing or direct sales company, nor will they encourage
> anyone to do what is prohibited under this rule.  (SUF ¶ 25.) (emphasis
> added.)

14   Rule 8-A has the effect of continuously restraining former Herbalife distributors

15   because, according to Herbalife's in-house counsel, it not only violates Rule 8-A to

16   solicit Herbalife distributors for one year after termination, but also to sponsor others

17   who do so.  (SUF ¶ 26, [Greenberg Depo. 220:22-221:20].)

**D.   Counterclaimants Compete at Melaleuca**

19   Counterclaimants terminated their distributorships with Herbalife and signed up

20   with the Melaleuca, Inc.  (SUF ¶ 27.)  Counterclaimants convinced other Herbalife

21   distributors to join Melaleuca.  After Ford and Fisher handed out business cards and

22   put flyers on cars at a hotel during an Herbalife event, Herbalife responded with a

23   publication stating that this conduct was unfair competition and falsely advertised that

24   Herbalife had over $3 billion in retail sales, and that Herbalife had paid distributors

25   $2.2 billion.  (SUF ¶¶ 28-29.)  Thereafter, Herbalife's CEO sent an "important

26   announcement" to its distributors identifying each of the Counterclaimants and stating

27   that they have been sued for unfair competition.  (SUF ¶ 30.)

28

III.    **HERBALIFE'S COUNTS 1, 2, 3, 4, 5 AND 7 SHOULD BE SUMMARILY DISMISSED.**

A.    **Herbalife's Count 1 for Breach of Contract Should Be Dismissed.**

In Count 1, Herbalife alleges Counterclaimants breached their contracts based upon the following alleged conduct: (i) use of Herbalife's trade secrets; (ii) violation of Herbalife's Rule 8-A; and (iii) violation of various other Herbalife rules. However, because Herbalife has not produced its so-called trade secrets, it cannot prove that Counterclaimants misappropriated them. Because Rule 8-A is an illegal restraint of trade, it cannot form the basis for a breach of contract claim. As to the other rules at issue, Herbalife has not produced any evidence that Counterclaimants violated them. Herbalife also did not produce any documents or admissible evidence that Counterclaimants assented to the Confidentiality Agreement. Accordingly, summary judgment in favor of Counterclaimants is appropriate.[2]

1.    **Herbalife has not identified its trade secrets.**

Herbalife has not produced any trade secrets in the course of discovery.   On June 15, 2007, Herbalife identified its trade secrets pursuant to California Code of Civil Procedure § 2019.210 as follows:

a.    **Herbalife Linage [sic] Documents**.  Herbalife, at significant time and expense, accumulates the names, addresses, contact information, sales records, payment/bonus information and related customer and sales distribution information concerning each of its distributors and customers.  The information is provided in what are referred to as downline, upline, genealogy reports (collectively "Linage [sic] Reports") and includes names, addresses, identification numbers, e-mail addresses, fax numbers, level or rank, volume and sales statistics or economic information that Herbalife only provides to its distributors

---

[2] Per Herbalife Rule 8-J, California law governs "all aspects of a Distributor's relationship with Herbalife . . . ."  (SUF ¶ 31.)

upon their express agreement they will not disclose the information to
any third-party or utilize the information for any purpose other than
building Herbalife's business. [3]  (SUF ¶ 32.)

In discovery, Herbalife was asked to produce its alleged trade secrets.  (SUF ¶ 33.)
Herbalife responded that it could not do so.  (SUF ¶ 34.)

**REQUEST FOR PRODUCTION NO. 1:**

All trade secrets that YOU contend were misappropriated by
COUNTERCLAIMANTS.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

. . . Herbalife has no way to identify the particular trade secrets or documents
reflecting those trade secrets Counterclaimants misappropriated and so has no
responsive documents.  (SUF ¶ 35.)

Herbalife bears the burden of producing the trade secret it contends Counterclaimants
misused.  Because Herbalife cannot produce its alleged trade secrets, Herbalife cannot
prove that Counterclaimants breached their agreements by misappropriating trade
secrets.  (*See* Complaint at ¶77.)  Therefore, summary judgment is proper.

> 2.    **Herbalife's rules are illegal restraints of trade and cannot form
> the basis for a breach of contract.**

Herbalife's rules and regulations violate California law, and a purported
violation of any of these illegal restraints does not equate to a valid claim for breach of
contract.

> a.    **California Business & Professions Code 16600 prohibits
> unlawful restraints on trade.**

California Business and Professions Code § 16600 provides that: "Except as
provided in this chapter, every contract by which anyone is restrained from engaging in

---

[3] Herbalife also designated its "passcode," and trade name and mark, but has produced
no evidence regarding the content of the "passcode" and obviously a trademark is the
antithesis of a trade secret as it is published widely.

- 8 -

a lawful profession, trade, or business of any kind is to that extent void." Under
California law, noncompetition covenants are to be closely scrutinized and narrowly
construed, and will not be enforced unless they plainly fall within certain statutory
exceptions.[4]  *Edwards*, 44 Cal. 4th at 955.

