1    my development?

2         Q    Anything.   Training since 1993.

3         A    You know, we've had a number of training

4    opportunities for management -- improve management.   And

5    I'm trying to think of what other things.   Just overall

6    improving -- you know, what you do as a manager.

7              Training on the job I do is really just

8    basically -- has been ongoing since I started with the

9    company.   And there's no -- you know, I may have sat in

10   on some trainings for marketing plan or whatever.   But

11   after '93, I would say not really that much.

12        Q    Have you had any training since 1993 regarding

13   the laws or regulations that apply to multi-level

14   marketing companies?

15        A    No.

16        Q    Have you ever read any case law regarding that

17   topic?

18        A    No.

19        Q    Have you ever read the Omnitrition case?

20        A    No.

21        Q    Do you know what it is?

22        A    I believe that they were -- I think it had to do

23   with pyramiding, but I'm not sure.

24        Q    You know Jim Fobair; right?

25        A    Yes.

JACQUELINE A. MILLER, VOLUME I

1      Q    You know that he was a principal at

2   Omnitrition?

3      A    Yes.

4      Q    And you know that he used to be a -- previously

5   was an Herbalife distributor?

6      A    Yes.

7      Q    And what was the nature of the case that

8   Herbalife had against Jim Fobair?

9      A    It was in regard to his activities at

10  Omnitrition.

11     Q    Do you remember what the allegations were?

12     A    I think solicitation.

13     Q    And you say you testified in that case?

14     A    I was deposed, I believe.

15     Q    Did that case settle, or did it go to trial?

16     A    I don't believe it went to trial.

17     Q    Do you remember what the nature of your

18  testimony was?

19     A    No.

20     Q    In connection with your conduct -- sorry

21  -- contact with that case, did you come to have any

22  understanding whatsoever regarding the Omnitrition

23  business model?

24     A    Not that I recall.

25     Q    Apart from your contact in connection with that

1        A    Yes.

2        Q    And it's Nancy Roth to Bob Bogard, dated

3    January 30th, 2007; correct?

4        A    Yes.

5        Q    Okay.  You say this is information that one of

6    the defendants used improperly a lineage report or

7    genealogy

8        A    Attempted to, in this case.

9        Q    Oh, attempted to.

10        A    Yes.

11        Q    Why are you qualifying it by saying "attempted

12    to" now?

13        A    Because I believe, at the time this E-mail came

14    to Bob, he was aware that there had been allegations

15    about Nancy Roth, and she was not provided with the

16    report.

17        Q    You've talked to Bob Bogard about that;

18    correct?

19        A    That was information that I got in the process

20    of the declaration.  I don't remember who gave that to

21    me.

22        Q    Have you talked to Bob Bogard about this E-mail,

23    ever?

24        A    I don't recall.

25        Q    Who's Bob Bogard?

105

BARKLEY

Exhibit A Page 33

1    little better how it worked.

2    BY MR. STEPHENS:

3        Q    Okay.  Are Herbalife distributors employees of

4    Herbalife?

5        A    No.

6        Q    Are they agents of Herbalife?

7        A    No.

8        Q    Are they representatives of Herbalife?

9        A    No.

10       Q    Are they independent businesses?

11       A    Independent contractors, yes.

12       Q    Does Herbalife pay for its distributors'

13   leads?

14       A    I would say no.

15       Q    Does Herbalife pay for its distributors'

16   insurance?

17       A    No.

18       Q    Does Herbalife pay for its distributors'

19   rents?

20       A    No.

21       Q    Does Herbalife pay for its distributors'

22   utilities?

23       A    No.

24       Q    Does Herbalife pay any expenses for its

25   distributors?

132

BARKLEY

1      A   I think that there are some payments made for

2   speakers.

3      Q   What are those?

4      A   I -- just speaking fees.  I don't know what they

5   pay for, whether or not they cover airfare or something

6   like that.

7      Q   So if an Herbalife independent distributor

8   speaks at an Herbalife event, does that distributor get

9   paid a fee?

10     A   In certain cases, they do.  I don't know what

11  the guidelines are on that.

12     Q   Who does know that?

13     A   Probably the sales department.

14     Q   If Herbalife distributors do not speak at an

15  Herbalife event, does Herbalife pay them any -- pay any

16  of their expenses?

