EXHIBIT F

CERTIFIED COPY

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA, WESTERN

DIVISION

| | | |
|---|---|---|
| HERBALIFE INTERNATIONAL OF AMERICA, INC., a Nevada corporation, | ) ) ) ) | |
| Plaintiff, | ) ) | No. CV 072529 GF (FMOx) |
| vs. | ) ) | |
| ROBERT E. FORD and JULIA A. FORD, husband and wife; BRUCE H. ROTH and NANCY A. ROTH, husband and wife; JEFF ORR and KATHY ORR, husband and wife; DIANNA N. THOMPSON; and JASON FISHER, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

DEPOSITION OF MIKE McKEE

February 18, 2009

Lisa DiGiovanni, CSR # 11969

�davit 277315

**BARKLEY**
Court Reporters

(310) 207-8000 Los Angeles   (949) 955-0400 Irvine   (415) 433-5777 San Francisco
(212) 808-8500 New York   (915) 922-5777 Sacramento   (408) 885-0550 San Jose   (760) 322-2240 Palm Springs
(702) 366-0500 Las Vegas   (858) 455-5444 San Diego   (951) 686-0606 Riverside   (818) 702-0202 Woodland Hills

Exhibit F Page 96

1          IN THE UNITED STATES DISTRICT COURT

2     FOR THE CENTRAL DISTRICT OF CALIFORNIA, WESTERN

3                         DIVISION

4

5    HERBALIFE INTERNATIONAL        )
     OF AMERICA, INC., a            )
6    Nevada corporation,            )
                                    )
7          Plaintiff,               )   No. CV 072529
                                    )   GF (FMOx)
8    vs.                            )
                                    )
9    ROBERT E. FORD and JULIA       )
     A. FORD, husband and           )
10   wife; BRUCE H. ROTH and        )
     NANCY A. ROTH, husband         )
11   and wife; JEFF ORR and         )
     KATHY ORR, husband and         )
12   wife; DIANNA N. THOMPSON;      )
     and JASON FISHER,              )
13                                  )
           Defendants.              )
14   _____)

15

16

17

18        Deposition of MIKE McKEE, taken on behalf of

19        the defendants, at 555 W. Fifth Street,

20        Los Angeles, California, commencing at

21        8:56 a.m., Wednesday, February 18, 2009,

22        before Lisa DiGiovanni, RPR, Certified

23        Shorthand Reporter No. 11969.

24

25

                              2

1  again, I say that without being privy to the lawsuit

2  details and what ended up happening and so forth.

3      Q.   Okay.  Do you have any -- well, when you

4  say "trying to take from other person's downline,"

5  what do you mean by "downline"?

6      A.   Their organization, anybody that they've

7  signed up or that their people have signed up,

8  anything that falls within a certain one person's

9  downline organization.

10     Q.   So Herbalife distributors are independent

11  businesses; right?

12     A.   Correct.

13     Q.   And they own -- well, strike that.

14          They are their own boss?

15     A.   Correct.

16     Q.   Many of them work from home?

17     A.   Yes.

18     Q.   Okay.  A lot of moms and people who want to

19  stay at home?

20     A.   Yes.

21     Q.   Okay.  And a lot of people who just want to

22  work part time and earn some extra money?

23     A.   Yes.

24     Q.   And Herbalife distributors pay their own

25  expenses?

7

1      A.   Herbalife distributors pay their own

2  expenses?

3      Q.   Yes.

4      A.   It depends.  They pay their own expenses to

5  run their business, yeah.

6      Q.   Okay.

7      A.   If we send them on the road -- you know, we

8  pay some expenses for them when they do trainings

9  for us, et cetera.

10     Q.   Okay.  But if -- but to be an Herbalife

11  distributor --

12     A.   And going back, when you say a lot of them

13  are part time, the majority of them are part time of

14  our Herbalife distributors.

15     Q.   They're not -- you would agree with me that

16  the majority of the people are unsophisticated, kind

17  of the mom and pop part-time business?

18     MR. PATTERSON:  Objection.  Calls for an opinion

19  without any evidence or foundation as to what every

20  person is like as a distributor.

21     Q.   BY MR. JOLLY:  You can answer.  Even when

22  there's an objection, you get to answer.

23     A.   Okay.  Our distributors are A to Z.  I

24  think the sophistication runs the gamut.

25     Q.   Okay.  So some of the distributors are

8

Mike McKee

1  the whole thing down.

