STEPHENS FRIEDLAND LLP
John B. Stephens, Bar No. 142718
4695 MacArthur Court, Suite 310
Newport Beach, CA 92660
Telephone: (949) 468-3200 / Facsimile (949) 468-3201
Email: john@sf-lawyers.com

Attorney for Defendants and Counterclaimants
ROBERT E. FORD, JULIA A. FORD,
BRUCE H. ROTH, NANCY A. ROTH,
DIANNA N. THOMPSON and JASON FISHER

MIXON JOLLY LLP
Cameron M. Jolly, Bar No. 132541
575 Anton Boulevard, Suite 670
Costa Mesa, CA 92626
Telephone: (714) 885-7000 / Facsimile (714) 885-7001
Email: CJolly@mixonjollylaw.com

Attorney for Defendants and Counterclaimants
JEFF ORR and KATHY ORR

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| HERBALIFE INTERNATIONAL OF AMERICA, INC., a Nevada corporation,<br><br>Plaintiff,<br><br>v.<br><br>ROBERT E. FORD and JULIA A. FORD, husband and wife; BRUCE H. ROTH and NANCY A. ROTH, husband and wife; JEFF ORR and KATHY ORR, husband and wife; DIANNA N. THOMPSON; and JASON FISHER,<br><br>Defendants. | Case No.:  CV 07 2529 GAF (FMOx)<br><br>**DEFENDANTS AND COUNTER-CLAIMANTS' SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF DEFENDANTS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT**<br><br>**[Fed. R. Civ. Proc. 56]**<br><br>**[Notice of Motion and Motions; Memorandum of Points and Authorities; and Declarations in Support Thereof filed herewith]**<br><br>Hearing Date:  March 23, 2009<br>Time:  9:30 a.m.<br>Courtroom:  740 – Roybal Crthse |

Pursuant to Local Rule 56-1, Defendants and Counterclaimants, Robert and Julia Ford, Bruce and Nancy Roth, Jeff and Kathy Orr, Dianna Thompson, and Jason Fisher ("Defendants" or "Counterclaimants") submit this separate statement of uncontroverted facts and conclusions of law, together with references to the supporting evidence, in support of its Motions for Partial Summary Judgment:

## UNCONTROVERTED FACTS FROM
## SECTION II. FACTUAL SUMMARY APPLICABLE TO ALL ISSUES
## FOR PARTIAL SUMMARY JUDGMENT

| UNCONTROVERTED FACT | SUPPORTING EVIDENCE |
|---|---|
| 1. Herbalife is a multi-level marketing company that sells nutritional supplements, vitamins, and skin care products. | 1. Deposition of Jacqueline A. Miller ["Miller Depo."] 30:24-31:4 (Declaration of J. Gregory Dyer ["Dyer Decl."], ¶ 2, Ex. "A," pp. 12-13). |
| 2. Herbalife publishes a chart showing its marketing plan that does not mention customers or retail sales. | 2. "Live the Good Life with Herbalife," p. 22 (Dyer Decl., ¶ 4, Ex. "C," p. 60). This "stair step" chart was authenticated by Miller.  Miller Depo. 71:2-15 (Dyer Decl., Ex. "A," p. 26).  "Sales & Marketing Plan and Business Rules," p. 4 (Dyer Decl., ¶ 5, Ex. "D," p. 63).  This document was authenticated by Paul Greenberg, Herbalife's Senior Vice President, |

| **UNCONTROVERTED FACT** | **SUPPORTING EVIDENCE** |
|---|---|
| | Counsel.  Deposition of Paul Greenberg ["Greenberg Depo."]) 225:23-226:1 (Dyer Decl., Ex. "E," pp. 86-87.) |
| 3.   According to the Herbalife's Marketing Plan, royalties, bonuses and advancement at Herbalife are based exclusively on purchases from Herbalife. | 3.   "Live the Good Life with Herbalife," p. 22 (Dyer Decl., Ex. "C," p. 60).<br><br>"Sales & Marketing Plan and Business Rules," p. 4 (Dyer Decl., Ex. "D," p. 63). |
| 4.   Herbalife does not keep records of retail sales. | 4.   Greenberg Depo. 117:3-5 (Dyer Decl., ¶ 6, Ex. "E," p. 80). |
| 5.   Herbalife's sales force is composed of independent contractors who start as "distributors." | 5.   "Live the Good Life with Herbalife," p. 22 (Dyer Decl., Ex. "C," p. 60).<br><br>"Sales & Marketing Plan and Business Rules," p. 3-4, 51-52 (Dyer Decl., Ex. "D," pp. 62-63, 68-69). |
| 6.   Distributors are not agents, employees, or legal representatives of Herbalife. | 6.   "Sales & Marketing Plan and Business Rules," p. 3-4, 51-52 (Dyer Decl., Ex. "D," pp. 62-63, 68-69). |
| 7.   Distributors have the right to buy products at a discount to use or resell and to recruit other | 7.   Miller Depo. 31:15-21, 33:6-10 (Dyer Decl., Ex. "A," pp. 13-14). |

| **UNCONTROVERTED FACT** | **SUPPORTING EVIDENCE** |
|---|---|
| distributors into the program. | |
| 8. Distributors qualify to become a "supervisor by ordering from Herbalife a minimum amount of product, costing thousands of dollars, for either one month or two consecutive months. | 8. "Sales & Marketing Plan and Business Rules," p. 4 (Dyer Decl., Ex. "D," p. 63). |
| 9. Supervisors must meet certain order quotas each year to retain their supervisor status. | 9. Miller Depo. 36:22-37:14, 38:13-39:8 (Dyer Decl., Ex. "A," pp. 15-18). |
| 10. Supervisors are entitled to receive a "Royalty Override" on up to three generations of "downline" supervisors. | 10. Miller Depo. 73:3-20 (Dyer Decl., Ex. "A," p. 27).<br><br>"Sales & Marketing Plan and Business Rules," p. 11 (Dyer Decl., Ex. "D," p. 64). |
| 11. The Royalty Override gives the supervisor a 1% to 5% commission on orders placed by downline supervisors. | 11. Miller Depo. 73:3-20 (Dyer Decl., Ex. "A," p. 27). |
| 12. Supervisors and those they recruit must continue to purchase a minimum amount of product each | 12. Miller Depo. 73:3-20 (Dyer Decl., Ex. "A," p. 27). |

