CHARLES E. PATTERSON (CA SBN 120081)
CPatterson@mofo.com
NANCY R. THOMAS (CA SBN 236185)
NThomas@mofo.com
SEAN P. GATES (CA SBN 186247)
SGates@mofo.com
MORRISON & FOERSTER LLP
555 West Fifth Street
Los Angeles, California 90013-1024
Telephone: 213.892.5200
Facsimile: 213.892.5454

Attorneys for Plaintiff
HERBALIFE INTERNATIONAL OF AMERICA, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| Herbalife International of America, Inc., a Nevada Corporation,<br><br>Plaintiff,<br><br>v.<br><br>Robert E. Ford and Julia A. Ford, husband and wife; Bruce H. Roth and Nancy A. Roth, husband and wife; Jeff Orr and Kathy Orr, husband and wife; Dianna N. Thompson; and Jason Fisher,<br><br>Defendants. | Case No. CV 07 2529 GAF (FMOx)<br><br>Hon. Gary A. Feess<br><br>**DECLARATION OF PAUL GREENBERG IN SUPPORT HERBALIFE INTERNATIONAL OF AMERICA, INC.'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>Date: June 1, 2009<br>Time: 9:30 a.m.<br>Courtroom: 740-Roybal |

la-1027093

I, Paul Greenberg, declare as follows:

1. I am an attorney licensed to practice law in the State of California and am Senior Vice President, Counsel for Herbalife International of America, Inc. ("Herbalife"). I have personal knowledge of the facts set forth herein, and if sworn as a witness, I could and would testify competently thereto.

2. Beginning in late 2006, Herbalife management received numerous complaints from Herbalife distributors regarding the Defendants in this case.

3. Herbalife distributors complained that Defendants were raiding their downlines. For example, attached hereto as Exhibits A, B, C, D and E are true and correct copies of communications Herbalife received from its distributors complaining that Defendants were soliciting people in their downlines to join Melaleuca. According to one of these distributors, for instance, a Defendant had been soliciting the distributor's downline and "bashing herbalife," a practice which the distributor described as "unethical" and "sleazy." (Exhibit A.) Another Herbalife distributor complained that Defendants "confuse [Herbalife distributors'] downline like crazy" and "then prey on Herbalife distributors in particular," which she called "unethical." (Exhibit B.)

4. Herbalife distributors also complained that Defendants were threatening to take the distributor's downline to Melaleuca unless they joined Melaleuca. Some Herbalife distributors called this practice "blackmail." For example, attached hereto as Exhibit F is a true and correct copy of a communication log (described below in Paragraph 12) and written statement of an Herbalife distributor stating that Defendants threatened that if the distributor "didn't join they'll call my downline – blackmail." (*See* HL000338 and HL000341.)

5. Other Herbalife distributors indicated that Defendants gained an entrée by falsely represented they are still with Herbalife.

6. Some Herbalife distributors complained that Defendants used Herbalife records to contact their downlines. For example, one distributor

complained that Defendants used logs of an Herbalife training event (Success Training Seminar (STS)) to obtain the contact information of Herbalife distributors and to "steal my team." (Exhibit B.)

7. Some Herbalife distributors complained that Defendants were disparaging them and Herbalife to their downlines. For instance, one distributor complained that Defendants were "saying horrible things about us and Herbalife." (Exhibit C.)

8. Herbalife received numerous similar complaints regarding Defendants.

9. Several Herbalife distributors requested that Herbalife take action to stop this conduct. (*See, e.g.*, Exhibits D, E.)

10. Based on these Herbalife distributor complaints, Herbalife management was concerned that Defendants' conduct was and could continue to disrupt Herbalife's business and negatively impact its distributors.

11. It is Herbalife's regular practice to receive and keep complaints from its distributors. Each of the communications from Herbalife distributors attached to this declaration as Exhibits A-E were received and kept in the normal course of Herbalife's business.

12. It is also Herbalife's regular practice to create electronic logs of communications regarding its distributors for whom Herbalife is investigating an ethics complaint. In these logs, employees in Herbalife's ethics department record notes of telephone conversations with Herbalife distributors and copy the text of written communications with those distributors. Exhibit F is a true and correct copy of a print out of such a log for David Schmaman, attaching a handwritten statement by Mr. Schmaman. This log was created and kept in the normal course of Herbalife's business.

