CHARLES E. PATTERSON (CA SBN 120081)
CPatterson@mofo.com
NANCY R. THOMAS (CA SBN 236185)
NThomas@mofo.com
SEAN P. GATES (CA SBN 186247)
SGates@mofo.com
MORRISON & FOERSTER LLP
555 West Fifth Street
Los Angeles, California 90013-1024
Telephone: 213.892.5200
Facsimile: 213.892.5454

Attorneys for Plaintiff and Counterclaim Defendant
Herbalife International of America, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| Herbalife International of America, Inc., a Nevada Corporation, <br><br> Plaintiff, <br><br> v. <br><br> Robert E. Ford and Julia A. Ford, husband and wife; Bruce H. Roth and Nancy A. Roth, husband and wife; Jeff Orr and Kathy Orr, husband and wife; Dianna N. Thompson; and Jason Fisher, <br><br> Defendants. | Case No. CV 07 2529 GAF (FMOx) <br><br> Hon. Gary A. Feess <br><br> **HERBALIFE INTERNATIONAL OF AMERICA, INC.'S OPPOSITION TO DEFENDANTS' AND COUNTERCLAIMANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> Date: June 1, 2009 <br> Time: 9:30 a.m. <br> Courtroom: 740-Roybal |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

FACTUAL BACKGROUND ....................................................................................2

I.   HERBALIFE'S BUSINESS STRUCTURE AND TRADE SECRETS .........2

    A.   Herbalife's Trade Secrets ...................................................................2

    B.   Herbalife's Efforts to Protect Its Confidential Information ................3

II.  DEFENDANTS MISUSE HERBALIFE'S CONFIDENTIAL INFORMATION TO RAID HERBALIFE'S DISTRIBUTORS ...................4

III. THE PARTIES' CLAIMS ..........................................................................6

    A.   Herbalife's Claims ..............................................................................6

    B.   Defendants' Counterclaims .................................................................7

GOVERNING STANDARD ...................................................................................8

ARGUMENT ..........................................................................................................8

IV.  DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON HERBALIFE'S CLAIMS ...........................................8

    A.   Herbalife's Breach of Contract Claim ................................................8

        1.   Herbalife Has Adequately Identified Its Trade Secrets .............9

        2.   Rule 8-A is Valid and Enforceable .........................................10

        3.   The Roths, the Fords, the Orrs and Thompson Agreed to the CNDAs ...........................................................................12

    B.   Herbalife's Misappropriation of Trade Secrets Claim ......................12

    C.   Herbalife's IIPEA, IIC, and Unfair Competition Claims ..................13

V.   DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THEIR COUNTERCLAIMS ........................................14

    A.   Defendants' Endless Chain Scheme Claim .......................................15

        1.   Herbalife Focuses on Product Sales .........................................16

        2.   Herbalife's rules, which Herbalife enforces, promote retail sales .............................................................................18

    B.   Defendants' False Advertising and Unfair Competition Claims ........21

        1.   Defendants Are Not Entitled to Summary Judgment on Their False Advertising Claims .............................................22

        2.   Defendants Are Not Entitled to Summary Judgment on Their Unfair Competition Claim ............................................24

CONCLUSION .....................................................................................................25

i

# TABLE OF AUTHORITIES

**CASES**                                                                    **Page(s)**

*Buskuhl v. Family Life Ins. Co.*,
    271 Cal. App. 2d 514 (1969) ...................................................................11

*Cal. v. Campbell*,
    138 F.3d 772 (9th Cir. 1998) ....................................................................8

*Chavez v. Blue Sky Natural Beverage Co.*,
    503 F. Supp. 2d 1370 (N.D. Cal. 2007)...................................................23

*Consumer Advocates v. Echostar Satellite Corp.*,
    113 Cal. App. 4th 1351 (2003) ...............................................................23

*Daro v. Super. Ct.*,
    151 Cal. App. 4th 1079 (2007) ...............................................................24

*Edwards v. Arthur Andersen LLP*,
    44 Cal. 4th 937 (2008) ............................................................................11

*Gordon v. Landau*,
    49 Cal. 2d 690 (1958) ..............................................................................11

*Green v. Sun Life Assurance Co.*,
    383 F. Supp. 2d 1224 (C.D. Cal. 2005) ....................................................8

*Hall v. Time Inc.*,
    158 Cal. App. 4th 847 (2008) .................................................................24

*Hauk v. JP Morgan Chase Bank USA*,
    552 F.3d 1114 (9th Cir. 2009) ..................................................................8

*In re Amway Corp.*,
    93 F.T.C. 618 (1979) ...............................................................................18

*In re Koscot Interplanetary, Inc.*,
    86 F.T.C. 1106 (1975) .............................................................................15

*Ingrassia v. Bailey*,
    172 Cal. App. 2d 117 (1959) ...................................................................11

ii

1
2

**TABLE OF AUTHORITIES**
**(Continued)**

Page(s)

3

*K.C. Multimedia, Inc. v. Bank of Am. Tech. & Operations Inc.,*
171 Cal. App. 4th 939 (2009) ............................................................. 14

4

5

*Klamath-Orleans Lumber, Inc. v. Miller,*
87 Cal. App. 3d 458 (1978) ......................................................... 10, 11

6

7

*Loral Corp. v. Moyes,*
174 Cal. App. 3d 268 (1985) ............................................................. 11

8

9

*MAI Systems Corp. v. Peak Computer, Inc.,*
991 F.2d 511 (9th Cir. 1993) ............................................................. 11

10

11

*McCormick v. The Fund Am. Cos.,*
26 F.3d 869 (9th Cir. 1994) ............................................................... 8

12

13

*Morlife, Inc. v. Perry,*
56 Cal. App. 4th 1514 (1997) ............................................................ 11

14

15

*State Farm Mut. Auto. Ins. Co. v. Dempster,*
174 Cal. App. 2d 418 (1959) ............................................................. 11

16

17

*Trujillo v. First Am. Registry, Inc.,*
157 Cal. App. 4th 628 (2007) ............................................................ 24

18

*VFD Consulting, Inc. v. 21st Servs.,*
425 F. Supp. 2d 1037 (N.D. Cal. 2006) ........................................ 10, 12

19

20

*Wall Data Inc. v. Los Angeles County Sheriff's Dept.,*
447 F.3d 769 (9th Cir. 2006) ............................................................ 12

21

22

*Webb v. West Side Dist. Hosp.,*
144 Cal App. 3d 946 (1983) ............................................................. 11

23

24

*Webster v. Omnitrition Int'l, Inc.,*
79 F.3d 776 (9th Cir. 1996) ......................................................passim

25

26

27

28

iii

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

**STATUTES**

Business & Professions Code § 17500 ..................................................................7

Cal. Penal Code § 327 ..........................................................................................7

California Business & Professions Code § 17200 ................................................7


**OTHER AUTHORITIES**

Fed. R. Evid. 807 .................................................................................................13

iv

**INTRODUCTION**

Defendants are eight former Herbalife distributors who used Herbalife's trade secrets and otherwise breached their agreements with Herbalife to solicit its current distributors for a competing company, Melaleuca, Inc.  Having breached their contracts and violated their legal obligations to Herbalife, Defendants Robert and Julia Ford, Jason Fisher, Bruce and Nancy Roth, Jeff and Kathy Orr and Dianna Thompson (collectively "Defendants") now bring a motion for summary judgment in an attempt to call the company with which they obtained great success an endless chain scheme and void the contracts from which they benefited for years.