In *Edwards*, the California Supreme Court reaffirmed California's position that it
will not tolerate restraints of trade that prevent competition, including solicitation.
There, an employee signed an agreement that prohibited the employee from soliciting
any client of the office for eighteen months following termination. *Id.* at 942.  The
employee was also prohibited from "solicit[ing] away from the Firm any of its
professional personnel for eighteen months after release or resignation." *Id.*

Arthur Anderson argued that Section 16600 should permit a limitation on an
employee's ability to practice his or her vocation so long as the limitation was
"reasonably based." *Id.* at 947.  The California Supreme Court disagreed and held that
an agreement that prohibited solicitation of clients or employees for a period of
eighteen months, was "invalid because it restrained his ability to practice his
profession." *Id.* at 948.

In this case, the Ninth Circuit has already ruled that the portion of the
preliminary injunction that prohibited the Counterclaimants from "Using or disclosing
for business related purpose . . . contacts or business information acquired during
[Counterclaimants'] work with Herbalife" was "overbroad." (SUF ¶ 36.)  The Ninth
Circuit accordingly narrowed the preliminary injunction to "exempt from its coverage
only customer contact or business information that the defendants developed of their
own accord." (SUF ¶ 37.)  While the Ninth Circuit held that the issue of 8-A's
enforceability was moot because the specific time restriction in the preliminary
injunction had passed as to Counterclaimants, Judge Silverman did state that 8-A
appears to be a non-compete clause: ". . . the way the injunction is written Ford cannot

[4] The statutory exceptions are inapplicable here.  *See Cal. Bus. & Prof Code* §§ 16601, 16602, 16602.5.

- 9 -

1   even go to his neighbor -- or if Ford goes to his neighbor and makes his neighbor a

2   customer, he can no longer solicit the neighbor for another year.  That strikes me as an

3   overbroad injunction . . . ." (SUF ¶ 38.)  Both California public policy, as embodied in

4   § 16600, and the law of this case, accordingly, prohibit unlawful restraints on trade.

5                        **b.        Herbalife's rules violate California law.**

6           Rule 8-A is clearly an illegal restraint of trade in violation of § 16600 and

7   *Edwards*.  Rule 8-A prohibits **soliciting, sponsoring, promoting or recruiting** for one

8   year after termination of the distributorship.  Rule 8-A fall does not fall within a

9   statutory exception to § 16600.  Rule 8-A does not mention trade secrets, much less

10  narrowly tailor its terms to protecting trade secrets.

11          Herbalife independent distributors own and operate their own businesses.  (SUF

12  ¶ 39, [Greenberg Depo. 72:12-73:13; Miller Depo. 132:3-133:20; McKee Depo. 7:10-

13  8:5].)  Herbalife independent distributors invest their own time and resources in

14  developing customers and recruiting other distributors.  (SUF ¶ 40, [*id.*].)  Rule 8-A,

15  however, is so broad that it prevents former distributors from **soliciting, sponsoring,**

16  **promoting or recruiting** anyone that the former distributor "became aware of in the

17  course of their Herbalife distributorship." (SUF ¶ 41.)  As such, Rule 8-A requires

18  former Herbalife distributors to throw out their own phone books and forget about

19  every relationship that they made while in Herbalife, including friends and family.

20  (SUF ¶ 42, [Greenberg Depo. 178:13-179:2].)

21          It is undisputed that, as written, a former Herbalife distributor could violate Rule

22  8-A and the 3-year non-compete without using Herbalife's trade secrets.  For example,

23  Herbalife claims that the Counterclaimants violated their rules and regulations by

24  putting flyers on cars in a parking lot.  (SUF ¶ 43, [Greenberg Depo. 32:20-33:5].)

25  Herbalife also claims that a former distributor who asked his or her child to join him or

26  her at a competing company would violate Herbalife's rules and regulations.  (SUF ¶

27  44, [Miller Depo. 171:23-172:12].)

28          Herbalife's restraints are designed to restrict former distributors' competitive

activities.  For example, Miller maintains that Herbalife distributors are required to refrain from competing for three years after their distributorship is over.  (SUF ¶ 45, [Miller Depo. 54:1-24, 56:6-20].)  Miller admitted that Rule 8-A is not tied to use of trade secrets or confidential information.  (SUF ¶ 46, [Miller Depo. 57:9-15].)

For these reasons, Rule 8-A is unenforceable and cannot serve as the basis for a breach of contract claim.  Accordingly, summary judgment is proper.

### c.   Rule 8-A was not in effect until September 1, 2006 – after Fisher and the Fords had left Herbalife.

Rule 8-A was enacted on September 1, 2006.  (SUF ¶ 47.)  Jason Fisher left Herbalife in January 2006.  (SUF ¶ 48.)  The Fords resigned on September 1, 2006. (SUF ¶ 49.)  Therefore, even if 8-A were enforceable, it would not bind these three Counterclaimants.   Therefore, summary adjudication is proper.

### 3.   Herbalife has produced no evidence that Counterclaimants executed the Confidentiality and Non-Disclosure Agreement.

Herbalife contends that Counterclaimants are bound by a Confidential and Non-Disclosure Agreement ("CNDA").  (Complaint at ¶ 22.)  Proving Counterclaimants assent to the CNDA is an essential element of Herbalife's breach of contract claim. However, during discovery, Herbalife has not produced any admissible evidence to support this element.  Indeed, Herbalife has submitted different versions of the CNDA that it contends Counterclaimants agreed to.  (SUF ¶ 50.)  But it has never produced any evidence of assent.  In fact, Miller testified that the best Herbalife can muster on this element is speculation and hearsay.   (SUF ¶ 51, [Miller Depo. 200:15-207:1].)