17     A   Not that I'm aware of.

18     Q   Are Herbalife distributors self-employed,

19  independent contractors?

20     A   I think that's correct.

21     Q   Do Herbalife distributors determine their own

22  hours of operation?

23     A   Yes.

24     Q   Do Herbalife distributors determine their own

25  objectives?

133

1    they sponsored was, let's say, their daughter -- okay?

2    -- under Rule A, if they call their daughter and say,

3    "Come over to Melaleuca," and they solicit them, did they

4    breach the rule?

5            MR. PATTERSON:  Calls for an opinion and

6    conclusion without proper foundation.

7    BY MR. STEPHENS:

8        Q   I'm asking your opinion as somebody who's

9    responsible

10           MR. PATTERSON:  You're asking

11   BY MR. STEPHENS:

12       Q   -- for enforcing the rules.

13           MR. PATTERSON:  You're asking for whether the

14   contract has been breached by doing that, not what the

15   rule says; and that's what my objection is.

16           MR. STEPHENS:  Okay.  Your objection

17           MR. PATTERSON:  It's on the record.

18           MR. STEPHENS:  -- is so stated.

19           You may answer.

20           THE WITNESS:  Can you repeat the question?

21   BY MR. STEPHENS:

22       Q   Yes.

23           If an Herbalife distributor sponsors one of

24   their centers of influence -- let's say, their

25   daughter -- and then that Herbalife distributor leaves

                             171

BARKLEY

1    Herbalife and goes to another company -- let's say

2    Melaleuca -- and the day after they terminate, they call

3    their daughter, and they say, "Honey, I want to solicit

4    you to come over to Melaleuca," and the daughter is an

5    active Herbalife distributor -- under that scenario, have

6    there been any rules that have been violated?

7        A   I believe so.

8        Q   What rules?

9        A   The rule on -- I'm sorry.  We have too many

10    different versions going on here.  Rule 8-A.

11        Q   Any others?

12        A   Yeah.  Rule 4 on the distributor agreement.

13        Q   Okay.  Anything else?

14        A   I'm not thinking of another.

15        Q   Okay.  Now, in interrogatory responses that you

16    verified that Bruce Roth sent Herbalife, Herbalife listed

17    a number of rules that the defendants violated, and I'm

18    just going to go through those.  I have them circled

19    here, and I'm going to direct them to you in Exhibit 4,

20    and ask you if you have any information about whether or

21    not any of the defendants violated any of these rules.

22    And then if you do, I'm going to drill down and find out

23    more information about what you know.  Okay?

24          MR. PATTERSON:  Exhibit 10.

25          THE WITNESS:  Okay.

172

```
 1        Q    We'll see what happens.
 2             In that interrogatory, the next one that's
 3    mentioned -- the next rule that, allegedly, my clients
 4    violated -- or the defendants, rather -- violated is
 5    Rule 8-B.  "May not associate other organizations with
 6    Herbalife."
 7             Are you familiar with that rule?
 8        A    Yes.
 9        Q    Are you aware of any information that any of the
10    defendants in this case violated Rule 8-B?
11        A    I think that if they were promoting Melaleuca in
12    the context of an Herbalife discussion, that they would
13    be violating this; an Herbalife meeting with Herbalife
14    distributors.
15        Q    Does Rule 8-B -- because there was this incident
16    that you probably read about in your declaration where I
17    had you read it.  There's an incident in the complaint
18    and so forth about Robert Ford and Jason Fisher going to
19    a hotel in Atlanta and passing out fliers and business
20    cards for Melaleuca.  You've read about that; right?
21        A    Yes.
22        Q    Does 8-B apply to former Herbalife distributors,
23    as well as Herbalife -- current Herbalife distributors,
24    or only current Herbalife distributors?
25        A    I would say standing on its own, that it's
```

174

1      applying to current distributors.

2          Q    Thank you.

3              Rule 8-D is the next one listed in the

4      interrogatories.  "Comply with the laws."  Are you aware

5      of any information that -- or let me withdraw the

6      question.