2        Q.    Okay.   Very good.   Thank you.

3             And then what -- what is an Herbalife

4  independent distributor's business in your

5  experience comprised of?   What is it?

6        A.    Well, they're in business for themselves,

7  so they've got to wake up and employ themselves

8  every day, which means do actual work that's going

9  to relate -- you know, going to give them retail

10  customers.   I mean, the goal is, you know, how many

11  people can we get taking tablets and drinking shakes

12  and getting healthier?   So how many people -- you

13  know, what we tell people is, "Every day, you know,

14  you should be getting" -- "looking at 10 people that

15  are interested and looking at the products, possibly

16  getting started on the products, inviting them."

17             And we also -- you know, there's people out

18  there that need to make an extra 500 bucks a month,

19  especially now in the economic times to pay their

20  bills, and we've got a great part-time opportunity

21  for them to do that.   And for more -- you know, if

22  they want to take it beyond a part-time opportunity,

23  they've got that option as well.

24        Q.    Do you think Herbalife is recession-proof?

25        A.    I don't think there's any company in the

1    world that's recession-proof.

2        Q.    All right.  So if Herbalife advertised that

3    it's recession-proof, that would be false?

4        MR. PATTERSON:  Objection.  Calls for a

5    conclusion based on facts not on evidence.

6        THE WITNESS:  I don't have an opinion on that I

7    don't think.

8        Q.    BY MR. JOLLY:  But you don't think

9    Herbalife is recession-proof?

10       A.    I don't think any company's

11   recession-proof, including Herbalife.

12       Q.    All right.  Fair enough.

13            And then when a distributor is operating

14   their own independent business and they talk to

15   these 10 people to get products, you expect them

16   personally to be talking to these people; right?

17       A.    Talking?

18       Q.    Yes.

19       A.    Talking, I think, comes in many forms.  So

20   talking might be a flyer, an Internet invitation to

21   come to their website to check out the products, to

22   check out the opportunity.  But yeah, they either

23   talk, you know, one-on-one with somebody or they can

24   do it in more mass ways, being flyers and Internet.

25   I'm trying to think of other examples, and I just

Mike McKee

```
 1              How long have you reported to Rob Levy?

 2       A.    Last year to year and a half when I've been

 3   in business development.

 4       Q.    And what are your duties as the vice

 5   president of business development?

 6       A.    To help the other countries -- we've got a

 7   very junior staff in many of our other countries,

 8   and basically my last year has been helping with

 9   the -- the staff learn the Herbalife business, you

10   know, learn how to work with their -- their strategy

11   groups, their distributors, let them know what's

12   working in markets where we've got things working

13   well, trying to share best practices.  That's pretty

14   much been my life.  It's -- this last year, lots of

15   travel, lots of visiting other countries.

16       Q.    Okay.  And what were your duties as vice

17   president of sales for North America?

18       A.    The biggest, I think, duty was -- you know,

19   I was really the communication link between our

20   leadership and the corporation on a regular basis.

21   You know, I think communications was probably the

22   biggest -- the biggest task in my job.  Obviously we

23   wanted to see the distributors all do well and we

24   wanted to see the company do well, and we worked

25   with programs like the weight loss challenge to get
```

                                   23

1    it adopted and implemented in as many places and --

2    you know, and similar programs.  I don't want to use

3    that one because that one's just in the last year

4    and a half or so.

5        Q.    Okay.  And have you attended Herbalife

6    training events?

7        A.    Sure.  Yes.

8        Q.    Have you attended Herbalife extravaganzas?

9        A.    Yes.

10       Q.    Have you ever heard Michael Johnson say

11   that Herbalife in 2006 reached a $3 billion in sales

12   mark?

13       A.    I don't recall.

14       Q.    Did Herbalife reach a $3 billion in sales

15   mark at some point?

16       A.    I don't know the answer to that.

17       Q.    Okay.  Have you ever seen an advertisement

18   that said to the distributors --

19       A.    No.

20       Q.    -- that there were $3 billion in sales?

21       A.    No.  Sorry, I didn't let you finish the

22   question.

23       Q.    Now, you said that as vice president of

24   sales for North America for Herbalife, you would

25   communicate with leadership?

24

Mike McKee

1     A.    With leadership, you know.  And then the

2     leadership in subsequent communications, whether

3     they were e-mails -- we would communicate with a

4     wider group than the leadership.  We would

5     communicate with supervisors and TAB Team.  My

6     primary role personally is I really worked more with

7     the leadership.  My staff then worked with the other

8     levels.