| | **UNCONTROVERTED FACT** | **SUPPORTING EVIDENCE** |
|---|---|---|
| | month from Herbalife to qualify the supervisor for the Royalty Override. | "Sales & Marketing Plan and Business Rules," p. 11 (Dyer Decl., Ex. "D," p. 64). |
| 13. | Herbalife supervisors receive the right to sell the products and earn royalties based on product orders made by the supervisor's recruits. | 13. "Live the Good Life with Herbalife," pp. 21-22 (Dyer Decl., Ex. "C," pp. 59-60). |
| 14. | Advancement within Herbalife "is not based on retail.  It's based on volume purchased from the company." | 14. Deposition of Mike McKee ["McKee Depo."]) 90:22-91:15 (Dyer Decl., ¶ 7, Ex. "F," pp. 109-110). |
| 15. | Counterclaimants signed Herbalife's Distributor Agreement (the "Agreement"). | 15. Complaint at ¶¶ 11-15. |
| 16. | The Agreement contains a broad prohibition against post-termination use of "information" and a blanket 3-year non-compete. | 16. Herbalife Distributor Agreements (Dyer Decl., ¶ 8, Ex. "G," pp. 120-125). |

| **UNCONTROVERTED FACT** | **SUPPORTING EVIDENCE** |
|---|---|
| 17. Herbalife has not made any announcement to its independent distributors that the non-compete covenant was abandoned. | 17. Greenberg Depo. 104:14-20 (Dyer Decl., Ex. "E," p. 78). |
| 18. Herbalife's in-house counsel maintains that the non-compete covenant is enforceable. | 18. Greenberg Depo. 106:4-9 (Dyer Decl., Ex. "E," p. 79). |
| 19. Mike McKee, Herbalife's Vice President of Business Development (Sales) agrees that the non-compete covenant is enforceable. | 19. McKee Depo. 28:17-29:5 (Dyer Decl., Ex. "F," pp. 105-106). |
| 20. McKee testified that the non-compete covenant prevents Counterclaimants from putting flyers on cars. | 20. McKee Depo. 35:16-36:6 (Dyer Decl., Ex. "F," pp. 107-108). |
| 21. McKee testified that the non-compete provision is "in full force and effect." | 21. McKee Depo. 35:16-36:6 (Dyer Decl., Ex. "F," pp. 107-108). |
| 22. Jacqueline Miller, Herbalife's top rules official, stated that Herbalife distributors are "not allowed to participate in a competing | 22. Miller Depo. 54:1-24 (Dyer Decl., Ex. "A," p. 20). |

| **UNCONTROVERTED FACT** | **SUPPORTING EVIDENCE** |
|---|---|
| business" for 3 years after termination. | |
| 23. Herbalife's Agreement also provides that distributors must follow Herbalife's rules, policies, and procedures. | 23. Herbalife Distributor Agreements (Dyer Decl., ¶ 8, Ex. "G," pp. 120-125). |
| 24. Herbalife enacted Rule 8-A, its restraint against post-termination solicitation, in September 2006—after Counterclaimants Robert and Julia Ford and Jason Fisher had resigned from Herbalife. | 24. Herbalife Complaint Form (Dyer Decl., ¶ 9, Ex. "H").  This document was authenticated by Greenberg.  Greenberg Depo. 219:12-16 (Dyer Decl., Ex. "E," p. 83).<br><br>Greenberg Depo. 219:20-220:6 (Dyer Decl., Ex. "E," pp. 83-84). |
| 25. Rule 8-A is a blanket non-solicitation restraint that does not reference the use of trade secrets. | 25. "Sales & Marketing Plan and Business Rules," p. 51 (Dyer Decl., Ex. "D," p. 68). |

| | **UNCONTROVERTED FACT** | **SUPPORTING EVIDENCE** |
|---|---|---|
| 26. | Rule 8-A has the effect of continuously restraining former Herbalife distributors because it not only violates Rule 8-A to solicit Herbalife distributors for one year after termination, but also to sponsor others who do so. | 26. Greenberg Depo. 220:22-221:20 (Dyer Decl., Ex. "E," pp. 84-85). |
| 27. | Counterclaimants terminated their distributorships with Herbalife and signed up with Melaleuca, Inc. | 27. Complaint at ¶ 26, 29, 31-33. |
| 28. | After Ford and Fisher handed out business cards and put flyers on cars at a hotel during an Herbalife event, Herbalife responded with a publication stating that this conduct was unfair competition. | 28. February 6, 2007 Email from Herbalife's Tom Zimmer to TAB Team Members (Dyer Decl., ¶ 10, Ex. "I," pp. 126-129). |
| 29. | Herbalife's February 6, 2007 email contained a publication that claimed that, in 2006, Herbalife had over $3 billion in retail sales and paid $2.2 billion in commissions, royalties, and bonuses to its Supervisors. | 29. February 6, 2007 Email from Herbalife's Tom Zimmer to TAB Team Members (Dyer Decl., Ex. "I," p. 130). |

| **UNCONTROVERTED FACT** | **SUPPORTING EVIDENCE** |
|---|---|
| 30. On April 20, 2007, Herbalife's CEO sent an "important announcement" to its distributors identifying each of the Counterclaimants and stating that they have been sued for unfair competition. | 30. April 20, 2007 Email From Michael Johnson (Dyer Decl., ¶ 11, Ex. "J," p. 131). |