13. Prior to February 2007, I and others in Herbalife management became aware that Defendants were representing that Melaleuca products are "safe and nontoxic." We also became aware of scientific studies and articles concerning the

safety and toxicity of Melaleuca products, which indicated to us that Defendants' representations were not true. Studies and articles on this subject include:

    a. An article entitled "Melaleuca Claims That It Markets Safer Products Than Its Competitors. Nothing Could Be Farther From The Truth" published in Protegez-Vous, October 2004, a true and correct copy of which is attached hereto as Exhibit G.

    b. A Final Report TM STUDY 96-14, conducted for Natural World by Tox Monitor Laboratories, Inc., dated February 16, 1996, a true and correct copy of which is attached hereto as Exhibit H. This Report states on page 7, "Mela Magic Industrial Strength Cleaner, Lot #10039224524 would be classified in Toxicity Category IV for oral effects in accordance with EPA/FIFRA Regulations."

    c. A Final Report TM STUDY 96-15, conducted for Natural World by Tox Monitor Laboratories, Inc., dated February 16, 1996, a true and correct copy of which is attached hereto as Exhibit I. This Report states on page 7, "Tub N Tile Bathroom Cleaner, Lot #10042223882 would be classified in Toxicity Category IV for oral effects in accordance with EPA/FIFRA Regulations."

    d. A Final Report TM STUDY 96-16, conducted for Natural World by Tox Monitor Laboratories, Inc., dated February 16, 1996, a true and correct copy of which is attached hereto as Exhibit J. This Report states on page 7, "Sol-U-Guard Citrus Scent Disinfectant, Lot #10011223943 would be classified in Toxicity Category IV for oral effects in accordance with EPA/FIFRA Regulations."

e. A Department of Health & Human Services Memorandum from Contaminants Standards Monitoring and Programs Branch, HFS-308 to Connie Hardy HFS-456 regarding Toxicity of *Melaleuca alternifolia* Cheel dated October 21, 1993, a true and correct copy of which is attached hereto as Exhibit K.

f. An article entitled "Melaleuca Oil Poisoning in a 17-Month-Old" published in Veterinary and Human Toxicology, Volume 37, Number 6, dated December 1995, a true and correct copy of which is attached hereto as Exhibit L.

g. An article entitled "Melaleuca Oil Poisoning" published in Clinical Toxicology, 32(4), 461-464 (1994), a true and correct copy of which is attached hereto as Exhibit M.

h. An article entitled "A Review – Antimicrobial activity of the essential oil of *Melaleuca alternifolia*" published in Letters in Applied Microbiology 1993, 16, 49-55, a true and correct copy of which is attached hereto as Exhibit N.

i. An article entitled "Toxicity of Melaleuca Oil and Related Essential Oils Applied Topically on Dogs and Cats" published in Scientific Reviews, a true and correct copy of which is attached hereto as Exhibit O.

j. An article entitled "Melaleuca Product Tips: The Medicine Chest," which states that customers use Melaleuca because they are changing to "Non-Toxic, Safer products," and then advocates the application, inhalation, or ingestion of various Melaleuca products to cure or alleviate the symptoms of diseases and ailments such as shingles, arthritis, asthma, bronchitis, athlete's foot, ringworm, eczema, lice, psoriasis, and

others. A true and correct copy of this article is attached hereto as Exhibit P.

14. In response to its distributors' concerns, Herbalife sent cease-and-desist letters to Robert Ford and Jason Fisher in February 2007. It also sent a letter to the Direct Selling Association complaining that this type by Melaleuca distributors violated the Association's ethical rules. To inform its distributors of these actions, Herbalife sent an email to Herbalife TAB Team Members (a subset of Herbalife distributors). The email contained links to demand letters sent to Messrs. Ford and Fisher as well as to a letter sent by Herbalife to the Direct Sales Association. A true and correct copy of this email is attached hereto as Exhibit Q.

15. The distributor complaints, scientific studies, and articles described above formed part of the basis for the statements in Exhibit Q.

16. After receiving further complaints from its distributors regarding Defendants' conduct, Herbalife brought this suit. Also in response to its distributors' continuing concerns, Herbalife sent an email to Herbalife President Team Members (a smaller subset of Herbalife distributors) informing them that Herbalife had filed suit against the Defendants. A true and correct copy of this email is attached hereto as Exhibit R.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration was executed on May 1, 2009, at Los Angeles, California.

*/s/ Paul Greenberg*
Paul Greenberg