Defendants seek summary judgment on Herbalife's claims for (1) breach of contract; (2) misappropriation of trade secrets; (3) intentional interference with prospective economic advantage; (4) intentional interference with contract; (5) unfair competition; and (6) fraud.  In doing so, they conveniently ignore this Court's Order granting Herbalife's preliminary injunction motion, in which the Court found that Herbalife presented substantial evidence that Defendants "misused protected information in competition with Herbalife."  (Order filed Dec. 11, 2007 [Dkt. No. 77] at 3.)  A year and a half after this Court's initial finding, discovery has produced even more evidence of Defendants' malfeasance and their concerted, coordinated efforts to lure and extort Herbalife distributors to their competing businesses using Herbalife's trade secrets.  Defendants have no basis on which to defeat Herbalife's claims.

Defendants also seek partial summary judgment on the following counterclaims: (1) unfair competition; (2) violation of the endless chain scheme law; and (3) false advertising.  These claims lack both evidentiary and legal support, and are undermined by the testimony of the Defendants themselves. Summary judgment is not warranted on any of these claims.  The Court should deny Defendants' motion in its entirety.

1

**FACTUAL BACKGROUND**

**I.      HERBALIFE'S BUSINESS STRUCTURE AND TRADE SECRETS**

Herbalife is a world leader in developing consumer health care-related products, including dietary supplements.  It is a direct sales company that retails its products through a network of independent distributors.  (Additional Material Facts ("AMF"), Statement of Genuine Issues in Support of Herbalife's Opposition to Counterclaimants' Motion for Partial Summary Judgment ¶ 131.)

Distributors purchase Herbalife products at wholesale prices for personal use and resale, and they earn commissions on the sale of products for which they are directly or indirectly responsible.  (AMF ¶ 132.)  To increase the profitability of participating in Herbalife, distributors may recruit and sponsor others who use and sell Herbalife products; those new distributors, in turn, may recruit and sponsor others who use and sell products.  (AMF ¶ 133.)  Each distributor's organization of directly and indirectly sponsored distributors is known as his "downline."  (AMF ¶ 134.)  The sponsor who recruited the distributor into Herbalife, as well as those above that sponsor, are known as the distributor's "upline."  (*Id.*)  A distributor's upline and downline are called the distributor's "lineage."

Each distributor who joins the organization enters into a contractual relationship with Herbalife, not with the sponsoring distributor.  Herbalife, like other direct sales companies, relies heavily on its distributor network to promote and sell its products.  (AMF ¶ 135.)

**A.      Herbalife's Trade Secrets**

Herbalife maintains detailed information concerning the lineage and performance of its distributor network, including the relationships among distributors (e.g., uplines and downlines), each distributor's performance and compensation-related statistics, the sales volume for which each distributor is directly or indirectly responsible, and compilations containing detailed contact information for each such distributor.  (AMF ¶ 136.)  This information is treated by

2

1  Herbalife as highly confidential and is critical to the company's survival.  (AMF

2  ¶ 137.)

3  　　　For business purposes, confidential information is made available to current

4  Herbalife distributors.  (AMF ¶ 139.)  For example, distributors have access to

5  "Indented Lineage Reports" that identify, for each person in a distributor's

6  downline, (a) the name of the distributor's sponsor; (b) where in the downline

7  organization the distributor is situated; (c) the bonus level applicable to each

8  distributor; (d) the distributor's sales volume and sales trend statistics; (e) the

9  number of new distributors recruited by each distributor; (f) other financial and

10 performance-related information for downline distributors; and (g) detailed contact

11 information for each such distributor.  (*Id.*)  Distributors also have access to

12 Royalty Override and Production Bonus statements containing confidential

13 information such as each distributor's sales volume and that of others downline

14 from that distributor. (AMF ¶ 140.)

15 　　　Herbalife, not the individual distributors, develops and maintains this sales,

16 lineage, contact and financial information for business purposes that include

17 calculating and distributing bonuses and commissions.  (AMF ¶ 136.)  As this

18 Court found in issuing its preliminary injunction, there is "inherent value" in this

19 confidential information that Herbalife protects from falling into the hands of its

20 competitors. (*See* Dec. 11, 2007 Minute Order at 2.)[1]

21 　　　**B.　　Herbalife's Efforts to Protect Its Confidential Information**

22 　　　To protect Herbalife's trade secrets, each Herbalife distributor must enter

23 into a Distributorship Agreement that provides they will, for three years after

24 leaving Herbalife, "hold in confidence any trade secrets, formulas, sales and

25 　　　　　[1] Melaleuca agrees.  As Melaleuca President and CEO Frank VanderSloot

26 explained to the FTC, "Melaleuca considers its list of Marketing Executives and
   customers to be highly confidential and proprietary. This list literally is Melaleuca's

27 most valuable asset. Competitor companies and their distributors would love to get
   their hands on even a small portion of the list."  (AMF ¶ 138.)

28

3

la- 1028745

1   distribution systems, business information, and literature which Distributor

2   acquired during the terms of this agreement and will not use directly or indirectly

3   such items."  (AMF ¶ 141.)[2]

4        To access Herbalife's website, which contains confidential sales and lineage

5   information, a distributor must agree to a Confidentiality and Non-Disclosure

6   Agreement ("CNDA").  It provides, for a period of three years after termination, the

7   distributor will not "use or disclose the Confidential Information for any purpose

8   other than promoting Herbalife," or "use the Confidential Information to solicit any

9   Distributor or Customer of Herbalife."  (AMF ¶ 142.)  "Confidential Information"

10  is defined by the agreement to include "[a]ll data and reports relating to my

11  downline or upline (collectively 'Lineage Reports')."  (*Id.*)

12       In addition, Herbalife's Rule 8-A provides that for one year after termination

13  of a distributorship, the former distributor will not "directly or indirectly … solicit,

14  promote, sponsor or recruit any Herbalife Distributor … they became aware of in

15  the course of their Herbalife Distributorship, to join … any multi-level marketing or

16  direct-sales company."  (AMF ¶ 145.)