### 4.   Herbalife has produced no evidence of violations of other rules.

In Herbalife's interrogatory responses, it contends that Counterclaimants violated the following other Herbalife rules:  8-B, 8-D, 8-G, and 8-H.  (SUF ¶ 52.)  But Herbalife has produced no evidence to support any violation of these rules.  8-B provides that "when training your organization," Herbalife distributors may not promote organizations "other than Herbalife."  (SUF ¶ 53.)  It does not apply to former

1  Herbalife distributors.  (SUF ¶ 54, [Miller Depo. 174:22-175:1].)  No evidence has

2  been presented that Counterclaimants breached this rule.  Rule 8-D, entitled "Comply

3  with Laws," also applies only to current Herbalife distributors (SUF ¶ 55) and it adds

4  nothing to the contract claim because an agreement to comply with the laws is

5  superfluous and illusory.  Rule 8-G prohibits providing "false and misleading"

6  information.  It applies only to current Herbalife distributors.  (SUF ¶ 56.)  No evidence

7  has been presented that Counterclaimants violated 8-G.  (SUF ¶ 57, [Miller Depo.

8  192:6-10 stating "I don't recall what [the alleged violation] might be . . . for this

9  rule."].)  Rule 8-H relates to maintaining the reputation and image of Herbalife.  It

10  applies only to current Herbalife distributors.  (SUF ¶ 58.)  Miller—Herbalife's top rule

11  official—does not know why Counterclaimants have been accused of violating this

12  rule.  (SUF ¶ 59, [Miller Depo. 192:11-193:14].)

**B.      Herbalife Cannot Prove Misappropriation of Trade Secrets.**

14      Because Herbalife has failed to produce its allegedly misappropriated trade

15  secrets in discovery, Herbalife's trade secret claim should be summarily dismissed.

16  Under California law a "trade secret" is "information, including a formula, pattern,

17  compilation, program, device, method, technique, or process, that: (1) Derives

18  independent economic value . . . from not being generally known to the public or to

19  other persons who can obtain economic value from its disclosure or use; and (2) Is the

20  subject of efforts that are reasonable under the circumstances to maintain its secrecy."

21  Cal. Civ. Code § 3426.1(d).

22      California Code of Civil Procedure § 2019.210 requires that the party alleging

23  trade secret misappropriation "shall identify the trade secret with reasonable

24  particularity . . . ."  The reasonable particularity element means that "the plaintiff must

25  make some showing that is reasonable, i.e., fair, proper, just, and rational under all of

26  the circumstances to identify its alleged trade secret . . . ."  *Advanced Modular*

27  *Sputtering, Inc. v. Superior Court*, 132 Cal. App. 4th 826, 836 (2005) (internal citations

28  omitted).

- 12 -

Here, as noted above, Herbalife has stated under oath that it cannot produce its trade secrets.  (SUF ¶ 60.)  Because Herbalife has not produced its trade secrets, it cannot produce an essential element of its case – i.e., the existence of its trade secrets.  Thus, Herbalife's trade secret claim should be summarily dismissed.  *See VFD Consulting, Inc. v. 21st Services*, 425 F. Supp. 2d 1037, 1048 n.6 (N.D. Cal. 2006) (noting that "[r]egardless of whether Plaintiff previously disclosed its trade secret, now that Counterclaimants have moved for summary judgment, Plaintiff is *obligated* to identify its alleged trade secret with particularity.  If Plaintiff cannot do so, Counterclaimants are entitled to summary judgment.") (emphasis in original).

**C.    Herbalife's Claims For IIPEA, IWC, and Unfair Competition Should Be Summarily Dismissed.**

Herbalife's third count for intentional interference with prospective economic advantage ("IIPEA"), fourth count for intentional interference with contract, and fifth count for unfair competition, are based upon purported violations of Rule 8-A and alleged misappropriation of Herbalife's trade secrets.  (Complaint at ¶¶ 91-123.)  Neither of those alleged acts can support these counts.

To the extent that Herbalife relies on alleged misappropriation of its trade secrets, partial summary judgment is proper because Herbalife has failed to produce its trade secrets.  (SUF ¶ 61.)  In addition, Rule 8-A cannot form the basis for the claims because Rule 8-A violates Cal. Bus. & Prof. Code § 16600 and *Edwards*.

Finally, to the extent that Herbalife's IIPEA claim depends on its allegation that Melaleuca's products are unsafe or toxic (Complaint at ¶¶ 100-101), Herbalife's contention fails because Herbalife has produced no evidence in support of such claims.  When Herbalife was asked to identify the Defendant's misrepresentations regarding Melaleuca's products being "safe and non-toxic," Herbalife could not identify a single statement made by Defendants.  (SUF ¶ 62.)  Herbalife also could not set forth any admissible evidence to support its claim that Melaleuca's products are unsafe or toxic.  (SUF ¶ 63.)  Herbalife relies exclusively on inadmissible hearsay.