7              You know, going back to that Atlanta meeting

8      that you've seen reference to

9          A    Yes.

10         Q    -- do you understand that?  You weren't at that

11     Atlanta meeting, were you?

12         A    No.

13         Q    And how do you even know what happened at that

14     Atlanta meeting, if you know anything about it?

15         A    From the information I was given when I did my

16     declaration, I believe.

17         Q    What information?

18         A    I think the attachment -- the letter that refers

19     to -- I think it refers to the meeting; correct?

20         Q    I don't know.

21         A    The letter to Jason Fisher.

22         Q    Paul Greenberg wrote a letter to Jason Fisher?

23         A    I believe it's attached to one of these.

24         Q    I've seen that one.

25         A    Okay.

175

```
 1    BY MR. STEPHENS:

 2        Q    Going back -- getting back to where we left off,

 3    the next rule that is listed is -- Herbalife contending

 4    that my -- sorry -- the defendants violated the Rule 8-G,

 5    "False or misleading information."

 6             Do you have any information that you're aware of

 7    that any of the defendants submitted false or misleading

 8    information to Herbalife?

 9        A    I don't recall what that might be in this -- for

10    this rule.

11        Q    Okay.  The final rule that's referenced in the

12    interrogatories is Rule 8-H, "Maintaining representation

13    and image of the company."

14             Are you aware of anything that the defendants

15    did while they were Herbalife distributors that would

16    have violated this rule, Rule 8-H?

17        A    I don't know what it refers to.

18        Q    Are you aware of any -- you don't know -- I

19    don't understand.  You don't know what the rule refers

20    to?

21        A    I don't know what part of the violation is

22    referred to as having violated this rule.

23        Q    Okay.  Do you know -- do you have any

24    information -- any facts that you know of that lead you

25    to the conclusion that any of the defendants violated
```

JACQUELINE A. MILLER, VOLUME I

BARKLEY

Exhibit A Page 40

1    Rule 8-H, "Maintaining representation and image of the

2    company"?

3    A   I would say that I believe that if they were

4    making comparisons -- negative comparisons about

5    Herbalife with Melaleuca, that might be considered

6    detrimental to the company.

7    Q   Does Rule 8-H apply to former Herbalife

8    distributors or only current Herbalife distributors?

9    A   It says "distributor," so I have to take that as

10    a current distributor.

11    Q   Are you aware of any information that any of the

12    defendants, while they were Herbalife distributors, did

13    anything to violate Rule 8-H?

14    A   I don't know.

15    Q   There's an allegation in the complaint that the

16    defendants made misleading income claims regarding their

17    Melaleuca income.  Do you have any information that would

18    support such an allegation?

19    A   Not as to the Melaleuca income.  I don't know.

20    Q   Do you know what the term "residual income"

21    means?

22    A   I understand it to mean when somebody develops

23    their organization and the organization is working, that

24    they still get income from that organization's work

25    without putting in any efforts on their own.

193

1     information from the people who manage the system.

2         Q    Okay.  Now, the second -- the second declaration

3     that you did was after my clients had submitted their own

4     declarations and their own oppositions to the preliminary

5     injunction.

6         .    You remember that; right?

7         A    I remember what?

8         Q    You remember that you gave this second

9     declaration, Exhibit 7, after my clients had provided

10    their declaration and their response?  You have no

11    recollection of that sequence?

12        A    No.

13        Q    You don't remember the sequence?

14        A    No.

15        Q    But you say here in that second sentence,

16    "Herbalife maintains records of when each distributor

17    agrees to abide by the confidentiality and nondisclosure

18    agreements."

19             Where are those records retained?

20        A    On the computer.

21        Q    Where?

22        A    I don't know.  It's in the department that

23    manages BizWorks, has the access to those records.

24        Q    Have you ever seen those records?

25        A    No.

                              200

1      Q    Have you ever asked to see those records?

2      A    No.

3      Q    Do you know whether the records exist?

4      A    I was told they did, yes, by the people who

5  manage them.

6      Q    Do you know whether the records exist with

7  respect to my -- sorry -- the defendants in this case?

8      A    I believe some of the defendants they found on

9  their records, yes, as agreeing to the confidentiality.

10     Q    Which ones?

11     A    My recollection is the Orrs and the Roths, and

12 possibly Dianna Thompson.