9         Q.    Very good.

10            And what do you mean by "leadership"?

11        A.    The TAB Team.  I refer to our TAB Team as

12    our leadership.  So whether it's Chairman's Club,

13    President's Team, TAB Team being the Millionaire

14    Team, and the GET Team, I would consider all that

15    leadership.

16        Q.    Okay.  Do you know Anthony Powell?

17        A.    Yes.

18        Q.    Have you ever told anybody in an e-mail

19    that Anthony Powell is a scam?

20        A.    No.

21        Q.    Have you ever told anybody in a verbal

22    communication that Anthony Powell is a scam?

23        A.    No.

24        Q.    Okay.  Do you believe Anthony Powell to be

25    an honest person?

Mike McKee

**Exhibit F Page 104**

1       THE WITNESS:  And then Clem Herron is C-L-E-M,

2   last name H-E-R-R-O-N.

3       MR. PATTERSON:  Thanks.

4       DEPOSITION OFFICER:  Thank you.

5       Q.   BY MR. JOLLY:  And how do you recall you

6   communicated with Annette Petrocelli?

7       A.   I don't recall the details of the

8   conversation.  I vaguely remember her telling me

9   that she was really upset because one of her

10  downline that she adored, Jason Fisher, was calling

11  other people within her organization and trying to

12  get them to go to Melaleuca, telling them that the

13  deal was there and that Herbalife -- all the bad

14  things about Herbalife.  And I just told Annette, as

15  I always do, "I will let compliance know, and hang

16  in there."

17      Q.   Do you believe that Jason Fisher's calling

18  people trying to get them to go to Melaleuca

19  violated a rule or policy of Herbalife?

20      A.   Yes, I believe.

21      Q.   Okay.  What policy?

22      A.   I don't know the rule numbers to be able

23  to --

24      Q.   Just what do you call the policy or rule?

25      A.   I don't know what we call it.  I guess

28

Mike McKee

1    it's -- well, Jason at that point had left the

2    company, so he had been terminated.  So according to

3    our rules, he's not allowed to have contact with any

4    of that for three years, I believe it is.  And

5    again, I don't know the rule number.

6        MR. PATTERSON:  If you know.  You don't want to

7    speculate on what the rules say unless you know what

8    they are.

9        THE WITNESS:  Okay.

10       Q.   BY MR. JOLLY:  And the -- so --

11       A.   Here is why -- I mean, again, on the rule

12   thing -- is that I just -- I was the conduit.  When

13   distributors called me about a complaint, I didn't

14   go to the rule book and look it up.

15       Q.   Sure.

16       A.   I just sent it off to the complaint

17   department.  I can tell you this much:  The

18   distributors know the rules because that's why

19   they're calling, and they're the ones on the phone

20   saying, "Mike, broke this rule, this rule."  I mean,

21   they know the rules inside and out.  I don't know

22   the rules.  Therefore, I just assume when I get that

23   call, they're hot, they're upset.  It goes right to

24   compliance.

25       Q.   Okay.  And have you ever read the

                            29

1    has told you that this is the rule?

2        A.    Over the years, I know that when this has

3    happened, that that ends up in our compliance

4    office.  And again, I don't know the details of why

5    it ends up there and -- I know at the end of the

6    day, it doesn't feel right, you know.  I know the

7    things out in the field that don't feel right and

8    don't add up to good conduct in terms of, you know,

9    just basic business conduct with people.  I'm not

10   going to go to your employees and take them to my

11   company and leave you -- and mess your livelihood

12   up.  That doesn't sound right to me.

13       Q.    How about -- have you heard that some of

14   the defendants placed flyers on cars?

15       A.    Can you give me any more detail on that?

16       Q.    Sure.  Did you hear that Jason Fisher and

17   Robert Ford placed flyers on cars at an event in

18   Atlanta?

19       A.    Yes, I heard that.

20       Q.    Okay.  And do you think that conduct was

21   inappropriate?

22       A.    Yes.

23       Q.    Why?

24       A.    Because they were targeting another

25   competitive company and going after their

35

1  distributors.

2     Q.   Okay.  And would -- under the three-year

3  rule, would they -- that you talked about earlier,

4  do you believe they would be prohibited from doing

5  that, in your understanding of the rule?