## UNCONTROVERTED FACTS FROM SECTION III. HERBALIFE'S COUNTS 1, 2, 3, 4, 5 AND 7 SHOULD BE DISMISSED.

| **UNCONTROVERTED FACT** | **SUPPORTING EVIDENCE** |
|---|---|
| 31. Per Herbalife Rule 8-J, California law governs "all aspects of a Distributor's relationship with Herbalife." | 31. "Sales & Marketing Plan and Business Rules," p. 52 (Dyer Decl., Ex. "D," p. 69). |
| 32. On June 15, 2007, pursuant to California Code of Civil Procedure § 2019.210, Herbalife identified its trade secrets as "Herbalife Linage [sic] Documents," "Herbalife Passcode," and "Herbalife Trade Name and Mark." | 32. Plaintiff Herbalife International of America, Inc's Disclosure of Trade Secrets (Dyer Decl., ¶ 12, Ex. "K," p. 133). |

| **UNCONTROVERTED FACT** | **SUPPORTING EVIDENCE** |
|---|---|
| 33. In discovery, Counterclaimant and Defendant Jeff Orr asked Herbalife to produce its alleged trade secrets. | 33. Defendant and Counterclaimant Jeff Orr's First Set of Request [sic] for Production to Plaintiff and Counterclaimant Herbalife of America, Inc. (Dyer Decl., ¶ 13, Ex. "L," p. 137). |
| 34. Herbalife did not produce its trade secrets. | 34. Herbalife's Responses to Defendant and Counterclaimant Jeff Orr's First Set of Requests for Production (Dyer Decl., ¶ 14, Ex. "M," p. 140). |
| 35. In its response to Jeff Orr's request for production of the trade secrets that Herbalife alleged had been misappropriated, Herbalife stated: "Herbalife has no way to identify the particular trade secrets or documents reflecting those trade secrets Counterclaimants misappropriated and so has no responsive documents." | 35. Herbalife's Responses to Defendant and Counterclaimant Jeff Orr's First Set of Requests for Production (Dyer Decl., Ex. "M," p. 140). |
| 36. The Ninth Circuit ruled that the portion of the preliminary injunction that prohibited the Counterclaimants from "Using or disclosing for business related | 36. Ninth Circuit Memorandum, filed July 22, 2008 (Dyer Decl., ¶ 15, Ex. "N," p. 143). |

| **UNCONTROVERTED FACT** | **SUPPORTING EVIDENCE** |
|---|---|
| purpose . . . contacts or business information acquired during [Counterclaimants'] work with Herbalife" was "overbroad." | |
| 37. The Ninth Circuit narrowed the preliminary injunction to "exempt from its coverage only customer contact or business information that the defendants developed of their own accord." | 37. Ninth Circuit Memorandum, filed July 22, 2008 (Dyer Decl., Ex. "N," pp. 143-144). |
| 38. During oral arguments before the Ninth Circuit, Judge Silverman stated that Rule 8-A, as incorporated into the preliminary injunction in this case, was a non-compete clause and struck him as "overbroad." | 38. Transcript of the Appeal from the United States District Court for the Central District of California, argued and submitted on July 15, 2008 (Dyer Decl., ¶ 16, Ex. "O," p. 147). |
| 39. Herbalife independent distributors own and operate their own businesses. | 39. Greenberg Depo. 72:12-73:13 (Dyer Decl., Ex. "E," pp. 75-76). Miller Depo. 132:3-133:20 (Dyer Decl., Ex. "A," pp. 34-35). McKee Depo. 7:10-8:5 (Dyer Decl., |

| **UNCONTROVERTED FACT** | **SUPPORTING EVIDENCE** |
|---|---|
| | Ex. "F," pp. 98-99). |
| 40.  Herbalife independent distributors invest their own time and resources in developing customers and recruiting other distributors. | 40.  Greenberg Depo. 72:12-73:13 (Dyer Decl., Ex. "E," pp. 75-76).

Miller Depo. 132:3-133:20 (Dyer Decl., Ex. "A," pp. 34-35).

McKee Depo. 7:10-8:5 (Dyer Decl., Ex. "F," pp. 98-99). |
| 41.  Rule 8-A prevents former distributors from *soliciting, sponsoring, promoting or recruiting* anyone that the former distributor "became aware of in the course of their Herbalife distributorship." | 41.  "Sales & Marketing Plan and Business Rules," p. 51 (Dyer Decl., Ex. "D," p. 68). |
| 42.  As such, Rule 8-A requires former Herbalife distributors to throw out their own phone books and forget about every relationship that they made while in Herbalife, including friends and family. | 42.  Greenberg Depo. 178:13-179:2 (Dyer Decl., Ex. "E," pp. 81-82). |

| **UNCONTROVERTED FACT** | **SUPPORTING EVIDENCE** |
|---|---|
| 43. Herbalife claims that the Counterclaimants violated their rules and regulations by putting flyers on cars in a parking lot. | 43. Greenberg Depo. 32:20-33:5 (Dyer Decl., Ex. "E," p. 72-73). |
| 44. Herbalife also claims that a former distributor who asked his or her child to join him or her at a competing company would violate Herbalife's rules and regulations. | 44. Miller Depo. 171:23-172:12 (Dyer Decl., Ex. "A," pp. 36-37). |
| 45. Miller claims that Herbalife distributors are required to refrain from competing for three years after their distributorship is over. | 45. Miller Depo. 54:1-24, 56:6-20 (Dyer Decl., Ex. "A," pp. 20-21). |
| 46. Miller admitted that Rule 8-A is not tied to use of trade secrets or confidential information. | 46. Miller Depo. 57:9-15 (Dyer Decl., Ex. "A," p. 22). |
| 47. Rule 8-A was enacted on September 1, 2006. | 47. Herbalife Complaint Form (Dyer Decl., Ex. "H").<br><br>Greenberg Depo. 219:20-220:6 (Dyer Decl., Ex. "E," pp. 83-84). |