17  **II.    DEFENDANTS MISUSE HERBALIFE'S CONFIDENTIAL**

18  **INFORMATION TO RAID HERBALIFE'S DISTRIBUTORS**

19       Each of the Defendants left Herbalife to join Herbalife's competitor,

20  Melaleuca.  (AMF ¶ 146.)  Melaleuca distributors earn money based on the product

21  sales of distributors they recruit to join the company.  (*Id.*)

22       Defendants launched a campaign to build their Melaleuca organizations by

23  raiding their former Herbalife organizations, using Herbalife's confidential

24  information.  For instance, in January 2007, defendants Jason Fisher and Robert

25  Ford persuaded Bruce and Nancy Roth to leave Herbalife to join Melaleuca.  (AMF

26  

27      [2] Although Herbalife's breach of contract claim is based, in part, on this three-year trade secret provision, its claim for misappropriation of trade secrets is not so limited.

28  

4

¶ 148.)  For the next month, while the Roths were still Herbalife distributors, the Roths, Fisher and Ford made plans to recruit away Herbalife distributors using Herbalife's confidential information.  (*Id.*)  Fisher and Ford told the Roths how to obtain their historical Herbalife lineage reports to use in their Melaleuca recruiting efforts, as Fisher and Ford had done when they left Herbalife.  (*Id.*)  Nancy Roth later asked Fisher for help converting her Herbalife paper lineage reports into digital format; Fisher had "an ex-Herbalifer in [his] downline who had software that could transfer over paper lineage reports."  (AMF ¶ 149.)  This was a hindrance to the Roths, because at their "peak with [Herbalife] we didn't have lineage reports in a digital format."  (*Id.*)

That same day, Ms. Roth asked Robert Ford if he had been "able to get [his] Distributor reports from Herbalife for years past," and he responded that "he had them in his tax files."  (AMF ¶ 150.)  Ms. Roth also asked Mr. Ford if he knew of a way to get lineage reports from Herbalife in digital format prior to May 2003, because "Herbalife Central only [went] back that far" in January 2007.  (*Id.*)  Ford, who had accessed Herbalife Central for the same reason, stated that he did "not believe you can go farther back than 2003."  (*Id.*)  Then, on the eve of their departure from Herbalife to Melaleuca, Nancy Roth e-mailed Herbalife to ask for copies of all of the Roths' lineage reports from the beginning of their association with Herbalife in 1995.  (AMF ¶ 151.)  She constructed an elaborate lie to convince Herbalife that it was "crucial" that she receive the reports by e-mail the following morning.  (*Id.*)

The Roths resigned from Herbalife on February 1, 2007.  (AMF ¶ 152.)  On that same day, they joined Jason Fisher and Robert Ford for a ten-day recruiting blitz, working continuously to solicit Herbalife distributors in the Roths' former downline.  (*Id.*)  Each of the Defendants made similar efforts.  (AMF ¶ 153.)

But Defendants did not simply solicit Herbalife distributors using Herbalife's confidential information.  Defendants engaged in various coercive and deceptive

5

recruiting tactics.  (AMF ¶ 153.)  For instance, Defendants have repeatedly sought to recruit Herbalife distributors to Melaleuca by threatening to "take [the distributor's] entire downline to Melaleuca" if the distributor would not convert to Melaleuca – a credible threat given the information they gained through their Herbalife distributorships and a practice that some Herbalife distributors describe as "blackmail."  (AMF ¶ 154.)

Defendants threatened to destroy the organizations that these distributors (not Defendants) had built unless they agreed to join Melaleuca, which Herbalife distributors decried as "unethical" and sleazy."  (AMF ¶ 155.)  Defendants have told distributors that people in their downline have already agreed to join Melaleuca – again a credible tale given their position as former distributors.  (AMF ¶ 156.)  Mr. Ford even told an Herbalife distributor that she should leave Herbalife because her upline supervisor would now "lose his house" because Ford left Herbalife.  (AMF ¶ 157.)  In addition, Defendants have solicited Herbalife distributors to not only leave Herbalife for Melaleuca, but to bring their downlines to Melaleuca as well (in breach of their contracts with Herbalife), increasing the pressure on upline Herbalife distributors.  (AMF ¶ 158.)   Defendants gained an entrée by falsely representing they were still with Herbalife, used Herbalife records to contact their downlines, and were "saying horrible things about  . . . Herbalife."  (AMF ¶ 159.)

## III.    THE PARTIES' CLAIMS

### A.    Herbalife's Claims

Herbalife brought suit, alleging that Defendants had breached their agreements with Herbalife by unlawfully soliciting Herbalife's distributors, misappropriating Herbalife's confidential information to build their Melaleuca businesses, violating their nondisclosure agreements, and making false representations about Herbalife and its competitor to lure Herbalife's distributors to Melaleuca.  Specifically, Herbalife alleged the following causes of action:

la- 1028745

(1) breach of contract, based on Defendants' solicitation and recruitment of Herbalife distributors in violation of Herbalife's rules, their failure to adhere to their non-disclosure agreements, and their misuse of confidential information;

(2) misappropriation of trade secrets, based on Defendants' use of lineage reports and other confidential information to target Herbalife distributors for solicitation to join Herbalife's competitor, Melaleuca;

(3) intentional interference with prospective economic advantage, based on Defendants' inducements to Herbalife's distributors to breach their contracts and Defendants' misrepresentations regarding Melaleuca's business opportunity, product safety and income opportunities;

(4) intentional interference with contract, based upon Defendants' unlawful attempts to poach Herbalife distributors and encourage them to breach their Herbalife contracts; and

(5) unfair competition, based upon Defendants' solicitation activities in violation of Rule 8-A, as well as their coercive recruiting tactics.

**B.      Defendants' Counterclaims**

Shortly before the Court issued its preliminary injunction, Defendants filed counterclaims, which they later amended, asserting that Herbalife's has wrongfully harmed their Melaleuca businesses.  At issue are three of Defendants' contentions:

(1)      Herbalife is an endless chain scheme in violation of Cal. Penal Code § 327;

(2)      Herbalife has engaged in fraudulent advertising, in violation of California's False Advertising Law, Business & Professions Code § 17500, based on two statements and that Herbalife is an endless chain scheme; and

(3)      Herbalife has engaged unfair competition under California's Unfair Competition Law, Business & Professions Code § 17200, because it is an endless chain scheme and included Rule 8-A and a never enforced non-compete provision in its distributor agreements and rules.

7

**GOVERNING STANDARD**

A motion for partial summary judgment is governed by the same standard as for summary judgment. *See Cal. v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998); *Green v. Sun Life Assurance Co.*, 383 F. Supp. 2d 1224, 1226 (C.D. Cal. 2005). Summary judgment is only appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See McCormick v. The Fund Am. Cos.*, 26 F.3d 869, 875 (9th Cir. 1994). When determining whether a genuine issue of material fact remains for trial, the court must view the evidence in the light most favorable to the non-moving party and may not weigh the evidence or make credibility determinations. *See Hauk v. JP Morgan Chase Bank USA*, 552 F.3d 1114, 1117-18 (9th Cir. 2009).