**D.    Herbalife's Claim For Fraud Fails Because Herbalife Did Not Rely On Nancy Roth's January 30, 2007 Email And Suffered No Damages.**

Justifiable reliance is a necessary element of Herbalife's Count 7 for fraud, as are damages arising from the fraud. *Alliance Mortgage Co. v. Rothwell*, 10 Cal. 4th 1226, 1239 (1995). Herbalife, however, cannot prove reliance. The sole fraud allegation in the Complaint is that Nancy Roth sent an email to Bob Bogard at Herbalife on January 30, 2007 requesting data on her downline distributors. (SUF ¶ 64, [Complaint at ¶ 125].) All other fraud allegations have been dismissed. (SUF ¶ 65.) Herbalife cannot prove that it justifiably relied on Nancy Roth's e-mail because it is undisputed that Bogard did not send Nancy Roth any information in response to the e-mail. (SUF ¶ 66.) In fact, Bogard specifically denied her request writing. (SUF ¶ 67, [Miller Depo. 105:5-16].) Thus, summary judgment on Count 7 is proper.

**IV.    SUMMARY JUDGMENT SHOULD BE GRANTED ON COUNTER-CLAIMANTS' THIRD, FOURTH AND FIFTH CLAIMS FOR RELIEF.**

**A.    Counterclaimants Are Entitled To Partial Summary Judgment On Their Fourth Claim for Violation of California's Endless Chain Scheme Law.**

**1.    Endless Chain Schemes are illegal *per se*.**

Counterclaimants' fourth count seeks injunctive relief and damages because Herbalife is an endless chain (pyramid) scheme. Endless chain (pyramid) schemes are illegal *per se* and are said to be "inherently fraudulent because they must eventually collapse." *Omnitrition*, 79 F.3d at 781.

> Whether [a] program runs afoul of California's laws against false advertising, unfair business practices and fraud is determined under California's statutory definition of 'Endless Chain' marketing schemes. California Penal Code § 327 makes it a public offense for any person to operate 'any scheme for the disposal or distribution of property whereby a participant pays a valuable consideration for the chance to receive compensation for introducing one or more additional persons into

- 14 -

1     participation in the scheme or for the chance to receive compensation

2     when a person introduced by the participant introduces a new

3     participant.' *Id.* at 787 (quoting Cal. Penal Code § 327).

4         The "*sine qua non* of a pyramid scheme" is "the right to receive in return for

5     recruiting other participants into the program rewards which are unrelated to sale of the

6     product to ultimate users." *Id.* at 781 (internal citation omitted).  In other words, the

7     inquiry is whether a company's "focus was in promoting *the program* rather than

8     selling *the products*." *Id.* at 782  (emphasis in original).  The "operation of a pyramid

9     scheme constitutes fraud . . . ." *Id.* at 781.

10                    **2.      Herbalife is Omnitrition.**

11        In *Omnitrition*, the Ninth Circuit found that Omnitrition's multi-level marketing

12    program qualified as a pyramid scheme because Omnitrition focused on promoting its

13    program as opposed to selling its products at the retail level.  As an example, the Court

14    found that:

15            [T]he supervisor receives the right to sell the products and earn

16            compensation based on product orders made by the supervisor's recruits.

17            This compensation is facially 'unrelated to the sale of the product to

18            ultimate users' because it is based on the suggested retail price of the

19            amount **ordered** from Omnitrition, rather than based on **actual sales** to

20            consumers.  *Id.* at 782 (emphasis original).

21        Omnitrition's principals included former Herbalife distributors.  (SUF ¶ 68,

22    [Miller Depo. 99:24-100:6].)  Like Omnitrition, Herbalife is constructed upon the same

23    promises of "lucrative rewards for recruiting others" that "tend[] to induce participants

24    to focus on the recruitment side of the business at the expense of their retail marketing

25    efforts." *Id.* at 782.  Indeed, based upon the undisputed facts, Omnitrition and

26    Herbalife are indistinguishable.  Herbalife, in all relevant respects, *is* Omnitrition.

27        For example, the following similarities can be found in both companies:

28    •     Like Omnitrition, Herbalife is a multi-level marketing program.  *Omnitrition*, 79

- 15 -

1     F.3d at 780; (SUF ¶ 69, [Miller Depo. 30:21-23].).

2    •    Like Omnitrition, Herbalife sells nutritional supplements, vitamins, and skin care

3     products. *Omnitrition*, 79 F.3d at 780; (SUF ¶ 70, [Miller Depo. 30:24-31:4].).

4    •    Like Omnitrition, Herbalife's sales force are "independent contractors" and the

5     first level of independent contractors are referred to as "distributors."

6     *Omnitrition*, 79 F.3d at 780; (SUF ¶ 71, [Miller Depo. 31:12-14].) .

7    •    Like Omnitrition, Herbalife distributors have the right to buy products at a

8     discount for use or resale and to recruit others into the program. *Omnitrition*, 79

9     F.3d at 780; (SUF ¶ 72, [Miller Depo. 31:15-21, 33:6-10].).

10    •    Like Omnitrition, Herbalife distributors can qualify to become a "supervisor" by

11     ordering a minimum amount (several thousand dollars) in products, measured by

12     suggested retail price, from Herbalife in one or two (consecutive) months.