13     Q    And have you seen those records?

14     A    No, I have not.

15     Q    What leads you to believe that they found the

16 records of the Orrs and the Roths, and perhaps Dianna

17 Thompson?

18     A    Because they were asked to search for those

19 records, and then they provided the answers.

20     Q    Okay.  It says in the last sentence of that

21 paragraph, "It is Herbalife's practice to record and

22 maintain this information."

23          Do you see that?

24     A    Yes.

25     Q    And is it, in fact, Herbalife's practice to

201

JACQUELINE A. MILLER, VOLUME I

BARKLEY

Exhibit A Page 43

1    record and maintain information indicating that a

2    distributor agreed to abide by the confidentiality and

3    nondisclosure agreement, which we've marked as

4    Exhibit 12?

5         A    Yes.

6         Q    How do you know that?

7         A    That's the information I was given.

8         Q    By the people

9         A    By the I.T. -- the people who manage the

10   BizWorks system.

11        Q    You see in paragraph -- just to refresh your

12   recollection, in Paragraph 24, there's -- you say you

13   reviewed the information in Herbalife's computer system

14   and learned that Robert Ford, Nancy Roth, and Kathy Orr

15   agreed to be bound by the terms.   I'm paraphrasing.

16             Do you see that?

17        A    Yes.

18        Q    Did you, in fact, review the information?

19        A    I don't believe that I reviewed it personally.

20   I believe that I was given that information.

21        Q    So then is the statement that you made in

22   Paragraph 24 of your sworn declaration that you reviewed

23   the information, false?

24        A    I don't think it's false.   I think I reviewed

25   the information I was given.   I think it's maybe

202

1    misstated slightly.

2        Q    Well, did you review the information or didn't

3    you?

4        A    I didn't review the report that resides in the

5    BizWorks system, no.

6        Q    But you testified here in 24 that you did?

7        A    As I said, I think it's a misstatement of how I

8    looked at the information.

9        Q    Describe the information that -- if you can,

10   describe the information in Herbalife's records -- what

11   does it look like?  I've never seen it.  It's never been

12   produced in this case -- that indicates that these

13   individuals who you reference in Paragraph 24 agreed to

14   the terms of Exhibit 12?  What does that information look

15   like?

16       A    I don't know what it looks like.

17       Q    Okay.  Because you've never seen it?

18       A    Right.

19            (Whereupon Defense Exhibit 11 was marked for

20           identification by the deposition officer and is

21           attached hereto.)

22   BY MR. STEPHENS:

23       Q    Exhibit 11.  Is this the BizWorks subscription

24   agreement that you're referencing in Paragraphs 26

25   through 29 of your declaration entitled "Access through

                              203

```
 1    BizWorks"?

 2         A    Yes.

 3         Q    And the information in Paragraphs 27 and 28

 4    regarding agreeing to the terms of the agreement by

 5    clicking through -- do you see that?  I'm specifically

 6    referring -- I'm paraphrasing to get through this, but

 7    I'm specifically referring to the sentence that runs from

 8    line 14 to 16 of page 7 of the document.

 9              Do you see that?

10         A    Yes.

11         Q    And this information in Paragraphs 27 through

12    28, did you receive all that information again through

13    phone conversations or E-mails from the I.T.

14    department?

15         A    I am not sure whether that's where I got the

16    information, or if it was through the tutorial that I

17    looked at for BizWorks.

18         Q    But did the tutorial that you looked at through

19    BizWorks -- did it mention specifically Robert Ford,

20    Nancy Roth, Kathy Orr, Dianna Thompson?

21         A    No.

22         Q    So the information that relates to those

23    defendants specifically, that would have been -- come not

24    from the tutorial; correct?

25         A    Correct.
```

JACQUELINE A. MILLER, VOLUME I

BARKLEY

Exhibit A Page 46

1      Q    That would not have come from the tutorial?

2      A    Right.  As it says here.

3      Q    It would have come from the people who manage

4   the system; correct?

5      A    Correct.

6      Q    Do you remember who you asked about that?

7      A    No, I do not.

8      Q    Do you remember whether you asked by telephone

9   or by E-mail?