6     A.   Yeah.  My understanding, yes.

7     Q.   Why do you believe Jason -- do you believe

8  Jason Fisher was terminated?

9     A.   That's my recollection.

10     Q.   Why do you think he was terminated?  For

11  what?

12     A.   Breaking Herbalife's rules.

13     Q.   Have you ever told anyone that Jason Fisher

14  was terminated?

15     A.   If anybody asked if Jason Fisher was with

16  Herbalife, I would answer that he's no longer with

17  the company.

18     Q.   You never said he was terminated?

19     A.   That's just my standard for everybody

20  that -- I mean, employees, distributors, no longer

21  with the company.

22     Q.   Okay.  Did you ever talk to Michael Johnson

23  and -- well, strike that.

24        Have you ever talked to Michael Johnson?

25     A.   Yes.

36

Mike McKee

1    "trade secrets."  I can only give you what I -- in

2    my opinion.

3        Q.   BY MR. JOLLY:  Okay.  What's your opinion?

4        A.   Anything that is on our database would be a

5    trade secret.  Any paper that's generated from the

6    company would be a trade secret.  Products is trade

7    secret.  Those would be my three biggies.  Again,

8    not understanding trade secrets to the...

9        MR. JOLLY:  All right.  Let's take a 10-minute

10   break.

11             (A brief recess was taken.)

12       Q.   BY MR. JOLLY:  You understand you are still

13   under oath?

14       A.   Yes.

15       Q.   All right.  In the 2005, 2006 time frame

16   when you were the vice president of sales of --

17       A.   North America.

18       Q.   -- North America for Herbalife, did -- do

19   you know anybody who was selling 16,000 volume

20   points retail per month?

21       A.   Not -- not that I'm aware of.

22       Q.   Okay.  Advancement from Herbalife is not

23   based on retail sales; correct?

24       A.   Advancement in -- clarify the question, if

25   you could.

Mike McKee

1    Q.   Okay.  Moving up the chain at Herbalife

2    from -- to different levels, it requires volume

3    purchased from Herbalife; correct?

4    A.   Yes.

5    Q.   And to move up between -- for example, on

6    my first day as a supervisor, all it takes is that I

7    have these 4,000 volume points and I will become a

8    supervisor; correct?

9    A.   Yes.  There's levels that are set at

10   certain -- to make certain levels, and that's all

11   based on volume purchased from the company obviously

12   to retail.

13   Q.   But it's not based on retail.  It's based

14   on volume purchased from the company; correct?

15   A.   Yes.

16   Q.   So do you know any person who was retailing

17   $16,000 or more a month in the 2006 time period in

18   North America?

19   A.   I cannot give you a name, but I can tell

20   you with assurance, yes, there are people that are

21   doing that.  There were people doing that then and

22   today.

23   Q.   Does Herbalife have any special awards for

24   best retailer in North America?

25   A.   No.

91

Mike McKee

**Exhibit F Page 110**

1      Q.   So if somebody buys 10 sample packs, then

2   they will qualify for the 10-customer rule?

3      A.   I don't know.  I don't know what -- what

4   the requirements are of the 10-customer other than

5   it's a way of making sure that we got our

6   distributors or retailing the product.

7      Q.   Okay.  So you don't know whether if I sold

8   10 retail -- different retail customers or discount

9   buyers a sample pack whether that will qualify for

10   the 10-customer rule?

11      A.   I don't know.

12      Q.   Who at Herbalife would know?

13      A.   Our distributor relations department

14   handles most of the back-ends of the business.

15      Q.   How does Herbalife know that the product is

16   being actually consumed by people?

17      A.   Stories that come in, people losing the

18   weight.

19      Q.   Have you seen the product on eBay?

20      A.   Yes.

21      Q.   A lot of product on eBay, isn't there?

22      A.   Everybody's product is on eBay.

23      Q.   And is an e-mail sale considered a retail

24   customer sale?

25      A.   I don't know how to answer that.

107

1   defendants in this case they couldn't find any

2   retail customers?

3        A.   I don't recall.

4        Q.   Did you ever hear from any distributors

5   that they -- it had become impossible to find retail

6   customers?

7        A.   No.

8        Q.   Have you ever heard from any distributors,

9   let's say, 2003 until the time you left vice

10  president sales North America that retail sales were

11  becoming very scarce?

12       A.   No.

13       Q.   Did you ever train any distributors on the

14  filling out of the 10-customer form?