| **UNCONTROVERTED FACT** | **SUPPORTING EVIDENCE** |
|---|---|
| 48. Jason Fisher left Herbalife in January 2006. | 48. Complaint at ¶ 26. |
| 49. Robert and Julie Ford resigned from Herbalife on September 1, 2006. | 49. Complaint at ¶ 28. |
| 50. Herbalife has submitted different versions of the Confidential and Non-Disclosure Agreement ("CNDA") to which it contends Counterclaimants agreed. | 50. Versions of Herbalife's CNDA (Dyer Decl., ¶ 17, Ex. "P," pp. 149-159). |
| 51. Miller testified that she had no personal knowledge of the Defendants assent to the CNDA. | 51. Miller Depo. 200:15-207:1 (Dyer Decl., Ex. "A," pp. 42-49). |
| 52. Herbalife contends that Counterclaimants violated the following additional Herbalife rules:  8-B, 8-D, 8-G, and 8-H. | 52. Herbalife's Responses to Defendant and Counterclaimant Bruce H. Roth's First Set of Interrogatories (Nos. 1-23) (Dyer Decl., ¶ 18, Ex. "Q," p.161). |
| 53. Rule 8-B prohibits Herbalife distributors from promoting organizations other than Herbalife when training their organizations. | 53. "Sales & Marketing Plan and Business Rules," p. 51 (Dyer Decl., Ex. "D," p. 68). |

| **UNCONTROVERTED FACT** | **SUPPORTING EVIDENCE** |
|---|---|
| 54. Rule 8-B does not apply to former Herbalife distributors. | 54. Miller Depo. 174:22-175:1 (Dyer Decl., Ex. "A," pp. 38-39). |
| 55. Rule 8-D, entitled "Comply with Laws," applies only to current Herbalife distributors. | 55. "Sales & Marketing Plan and Business Rules," p. 51 (Dyer Decl., Ex. "D," p. 68. |
| 56. Rule 8-G prohibits providing "false and misleading" information, but applies only to current Herbalife distributors. | 56. "Sales & Marketing Plan and Business Rules," p. 52 (Dyer Decl., Ex. "D," p. 69). |
| 57. Herbalife has not presented any evidence that Counterclaimants violated Rule 8-G. | 57. Miller Depo. 192:6-10 (Dyer Decl., Ex. "A," p. 40). |
| 58. Rule 8-H relates to maintaining the reputation and image of Herbalife. It applies only to current Herbalife distributors. | 58. "Sales & Marketing Plan and Business Rules," p. 52 (Dyer Decl., Ex. "D," p. 69). |
| 59. Herbalife's top rule official testified that she did not know why Counterclaimants have been accused of violating Rule 8-H. | 59. Miller Depo. 192:11-193:14 (Dyer Decl., Ex. "A," p. 40-41). |

| **UNCONTROVERTED FACT** | **SUPPORTING EVIDENCE** |
| --- | --- |
| 60. Herbalife has stated under oath that it cannot produce its trade secrets. | 60. Herbalife's Responses to Defendant and Counterclaimant Jeff Orr's First Set of Requests for Production (Dyer Decl., Ex. "M," p. 140). |
| 61. Herbalife has failed to produce the allegedly misappropriated trade secrets. | 61. Herbalife's Responses to Defendant and Counterclaimant Jeff Orr's First Set of Requests for Production (Dyer Decl., Ex. "M," p. 140). |
| 62. When Herbalife was asked to identify the Defendant's misrepresentations regarding Melaleuca's products being "safe and non-toxic," Herbalife could not identify a single statement made by Defendants. | 62. Herbalife's Responses to Defendant and Counterclaimant Robert E. Ford's First Set of Interrogatories (Nos. 1-18) (Dyer Decl., ¶ 19, Ex. "R," p. 165-166). |
| 63. Herbalife also could not set forth any admissible evidence to support its claim that Melaleuca's products are unsafe or toxic. | 63. Herbalife's Responses to Defendant and Counterclaimant Robert E. Ford's First Set of Interrogatories (Nos. 1-18) (Dyer Decl., ¶ 19, Ex. "R," p. 165-166). |
| 64. The sole fraud allegation in the Complaint is that Nancy Roth sent an email to Bob Bogard at Herbalife on January 30, 2007 | 64. Complaint at ¶ 125. |

| **UNCONTROVERTED FACT** | **SUPPORTING EVIDENCE** |
|---|---|
| requesting data on her downline distributors. | |
| 65. All other fraud allegations have been dismissed. | 65. Memorandum and Order Regarding Defendants' Motion to Dismiss and to Strike (Dyer Decl., ¶ 20, Ex. "S," p. 170-172). |
| 66. Herbalife did not send Nancy Roth with her downline list in response to her January 30, 2007 e-mail. | 66. Declaration of Nancy Roth ["Roth Decl."], ¶ 2, Ex. "A," p. 2-3). |
| 67. Herbalife denied Nancy Roth's request for her downline information. | 67. Declaration of Nancy Roth ["Roth Decl."], ¶ 2, Ex. "A," p. 2-3). |
| | Miller Depo. 105:5-16 (Dyer Decl., Ex. "A," p. 33. |