**ARGUMENT**

**IV.   DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON HERBALIFE'S CLAIMS**

Defendants move for summary judgment on Herbalife's breach of contract, misappropriation of trade secrets, intentional interference with prospective economic advantage (IIPEA), intentional interference with contract (IIC), and unfair competition claims.[3] Genuine issues of material fact preclude summary judgment on any of these claims.

**A.   Herbalife's Breach of Contract Claim**

Herbalife's breach of contract claim is based on Defendants' distributor agreements, in which they agreed to be bound by all of Herbalife's rules and regulations.[4] (AMF ¶ 160.) And for all Defendants except Fisher, Herbalife's

---

[3] Defendants also seek summary judgment on Herbalife's fraud claim. Herbalife dismisses this claim voluntarily, with prejudice.

[4] It is undisputed that defendants Thompson, the Orrs, and the Roths are bound by Rule 8-A. Jason Fisher and the Fords are liable for having induced others to breach Rule 8-A and their distributor agreements. (AMF ¶ 161.)

8

la- 1028745

claim is also based on the CNDA they consented to before accessing Herbalife's trade secrets on Herbalife's distributor website.[5]  (AMF ¶ 162.)

Defendants argue that they are entitled to summary judgment on Herbalife's breach of contract claim because (1) Herbalife supposedly failed to "produce" the trade secrets Defendants' misappropriated; (2) Herbalife's Rule 8-A is allegedly an unlawful restraint of trade; and (3) there is supposedly no evidence that Defendants agreed to the CNDA.  Each argument fails; Defendants' motion should be denied.

### 1.     Herbalife Has Adequately Identified Its Trade Secrets

Defendants argue that Herbalife supposedly "bears the burden of producing the trade secret it contends Counterclaimants misused" and that the Court must enter summary judgment because "Herbalife cannot produce its alleged trade secrets."  (Def. Br. at 8.)  Defendants offer no authority for this proposition.  It is wrong as a matter of a law.

The sole basis for this argument is a single response to Defendants' request for the production of documents seeking "All trade secrets that YOU contend were misappropriated by COUNTERCLAIMANTS."  (Statement of Genuine Issues ("SGI") ¶ 35, AMF ¶ 165.)  Herbalife's substantive response, which Defendants truncated, states in full:

> Herbalife contends Defendants misappropriated, "among other things,
> the Lineage Reports and downline information … Herbalife's
> prospective product lines and marketing materials, confidential
> business and financial information concerning Herbalife's products,
> prices and pricing schedules, profitability considerations, marketing

---

[5] Dianna Thompson's conduct was even more egregious; she was contacting Herbalife distributors to recruit for Melaleuca while still an Herbalife distributor. (AMF ¶ 163)  She therefore also breached her Tab Team Agreement and her Distributor Agreement by violating Rules 8B and 8G.  (*Id.*)  In addition, Nancy Roth admits she lied to Herbalife to try to obtain lineage information, which violates Rule 8G and their Tab Team Agreement.  Bruce Roth admits he knew all about his wife's deceit.  (AMF ¶ 164)

la- 1028745

1    techniques and/or other market considerations," as stated in Paragraph

2    83 of the Complaint.  As Distributors, Defendants had access to the

3    above-mentioned information and received it in a variety of ways,

4    including by mail and on [Herbalife's website].  Herbalife has no way

5    to identify the particular trade secrets or documents reflecting those

6    trade secrets Defendants misappropriated and so has no responsive

7    documents.

8    (SGI ¶ 35, AMF ¶ 165.)  Defendants rely on the last sentence of this response to

9    argue that Herbalife "failed to produce" its trade secrets.  This is hogwash.

10    Under Defendants' own authority, all Herbalife need do is "identify" (not

11    "produce") its trade secrets.  *See VFD Consulting, Inc. v. 21st Servs.*, 425 F. Supp.

12    2d 1037, 1048 n.6 (N.D. Cal. 2006); *cf. Klamath-Orleans Lumber, Inc. v. Miller*, 87

13    Cal. App. 3d 458, 464-65 (1978) (misappropriation by use of information from

14    memory).  As this Court found, Herbalife did so in its complaint.  (*See* Oct. 1, 2007

15    Mem. and Order [Dkt. No. 55] at 16 (Herbalife "has sufficiently alleged the subject

16    matter of its trade secrets").)  The Court also found that Herbalife did so in its

17    motion for a preliminary injunction.  (*See* Dec. 11, 2007 Minute Order [Dkt. No.

18    77] at 2 (agreeing that "distributor's sales data and the composition of a

19    distributor's up and down lines" qualifies for trade secret protection).)  Herbalife

20    has repeated this identification in its discovery responses.  (AMF ¶ 166

21    (interrogatory response identifying "Herbalife Lineage Reports, Royalty Override

22    Statements, Production Bonus Statements … are trade secrets").)  And discovery

23    has revealed that Defendants used these trade secrets after they left Herbalife.

24    (AMF ¶ 167.)

25    **2.      Rule 8-A is Valid and Enforceable**

26    Defendants claim that Rule 8-A is unenforceable because it is not limited to

27    protecting trade secrets and prohibits former Herbalife distributors from "soliciting,

28    sponsoring, promoting or recruiting for one year after termination" any current

10

la- 1028745

1    Herbalife distributor they became aware of during the course of their
2    distributorship. (Def. Br. at 10.) As Herbalife explained in its motion for summary
3    judgment, this nonsolicitation provision is valid under California law whether or
4    not it is necessary to protect trade secrets.[6] *See Loral Corp. v. Moyes*, 174 Cal.
5    App. 3d 268 (1985); *Webb v. West Side Dist. Hosp.*, 144 Cal App. 3d 946 (1983);
6    *Buskuhl v. Family Life Ins. Co.*, 271 Cal. App. 2d 514 (1969).

7         Defendants' motion should also be denied because they have failed to show
8    that Rule 8-A is not a valid means to protect Herbalife's trade secrets. As the Court
9    found in issuing its preliminary injunction, "information between and among
10   Herbalife distributors is in the nature of a customer database and has economic
11   value." (Dec. 11, 2007 Minute Order at 2.) This is precisely the type of
12   information that may be misappropriated by former employees or contractors to
13   identify solicitation targets. *See Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514, 1521
14   (1997) (information identifying customers' particular characteristics, as distinct
15   from mere identities, was trade secret); *MAI Systems Corp. v. Peak Computer, Inc.*,
16   991 F.2d 511, 521-22 (9th Cir. 1993) (misappropriation by soliciting customers
17   former employee recognized from employer's database); *Klamath-Orleans*, 87 Cal.
18   App. 3d at 464-65 (misappropriation where former employee identified targets from
19   memory of employer's confidential customer list). California courts routinely
20   uphold nonsolicitation provisions that protect this sort of trade secret. *See Gordon
21   v. Landau*, 49 Cal. 2d 690, 694 (1958); *State Farm Mut. Auto. Ins. Co. v. Dempster*,
22   174 Cal. App. 2d 418, 426-27 (1959); *Ingrassia v. Bailey*, 172 Cal. App. 2d 117,
23   124 (1959).