13     *Omnitrition*, 79 F.3d at 780; (SUF ¶ 73, [Miller Depo. 36:22-37:14].).

14    •    Like Omnitrition, Herbalife supervisors must meet certain order requirements to

15     maintain the status of supervisor. *Omnitrition*, 79 F.3d at 780; (SUF ¶ 74,

16     [Miller Depo. Miller 38:13-39:8].).

17    •    Like Omnitrition, Herbalife supervisors are entitled to receive a royalty override

18     on up to three generations of "downline" supervisors, i.e. people the supervisor

19     recruits who themselves also meet the supervisor requirements. *Omnitrition*, 79

20     F.3d at 780; (SUF ¶ 75, [Miller Depo. 73:3-20; Herbalife Sales and Marketing

21     Plan, p. 11].).

22    •    Like Omnitrition, the royalty override gives the Herbalife supervisor a

23     percentage commission on orders placed by downline supervisors. *Omnitrition*,

24     79 F.3d at 780; (SUF ¶ 76, [Miller Depo. 73:3-20].).

25    •    Like Omnitrition, Herbalife supervisors and those they recruit must continue to

26     purchase a minimum amount of product each month from Herbalife to qualify

27     the supervisor for the royalty override. *Omnitrition*, 79 F.3d at 780; (SUF ¶ 77,

28     [Miller Depo. 73:3-20; Herbalife Sales and Marketing Plan, p. 11].).

- Like Omnitrition, Herbalife supervisors receive the right to sell the products and earn compensation based on product orders made by the supervisor's recruits. *Omnitrition*, 79 F.3d at 782; (SUF ¶ 78.).

- Like Omnitrition, Herbalife's entire advancement, royalty, and bonus system is based exclusively upon purchases from the company.  Advancement "is not based on retail.  It's based on volume purchased from the company." *Omnitrition*, 79 F.3d at 782; (SUF ¶ 79, [McKee Depo. 90:22-91:15].).

Herbalife is not focused primarily on selling products to retail customers as opposed to selling product to its distributors who are within the scheme.  Herbalife does not even keep track of retail sales.  (SUF ¶ 80, [Greenberg Depo. 117:3-5].)  In fact, in Herbalife's "Marketing Plan" (which is remarkably in the shape of a pyramid) retail sales are completely unrelated to advancement.  (SUF ¶ 81.)  Herbalife's chart depicting its Marketing Plan does not mention retail or customers in any way.   (SUF ¶ 82.)  Instead, the bottom level of the plan is "Distributor," not "customer."  (SUF ¶ 83.)

### 3.  <u>Herbalife's policies are not effective to separate it from Omnitrition.</u>

Like Omnitrition, Herbalife has three policies that are supposed to encourage retail sales.   But, also like Omnitirtion, Herbalife's policies are fundamentally flawed an ineffective  First, like Omnitrition, to earn royalty overrides on downline orders, supervisors must certify that they have made sales to 10 retail customers in the past month.  (SUF ¶ 84, [Greenberg Depo. 248:4- 249:6].); *see Omnitrition*, 79 F.3d at 783. Second, to receive a royalty override, Herbalife supervisors must certify that they have sold at least 70% of products "they retain for resale" to *either* other Herbalife distributors *or* retail customers.   (SUF ¶ 85, [Miller Depo. 41:14-21].); *see Omnitrition*, 79 F.3d at 783.  McKee, Herbalife's Vice President of Business Development (Sales), admitted that he does not know what the "70% rule" is.  (SUF ¶ 86, [McKee Depo. 127:16-20].)  McKee doesn't train on the 70% rule because he does not consider it to be "exciting stuff."  (SUF ¶ 87, [*Id.* at 127:21-128:9].)  Third,

- 17 -

1  Herbalife, like Omnitrition, has a buyback policy.  (SUF ¶ 88.); *see Omnitrition*, 79

2  F.3d at 780.

3        The Ninth Circuit held that Omnitrition could not save itself from a charge of

4  conducting an endless chain (pyramid) scheme by pointing to the 10-customer rule or

5  the 70% rule because such rules were not adequately enforced and were ineffective in

6  promoting retail sales outside Omnitrition:

7            Where, as here, a distribution program appears to meet the *Koscot*

8            definition of a pyramid scheme, there must be evidence that the

9            program's safeguards are enforced and actually serve to deter inventory

10            loading and encourage retail sales. *Id*. at 783.

11            a.    **Herbalife's 10-Customer Rule is not effective.**

12        The Ninth Circuit first looked at Omnitrition's 10-customer rule, which required

13  each participant to "submit [monthly] proof of retail sales made to ten different

14  consumers." *Id*. at 783.  The Ninth Circuit concluded that Omnitrition's 10-customer

15  rule was inadequate to insure "that overrides are being paid as a result of actual retail

16  sales." *Id*.  As with Omnitrition, Herbalife's policies are not effective to promote retail

17  sales as opposed to recruiting and selling to other members of Herbalife's endless chain

18  (pyramid) scheme.