10     A    I don't remember.

11     Q    Do you remember whether you reviewed any

12  documentation before you testified in Paragraph 28 that

13  defendants Robert Ford, Nancy Roth, Kathy Orr, and Dianna

14  Thompson all agreed to abide by the BizWorks subscription

15  agreement because they were all subscribers to

16  BizWorks?

17     A    No.

18          (Whereupon Defense ExhibitS 12 and 13 were

19     marked for identification by the deposition

20     officer and are attached hereto.)

21  BY MR. STEPHANS:

22     Q    Okay.  Moving forward in Paragraph 7 -- just a

23  few additional questions.  Oh, withdraw the question.

24          Now, just real quick.  Exhibit 13 was attached

25  to the complaint, and it's slightly different than

205

JACQUELINE A. MILLER, VOLUME I

BARKLEY

```
 1     -- it's similar, but slightly different to Exhibit 12.

 2     And there's an allegation in the complaint that was

 3     verified by Mr. Greenberg that the clients -- defendants,

 4     rather -- agreed to Exhibit 13.

 5          Do you have any information that any of the

 6     clients agreed to the terms of Exhibit 13?  That's also

 7     entitled "Confidentiality and Nondisclosure Agreement."

 8     A    I don't.

 9     Q    If you look down at the fourth paragraph on

10     Exhibit 13, the one, two, three, four -- fifth line,

11     there's a reference to "France."  Do you see that?

12          "In such latter case, I will abide by the legal

13     requirements enforced in France with respect to

14     processing personal data."

15          Do you see that?

16     A    Yes.

17     Q    Do you have any reason to believe that our

18     clients -- sorry -- the defendants, would agree to be

19     bound by the laws in France?

20     A    No.

21     Q    None of them are French; right?

22     A    I don't know.

23     Q    They're all American?  But, to your knowledge,

24     they're United States

25          MR. PATTERSON:  We give.  We give.  That's it.
```

BARKLEY

Exhibit A Page 48

1    You've established that you -- oh, my God.

2    BY MR. STEPHENS:

3       Q   Okay.  Next is page 8 of Exhibit 7.  Paragraph

4    30.  The last sentence reads:  "When Herbalife

5    distributors leave, especially those in leadership

6    positions, it is difficult to recreate these bonds, and

7    typically everyone in the lineage is harmed as a result."

8           Did I read that correctly?

9       A   Yes.

10      Q   And that's part of your testimony in this

11   declaration; right?

12      A   Yes.

13      Q   You read that sentence before you signed the

14   document

15      A   Yes.

16      Q   -- correct?

17          You understood what that sentence meant?

18      A   Yes.

19      Q   And what did you mean by "these bonds"?

20      A   Bonds with the up line.

21      Q   And are those bonds an Herbalife trade secret?

22      A   They could be.

23      Q   How?

24      A   They could be just, you know, a way of doing

25   business that they've developed.

207

<u>DEPOSITION OFFICER'S CERTIFICATE</u>

STATE OF CALIFORNIA        )
                           )  ss.
COUNTY OF <u>ORANGE</u>            )

I, <u>TRACY MAFI</u>, hereby certify:

I am a duly qualified Certified Shorthand Reporter in the State of California, holder of Certificate Number CSR <u>11850</u> issued by the Court Reporters Board of California and which is in full force and effect.  (Fed. R. Civ. P. 28(a)).

I am authorized to administer oaths or affirmations pursuant to California Code of Civil Procedure, Section 2093(b) and prior to being examined, the witness was first duly sworn by me.  (Fed. R. Civ. P. 28(a), 30(f)(1)).

I am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in this action.  (Fed. R. Civ. P. 28).

I am the deposition officer that stenographically recorded the testimony in the foregoing deposition and the foregoing transcript is a true record

/ / /

231

1   of the testimony given by the witness.  (Fed. R. Civ. P.

2   30(f)(1)).

3          Before completion of the deposition, review of

4   the transcript [XX] was [  ] was not requested.  If

5   requested, any changes made by the deponent (and

6   provided to the reporter) during the period allowed, are

7   appended hereto.  (Fed. R. Civ. P. 30(e)).

8

9   Dated:  February 23      ,  2009

10

11          _____ _Tracy Mozzi._

12

13

14

15

16

17

18

19

20

21

22

23

24

25

232