15       A.   No.

16       Q.   Do you know what the 70-percent rule is?

17       A.   No.

18       Q.   Did you ever train --

19       A.   I've heard of it.  I don't recall what it

20  is.

21       Q.   Have you ever trained any persons -- as

22  vice president of sales for North America and the

23  link between GET Team members and Herbalife, have

24  you ever trained anybody about what the 70-percent

25  rule means?

127

Mike McKee

1    A.   No.

2    Q.   Of these --

3    A.   I do as vice president tell them that they

4  need to read the rules in the rule book.

5    Q.   Okay.

6    A.   I'm not going to get on a call and spend

7  time going over rules.  That would be like the

8  deposition today; right?  You know, I want to talk

9  about exciting stuff.  I'm the sales end of it.

10    Q.   I think yesterday --

11    MR. PATTERSON:  Of course you don't want to

12  imply this is not exciting.

13    THE WITNESS:  I didn't want to imply.

14    MR. JOLLY:  Somebody said paint dry yesterday.

15    MR. PATTERSON:  That did wake me up when you

16  said that.

17    Q.   BY MR. JOLLY:  What time would you like

18  lunch at today?  I don't care.

19    MR. PATTERSON:  12:30?

20    MR. JOLLY:  Okay.

21    MR. PATTERSON:  Is that okay.

12:30 22    Q.   BY MR. JOLLY:  Is that okay with you,

23  for a break?

24    A.   That's great.  How long is the break?

25  Hour?

128

1      Q.    Whatever you guys want.   Shorter is better

2  for me.

3      MR. PATTERSON:   What do you want?

4      THE WITNESS:   Hour.

5            (Off-the-record discussion.)

6      Q.    BY MR. JOLLY:   In this exciting moment in

7  your life, have you ever had your deposition taken

8  before?

9      A.    Never.

10     Q.    Did -- in all of these 500 or 1,000

11 training events that you've been to for Herbalife,

12 did you ever hear anyone talk about the 70-percent

13 rule and explain to you what it meant?

14     A.    Not that I can recall.

15     Q.    Okay.   In all of these 500 or 1,000

16 trainings that you attended, did you ever hear

17 anybody complain about Anthony Powell?

18     A.    Yes.

19     Q.    Do you know -- do you recall who complained

20 about Anthony Powell?

21     A.    No.

22     Q.    Do you recall the nature of the complaint?

23     A.    Nature of the complaints that I hear around

24 the events -- and again, they're different I hear

25 when somebody calls you about something, but the

                         129

1      A.   No.

2      Q.   Okay.  Has anybody ever told you that the

3  language, "For such period distributor also agrees

4  not to enter or participate in a competing business

5  or business activity" has been abandoned?

6      A.   No.

7      Q.   As far as you know, it's still in full

8  force and effect?

9      A.   As far as I know.  I don't have any

10  knowledge of when it was abandoned.

11      Q.   No one ever said it's abandoned to you?

12      A.   No.

13      Q.   That's what I'm getting at.

14      A.   No.

15      Q.   Just asking.  Can I have that back?  These

16  are --

17      A.   Do you want this one back from before?

18      Q.   No.  Yes.  You're right.  I stand

19  corrected.  Now I'm going to hand you a document we

20  used yesterday called a TAB Team Newsflash.  That's

21  Exhibit 26 -- Exhibit 25.  Would you please review

22  Exhibit 25?

23      A.   Okay.

24      Q.   Have you had an opportunity to review

25  Exhibit 25?

158

Mike McKee

**Exhibit F Page 115**

1     Q.   Did you ever see any e-mails relating to

2  Exhibit 32?

3     A.   I believe I saw this one.  I didn't recall

4  it until you showed it to me, but I don't -- again,

5  I don't remember reading this.  I would have if it

6  came from Michael and Greg.  I would have read my

7  company announcement.

8     Q.   Okay.  And Exhibit 32 has some text, and

9  after the words "In 27 years" there's a sentence

10  that says -- are you with me?

11     A.   Uh-huh.

12     Q.   "The company will take steps to prevent

13  others from competing unfairly with our independent

14  distributors."

15     Did I read that correctly?

16     A.   Yes.

17     Q.   Earlier this morning you talked about what

18  you knew relating to the defendants' competition or

19  move to Melaleuca.

20     Do you recall that?

21     A.   In terms --

22     Q.   In terms of what you knew personally about

23  it.