**UNCONTROVERTED FACTS FROM SECTION IV. SUMMARY JUDGMENT SHOULD BE GRANTED ON COUNTERCLAIMANTS' THIRD, FOURTH AND FIFTH CLAIMS FOR RELIEF.**

| **UNCONTROVERTED FACT** | **SUPPORTING EVIDENCE** |
|---|---|
| 68. Omnitrition's principals included former Herbalife distributors. | 68. Miller Depo. 99:24-100:6 (Dyer Decl., Ex. "A," p. 31-32). |

| UNCONTROVERTED FACT | SUPPORTING EVIDENCE |
|---|---|
| 69.  Herbalife is a multi-level marketing program. | 69. Miller Depo. 30:21-23 (Dyer Decl., Ex. "A," p. 12). |
| 70.  Herbalife sells nutritional supplements, vitamins, and skin care products. | 70. Miller Depo. 30:24-31:4 (Dyer Decl., Ex. "A," p. 12-13). |
| 71.  Herbalife's sales force are "independent contractors" and the first level of independent contractors are referred to as "distributors." | 71. Miller Depo. 31:12-14 (Dyer Decl., Ex. "A," p. 13). |
| 72.  Herbalife distributors have the right to buy products at a discount for use or resale and to recruit others into the program. | 72. Miller Depo. 31:15-21, 33:6-10 (Dyer Decl., Ex. "A," p. 13, 14). |
| 73.  Herbalife distributors can qualify to become a "supervisor" by ordering a minimum amount (several thousand dollars) in products, measured by suggested retail price, from Herbalife in one or two (consecutive) months. | 73. Miller Depo. 36:22-37:14 (Dyer Decl., Ex. "A," p. 15-16). |

| **UNCONTROVERTED FACT** | **SUPPORTING EVIDENCE** |
|---|---|
| 74. Herbalife supervisors must meet certain order requirements to maintain the status of supervisor. | 74. Miller Depo. 38:13-39:8 (Dyer Decl., Ex. "A," p. 17-18). |
| 75. Herbalife supervisors are entitled to receive a royalty override on up to three generations of "downline" supervisors. | 75. Miller Depo. 36:22-37:14 (Dyer Decl., Ex. "A," p. 15-16).<br><br>"Sales & Marketing Plan and Business Rules," p. 11 (Dyer Decl., Ex. "D," p. 64). |
| 76. The royalty override gives the Herbalife supervisor a percentage commission on orders placed by downline supervisors. | 76. Miller Depo. 73:3-20 (Dyer Decl., Ex. "A," p. 27). |
| 77. Herbalife supervisors and those they recruit must continue to purchase a minimum amount of product each month from Herbalife to qualify the supervisor for the royalty override. | 77. Miller Depo. 73:3-20 (Dyer Decl., Ex. "A," p. 27).<br><br>"Sales & Marketing Plan and Business Rules," p. 11 (Dyer Decl., Ex. "D," p. 64). |

| | **UNCONTROVERTED FACT** | **SUPPORTING EVIDENCE** |
|---|---|---|
| 78. | Herbalife supervisors receive the right to sell the products and earn compensation based on product orders made by the supervisor's recruits. | 78. "Live the Good Life with Herbalife," p. 21-22 (Dyer Decl., Ex. "C," p. 59-60). |
| 79. | Advancement at Herbalife "is not based on retail.  It's based on volume purchased from the company." | 79. McKee Depo. 90:22-91:15 (Dyer Decl., Ex. "F," p. 109-110). |
| 80. | Herbalife does not keep track of retail sales. | 80. Greenberg Depo. 117:3-5 (Dyer Decl., ¶ 6, Ex. "E," p. 80). |
| 81. | In Herbalife's Marketing Plan, which is shaped like a pyramid, retail sales are unrelated to advancement. | 81. "Live the Good Life with Herbalife," p. 22 (Dyer Decl., Ex. "C," p. 60). |
| 82. | Herbalife's Marketing Plan, which is shaped like a pyramid, does not mention retail sales or retail customers in any way. | 82. "Live the Good Life with Herbalife," p. 22 (Dyer Decl., Ex. "C," p. 60). |
| 83. | The bottom level of Herbalife's Marketing Plan is "Distributor"—not "customer." | 83. "Live the Good Life with Herbalife," p. 22 (Dyer Decl., Ex. "C," p. 60). |

| **UNCONTROVERTED FACT** | **SUPPORTING EVIDENCE** |
|---|---|
| 84. To earn royalty overrides on downline orders, Herbalife supervisors must certify that they have made sales to ten retail customers in the past month. | 84. Greenberg Depo. 248:4-249:6 (Dyer Decl., ¶ 6, Ex. "E," p. 88-89).<br><br>"Sales & Marketing Plan and Business Rules," p. 42 (Dyer Decl., Ex. "D," p. 65). |
| 85. To receive a royalty override, Herbalife supervisors must certify that they have sold at least 70% of products "they retain for resale" to either other Herbalife distributors or retail customers. | 85. Miller Depo. 41:14-21 (Dyer Decl., Ex. "A," p. 19). |
| 86. In his deposition, McKee, Herbalife's Vice President of Business Development (Sales), admitted that he did not know what the "70% rule" was. | 86. McKee Depo. 127:16-20 (Dyer Decl., Ex. "F," p. 112). |
| 87. McKee doesn't train on the 70% rule because he does not consider it to be "exciting stuff." | 87. McKee Depo. 127:21-128:9 (Dyer Decl., Ex. "F," p. 112-113). |
| 88. Herbalife has a buyback policy. | 88. "Sales & Marketing Plan and Business Rules," p. 44 (Dyer Decl., Ex. "D," p. 66). |