---

24      [6] Citing *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937 (2008),
25   Defendants argue that the California Supreme Court held that a provision
     prohibiting a former employee from soliciting former coworkers is invalid. (Def.
26   Br. 9.) This is not true. The *Edwards* plaintiff did not "contend that the
     provision … prohibiting him from recruiting Andersen's employees violated
27   section 16600." *Id.* at 946 n.4. The *Edwards* holding was limited to provisions
     barring the plaintiff from soliciting the employer's *clients*. *Id.* at 948.
28

la- 1028745

Rule 8-A similarly prevents the misuse of Herbalife's trade secrets. Herbalife distributors are given access to confidential information regarding Herbalife distributors' sales and lineage.  (AMF ¶¶ 139, 140, & 142.)  Using this information, as Defendants' conduct demonstrates, former distributors can easily target key Herbalife distributors.  (AMF ¶ 168.)  Rule 8-A does not violate section 16600.

### 3.     The Roths, the Fords, the Orrs and Thompson Agreed to the CNDAs

Defendants argue that there is "no evidence" they assented to the CNDA required to access Herbalife's trade secrets on its website.  However, the evidence is undisputed that all users must agree to the CNDA by clicking through it in order to access the password-protected trade secrets maintained there by Herbalife.  (AMF ¶ 169.)  *See Wall Data Inc. v. Los Angeles County Sheriff's Dept.*, 447 F.3d 769 (9th Cir. 2006) (click-through agreement valid).  Information from Herbalife's information technology department shows that Robert Ford, Nancy Roth and Kathy Orr all agreed to be bound by the CNDA.  These Defendants and their spouses therefore agreed to maintain the confidentiality of Herbalife's lineage information.  (AMF ¶ 170.)  And Dianna Thompson has conceded that she agreed to the terms of the CNDA.  (AMF ¶ 170.)

For all these reasons, Defendants are not entitled to summary judgment on Herbalife's breach of contract claim.

### B.     Herbalife's Misappropriation of Trade Secrets Claim

Defendants' sole argument against Herbalife's trade secrets claim is that Herbalife has "failed to produce" its trade secrets.  As discussed above, this argument is baseless. All Herbalife need do is *identify* the misappropriated trade secrets; it has done so.  *See VFD Consulting*, 425 F. Supp. 2d at 1048 n.6.

Defendants have nothing more to offer.  The record is replete with evidence of Defendants' misuse of Herbalife's confidential information – lineage and sales

12

1   information concerning Herbalife distributors' downline organizations as reflected

2   in Lineage Reports, Royalty Override Statements, and Production Bonus

3   Statements.  (AMF ¶ 167.)  Their motion for summary judgment on Herbalife's

4   trade secrets claim should be denied.

5   **C.   Herbalife's IIPEA, IIC, and Unfair Competition Claims**

6   Defendants seek summary judgment on Herbalife's IIPEA, IIC and unfair

7   competition claims on a variety of grounds, most of which they have argued

8   elsewhere and none of which have merit.  As to Herbalife's IIPEA claim,

9   Defendants argue again that Herbalife failed to "produce" its trade secrets.

10   Defendants also argue that IIPEA claim fails for lack of evidence to the extent it is

11   based on an allegation that Melaleuca's products are unsafe and toxic.  As to all

12   three claims, Defendants again contend summary judgment is proper because Rule

13   8-A is supposedly an unlawful restraint of trade.  Finally, Defendants argue that all

14   of these claims are preempted by the California Uniform Trade Secrets Act

15   (CUTSA) to the extent they are based on the misappropriation of trade secrets.

16   Defendants are not entitled to summary judgment on any of these claims

17   based on the failure to "produce" the misappropriated trade secrets and Rule 8-A

18   arguments.  These arguments are addressed above, and they have no more merit

19   regarding these claims than they do for any of the other claims.

20   Nor are Defendants entitled to summary judgment on their IIPEA claim

21   based on a supposed lack of evidence concerning the toxicity of Melaleuca

22   products.  There is substantial evidence showing the falsity of representations

23   claiming Melaleuca's products are safe and nontoxic.  (SGI ¶¶ 62, 63; AMF ¶ 171,

24   172.)  Herbalife has produced several scientific studies and articles demonstrating

25   this fact.[7]  These are the types of documents generally relied on by scientists when

26   analyzing the safety and toxicity of household products and nutritional

27   _____

28   [7] These documents are admissible under Fed. R. Evid. 807.

supplements.  (SGI ¶ 63; AMF ¶ 172.)   Some of the documents were disseminated by government-run poison control centers.  (*Id.*)  One document is a memorandum created by the U.S. Department of Health & Human Services.  (*Id.*)  And several are lab reports that were created as part of regularly conducted business activity.  (*Id.*)

Finally, none of these claims is preempted by the CUTSA.  A claim is only preempted if it is based on the same nucleus of facts as the misappropriation claim.  *K.C. Multimedia, Inc. v. Bank of Am. Tech. & Operations Inc.*, 171 Cal. App. 4th 939, 959 (2009).  Herbalife's IIPEA claim is based not just on Defendants using Herbalife trade secrets to solicit Herbalife distributors but upon their (1) inducing Herbalife distributors to breach their contracts with Herbalife, (2) misrepresenting the Melaleuca business opportunity, (3) misrepresenting the safety and toxicity of Melaleuca products, and (4) false claims regarding income.  (Complaint ¶¶ 95-103.)  Herbalife's IIC and unfair competition claims are not based on the misuse of trade secrets at all, but rather upon Defendants' solicitation activities in violation of Rule 8-A, their inducing Herbalife distributors to violate Herbalife's rules and breach their contracts, and Defendants' coercive recruiting tactics.  (*Id.* ¶¶ 109-115.)

The Court should deny Defendants' motion for summary judgment on Herbalife's claims.

## V.   DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THEIR COUNTERCLAIMS

Defendants misstate both the law and the facts in their attempt to persuade this Court that their counterclaims merit a grant of summary judgment.  Defendants cannot establish as a matter of law that Herbalife is an endless chain scheme or that it has engaged in false advertising or unfair competition.  Defendants' motion for summary judgment on these claims should be denied.