19        Here, it is undisputed that Herbalife's 10-customer rule is not enforced in any

20  meaningful way and is even less effective than Omnitrition's 10-customer rule.   Unlike

21  Omnitrition, Herbalife allows mere certification by distributors and does not even

22  request the names of the 10 customers.  (SUF ¶ 89, [Miller Depo. 63:5-9].)  Therefore,

23  it is impossible for Herbalife to conduct the same "random calls" that Omnitrition made

24  to retail customers.[5]  Instead, Herbalife has distributors sign a "certification form" that

25  contains no information whatsoever about the retail customer, the contact information

26

27  _____

    [5] In *Omnitrition,* the Ninth Circuit criticized the distributor "certification" process as

28  to the 70% rule.  It did not address the issue regarding the 10 customer rule because, unlike Herbalife, Omnitrition's policy required customer information.

of the customer, the products sold, or the price paid for the products.  (SUF ¶ 90.)
Instead of random audits, Herbalife claims that it conducts a small number of audits by
merely contacting distributors and requesting the names of the distributors' ten
customers.  (SUF ¶ 91, [Miller Depo. 62:14-20, 69:10-14].)  This process makes
enforcement easy to circumvent.

Moreover, McKee, who is the primary "link between Herbalife and its mid-level
to top Supervisors" testified that he does not know the requirements of Herbalife's 10-
customer rule.   (SUF ¶ 92, [McKee Depo. 23:16-25:15, 107:1-6].)  The 10-customer
rule is difficult to understand, even for the person at Herbalife who is responsible for
enforcing it.  (SUF ¶ 93, [Miller Depo. 12:4-17, 41:14-21].)

Most troubling is that Herbalife leaves the training of the rules to the
independent distributors who are not agents or employees of Herbalife and who
themselves lack experience and training to train the members of this requirement.
(SUF ¶ 94.)  There are no educational or other requirements to be a Herbalife
distributor.  (SUF ¶ 95, [Greenberg Depo. 63:12-14].)  If Herbalife were serious about
enforcing the rule, it could require customers to submit a monthly list of retail
customers and make blind, random calls to corroborate the validity of the list.  (SUF ¶
96.)  And it would provide training to its distributors regarding the rule.  But Herbalife
is not serious about enforcement.  Thus, the 10-customer rule is not worth the paper it
is printed on.

**b.**    **Herbalife's 70% rule is confusing and ineffective.**

In *Omnitrition,* the Ninth Circuit rejected Omnitrition's defense that the
existence of a 70% rule insured sales to persons outside of the company.  *See
Omnitrition*, 79 F.3d at 783.  Omnitrition's 70% rule required every participant to sell
at wholesale or retail at least 70% of the products bought in a given month in order to
receive a bonus for that month. *Id.*  In rejecting Omnitrition's defense, the Ninth
Circuit found that there was no evidence of enforcement of the 70% rule because (like
Herbalife) supervisors simply signed certifications. *Id.*  The Ninth Circuit also

determined that the rule was ineffective because it allowed compliance through *non-retail* sales to downline distributors (like Herbalife's rule) and personal use of the products by the distributors:

> Second, Omnitrition produced no evidence of enforcement of its 70%
> rule.  It merely states that, in order to place further orders IMAs must
> "certify" that they have sold 70% of the product they previously ordered.
> There is no evidence that this "certification" requirement actually serves
> to deter inventory loading.  Importantly, the requirement can be satisfied
> by *non-retail* sales to a supervisor's own downline IMAs.  This makes it
> less likely that the rule will effectively tie royalty overrides to sales to
> ultimate users, as *Koscot* requires.  In addition, plaintiffs have produced
> evidence that the 70% rule can be satisfied by a distributor's personal use
> of the products.  If *Koscot* is to have any teeth, such a sale cannot satisfy
> the requirements that sales be to "ultimate users" of a product.  *Id.*
> (emphasis in original.)

Again, just as with Omnitrition, Herbalife's distributors simply "certify" that they have complied with the 70% rule.  (SUF ¶ 97.)  Moreover, in violation of *Omnitrition*, <u>Herbalife's 70% requirement can be satisfied by non-retail sales to a supervisor's own downline</u>.  In addition, Herbalife's distributors only certify that 70% of the product they "hold for resale" has been sold.  (SUF ¶ 98.)  This allows distributors to comply by subjectively deciding that they are holding the product for personal use.  Herbalife's 70% rule, consequently, can never be policed or enforced.

Herbalife does not train distributors on the 70% rule.  In fact, McKee admitted that he had attended 500 to 1,000 Herbalife trainings but did not know what the 70% rule was and could not recall any training or explanation of the rule occurring at those 500 to 1,000 Herbalife events.  (SUF ¶ 99, [McKee Depo. 127:16-20, 129:10-13].) Also, Herbalife's chief rule enforcer is uncertain as to the requirements of this "difficult" rule.  (SUF ¶ 100, [Miller Depo. 14:21-15:4, 19:12-18, 41:14-21].)  Finally,

1  Herbalife does not conduct routine audits to ensure compliance with the 70% rule.

2  (SUF ¶ 101, [Miller Depo. 25:5-20].)