24     A.   Sure.

25     Q.   You have no personal knowledge that any of

198

<u>DEPOSITION OFFICER'S CERTIFICATE</u>

1

2

3  STATE OF CALIFORNIA    )
                          )    ss.
4  COUNTY OF <u>LOS ANGELES</u>  )

5

6          I, <u>Lisa DiGiovanni</u>, hereby certify:

7          I am a duly qualified Certified Shorthand

8  Reporter in the State of California, holder of

9  Certificate Number CSR <u>11969</u> issued by the Court

10 Reporters Board of California and which is in full force

11 and effect.  (Fed. R. Civ. P. 28(a)).

12         I am authorized to administer oaths or

13 affirmations pursuant to California Code of Civil

14 Procedure, Section 2093(b) and prior to being examined,

15 the witness was first duly sworn by me.  (Fed. R. Civ.

16 P. 28(a), 30(f)(1)).

17         I am not a relative or employee or attorney or

18 counsel of any of the parties, nor am I a relative or

19 employee of such attorney or counsel, nor am I

20 financially interested in this action.  (Fed. R. Civ. P.

21 28).

22         I am the deposition officer that

23 stenographically recorded the testimony in the foregoing

24 deposition and the foregoing transcript is a true record

25                         / / /

222

1    of the testimony given by the witness.   (Fed. R. Civ. P.

2    30(f)(1)).

3        Before completion of the deposition, review of

4    the transcript [XX] was [  ] was not requested.   If

5    requested, any changes made by the deponent (and

6    provided to the reporter) during the period allowed, are

7    appended hereto.   (Fed. R. Civ. P. 30(e)).

8

9    Dated:   February 20th   , 2009

10

11                    Lisa DiGiovanni

12

13

14

15

16

17

18

19

20

21

22

23

24

25

223

nancy, 4/20/07 5:23 PM -0400, Fwd: Important Message from Michael Johnson and Greg          1

X-YMail-OSG:
F_dzVKcVM1lmYriBw5tNETFzc_AKTk8HNbLSVNMl84c6zyuQ1ghl5Ll7ZHci2k1HPv
OeNWUrDMKJZe.bkp8ClDV8vcgBxPDGg6AGOQtnpjeqMKTjl9ByHz.Nx2b5SGmznNh
m2KFz88H6w8qdwT6r
From: "nancy" <nwillis2006@sbcglobal.net>
To: "'nancy roth'" <nancyaroth@sbcglobal.net>,
        "'bruce roth'" <brucehroth@sbcglobal.net>,
        "'Robert Ford'" <robertford@adelphia.net>
Subject: FW: Important Message from Michael Johnson and Greg Probert
Date: Fri, 20 Apr 2007 17:23:57 -0400
Thread-Index: AceDkLd4BBP3olk+QoCDd6sWctECegAAV7XA

Did you guys see this

**From:** Herbalife U.S. [mailto:info@reply.herbalifemail.com]
**Sent:** Friday, April 20, 2007 5:13 PM
**To:** nwillis2006@yahoo.com
**Subject:** Important Message from Michael Johnson and Greg Probert

To To view this email as a web page, click here. | La versión en Español



ANNOUNCEMENT

April 20, 2007
Dear President's Team Member,
We have all worked tirelessly to build Herbalife into the outstanding company it is today and we are
very proud of what has been accomplished in 27 years. The company will take steps to prevent
others from competing unfairly with our Independent Distributors. We want you to be aware of such
an action taken today to defend Herbalife and your business.
Today we filed a lawsuit against Distributors of another direct-selling company. The lawsuit was
brought in to the United States District Court in Los Angeles. They are: Robert E. and Julia A. Ford;
Jason Fisher; Jeffrey A. and Kathy E. Orr; Bruce H. and Nancy A. Roth; and Dianna N. Thompson.
The complaint alleges they are competing unfairly and seeks injunctions and money damages.
We regret having to do this. At the end of the day, however, we will not allow our company and the
businesses and livelihood of our Distributors to be damaged by what we believe to be unlawful
activities.
We wanted you to have the facts and appreciate your support in keeping your Organizations focused
on growing and servicing their businesses. We will post a basic statement with Distributor Relations
for any inquiries.
We have so many very positive stories and activities in our company right now – let's make sure we
spread all our good news far and wide.
Thank you for your leadership,

As   Exhibit  32
Lisa DiGiovanni CSR 11969
Deponent  McKee
2/19/09  pg  1  of  1                    D00790