| **UNCONTROVERTED FACT** | **SUPPORTING EVIDENCE** |
|---|---|
| 89. Herbalife allows mere certification by distributors and does not even request the names of the ten customers. | 89. Miller Depo. 63:5-9 (Dyer Decl., Ex. "A," p. 24).<br><br>"Sales & Marketing Plan and Business Rules," p. 42 (Dyer Decl., Ex. "D," p. 65). |
| 90. Herbalife has distributors sign a "certification form" that contains no information whatsoever about the retail customer, the contact information of the customer, the products sold, or the price paid for the products. | 90. "Sales & Marketing Plan and Business Rules," p. 42 (Dyer Decl., Ex. "D," p. 65). |
| 91. Instead of random audits, Herbalife claims that it conducts a small number of audits by merely contacting distributors and requesting the names of the distributors' ten customers. | 91. Miller Depo. 62:14-20, 69:10-14 (Dyer Decl., Ex. "A," p. 23, 25) (stating that Herbalife conducts about 100 10-customer audits per month, even though Herbalife claims to have over 1.5 million distributors. *See* Dyer Decl., Ex. "I," p. 130). |
| 92. McKee, who is the primary "link between Herbalife and its mid-level to top Supervisors" testified that he does not know the | 92. McKee Depo. 23:16-25:15, 107:1-6 (Dyer Decl., Ex. "F," p. 102-104, 111). |

| **UNCONTROVERTED FACT** | **SUPPORTING EVIDENCE** |
|---|---|
| requirements of Herbalife's 10-customer rule. | |
| 93. The 10-customer rule is difficult to understand, even for the person at Herbalife who is responsible for enforcing it. | 93. Miller Depo. 12:4-17, 41:14-21 (Dyer Decl., Ex. "A," p. 7, 19). |
| 94. Herbalife leaves the training of the rules to the independent distributors who are not agents or employees of Herbalife and who themselves lack experience and training to train the members of this requirement. | 94. Miller Depo. 62:14-20, 69:10-14 (Dyer Decl., Ex. "A," p. 23, 25). |
| 95. There are no educational or other requirements to be a Herbalife distributor. | 95. Greenberg Depo. 63:12-14 (Dyer Decl., ¶ 6, Ex. "E," p. 74). |
| 96. Herbalife could require customers to submit a monthly list of retail customers and make blind, random calls to corroborate the validity of the list. | 96. "Sales & Marketing Plan and Business Rules," p. 42 (Dyer Decl., Ex. "D," p. 65). |

| | **UNCONTROVERTED FACT** | **SUPPORTING EVIDENCE** |
|---|---|---|
| 97. | Herbalife's distributors simply "certify" that they have complied with the 70% rule. | 97. "Sales & Marketing Plan and Business Rules," p. 42 (Dyer Decl., Ex. "D," p. 65). |
| 98. | Herbalife's distributors only certify that 70% of the product they "hold for resale" has been sold. | 98. "Sales & Marketing Plan and Business Rules," p. 42 (Dyer Decl., Ex. "D," p. 65). |
| 99. | Despite having attended 500 to 1,000 Herbalife trainings, McKee did not know what the 70% rule was and could not recall any training or explanation of the rule occurring at those 500-1,000 Herbalife events. | 99. McKee Depo. 127:16-20, 129:10-13 (Dyer Decl., Ex. "F," pp. 112, 114). |
| 100. | Herbalife's chief rule enforcer is uncertain as to the requirements of the "difficult" 70% rule. | 100. Miller Depo. 14:21-15:4, 19:12-18, 41:14-21 (Dyer Decl., Ex. "A," p. 8-10, 19). |
| 101. | Herbalife does not conduct routine audits to ensure compliance with the 70% rule. | 101. Miller Depo. 25:5-20 (Dyer Decl., Ex. "A," p. 11). |
| 102. | Current Herbalife distributors are not eligible for any buyback. | 102. "Sales & Marketing Plan and Business Rules," p. 44 (Dyer Decl., Ex. "D," p. 66). |

| **UNCONTROVERTED FACT** | **SUPPORTING EVIDENCE** |
|---|---|
| 103. Herbalife distributors who request a buyback suffer a permanent loss of their distributorships. | 103. "Sales & Marketing Plan and Business Rules," p. 44 (Dyer Decl., Ex. "D," p. 66). |
| 104. Herbalife will not buy back product from an active distributor or even an inactive distributor who has not "permanently" resigned. | 104. "Sales & Marketing Plan and Business Rules," p. 44 (Dyer Decl., Ex. "D," p. 66). |
| 105. A distributor requesting a buyback must first permanently resign his/her distributorship in writing. | 105. "Sales & Marketing Plan and Business Rules," p. 44 (Dyer Decl., Ex. "D," p. 66). |
| 106. A distributor that requests a buyback loses all royalties, commissions, bonuses, and discounts from Herbalife. | 106. Greenberg Depo. 264:11-21 (Dyer Decl., ¶ 6, Ex. "E," p. 92). |
| 107. If a distributor asks for a buyback, the distributor and the distributor's upline are retroactively charged back on their royalty bonus checks. | 107. "Sales & Marketing Plan and Business Rules," p. 43 (Dyer Decl., Ex. "D," p. 65-66). |
| 108. Herbalife's agreements and rules state that a former distributor is subject to Herbalife's 3-year covenant not to compete and the 1-year non-solicitation provision. | 108. Herbalife Distributor Agreements (Dyer Decl., Ex. "G," pp. 120-125). "Sales & Marketing Plan and Business Rules," p. 44 (Dyer Decl., Ex. "D," p. |