### A.   Defendants' Endless Chain Scheme Claim

Defendants' contention that they are entitled to summary judgment on their endless chain scheme claim is based solely on an erroneous reading of *Webster v. Omnitrition Int'l, Inc.*, 79 F.3d 776 (9th Cir. 1996), and fails for that reason.[8]  The Ninth Circuit did not, as Defendants assert, find that Omnitrition's multi-level marketing program "*qualified* as a pyramid scheme."  (Def. Br. at 15:17-18 (emphasis added).)  Rather, the Ninth Circuit reversed the lower court's decision granting summary judgment for Omnitrition, holding "plaintiffs have produced sufficient evidence" to show that genuine issues of material fact prevented summary judgment.  *Id.* at 782; *accord id.* at 784 ("Omnitrition's Amway defense must fail, *at least on summary judgment,*" because "crucial evidence" is missing).

*Omnitrition* holds only that a defendant is not entitled to summary judgment on an endless chain scheme claim merely because the company has certain rules in place.  Nothing in *Omnitrition* supports Defendants' assertion that the nature of a defendant's business model alone proves it is an endless chain scheme claim.  Defendants' argument that Herbalife is identical to Omnitrition because they are both multi-level marketing programs that sell nutritional products (Def. Br. at 15-16), is thus background noise.  Neither of these facts has any bearing on whether a business is an endless chain scheme.

In *Omnitrition*, the court explained that the relevant factual inquiry for an endless chain scheme claim is whether an organization "serves to reward recruitment more than retailing," 79 F.2d at 783, or put another way, whether the product is merely ancillary to the organization's business plan.[9]  As has been

---

[8] As demonstrated in Herbalife's motion for summary judgment, Defendants' endless chain scheme claim must be dismissed because Defendants cannot obtain relief. (*See* Herbalife's Motion for Summary Judgment at 15, 16.)

[9] In *Omnitrition*, the Ninth Circuit adopted the FTC test as articulated in *In re Koscot Interplanetary, Inc.*, 86 F.T.C. 1106 (1975), which defined the two elements of an endless chain scheme as (1) the right to sell a product and (2) the right to receive in return for recruiting other participants into the program rewards which

la- 1028745

extensively documented by Herbalife, and corroborated by the testimony of Defendants themselves, sale of Herbalife's products are "the foundation of Herbalife's business." (AMF ¶¶ 177, 183.)  Herbalife has rules in place that govern product sales and protect against recruiting abuses.  And, as Defendants themselves testified, Herbalife enforces these rules in order to ensure that the focus of its business opportunity is retail sales rather than recruitment.

Defendants' motion cannot overcome their own testimony: "Retail is the basis and foundation and bread and butter of your business."   (AMF ¶¶ 182, 183.)

### 1. Herbalife Focuses on Product Sales

Herbalife spends millions of dollars every year on research and development of new products, employing top doctors and nutritional experts to create exceptional products. (AMF ¶ 173.)  Defendants and the third-party witnesses in this case prove as much:  they testified they regularly consume Herbalife products. (AMF ¶ 176.)

Herbalife invests in extensive advertising and branding to raise its profile and that of its products among consumers.  (AMF ¶ 174.)  For example, Herbalife sponsors the LA Galaxy, youth soccer programs, Indy car drivers, and local athletes, all in a bid to raise its public profile and increase demand for the company's products.  (*Id.*)

Defendants contend otherwise by presenting a misleading and incomplete view of the Herbalife business opportunity.  What Defendants refer to as the Herbalife "marketing plan" is actually one page in an Herbalife brochure.  (Def. Br. at 17:10-17, citing SUF ¶¶ 81-83, all citing Ex. C to G. Dyer Declaration.)  Defendants submit only two pages from this 29-page brochure.  (Dyer Decl. Ex. C.)

---

are unrelated to the sale of the product to the ultimate users.  *Omnitrition*, 79 F.2d at 781.  The Ninth Circuit emphasized that satisfaction of the second element was essential to proving that a business operated as an endless chain scheme.  *Id.*

la- 1028745

1   This incomplete submission was intentional:  the first 19 pages refer solely to use of

2   the product, including product quality, product descriptions, and how to use the

3   products to lose weight and get healthier.  Only by excluding the majority of the

4   brochure can Defendants contend that "Herbalife's marketing plan … does not

5   mention retail sales or retail customers in any way."  (SUF 82; Dyer Decl. Ex. C.)[10]

6         Herbalife's actual Sales and Marketing Plan also makes clear that Herbalife

7   emphasizes retail sales.  (AMF ¶¶ 177-179.)  The Overview on the very first page

8   explains:

9              The Herbalife opportunity and the Marketing Plan is identical for

10             every Distributor.  Each Distributor's success is dependent on two

11             primary factors:

12         •   The time, effort and commitment a Distributor puts into

13             their Herbalife business and

14         •   The product sales made by a Distributor and their

15             downline organization.

16   (AMF ¶ 179.)

17         Abundant evidence shows that Herbalife teaches its distributors that use of

18   the products is the best way to successfully sell the products.  (AMF ¶ 180.)

19   Herbalife urges its Distributors to "tell a story" of how use of Herbalife products

20   improved their lives to create demand for the products.  (*Id.*)  Julia Ford and Kathy

21   Orr, who were successful Herbalife distributors, acknowledge this model as key,

22   and also acknowledge using and believing in the products themselves.  (*Id.*)

23         Indeed, Defendants testified that retail was crucial to their businesses.

24   Robert Ford claimed that he probably had one of the "largest retail businesses … in

25

26         [10] Defendants aren't even correct in asserting the chart in the brochure on
    which they rely does not "mention retail or customers in any way."  (Def. Br. at
27   17:16.)  Under the "distributor" heading, the chart refers explicitly to retail profits.
    (SGI ¶¶ 2, 81, & 82.)
28

17

Herbalife, in the United States." (AMF ¶ 182.) Similarly, Julia Ford, the Orrs and Dianna Thompson focused nearly exclusively on retailing in building their businesses. (*Id.*)

Defendants urged their downlines to focus on retail sales as well:

- Kathy Orr: "I was a retail person. I retailed my way to Presidents Team and that was the core of my business and my foundation … I didn't like people having $4000 sitting in a garage. So I would teach them like crazy to get rid of it and get that credit card paid off." (*Id.*)

- Nancy Roth: "You need to show some success in retail sales . . . We encouraged [our distributors] to be successful in retail sales." (AMF ¶ 183.)

- Dianna Thompson: "Q: When you recruited somebody, did you recruit them with the goal in mind that that person would then focus on doing retail sales? A: Hopefully yes." (*Id.*)

- Jeff Orr: "The people we recruited, they purchased products because they wanted to sell them, yes, absolutely, because they wanted to sell them and build supplemental income. It's a product-driven company. You have to have something in order to sell." (AMF ¶¶ 182, 183.)