3  <center>**c.      Herbalife's Buyback Policy is not effective.**</center>

4       In *Omnitrition*, the Ninth Circuit found that the company's buyback rule was

5  ineffective on its face because "Omnitrition only refunds 90% of the price of the

6  product" and that the policy did not "reduce or eliminate the possibility of inventory

7  loading . . . ." *Id.* at 783-84.  Herbalife's buyback policy is even less effective than

8  Omnitrition's buyback rule.

9       Herbalife has made it very difficult to receive ***any*** buyback of inventory.  In fact,

10  a current Herbalife distributor is not eligible for any buyback.  (SUF ¶ 102.)

11  Herbalife's "buyback" policy is more of a "payback" policy because it punishes those

12  who request a buyback with the "permanent" loss of their distributorship and thus their

13  entire investment in their own, independent Herbalife business.   (SUF ¶ 103.)

14       Herbalife will not buy back product from an active distributor or even an inactive

15  distributor who has not "permanently" resigned.  (SUF ¶ 104.)  A distributor requesting

16  a buyback must first permanently resign his/her distributorship in writing.  (SUF ¶

17  105.)  This means that the distributor loses all royalties, commissions, bonuses, and

18  discounts from Herbalife.  (SUF ¶ 106, [Greenberg Depo. 264:11-21].)  Also, if a

19  distributor asks for a buyback, the distributor and the distributor's upline are

20  retroactively charged back on their royalty bonus checks.  (SUF ¶ 107.)  Moreover,

21  Herbalife's agreements and rules state that a former distributor is subject to Herbalife's

22  3-year covenant not to compete and the 1-year non-solicitation provision.  (SUF ¶ 108.)

23  He or she is effectively out of the direct sales industry, under Herbalife's illegal web of

24  post-termination restraints.

25       The second hurdle is that, to obtain a buyback, the former distributor must sign

26  an agreement that states the former distributor agrees to Herbalife's various buyback

27  terms and rules.  (SUF ¶ 109.)  Third, the former distributor must provide a complete,

28  detailed written inventory of product to be returned.  (SUF ¶ 110.)  Fourth, the former

<center>- 21 -</center>

1   distributor has to provide cancelled checks and credit card statements proving the

2   purchase of each item on the inventory.  (SUF ¶ 111.)  Fifth, *for the first time,* the

3   former distributor must provide two years of records of sales to his/her retail customers

4   and downline.  (SUF ¶ 112.)  Sixth, the refund is discretionary based on Herbalife's

5   determinations of condition of the product and other factors.  (SUF ¶ 113.)  Finally,

6   Herbalife does not return its 10-11% handling charges that were originally paid on the

7   product and the former distributor must pay the shipping charges to return the product

8   to Herbalife.  (SUF ¶ 114, [Greenberg Depo. 264:11-265:10].)

9              **4.    Herbalife's focus is on recruiting—not retail.**

10          If these policies were not ineffective and confusing enough, Herbalife's top

11   official in charge of the department that enforces the 10-customer and 70% rules does

12   not know whether Herbalife's policies are effective and does not think that Herbalife

13   has conducted any studies to determine whether the rules are effective to promote sales

14   outside of Herbalife.  (SUF ¶ 115, [Miller Depo. 14:21-15:4, 19:12-18, 94:23-95:13,

15   96:5-8].)  Herbalife is so indifferent to retail sales that it does not keep any records

16   relating to its distributors' retail sales and does not know the names of its retail

17   customer.  (SUF ¶ 116, [Greenberg Depo. 117:3-5, 251:13-252:17].)  Herbalife's total

18   indifference to retail sales is emblematic that Herbalife's primary focus in on

19   recruitment – not retail sales to people outside of Herbalife as *Omnitrition* requires.

20          In that Counterclaimants are in competition with Herbalife (SUF ¶ 117,

21   [Complaint at ¶¶ 25-35]), Counterclaimants request that this Court issue a permanent

22   injunction prohibiting Herbalife from continuing to operate its illegal pyramid scheme

23   and prohibiting related acts of unfair competition.  Based on Herbalife's *per se*

24   violations of the standards set forth in *Omnitrition*, this Court should determine that:

25   (1) Herbalife is an illegal pyramid scheme and (2) Herbalife is unfairly competing with

26   the Counterclaimants.

27         **B.    Herbalife Has Engaged In False Advertising.**

28          Counterclaimants' fifth claim for relief is based on Herbalife's false advertising

1   in violation of Cal. Bus. & Prof. Code § 17500, *et seq.*  Counterclaimants are entitled to

2   summary judgment on this issue because Herbalife has made statements, both in its

3   publications and its public filings, that are either false, misleading, or have the

4   tendency to deceive or confuse the general public.

5       For example, in an email sent to all members of its "TAB Team" on February 6,

6   2007, Herbalife boasted that Herbalife had achieved a "record $3 Billion in retail sales

7   in 2006."  (SUF ¶ 118, [Greenberg Depo. 98:8-13].)  Herbalife also included a

8   hyperlink in its February 6, 2007 email that invited its TAB Team members to

9   download a document called: "Herbalife…A Proven Success."  (SUF ¶ 119.)  This

10  document claimed that Herbalife had "record retail sales of $3 billion in 2006 and still

11  growing."  (SUF ¶ 120.)