| **UNCONTROVERTED FACT** | **SUPPORTING EVIDENCE** |
|---|---|
| | 66). |
| 109. To obtain a buyback, the former Herbalife distributor must sign an agreement that states that the former distributor agrees to Herbalife's various buyback terms and rules. | 109. "Sales & Marketing Plan and Business Rules," p. 44 (Dyer Decl., Ex. "D," p. 66). |
| 110. To obtain a buyback, the former Herbalife distributor must also provide a complete, detailed written inventory of product to be returned. | 110. "Sales & Marketing Plan and Business Rules," p. 45 (Dyer Decl., Ex. "D," p. 67). |
| 111. To obtain a buyback, the former Herbalife distributor must also provide cancelled checks and credit card statements proving the purchase of each item on the inventory. | 111. "Sales & Marketing Plan and Business Rules," p. 44 (Dyer Decl., Ex. "D," p. 66). |
| 112. To obtain a buyback, the former Herbalife distributor must also provide two years of records of sales to his/her retail customers and downline. | 112. "Sales & Marketing Plan and Business Rules," p. 44 (Dyer Decl., Ex. "D," p. 66). |

| **UNCONTROVERTED FACT** | **SUPPORTING EVIDENCE** |
|---|---|
| 113. Herbalife's buyback offer is discretionary based on Herbalife's determinations of condition of the product and other factors. | 113. "Sales & Marketing Plan and Business Rules," p. 44 (Dyer Decl., Ex. "D," p. 66). |
| 114. When it provides its buyback refund, Herbalife does not return its 10-11% handling charges that were originally paid on the product and the former distributor must pay the shipping charges to return the product to Herbalife. | 114. "Sales & Marketing Plan and Business Rules," p. 44 (Dyer Decl., Ex. "D," p. 66).<br><br>Greenberg Depo. 264:11-265:10 (Dyer Decl., ¶ 6, Ex. "E," p. 92-93). |
| 115. Herbalife's top official in charge of the department that enforces the 10-customer and 70% rules does not know whether Herbalife's policies are effective and does not think that Herbalife has conducted any studies to determine whether the rules are effective to promote sales outside of Herbalife. | 115. Miller Depo. 14:21-15:4, 19:12-18, 94:23-95:13, 96:5-8 (Dyer Decl., Ex. "A," p. 8-10, 28-30). |
| 116. Herbalife does not keep any records relating to its distributors' retail sales and does not know the names of its retail customer. | 116. Greenberg Depo. 117:3-5, 251:13-252:17 (Dyer Decl., ¶ 6, Ex. "E," pp. 80, 90-91). |

| **UNCONTROVERTED FACT** | **SUPPORTING EVIDENCE** |
|---|---|
| 117. Counterclaimants are in competition with Herbalife. | 117. Complaint at ¶¶ 25-35. |
| 118. In an email sent to all members of its "TAB Team" on February 6, 2007, Herbalife claimed that Herbalife had achieved a "record $3 Billion in retail sales in 2006." | 118. February 6, 2007 Email from Herbalife's Tom Zimmer to TAB Team Members (Dyer Decl., Ex. "I," p. 126). |
| 119. Herbalife also included a hyperlink in its February 6, 2007 email that invited its TAB Team members to download a document called: "Herbalife…A Proven Success." | 119. February 6, 2007 Email from Herbalife's Tom Zimmer to TAB Team Members (Dyer Decl., Ex. "I," p. 127). |
| 120. The document titled: Herbalife…A Proven Success" claimed that Herbalife had "record retail sales of $3 billion in 2006 and still growing." | 120. February 6, 2007 Email from Herbalife's Tom Zimmer to TAB Team Members (Dyer Decl., Ex. "I," p. 130). |
| 121. Herbalife does not keep records of its retail sales. | 121. Greenberg Depo. 117:3-5 (Dyer Decl., ¶ 6, Ex. "E," p. 80). |
| 122. Herbalife did not receive gross revenues or retail sales of $3 | 122. Herbalife's 2006 Annual Report (Dyer Decl., Ex. "B," pp. 54-56). |

| **UNCONTROVERTED FACT** | **SUPPORTING EVIDENCE** |
|---|---|
| billion in 2006. | |
| 123. Herbalife's "product sales," which represent the purchase price paid to Herbalife by its distributors, were $1.627 billion in 2006. | 123. Herbalife's 2006 Annual Report (Dyer Decl., Ex. "B," p. 55). |
| 124. Herbalife's "net sales," which include Herbalife's income from shipping and handling on its products, were $1.885 billion in 2006. | 124. Herbalife's 2006 Annual Report (Dyer Decl., Ex. "B," p. 54). |
| 125. The document titled: Herbalife…A Proven Success" claimed that" [i]n 2006, Herbalife Supervisors were paid $2.2 billion in commissions, royalties, and bonuses." | 125. February 6, 2007 Email from Herbalife's Tom Zimmer to TAB Team Members (Dyer Decl., Ex. "I," p. 130). |
| 126. Herbalife's product sales in 2006 were $1.627 billion. | 126. Herbalife's 2006 Annual Report (Dyer Decl., Ex. "B," p. 55). |
| 127. Herbalife's 2006 10-K showed that "Royalty overrides" for 2006 were $675 million. | 127. Herbalife's 2006 Annual Report (Dyer Decl., Ex. "B," p. 54). |
| 128. Herbalife advertises that its | 128. December 22, 2008 Video titled: |

| **UNCONTROVERTED FACT** | **SUPPORTING EVIDENCE** |
|---|---|
| business opportunity is "recession proof." | "Why Herbalife, Why Now?" (Dyer Decl., ¶ 21, Ex. "T"). |
| 129. The video states: "Why Herbalife? Herbal-nomics.  It's recession proof . . .  This opportunity can be your answer . . . ." | 129. December 22, 2008 Video titled: "Why Herbalife, Why Now?" (Dyer Decl., ¶ 21, Ex. "T"). |
| 130. Mike Mckee, Herbalife's Vice President of Business Development (Sales), testified that no company was recession proof, including Herbalife. | 130. McKee Depo. 12:24-13:1, 13:8-11 (Dyer Decl., Ex. "F," p. 100-101). |

## CONCLUSIONS OF LAW

Based on the foregoing Undisputed Facts, the Court now makes its CONCLUSIONS OF LAW:

1.      The Court has jurisdiction over this action, pursuant to 28 U.S.C. § 1332(a)(1).

2.      Herbalife cannot meet its burden proving that Counterclaimants misappropriated Herbalife's trade secrets because (1) Herbalife has failed to identify its trade secrets with particularity, and (2) Herbalife has not produced its trade secrets and, thus, cannot prove that its trade secrets exist.