Defendants have not and cannot prove that retail product sales are merely ancillary to Herbalife's business opportunity.

**2.     Herbalife's rules, which Herbalife enforces, promote retail sales**

Defendants present nothing more than their own assertions that "Herbalife's policies are fundamentally flawed and ineffective." (Def. Br. at 17:20-21.) They assert that Herbalife's rules are similar to Omnitrition's and jump to the conclusion that Herbalife therefore qualifies as an endless chain scheme. (Def. Br. at 17:19-22:9.) This is manifest error. Omnitrition's rules were very similar to rules the FTC found *sufficient* to ensure a focus on retail sales in *In re Amway Corp.*, 93 F.T.C. 618 (1979). *Omnitrition*, 79 F.3d at 782. Similarity is not the issue. As

18

1   Defendants concede, the relevant inquiry is "whether the program's safeguards are

2   enforced and actually serve to deter inventory loading and encourage retail sales."

3   (Def. Br. at 18:10-11, quoting *Omnitrition*, 79 F.3d at 783.)

4        Defendants fail to cite any evidence that Herbalife does not enforce its rules

5   or that these rules are not effective in ensuring retail sales.  In fact, all evidence is to

6   the contrary.  A few examples, focusing only on the few rules and policies

7   Defendants rely on, defeat their motion:

8        10 Customer Rule.  The 10 Customer Rule requires that Herbalife

9   distributors "must personally make sales to at least 10 separate retail customers

10  each month to qualify for and receive" royalties and other bonuses.  (AMF ¶ 184.)

11  Every month, Herbalife conducts 100 random distributor audits to monitor

12  compliance with this rule.  (SGI ¶ 91; AMF ¶ 186.)

13       The record simply does not support Defendants' bald assertion that it "is

14  undisputed that [this] rule is not enforced in any meaningful way and is even less

15  effective than *Omnitrition*'s."  (Def. Br. 18.)  Robert Ford himself was audited.

16  (AMF ¶ 190.)  Several Defendants admit that members of their downline

17  organizations were audited.  (*Id.*)  Third-party witness Lilith Nix was audited.  (*Id.*)

18  Stephan Gratziani, one of Herbalife's most successful distributors, has likewise

19  been audited.  (AMF ¶ 191.)

20       The evidence also shows that Herbalife insists its distributors comply with

21  the 10 Customer Rule.  Third-party witness David Schmaman testified that,

22  although he is a supervisor and therefore could be entitled to receive royalty

23  overrides, he does not have 10 retail customers so he does not submit the 10-

24  customer rule certification and does not receive these overrides.  (AMF ¶ 192.)

25  Lilith Nix recalled that Herbalife withheld one of her royalty checks when it did not

26  receive her 10-customer certification on time.  (AMF ¶ 190.)

27       70% Rule.  The 70% rule requires distributors to certify that they have sold at

28  least 70% of the products purchased, either to their downline or to other retail

19

customers.  (AMF ¶ 184.)  The evidence is undisputed that Herbalife enforces compliance with this rule as well.  (AMF ¶ 185.)  In *Omnitrition*, 79 F.3d at 783, the Ninth Circuit found it was less likely the rule was effective in that case because "the requirement can be satisfied by *non-retail* sales to a supervisor's own downline."

The premise on which the Ninth Circuit analyzed the 70% rule in *Omnitrition* does not apply here; the evidence shows sales of Herbalife products by supervisors to distributors in their downline are retail sales.  Many people become Herbalife distributors and supervisors to have the ability to purchase the product at a discount for personal consumption.  Stephan Gratziani noted that 9 times out of 10, individuals who signed up as Herbalife distributors do not intend to "build a business long term with the company" because they were interested in a distributorship for other reasons; for example, because "they want[ed] to get a discount on the products." (AMF ¶ 198.)  Thus, it is not surprising that Jeff Orr testified that over 50% of the distributors in the Orrs' extensive downline did not sell the products.  (*Id.*)

Buyback Policy.  Herbalife's buyback policy allows distributors who no longer want to consume or sell the products to return them for a refund in accordance with certain procedures specified in the Herbalife rules.  This policy ensures that Herbalife distributors may seek a refund of their business investment – the antithesis of an endless chain scheme.  Once again, Defendants assert Herbalife has made it "difficult to receive any buyback of inventory," (Def. Br. at 21:11) without citing any evidence.  How could they?  Defendants freely admitted they failed to even read the rules they agreed to abide by in becoming Herbalife distributors and, in direct violation of those rules, failed to teach their downlines about this policy either.  (AMF ¶¶ 204, 205.)

The Ninth Circuit did not, as Defendants assert (Def. Br. at 21:6-7), find that Omnitrition's "buyback rule was ineffective on its face" because it did not offer a

20

1  complete refund.  Rather, the Ninth Circuit found a genuine issue of material fact as

2  to whether Omnitrition "enforces its buy-back rule, or the extent to which

3  Omnitrition has actually repurchased product from disappointed [independent

4  marketing associates]." *Omnitrition*, 79 F.3d at 783.  Here, in contrast, there is no

5  dispute that Herbalife honors almost all buyback claims and repurchases product

6  from many Herbalife distributors each year.  (AMF ¶ 202.)  As Nancy Roth

7  testified, she was not aware of any instance in which a customer requested a

8  buyback and Herbalife did not provide one.  (AMF ¶ 203.)

9        These examples amply illustrate that Defendants' own experiences and the

10  experiences of the third-party witnesses in this case defeat any contention that

11  Herbalife rewards recruitment rather than retail sales.  The California Attorney

12  General found as much, as did the Direct Selling Association.  (AMF ¶ 207.)

13        All Defendants offer to establish the supposed ineffectiveness of Herbalife's

14  rules is that one Herbalife employee, Michael McKee, is not familiar with the

15  specifics of the 70% and 10 customer rules.  (Def. Br. at 18-19.)  But rule

16  compliance is monitored by an entirely different department; Mr. McKee works

17  with distributors to develop retail sales initiatives and to teach distributors how to

18  implement successful methods in order to improve their business.  (SGI ¶¶ 86, 87 &

19  92 .)  He is not in charge of rule compliance, and refers all compliance issues to the

20  appropriate department.  (*Id.*)

21        Defendants have not and cannot prove as a matter of law that Herbalife is an

22  endless chain scheme.  Their motion as to this claim should be denied.

23        **B.    Defendants' False Advertising and Unfair Competition Claims**

24        In its motion for summary judgment, Herbalife has demonstrated that

25  Defendants lack standing to bring their false advertising and unfair competition

26  claims and cannot show any injury caused by any non-privileged Herbalife conduct.