12      The truth, however, is that Herbalife does not keep records of its retail sales.

13  (SUF ¶ 121, [Greenberg Depo. 117:3-5].)  Nor did Herbalife actually receive gross

14  revenues of $3 billion in 2006.  As Herbalife stated in its 2006 Annual Report:

15          Retail sales represent the gross sales amount reflected *on our invoices*

16          *to our distributors.  We do not receive the retail sales amount.*  (SUF

17          ¶ 122.) (emphasis added.)

18  Herbalife's "product sales," which represent the purchase price paid to Herbalife by its

19  distributors, were $1.627 billion in 2006.  (SUF ¶ 123.)  Even Herbalife's "net sales,"

20  which include Herbalife's income from shipping and handling on its products, were

21  only $1.885 billion in 2006.  (SUF ¶ 124.)

22      Herbalife also claimed that "[i]n 2006, Herbalife Supervisors were paid $2.2

23  billion in commissions, royalties, and bonuses."  (SUF ¶ 125.)  This claim is also false.

24  As noted above, Herbalife's product sales in 2006 were only $1.627 billion,

25  significantly less than the $2.2 billion that Herbalife claimed to have "paid" to its

26  Supervisors.  (SUF ¶ 126.)  Furthermore, Herbalife's 2006 10-K showed that "Royalty

27  overrides" for 2006 were only $675 million—not $2.2 billion.  (SUF ¶ 127.)

28      In addition, Herbalife falsely advertises that its business opportunity is

- 23 -

1    "recession proof."  (SUF ¶ 128.)  On December 22, 2008, Herbalife released a

2    promotional video called "Why Herbalife, Why Now?"  that makes the following

3    statements:

4              Why Herbalife?  Herbal-nomics.  *It's recession proof*.  When every-body

5              else is having troubles, listen, we're flourishing.  When the economy is

6              bad, our business is fueled.  I mean I got started in a recession, this is my

7              fourth recession.  I'm more excited about today than ever before.  This

8              opportunity can be your answer.  A better life.  That's why.  (0:49 – 1:09)

9              (SUF ¶ 129.) (emphasis added.)

10   In his deposition, however, when asked whether Herbalife was "recession proof," Mike

11   Mckee, Herbalife's Vice President of Business Development (Sales), testified: "I don't

12   think there's any company in the world that's recession-proof . . . I don't think any

13   company's recession-proof, including Herbalife."  (SUF ¶ 130, [McKee Depo. 12:24-

14   13:1, 13:8-11].)

15          Finally, as noted above, Herbalife is operating an endless chain (pyramid)

16   scheme in violation of *Omnitrition* and Cal. Penal Code section 327.  An endless chain

17   (pyramid) schemed is inherently false and misleading.  *See Omnitrition*, 79 F.3d at 788

18   (holding that "California Business and Professions Code §§17500 *et seq.* make it

19   unlawful for anyone to use false or deceptive marketing practices.  The operation and

20   promotion of an Endless Chain scheme within the meaning of Penal Code § 327 is an

21   inherently deceptive marketing practice, actionable under § 17500."); *People v.*

22   *Bestline Products, Inc.*, 61 Cal. App. 3d 879, 910-11 (1976).

23          **C.    Counterclaimants Are Entitled To Partial Summary Judgment On**
               **Their Third Claim For Unfair Competition In Violation of Cal. Bus. &**
24             **Prof. Code § 17200.**

25

26          As noted above, Herbalife has engaged in unlawful, unfair, and deceptive

27   business practices in violation of Cal. Bus. & Prof. Code § 17200.  Herbalife's Rule 8-

28   A and its three-year non-compete covenant in paragraph 4 of the Distributor Agreement

- 24 -

1   violate Cal. Bus. & Prof. Code § 16600 because they are illegal restraints on trade, as is

2   its prohibition on using a distributor's own business information.  Finally, Herbalife is

3   an illegal Endless Chain (Pyramid) Scheme in violation of Cal. Penal Code § 327 and

4   *Omnitrition*.

5          Paragraph 4 of Herbalife's Distributor Agreement also violates § 16600 and

6   therefore constitutes unfair competition.   On its face, paragraph 4 prohibits any

7   competition for three years after a distributor leaves Herbalife.  As noted above,

8   Herbalife's top officials are of the position that this provision is in effect.  *See* evidence

9   cited at II.C, *supra*.  In addition, paragraph 4's prohibition on the use of business

10  information and literature violates § 16600.  By its terms, a distributor is restrained

11  from using such information even if the information has no relationship to Herbalife's

12  claimed trade secrets.   Again, this provision clearly violates § 16600 and *Edwards*.

13  Thus, paragraph 4 of Herbalife's distributorship agreement also gives rise to an unfair

14  competition claim.

15  Dated:  March 2, 2009

16

17

18  STEPHENS FRIEDLAND LLP              MIXON JOLLY LLP

19

20  By: /s/John B. Stephens            By: /s/Cameron M. Jolly
        Todd G. Friedland                     Cameron M. Jolly
21      J. Gregory Dyer                        Attorney for Defendants and
        Attorney for Defendants and           Counterclaimants Jeff Orr and
22      Counterclaimants Robert E. Ford,       Nancy Orr
        Julia A. Ford,Bruce H. Roth,
23      Nancy A. Roth, Dianna N.
        Thompson and Jason Fisher
24

25

26

27

28