3.      Under California law, noncompetition covenants are to be closely scrutinized and narrowly construed, and will not be enforced unless they plainly fall within certain statutory exceptions. *Edwards v. Arthur Andersen LLP*, 189 P.3d 285, 290-91, 297 (Cal. 2008).

4.      California Business and Professions Code § 16600 provides that: "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."

5.      Herbalife's Rule 8-A is an illegal restraint of trade in violation of § 16600 and *Edwards* and is, therefore, unenforceable and cannot form the basis for Herbalife's claims for breach of contract, intentional interference with prospective advantage, interference with contract, and unfair competition.

6.      Because Rule 8-A was not enacted until September 1, 2006, Herbalife cannot meet its burden to prove that Rule 8-A should bind Jason Fisher, Robert Ford, or Julia Ford because: (1) Jason Fisher left Herbalife in January 2006 and (2) Robert and Julia Ford submitted their letter of resignation to Herbalife on September 1, 2006.

7.      Herbalife has not met its burden of proving that Counterclaimants are bound by a Confidential and Non-Disclosure Agreement ("CNDA") with Herbalife because it has not produced any admissible evidence showing that Counterclaimants assented to the terms of the CNDA.

8.      Herbalife has not met its burden of proving that Counterclaimants violated Herbalife Rules 8-B, 8-D, 8-G, and 8-H because: (1) Rule 8-B does not does not apply to former Herbalife distributors and no evidence has been presented that Counterclaimants breached this rule; (2) Rule 8-D, applies only to current Herbalife distributors; (3) Rule 8-G applies only to current Herbalife distributors and no evidence has been presented that Counterclaimants violated 8-G; and (4) Rule 8-H applies only to current Herbalife distributors.

9.      Herbalife has not met its burden of proving fraud as to Nancy Roth (or any of the other Counterclaimants) because: (1) Herbalife did not rely on any conduct by Ms. Roth, (2) Herbalife denied Ms. Roth's request, and (3) Herbalife suffered no damages.

10.     California Penal Code section 327 makes it a public offense for any person to operate "any scheme for the disposal or distribution of property whereby a participant pays a valuable consideration for the chance to receive compensation for introducing one or more additional persons into participation in the scheme or for the chance to receive compensation when a person introduced by the participant introduces a new participant."

11.     Herbalife is operating an Endless Chain (Pyramid) Scheme in violation of California Penal Code section 327 because: (1) Herbalife focuses on promoting its "business opportunity" as opposed to selling its products at the retail level; (2) Herbalife's advancement, royalty, and bonus system is based upon purchases from Herbalife—not sales to retail customers; (3) Herbalife's policies, including the 10-customer rule and the 70% rule are not effective because they are not adequately enforced; (4) Herbalife's polices, including the 10-customer rule and the 70% rule are not effective because they are confusing; and (5) Herbalife's buyback policy is ineffective on its face because it does not fully refund the price of the product and it does not reduce or eliminate the possibility of inventory loading.

12.     Herbalife has engaged in false advertising in violation of California Business & Professions Code section 17500, *et seq.*, because (1) Herbalife falsely claims that it had $3 billion in retail sales in 2006; (2) Herbalife falsely claims that its Supervisors were paid $2.2 billion in commissions, royalties, and bonuses in 2006; (3) Herbalife falsely advertises that its business opportunity is "recession proof;" and (4) Herbalife is operating an Endless Chain (Pyramid) scheme in violation of *Omnitrition* and California Penal Code section 327 and an Endless Chain scheme is inherently false and misleading.

13.     Herbalife has engaged in unlawful, unfair, and deceptive business practices in violation of California Business & Professions Code section 17200

because: (1)   Herbalife's Rule 8-A and its three-year non-compete covenant in paragraph 4 of the Distributor Agreement are illegal restraints on trade, (2) Herbalife's prohibition on a distributor's using his or her own business information is also an illegal restraint on trade; and(3) Herbalife is an illegal Endless Chain (Pyramid) Scheme in violation of California Penal Code section 327 and *Omnitrition*.

14.     To the extent that any of these Conclusions of Law are more fittingly denominated as an Uncontroverted Fact, or *vice versa*, they shall be so construed.

15.     Judgement shall be entered in Counterclaimants' favor consistent herewith.

Dated: March _____, 2009


_____
THE HONORABLE GARY A. FEESS
UNITED STATES DISTRICT JUDGE


Separate Statement of Uncontroverted Facts and Conclusions of Law submitted by Defendants and Counterclaimants.

Dated:  March 2, 2009


STEPHENS FRIEDLAND LLP                    MIXON JOLLY LLP


By: /s/John B. Stephens_____          By: /s/Cameron M. Jolly_____
    Todd G. Friedland                          Cameron M. Jolly
    J. Gregory Dyer                             Attorney for Defendants and
    Attorney for Defendants and                 Counterclaimants Jeff Orr and
    Counterclaimants Robert E. Ford,            Nancy Orr
    Julia A. Ford,Bruce H. Roth,
    Nancy A. Roth, Dianna N.
    Thompson and Jason Fisher