27  (Herbalife's Mtn. for Summary Jdgt. filed May 4, 2009 [Dkt. No. 219] at 7-15.)  As

28  explained more fully in Herbalife's memorandum of points and authorities in

21

1 support of its motion, the conduct Defendants allege harmed them is protected

2 under federal and California law; it cannot be the basis for liability.  Nor is there

3 any evidence that any non-privileged conduct harmed Defendants, as reflected in

4 the declarations from Herbalife distributors Defendants asserted would have joined

5 them at Melaleuca absent Herbalife's rules, business model, or supposed

6 misrepresentations.  (*Id.*)

7      Defendants' motion for summary judgment also fails for additional reasons.

8        **1.**      **Defendants Are Not Entitled to Summary Judgment on**

9                **Their False Advertising Claims**

10      Defendants rest their false advertising claim on their allegation that Herbalife

11 is an endless chain scheme, which is not amenable to summary judgment for the

12 reasons discussed above.  Their only other bases for this claim are the following

13 two supposedly false statements contained in Herbalife materials: (1) a statement

14 Herbalife sent to some of its distributors that in 2006 Herbalife made $3 billion in

15 retail sales and paid Herbalife supervisors $2.2 billion in commissions, royalties,

16 and bonuses; and (2) a statement that Herbalife is "recession proof" in a twenty-

17 second videotape.  (Def. Br. at 23, 24.)

18      Presumably, Defendants' claim is that they were unable to recruit persons

19 away from Herbalife to join them at Melaleuca because of these statements.  But

20 Defendants have not provided evidence that anyone relied on these statements at

21 all, let alone in a manner that may have caused injury to Defendants.  Nor is there

22 any evidence that anyone is likely to be deceived by them.  (AMF ¶¶ 209, 211.)

23 Defendants cannot obtain summary judgment without proving essential elements of

24 their claims.

25      Moreover, the statements on which Defendants rely are not false.  Regarding

26 the "recession-proof" statement, the Defendants take this statement made by an

27 Herbalife distributor in a promotional video out of context.  The video makes the

28 point, which is absolutely true, that Herbalife provides a great money-making

1   opportunity in the midst of a deep recession, when businesses are faltering and

2   laying off workers.  (AMF ¶ 210.)  Independent sources have recognized that this is

3   the case.  (*Id.*)  That one statement of opinion, taken out of context, cannot support

4   a false advertising claim.  *Consumer Advocates v. Echostar Satellite Corp.*, 113

5   Cal. App. 4th 1351, 1361 n.3 (2003) (false advertising claim cannot be based on

6   "mere puffing" statements).

7         The statements concerning Herbalife sales and commissions are equally

8   unavailing.  First, these statements are true.  (AMF ¶¶ 208, 211.)  In addition,

9   Defendants have not identified even one person who relied on them to become an

10   Herbalife distributor or remain at Herbalife instead of joining them at Melaleuca.

11   *See Chavez v. Blue Sky Natural Beverage Co.*, 503 F. Supp. 2d 1370, 1734 (N.D.

12   Cal. 2007) (dismissing section 17500 claim because alleged false statement did not

13   cause plaintiff injury).

14         In fact, the evidence is to the contrary.  Herbalife distributors uniformly

15   testified that they did not rely on these statements.  (AMF ¶¶ 209, 211.)  For

16   instance, distributor Lilith Nix testified that she had no idea as to whether

17   Herbalife's claim distributors received $2.2 billion in commissions, royalties and

18   bonuses was accurate, and that she did not pass this statement on to anyone.

19         Herbalife's statement that it reached $3 billion in "retail sales" in 2006 is also

20   true.  (AMF ¶ 211.)  Defendants contend that Herbalife cannot claim "retail sales"

21   of $3 billion because Herbalife does not track actual retail sales.  But Herbalife

22   reports retail sales in its annual 10K using the same accepted measure of "retail

23   sales" that is used throughout the financial community, disclosing the manner in

24   which it is calculated.  (AMF ¶¶ 208, 211.)  Moreover, Defendants have not

25   articulated any theory as to how they could possibly have been harmed by this

26   assertion.  For example, distributor David Schmaman testified he had never even

27   heard that Herbalife had $3 billion in retail sales.  Distributor Libby Klucken

28

la- 1028745

testified likewise.  Even Defendants could not affirmatively state that they had either heard or relied upon the $3 billion sales figure.  (AMF ¶ 211.)

### 2. Defendants Are Not Entitled to Summary Judgment on Their Unfair Competition Claim

Defendants argue the Court should grant summary judgment on this claim because Rule 8-A and a never enforced non-compete provision in old versions of Herbalife's Distributor Agreement supposedly violate section 16600,[11] and because Herbalife is an endless chain scheme.  (Def. Br. at 24-25.)  Defendants' Rule 8-A and endless chain scheme arguments fail for the reasons already discussed.

Moreover, Defendants offer no evidence that Rule 8-A, anything in the distributor agreement, or Herbalife's business model caused them harm. Defendants were not deterred from joining Melaleuca, soliciting Herbalife distributors, or using Herbalife confidential business information to do so.  (AMF ¶¶ 147, 148 & 213.)  *See Hall v. Time Inc.*, 158 Cal. App. 4th 847, 857-58 (2008) (dismissing unfair competition claim for failure to show conduct caused plaintiff harm; conduct did not induce plaintiff to do anything).  Nor is there any evidence that even one Herbalife distributor refused to join Melaleuca because of Herbalife's rules or because of its business model.  *See, e.g.*, *Trujillo v. First Am. Registry, Inc.*, 157 Cal. App. 4th 628, 639 (2007) (granting summary judgment against unfair competition claims because even absent defendant's conduct plaintiffs would have suffered same injury); *Daro v. Super. Ct.*, 151 Cal. App. 4th 1079, 1099 (2007) (reversing injunction because plaintiffs failed to prove causal connection between alleged unfair business practice and injury; injury caused by lawful act).

---

[11] Herbalife's current Distributor Agreements do not contain a 3-year covenant not to compete.  (AMF ¶ 212.)  Moreover, there is no evidence Herbalife has ever enforced the 3-year non-compete or warned any Herbalife distributor that going to another direct sales or multi-level marketing firm would violate this provision.  (AMF ¶ 213.)

la- 1028745

1    Defendants' motion for summary judgment on these claims therefore fails as
2  well.

3                            **CONCLUSION**

4    For the aforementioned reasons, the Court should deny Defendants' motion
5  for summary judgment in its entirety.

6

7

8  Dated:    May 18, 2009                    MORRISON & FOERSTER LLP

9                                            /s/ Sean P. Gates
10                                           Charles E. Patterson
                                             Nancy R. Thomas
11                                           Sean P. Gates

12                                           Attorneys for Plaintiff and
                                             Counterclaim Defendant
13                                           HERBALIFE INTERNATIONAL
                                             OF AMERICA, INC.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                 25

la- 1028745