CHARLES E. PATTERSON (CA SBN 120081)
CPatterson@mofo.com
NANCY R. THOMAS (CA SBN 236185)
NThomas@mofo.com
SEAN P. GATES (CA SBN 186247)
SGates@mofo.com
MORRISON & FOERSTER LLP
555 West Fifth Street
Los Angeles, California  90013-1024
Telephone: 213.892.5200
Facsimile: 213.892.5454

Attorneys for Plaintiff
HERBALIFE INTERNATIONAL
OF AMERICA, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| Herbalife International of America, Inc., a Nevada Corporation,<br><br>Plaintiff,<br><br>v.<br><br>Robert E. Ford and Julia A. Ford, husband and wife; Bruce H. Roth and Nancy A. Roth, husband and wife; Jeff Orr and Kathy Orr, husband and wife; Dianna N. Thompson; and Jason Fisher,<br><br>Defendants. | Case No. CV 07 2529 GAF (FMOx)<br><br>Hon. Gary A. Feess<br><br>**STATEMENT OF GENUINE ISSUES IN SUPPORT OF HERBALIFE'S OPPOSITION TO DEFENDANTS' AND COUNTERCLAIMANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:          June 1, 2009<br>Time:          9:30 a.m.<br>Courtroom: 740-Roybal |

Plaintiff and Counterdefendant Herbalife International of America, Inc. ("Herbalife") submits this statement of genuine issues pursuant to Central District of California Local Rule 56-2 in opposition to Defendants' and Counterclaimants' Motion for Partial Summary Judgment.

Facts 1 through 130 below correspond to the alleged facts and supporting evidence presented in Defendants' and Counter-claimants' Separate Statement of Uncontroverted Facts. These facts are followed by Facts 131 through 213, additional material facts and supporting evidence demonstrating a genuine dispute. Where Herbalife responds that a statement of fact submitted by Counterclaimants is "undisputed," the response is limited for purposes of this motion.

## I.    COUNTERCLAIMANTS' ALLEGED FACTS

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| 1.    Herbalife is a multi-level marketing company that sells nutritional supplements, vitamins, and skin care products. | 1.    Undisputed. |
| 2.    Herbalife publishes a chart showing its marketing plan that does not mention customers or retail sales. | 2.    Disputed, in that the chart to which Counterclaimants refer is part of a booklet with extensive discussion of customers and retail sales. <u>Moving Party's Evidence</u> "Live the Good Life with Herbalife," p. 22 (Dyer Decl., ¶ 4, Ex. "C," p. 60). This "stair step" chart was authenticated by Miller. Miller Depo. |

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| | 71:2-15 (Dyer Decl., Ex. "A," p. 26). "Sales & Marketing Plan and Business Rules," p. 4 (Dyer Decl., ¶ 5, Ex. "D," p. 63). This document was authenticated by Paul Greenberg, Herbalife's Senior Vice President, Counsel. Deposition of Paul Greenberg ["Greenberg Depo."]) 225:23-226:1 (Dyer Decl., Ex. "E," pp. 86-87.) Evidence Controverting the Fact Declaration of Sean Gates in Support of Herbalife International of America, Inc.'s Opposition to Defendants and Counterclaimants' Motions for Partial Summary Judgment (Gates Decl.) Ex. A ("Live the Good Life with Herbalife" – Dep. Ex. 5). This document was authenticated by J. Miller. J. Miller Dep. Tr. 70:23-71:4 (Gates Decl. Ex. O); Gates Decl. Ex. B (Sales and Marketing Plan – Dep. Ex. 30). This document was authenticated by Paul Greenberg, Herbalife's Senior Vice President, Counsel. P. Greenberg Dep. Tr. 225:15-226:1 (Gates Decl. Ex. |

3

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| | R). |
| 3.     According to the Herbalife's Marketing Plan, royalties, bonuses and advancement at Herbalife are based exclusively on purchases from Herbalife. | 3.     Disputed.  Royalties, bonuses and advancement at Herbalife cannot be earned without actual and substantial retail sales. |

3.     According to the Herbalife's
Marketing Plan, royalties, bonuses
and advancement at Herbalife are
based exclusively on purchases from
Herbalife.

3.     Disputed.  Royalties, bonuses
and advancement at Herbalife cannot
be earned without actual and
substantial retail sales.

<u>Moving Party's Evidence</u>

"Live the Good Life with Herbalife,"
p. 22 (Dyer Decl., Ex. "C," p. 60).
"Sales & Marketing Plan and Business
Rules," p. 4 (Dyer Decl., Ex. "D,"
p. 63).

<u>Evidence Controverting the Fact</u>

Gates Decl. Ex. B pp. 6, 7, 59, 62
(Sales & Marketing Plan – citing to
Rules 20-C, 20-D, & 24-B), Ex. C
(McKee Dep. Tr. 12:2-23, 17:11-25,
51:13-24, 104:21-105:9, 133:1-9,
190:2-21), Ex. C (N. Roth Dep. Tr.
94:16-21, 95:8-11), Ex. E (L. Nix Dep.
Tr. 168:23-169:14, 237:23-238:12),
Ex. F (J. Orr Dep. Tr. 23:16-24:12,
71:8-72:7, 81:21-82:10, 123:22-
124:11), Ex. G (K. Orr Dep. Tr. 72:2-
10), Ex. H (Johnson Dep. Tr. 80:25-
81:23), Ex. I (J. Ford Dep. Tr. 30:9-12;

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| | 33:3-34:11; 34:25-35:21; 50:22-51:14; 79:15-80:4), Ex. I (J. Fisher Dep. Tr. 9:16-10:12; 39:24-40:3; 55:6-56:5), Ex. K (R. Ford Dep. Tr. 20:3-10; 46:3-7; 46:14-47:3), Ex. L (D. Schmaman Dep. Tr. 36:10-18; 53:2-12), Ex. M (S. Gratziani Dep. Tr. 40:1-20; 66:12-67:8; 96:1-9; 144:13-22), Ex. N (D. Thompson Dep. Tr. 26:15-27:21; 50:4-10); Confidential Declaration of Sean P. gates in Support of Opposition By Herbalife International of America, Inc. to Defendants' Motion for Partial Summary Judgment (Gates Confid. Decl.) Ex. F (Johnson Dep. Tr. 133:8-25); Declaration of Mike McKee in Support of Plaintiff Herbalife International of America, Inc.'s Opposition to Defendants' Motion for Partial Summary Judgment (McKee Declaration) ¶¶ 14, 15, 17, 18, 20-23; Declaration of Jennifer Hienrich in Support of Plaintiff Herbalife International of America, Inc.'s Opposition to Defendants' Motion for |

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| | Partial Summary Judgment (Hienrich Declaration) ¶¶ 5, 7 |
| 4.     Herbalife does not keep records of retail sales. | 4.     Undisputed that Herbalife cannot and does not keep records of actual retail sales by distributors.  Disputed in that (1) HL does calculate retail sales figures as that phrase is commonly used in sales reporting and (2) Herbalife does know the names of many of its retail customers which include, among others, Herbalife distributors. |
| | <u>Moving Party's Evidence</u> |
| | Greenberg Depo. 117:3-5 (Dyer Decl., ¶ 6, Ex. "E," pp. 80). |
| | <u>Evidence Controverting the Fact</u> |
| | Gates Decl. Ex. B, pp 42, 59 (Sales & Marketing Plan – citing to Rules 20-C & 20-D), Ex. H (Johnson Depo. 175:6-176:9, 188:2-9), Ex. F (J. Orr Dep. Tr. 31:20-32:4, 95:17-96:3), Ex. G (K. Orr Dep. Tr. 67:17-68:22), Ex. I (J. Ford Dep. Tr. 74:8-11), Ex. E (L. Nix Dep. Tr. 247:3-15) |
| 5.     Herbalife's sales force is | 5.     Undisputed. |

la-1028190

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| composed of independent contractors who start as "distributors." | |
| 6. Distributors are not agents, employees, or legal representatives of Herbalife. | 6. Undisputed. |
| 7. Distributors have the right to buy products at a discount to use or resell and to recruit other distributors into the program. | 7. Undisputed. |
| 8. Distributors qualify to become a "supervisor by ordering from Herbalife a minimum amount of product, costing thousands of dollars, for either one month or two consecutive months. | 8. Disputed. Supervisors qualify based total volume, as defined in the Sales and Marketing Plan. <br><br> <u>Moving Party's Evidence</u> <br> "Sales & Marketing Plan and Business Rules," p. 4 (Dyer Decl., Ex. "D," p. 63). <br><br> <u>Evidence Controverting the Fact</u> <br> McKee Decl. ¶ 13; Gates Decl. Ex. B, pp. 6-7, 9-10 (Sales & Marketing Plan and Business Rules) |
| 9. Supervisors must meet certain order quotas each year to retain their supervisor status. | 9. Disputed. Supervisors requalify based on total volume, as explained in the Sales and Marketing Plan. <br><br> <u>Moving Party's Evidence</u> <br> Miller Depo. 36:22-37:14, 38:13-39:8 |

7

la-1028190

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| | (Dyer Decl., Ex. "A," pp. 15-18). |
| | <u>Evidence Controverting the Fact</u> |
| | Gates Decl. Ex. B, pp. 10, 11 (Sales & Marketing Plan) |
| 10.   Supervisors are entitled to receive a "Royalty Override" on up to three generations of "downline" supervisors. | 10.   Disputed.  As a Supervisor, with Fully Qualified or Qualifying Supervisors in your first three levels, you may qualify to receive Royalty Overrides if additional requirements are met.  A Royalty Override is a "payment ranging from 1% to 5% made to Fully Qualified Supervisors on the Monthly Volume of their three levels of active downline Supervisors." |
| | <u>Moving Party's Evidence</u> |
| | Miller Depo. 73:3-20 (Dyer Decl., Ex. "A," p. 27). |
| | "Sales & Marketing Plan and Business Rules," p. 11 (Dyer Decl., Ex. "D," p. 64). |
| | <u>Evidence Controverting the Fact</u> |
| | Gates Decl. Ex. B, pp. 11, 18 (Sales and Marketing Plan) |
| 11.   The Royalty Override gives the supervisor a 1% to 5% commission on | 11.   Disputed.  As a Supervisor, with Fully Qualified or Qualifying |

8

la-1028190

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| orders placed by downline supervisors. | Supervisors in your first three levels, you may qualify to receive Royalty Overrides if additional requirements are met.  A Royalty Override is a "payment ranging from 1% to 5% made to Fully Qualified Supervisors on the Monthly Volume of their three levels of active downline Supervisors." <u>Moving Party's Evidence</u> Miller Depo. 73:3-20 (Dyer Decl., Ex. "A," p. 27). <u>Evidence Controverting the Fact</u> Gates Decl. Ex. B, pp. 11, 18 (Sales and Marketing Plan) |
| 12.     Supervisors and those they recruit must continue to purchase a minimum amount of product each month from Herbalife to qualify the supervisor for the Royalty Override. | 12.     Disputed.  Qualification for Royalty Overrides is based on total volume, as specified in the Sales & Marketing Plan. <u>Moving Party's Evidence</u> Miller Depo. 73:3-20 (Dyer Decl., Ex. "A," p. 27). "Sales & Marketing Plan and Business Rules," p. 11 (Dyer Decl., Ex. "D," p. 64). <u>Evidence Controverting the Fact</u> |

9

la-1028190

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| | Gates Decl. Ex. O (Miller Dep. Tr. 73:3-20), Ex. B, pp. 11, 18 (Sales & Marketing Plan and Business Rules) |
| 13.     Herbalife supervisors receive the right to sell the products and earn royalties based on product orders made by the supervisor's recruits. | 13.     Disputed, in that Herbalife supervisors have right to sell products without regard to orders placed by their supervisors, and have right to earn royalties if they meet the additional requirements (e.g., retail product sales). |
| | Moving Party's Evidence |
| | "Live the Good Life with Herbalife," pp. 21-22 (Dyer Decl., Ex. "C," pp. 59-60). |
| | Evidence Controverting the Fact |
| | Gates Decl. Ex. B, pp. 9, 11 (Sales and Marketing Plan) |
| 14.     Advancement within Herbalife "is not based on retail. It's based on volume purchased from the company." | 14.     Disputed, in that retails sales are required for advancement. |
| | Moving Party's Evidence |
| | Deposition of Mike McKee ["McKee Depo."]) 90:22-91:15 (Dyer Decl., If 7, Ex. "F," pp. 109-110). |
| | Evidence Controverting the Fact |
| | Cited evidence does not support assertion. |

la-1028190

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
| --- | --- |
| | Deposition of Mike McKee ["McKee Depo."]) 90:22-91:15 (Dyer Decl., If 7, Ex. "F," pp. 109-110). Gates Decl. Ex. B pp. 6, 7, 59, 62 (Sales & Marketing Plan – citing to Rules 20-C, 20-D, & 24-B), Ex. C (McKee Dep. Tr. 12:2-23, 17:11-25, 51:13-24, 104:21-105:9, 133:1-9, 190:2-21), Ex. D (N. Roth Dep. Tr. 94:16-21, 95:8-11), Ex. E (L. Nix Dep. Tr. 168:23-169:14, 237:23-238:12), Ex. F (J. Orr Dep. Tr. 23:16-24:12, 71:8-72:7, 81:21-82:10, 123:22-124:11), Ex. G (K. Orr Dep. Tr. 72:2-10), Ex. H (Johnson Dep. Tr. 80:25-81:23), Ex. I (J. Ford Dep. Tr. 30:9-12; 33:3-34:11; 34:25-35:21; 50:22-51:14; 79:15-80:4), Ex. J (J. Fisher Dep. Tr. 9:16-10:12; 39:24-40:3; 55:6-56:5), Ex. K (R. Ford Dep. Tr. 20:3-10; 46:3-7; 46:14-47:3), Ex. L (D. Schmaman Dep. Tr. 36:10-18; 53:2-12), Ex. M (S. Gratziani Dep. Tr. 40:1-20; 66:12-67:8; 96:1-9; 144:13-22), Ex. N (D. Thompson Dep. Tr. 26:15-27:21; 50:4- |

11

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| | 10); Gates Confid. Decl. Ex. F (Johnson Dep. Tr. 133:8-25); McKee Decl. ¶¶ 14, 15, 17, 18, 20-23; Hienrich Decl. ¶¶ 5, 7 |
| 15.    Counterclaimants signed Herbalife's Distributor Agreement (the "Agreement"). | 15.    Undisputed. |
| 16.    The Agreement contains a broad prohibition against post termination use of "information" and a blanket 3-year non-compete. | 16.    Disputed.  Agreement incorporates a valid and enforceable prohibition on use of confidential information, and incorporates valid non-solicitation provision.  Three year non-compete in version of Agreement defendants signed not enforced. Moving Party's Evidence Herbalife Distributor Agreements (Dyer Decl., ¶8, Ex. "G," pp. 120-125). Evidence Controverting the Fact Gates Decl. Ex. P (Dep. Exs. 2, 15 & 16 - HL000001, HL000003, HL000005, Hl000007, HL000008, HL000009, HL000012). Defendants' Distributorship Agreements were authenticated by J. Miller. Miller Dep. Tr. 49:6-50:8 (Gates Decl. Ex. O). A |

la-1028190

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| | blank copy of the Distributorship Agreement and Jeff Orr's Tab Team Agreement were authenticated by Jeff Orr. J Orr Dep. Tr. 30:11-17, 65:3-20 (Gates Decl. Ex. F). Gates Decl. Ex. B, p. 51 (Sales & Marketing Plan – citing to Rule 8-A), Ex. Q (B. Roth Dep. Tr. 79:3-22), Ex. R (P. Greenberg Dep. Tr. 104:3-16), Ex. D (N. Roth Dep. Tr. 19:3-9), Ex. I (J. Ford Dep. Tr. 108:12-109:4; 109:16-21; 110:20-24), Ex. S (E. Klucken Dep. Tr. 125:8-16), Ex. N (D. Thompson Dep. Tr. 158:18-25) |
| 17.    Herbalife has not made any announcement to its independent distributors that the non-compete covenant was abandoned. | 17.    Undisputed, *see* Statement of Genuine Issue 16, *see also* Additional Material Fact (AMF) 214. |
| 18.    Herbalife's in-house counsel maintains that the non-compete covenant is enforceable. | 18.    Disputed, in that Mr. Greenberg does not "maintain" that it is enforceable, because Herbalife does not enforce it.  However, undisputed in that when asked whether he believed it was enforceable, Mr. Greenberg testified he thought it was. <u>Moving Party's Evidence</u> |

13

la-1028190

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| | Greenberg Depo. 106:4-9 (Dyer Decl., Ex. "E," p. 79). |
| | Evidence Controverting the Fact |
| | *See* Statement of Genuine Issue 16, 17; *see also* Additional Material Fact 214. |
| 19.    Mike McKee, Herbalife's Vice President of Business Development (Sales) agrees that the non-compete covenant is enforceable. | 19.    Disputed.  Mr. McKee did not express an opinion on the enforceability of any non-compete covenant.  Mr. McKee is not responsible for rules interpretation or enforcement; he refers all rules issues to compliance personnel. |
| | Moving Party's Evidence |
| | McKee Depo. 28:17-29:5 (Dyer Decl., Ex. "F," pp. 105-106). |
| | Evidence Controverting the Fact |
| | The evidence cited does not support the assertion. |
| | McKee Depo. 28:17-29:5 (Dyer Decl., Ex. "F," pp. 105-106). |
| | McKee Decl. ¶ 6 |
| 20.    McKee testified that the non-compete covenant prevents Counterclaimants from putting flyers on cars. | 20.    Disputed.  Mr. McKee is not responsible for rule interpretation or enforcement, and did not testify as to the meaning of any Herbalife rule.  He |

14

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| | simply responded to a question from defendant's counsel asking his personal understanding based on the rule. |
| | <u>Moving Party's Evidence</u> |
| | McKee Depo. 35:16-36:6 (Dyer Decl., Ex. "F," pp. 107-108). |
| | <u>Evidence Controverting the Fact</u> |
| | McKee Depo. 35:16-36:6 (Dyer Decl., Ex. "F," pp. 107-108). |
| | McKee Decl. ¶ 6 |
| 21.    McKee testified that the non-compete provision is "in full force and effect." | 21.    Disputed.  Misstates testimony. Mr. McKee is not responsible for rules interpretation or enforcement; he refers all rules issues to compliance personnel. |
| | <u>Moving Party's Evidence</u> |
| | McKee Depo. 35:16-36:6 (Dyer Decl., Ex. "F," pp. 107-108). |
| | <u>Evidence Controverting the Fact</u> |
| | The evidence cited does not support the assertion. |
| | McKee Depo. 35:16-36:6 (Dyer Decl., Ex. "F," pp. 107-108). |
| | McKee Decl. ¶ 6 |

15

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| 22.    Jacqueline Miller, Herbalife's top rules official, stated that Herbalife distributors are "not allowed to participate in a competing business" for 3 years after termination. | 22.    Disputed.  Ms. Miller is not Herbalife's "top rule official." <u>Moving Party's Evidence</u> Miller Depo. 54:1-24 (Dyer Decl., Ex. "A," p. 20). <u>Evidence Controverting the Fact</u> The evidence cited does not support the assertion, in that Ms. Miller was simply asked to read a portion of a distributorship agreement. Miller Dep. 54:1-24 (Dyer Decl., Ex. "A," p. 20) Gates Decl. Ex. O (Miller Dep. Tr. 12:7-12, 14:2-15); Hienrich Decl. ¶¶ 1-4 |
| 23.    Herbalife's Agreement also provides that distributors must follow Herbalife's rules, policies, and procedures. | 23.    Undisputed. |
| 24.    Herbalife enacted Rule 8-A, its restraint against post-termination solicitation, in September 2006-after Counterclaimants Robert and Julia Ford and Jason Fisher had resigned from Herbalife. | 24.    Undisputed to the extent that Herbalife does not contend that defendants Robert and Julia Ford and Jason Fisher were subject to Rule 8-A prior to their resignation.  However, Herbalife does contend that those |

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
| --- | --- |
| | defendants induced others to violate Rule 8-A. |
| 25.     Rule 8-A is a blanket non-solicitation restraint that does not reference the use of trade secrets. | 25.     Disputed.  Rule 8-A is not a "blanket non-solicitation restraint" and it serves to protect trade secrets. |
| | <u>Moving Party's Evidence</u> |
| | "Sales & Marketing Plan and Business Rules," p. 51 (Dyer Decl., Ex. "D," p. 68). |
| | <u>Evidence Controverting the Fact</u> |
| | Gates Decl. Ex. B, p. 51 (Sales & Marketing Plan), Ex. O (Miller Dep. Tr. 58:16-20), Dkt. No. 77, December 11, 2007 Minute Order, pp. 2, 4. |
| 26.     Rule 8-A has the effect of continuously restraining former Herbalife distributors because it not only violates Rule 8-A to solicit Herbalife distributors for one year after termination, but also to sponsor others who do so. | 26.     Disputed.  Cited evidence does not support assertion.  Also, Rule 8-A does not prevent solicitation of all Herbalife distributors, and does not "continuously restrain" former Herbalife distributors. |
| | <u>Moving Party's Evidence</u> |
| | Greenberg Depo. 220:22-221:20 (Dyer Decl., Ex. "E," pp. 84-85). |
| | <u>Evidence Controverting the Fact</u> |
| | Greenberg Depo. 220:22-221:20 (Dyer |

17

la-1028190

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| | Decl., Ex. "E," pp. 84-85). Gates Decl. Ex. B, p. 51 (Sales & Marketing Plan - citing Rule 8A) |
| 27.   Counterclaimants terminated their distributorships with Herbalife and signed up with Melaleuca, Inc. | 27.   Disputed, in that defendant Dianna Thompson signed up with Melaleuca, after which, Herbalife terminated her distributorship. Moving Party's Evidence Complaint at ¶ 26, 29, 31-33. Evidence Controverting the Fact Dkt. No. 1, Herbalife's Complaint ¶¶ 26, 29, 31-33; Gates Decl. Ex. T (HL000611), Ex. N (Thompson Dep. Tr. 9:23-10:5; 144:14-17, 146:4-23) |
| 28.   After Ford and Fisher handed out business cards and put flyers on cars at a hotel during an Herbalife event, Herbalife responded with a publication stating that this conduct was unfair competition. | 28.   Disputed. Moving Party's Evidence February 6, 2007 Email from Herbalife's Tom Zimmer to TAB Team Members (Dyer Decl., ¶ 10, Ex. "I," pp. 126-129). Evidence Controverting the Fact The cited evidence does not support the assertion. February 6, 2007 Email from Herbalife's Tom Zimmer to TAB |

18

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| | Team Members (Dyer Decl., ¶ 10, Ex. "I," pp. 126-129). |
| 29.    Herbalife's February 6, 2007 email contained a publication that claimed that, in 2006, Herbalife had over $3 billion in retail sales and paid $2.2 billion in commissions, royalties, and bonuses to its Supervisors. | 29.    Undisputed. |
| 30.    On April 20, 2007, Herbalife's CEO sent an "important announcement" to its distributors identifying each of the Counterclaimants and stating that they have been sued for unfair competition. | 30.    Disputed that e-mail went to all distributors.  Undisputed that e-mail stated that Herbalife sued defendants for unfair competition.<br><br>Moving Party's Evidence<br>April 20, 2007 Email From Michael Johnson (Dyer Decl., ¶ 11, Ex. "J," p. 131).<br><br>Evidence Controverting the Fact<br>April 20, 2007 Email From Michael Johnson (Dyer Decl., ¶ 11, Ex. "J," p. 131). |
| 31.    Per Herbalife Rule 8-J, California law governs "all aspects of a Distributor's relationship with Herbalife." | 31.    Undisputed. |

19

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
| --- | --- |
| 32.    On June 15, 2007, pursuant to California Code of Civil Procedure § 2019.210, Herbalife identified its trade secrets as "Herbalife Linage [sic] Documents," "Herbalife Passcode," and "Herbalife Trade Name and Mark." | 32.    Undisputed. |
| 33.    In discovery, Counterclaimant and Defendant Jeff Orr asked Herbalife to produce its alleged trade secrets. | 33.    Disputed.  Discovery request sought all trade secrets that were misappropriated by defendants. <u>Moving Party's Evidence</u> Defendant and Counterclaimant Jeff Orr's First Set of Request [sic] for Production to Plaintiff and Counterclaimant Herbalife of America, Inc. (Dyer Decl., II 13, Ex. "L," p. 137). <u>Evidence Controverting the Fact</u> Defendant and Counterclaimant Jeff Orr's First Set of Request [sic] for Production to Plaintiff and Counterclaimant Herbalife of America, Inc. (Dyer Decl., II 13, Ex. "L," p. 137). |

20

la-1028190

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
| --- | --- |
| 34.   Herbalife did not produce its trade secrets. | 34.   Disputed.  Herbalife has produced thousands of pages of trade secrets in this action (e.g., Royalty Override statements) of the type that defendants misappropriated. <br><br> <u>Moving Party's Evidence</u> <br> Herbalife's Responses to Defendant and Counterclaimant Jeff Orr's First Set of Requests for Production (Dyer Decl., ¶ 14, Ex. "M," p. 140). <br><br> <u>Evidence Controverting the Fact</u> <br> *See* Gates Decl. ¶ 48 |
| 35.   In its response to Jeff Orr's request for production of the trade secrets that Herbalife alleged had been misappropriated, Herbalife stated: "Herbalife has no way to identify the particular trade secrets or documents reflecting those trade secrets Counterclaimants misappropriated and so has no responsive documents." | 35.   Disputed, in that assertion quotes only a portion of Herbalife's response. Herbalife also identified categories of trade secrets that were misappropriated and used. <br><br> <u>Moving Party's Evidence</u> <br> Herbalife's Responses to Defendant and Counterclaimant Jeff Orr's First Set of Requests for Production (Dyer Decl., Ex. "M," p. 140). <br><br> <u>Evidence Controverting the Fact</u> <br> Herbalife's Responses to Defendant and Counterclaimant Jeff Orr's First |

la-1028190

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| | Set of Requests for Production (Dyer Decl., Ex. "M," p. 140). |
| 36.     The Ninth Circuit ruled that the portion of the preliminary injunction that prohibited the Counterclaimants from "Using or disclosing for business related purpose . . . contacts or business information acquired during [Counterclaimants] work with Herbalife" was "overbroad." | 36.     Undisputed. |
| 37.     The Ninth Circuit narrowed the preliminary injunction to "exempt from its coverage only customer contact or business information that the defendants developed of their own accord." | 37.     Undisputed. |
| 38.     During oral arguments before the Ninth Circuit, Judge Silverman stated that Rule 8-A, as incorporated into the preliminary injunction in this case, was a non-compete clause and struck him as "overbroad." | 38.     This is not a "material fact" in the sense contemplated by FRCP Rule 56. |
| 39.     Herbalife independent distributors own and operate their own businesses. | 39.     Undisputed. |

la-1028190

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| 40.    Herbalife independent distributors invest their own time and resources in developing customers and recruiting other distributors. | 40.    Undisputed. |
| 41.    Rule 8-A prevents former distributors from soliciting, sponsoring, promoting or recruiting anyone that the former distributor "became aware of in the course of their Herbalife distributorship." | 41.    Disputed, in that the assertion quotes only a portion of Rule 8A and the full text of Rule 8A contains additional limitations. <u>Moving Party's Evidence</u> "Sales & Marketing Plan and Business Rules," p. 51 (Dyer Decl., Ex. "D," p. 68). <u>Evidence Controverting the Fact</u> Gates Decl. Ex. B, p. 51 (Sales & Marketing Plan – citing Rule 8-A) |
| 42.    As such, Rule 8-A requires former Herbalife distributors to throw out their own phone books and forget about every relationship that they made while in Herbalife, including friends and family. | 42.    Disputed. <u>Moving Party's Evidence</u> Greenberg Depo. 178:13-179:2 (Dyer Decl., Ex. "E," pp. 81-82) <u>Evidence Controverting the Fact</u> Cited evidence does not support the assertion. Greenberg Depo. 178:13-179:2 (Dyer Decl., Ex. "E," pp. 81-82) Gates Decl. Ex. R (Greenberg Dep. Tr. |

23

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| | 177:19-178:9), Ex. B, p. 51 (Sales & Marketing Plan – citing Rule 8-A) |
| 43.    Herbalife claims that the Counterclaimants violated their rules and regulations by putting flyers on cars in a parking lot. | 43.    Disputed.  Herbalife contends that entire course of conduct, including this conduct, violated Herbalife's rules. <u>Moving Party's Evidence</u> Greenberg Depo. 32:20-33:5 (Dyer Decl., Ex. "E," p. 72-73). <u>Evidence Controverting the Fact</u> Cited evidence does not support assertion. Greenberg Depo. 32:20-33:5 (Dyer Decl., Ex. "E," p. 72-73). Gates Decl. Ex. R (Greenberg Dep. Tr. 31:13-33:5, 109:11-24) |
| 44.    Herbalife also claims that a former distributor who asked his or her child to join him or her at a competing company would violate Herbalife's rules and regulations. | 44.  Disputed, in that Herbalife does not make any such claim in this litigation. <u>Moving Party's Evidence</u> Miller Depo. 171:23-172:12 (Dyer Decl., Ex. "A," pp. 36-37). <u>Evidence Controverting the Fact</u> Cited evidence does not support assertion, in that Ms. Miller was responding to a hypothetical presented |

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| | by Defendants' counsel. Miller Depo. 171:23-172:12 (Dyer Decl., Ex. "A," pp. 36-37). |
| 45.    Miller claims that Herbalife distributors are required to refrain from competing for three years after their distributorship is over. | 45.    Disputed. Herbalife has made no such claim.  Defendants have all conceded that Herbalife never asserted a violation of that clause. <u>Moving Party's Evidence</u> Miller Depo. 54:1-24, 56:6-20 (Dyer Decl., Ex. "A," pp. 20-21) <u>Evidence Controverting the Fact</u> Gates Decl. Ex. Q (B. Roth Dep. Tr. 79:3-22), Ex. R (P. Greenberg Dep. Tr. 104:3-16), Ex. D (N. Roth Dep. Tr. 19:3-9), Ex. I (J. Ford Dep. Tr. 108:12-109:4; 109:16-21; 110:20-24), Ex. S (E. Klucken Dep. Tr. 125:8-16), Ex. N (D. Thompson Dep. Tr. 158:18-25) |
| 46.    Miller admitted that Rule 8-A is not tied to use of trade secrets or confidential information. | 46.    Disputed.  The evidence cited does not support the assertion.  Rule 8-A serves to protect trade secrets. <u>Moving Party's Evidence</u> Miller Depo. 57:9-15 (Dyer Decl., Ex. "A," p. 22) <u>Evidence Controverting the Fact</u> |

la-1028190

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| | The evidence cited does not support the assertion.  See Miller Depo. 57:9-15 (Dyer Decl., Ex. "A," p. 22) Rule 8-A protects trade secrets: Gates Decl. Ex. U ¶¶ 12, 38 (Declaration of Jacqueline Miller in Support of Herbalife's Motion for Preliminary Injunction (Miller Declaration)); Ex. M (Gratziani Dep. Tr. 108:24-109:13); Dkt. No. 77, December 11, 2007 Minute Order, pp. 2 & 4 |
| 47.     Rule 8-A was enacted on September 1, 2006. | 47.     Disputed. Moving Party's Evidence Herbalife Complaint Form (Dyer Decl., Ex. "H"). Greenberg Depo. 219:20-220:6 (Dyer Decl., Ex. "E," pp. 83-84). Evidence Controverting the Fact Cited evidence states that Rule 8-A applies to conduct after September 1, 2006, not that it was enacted September 1, 2006.  Herbalife Complaint Form (Dyer Decl., Ex. "H"). |

la-1028190

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| 48. Jason Fisher left Herbalife in January 2006. | 48. Undisputed. |
| 49. Robert and Julie Ford resigned from Herbalife on September 1, 2006. | 49. Undisputed. |
| 50. Herbalife has submitted different versions of the Confidential and Non-Disclosure Agreement ("CNDA") to which it contends Counterclaimants agreed. | 50. Disputed, to the extent that defendants imply that Herbalife contends defendants agreed to different versions of the same agreement. They consented to two separate agreements: 1) the Bizworks Subscription Agreement containing a confidentiality provision, and 2) a separate Confidentiality and Nondisclosure Agreement. <u>Moving Party's Evidence</u> Versions of Herbalife's CNDA (Dyer Decl., ¶ 17, Ex. "P," pp. 149-159). <u>Evidence Controverting the Fact</u> Gates Decl. Ex. V ¶¶ 23 & 27 (Declaration of Jacqueline Miller in Further Support of Herbalife's Motion for Preliminary Injunction (Miller Declaration in Further Support)) |
| 51. Miller testified that she had no personal knowledge of the Defendants | 51. Disputed in that Miller has knowledge regarding the "click |

27

la-1028190

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
| --- | --- |
| assent to the CNDA. | through" defendants must have done in order to obtain access to Herbalife confidential information, e.g., Bizworks.  Undisputed that Miller has no personal knowledge regarding the actual click through, however. |
| | <u>Moving Party's Evidence</u> |
| | Miller Depo. 200:15-207:1 (Dyer Decl., Ex. "A," pp. 42-49). |
| | <u>Evidence Controverting the Fact</u> |
| | Gates Decl. Ex. U ¶¶ 13-15 (Miller Declaration) |
| | *See* AMF 143 |
| 52.    Herbalife contends that Counterclaimants violated the following additional Herbalife rules: 8-B, 8-D, 8-G, and 8-H. | 52.    Disputed in that defendant Thompson violated these rules, and defendants Nancy and Bruce Roth violated at least Rule 8-G. |
| | <u>Moving Party's Evidence</u> |
| | Herbalife's Responses to Defendant and Counterclaimant Bruce H. Roth's First Set of Interrogatories (Nos. 1-23) (Dyer Decl., If 18, Ex. "Q," p.161). |
| | <u>Evidence Controverting the Fact</u> |
| | Gates Decl. Ex. N (Thompson Dep. Tr. 144:14-17, 146:4-23), Ex. D (N. Roth |

la-1028190

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| | Dep. Tr. 125:2-126:12) |
| 53.    Rule 8-B prohibits Herbalife distributors from promoting organizations other than Herbalife when training their organizations. | 53.    Undisputed. |
| 54.    Rule 8-B does not apply to former Herbalife distributors. | 54.    Undisputed that Rule 8-B does not govern conduct occurring after distributor resigns from Herbalife. <u>Moving Party's Evidence</u> Miller Depo. 174:22-175:1 (Dyer Decl., Ex. "A," pp. 38-39). <u>Evidence Controverting the Fact</u> Gates Decl. Ex. B, p. 51 (Sales & Marketing Plan – citing Rule 8-B) |
| 55.    Rule 8-D, entitled "Comply with Laws," applies only to current Herbalife distributors. | 55.    Undisputed that Rule 8-D does not govern conduct occurring after distributor resigns from Herbalife <u>Moving Party's Evidence</u> "Sales & Marketing Plan and Business Rules," p. 51 (Dyer Decl., Ex. "D," p. 68. <u>Evidence Controverting the Fact</u> Gates Decl. Ex. B, p. 51 (Sales & Marketing Plan – citing Rule 8-D) |
| 56.    Rule 8-G prohibits providing | 56.    Undisputed that Rule 8-G does |

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| "false and misleading" information, but applies only to current Herbalife distributors. | not govern conduct occurring after distributor resigns from Herbalife <u>Moving Party's Evidence</u> "Sales & Marketing Plan and Business Rules," p. 52 (Dyer Decl., Ex. "D," p. 69.) <u>Evidence Controverting the Fact</u> Gates Decl. Ex. B, p. 52 (Sales & Marketing Plan – citing Rule 8-G) |
| 57.    Herbalife has not presented any evidence that Counterclaimants violated Rule 8-G. | 57.    Disputed as to Dianna Thompson and Nancy and Bruce Roth. <u>Moving Party's Evidence</u> Miller Depo. 192:6-10 (Dyer Decl., Ex. "A," p. 40). <u>Evidence Controverting the Fact</u> Gates Decl. Ex. N (Thompson Dep. Tr. 144:14-17, 146:4-23), Ex. D (N. Roth Dep. Tr. 125:2-126:12) |
| 58.    Rule 8-H relates to maintaining the reputation and image of Herbalife. It applies only to current Herbalife distributors. | 58.    Undisputed. |
| 59.    Herbalife's top rule official testified that she did not know why Counterclaimants have been accused | 59.    Dispute characterization of Ms. Miller as Herbalife's "top rule official."  Undisputed that she testified |

30

la-1028190

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
| --- | --- |
| of violating Rule 8-H. | to that effect. |
| | <u>Moving Party's Evidence</u> |
| | Miller Depo. 192:11-193:14 (Dyer Decl., Ex. "A," p. 40-41). |
| | <u>Evidence Controverting the Fact</u> |
| | Gates Decl. Ex. O (Miller Dep. Tr. 12:7-12, 14:2-15, 192:23-193:6); Hienrich Decl. ¶¶ 1-4 |
| 60.    Herbalife has stated under oath that it cannot produce its trade secrets. | 60.    Disputed. Defendants' assertion misrepresents Herbalife's full response to Defendant and Counterclaimant Jeff Orr's First Set of Requests for Production. |
| | <u>Moving Party's Evidence</u> |
| | Herbalife's Responses to Defendant and Counterclaimant Jeff Orr's First Set of Requests for Production (Dyer Decl., Ex. "M," p. 140). |
| | <u>Evidence Controverting the Fact</u> |
| | Herbalife's Responses to Defendant and Counterclaimant Jeff Orr's First Set of Requests for Production (Dyer Decl., Ex. "M," p. 140). |
| 61.    Herbalife has failed to produce the allegedly misappropriated trade | 61.    Disputed. Defendants' assertion misrepresents Herbalife's full response |

la-1028190

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| secrets. | to Defendant and Counterclaimant Jeff Orr's First Set of Requests for Production. <u>Moving Party's Evidence</u> Herbalife's Responses to Defendant and Counterclaimant Jeff Orr's First Set of Requests for Production (Dyer Decl., Ex. "M," p. 140). <u>Evidence Controverting the Fact</u> Herbalife's Responses to Defendant and Counterclaimant Jeff Orr's First Set of Requests for Production (Dyer Decl., Ex. "M," p. 140). |
| 62.    When Herbalife was asked to identify the Defendant's misrepresentations regarding Melaleuca's products being "safe and non-toxic," Herbalife could not identify a single statement made by Defendants. | 62.    Disputed. <u>Moving Party's Evidence</u> Herbalife's Responses to Defendant and Counterclaimant Robert E. Ford's First Set of Interrogatories (Nos. 1-18) (Dyer Decl., ¶ 19, Ex. "R," p. 165-166). <u>Evidence Controverting the Fact</u> Gates Decl. Ex. W (Herbalife's Responses to Defendant and Counterclaimant Robert E. Ford's First Set of Interrogatories (No. 8)), Ex. EE |

la-1028190

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| | Declaration of Paul Greenberg in Support Herbalife International of America, Inc.'s Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment (Greenberg Declaration), Ex. X (FORD0010701-FORD0010706). |
| 63.    Herbalife also could not set forth any admissible evidence to support its claim that Melaleuca's products are unsafe or toxic. | 63.    Disputed.

Moving Party's Evidence

Herbalife's Responses to Defendant and Counterclaimant Robert E. Ford's First Set of Interrogatories (Nos. 1-18) (Dyer Decl., ¶ 19, Ex. "R," p. 165-166).

Evidence Controverting the Fact

Gates Decl. Ex. W (Herbalife's Responses to Defendant and Counterclaimant Robert E. Ford's First Set of Interrogatories (No. 9)); Declaration of Dr. Steve Henig in Support of Herbalife International of America, Inc.'s Opposition to Defendants' Motion for Partial Summary Judgment (Henig Declaration) ¶¶ 4, 5 |

33

la-1028190

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| 64.    The sole fraud allegation in the Complaint is that Nancy Roth sent an email to Bob Bogard at Herbalife on January 30, 2007 requesting data on her downline distributors. | 64.    Disputed, but moot: Herbalife voluntarily dismisses its fraud claim. <br> Moving Party's Evidence <br> Complaint at ¶ 125. <br> Evidence Controverting the Fact <br> Dkt. No. 1, Herbalife's Complaint ¶ 125 |
| 65.    All other fraud allegations have been dismissed. | 65.    Undisputed |
| 66.    Herbalife did not send Nancy Roth with her downline list in response to her January 30, 2007 e-mail. | 66.    Undisputed. |
| 67.    Herbalife denied Nancy Roth's request for her downline information. | 67.    Undisputed. |
| 68.    Omnitrition's principals included former Herbalife distributors. | 68.    Undisputed that at least one principal of Omnitrition is a former Herbalife distributor. Disputed in that cited evidence does not support assertion. <br> Moving Party's Evidence <br> Miller Depo. 99:24-100:6 (Dyer Decl., Ex. "A," p. 31-32). <br> Evidence Controverting the Fact <br> Cited evidence does not support |

34

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| | assertion. |
| | Miller Depo. 99:24-100:6 (Dyer Decl., Ex. "A," p. 31-32). |
| 69.    Herbalife is a multi-level marketing program. | 69.    Disputed, in that Herbalife is a company, which operates a multi-level marketing plan. |
| | <u>Moving Party's Evidence</u> |
| | Miller Depo. 30:21-23 (Dyer Decl., Ex. "A," p. 12). |
| | <u>Evidence Controverting the Fact</u> |
| | Miller Depo. 30:21-23 (Dyer Decl., Ex. "A," p. 12). |
| 70.    Herbalife sells nutritional supplements, vitamins, and skin care products. | 70.    Undisputed. |
| 71.    Herbalife's sales force are "independent contractors" and the first level of independent contractors are referred to as "distributors." | 71.    Undisputed. |
| 72.    Herbalife distributors have the right to buy products at a discount for use or resale and to recruit others into the program. | 72.    Undisputed. |
| 73.    Herbalife distributors can qualify to become a "supervisor" by | 73.    Disputed. Supervisors qualify based total volume, as defined in the |

la-1028190

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| ordering a minimum amount (several thousand dollars) in products, measured by suggested retail price, from Herbalife in one or two (consecutive) months. | Sales and Marketing Plan. <u>Moving Party's Evidence</u> Miller Depo. 36:22-37:14 (Dyer Decl., Ex. "A," p. 15-16). <u>Evidence Controverting the Fact</u> McKee Decl. ¶ 13; Gates Decl. Ex. B, pp. 6-7, 9-10 (Sales and Marketing Plan) |
| 74.    Herbalife supervisors must meet certain order requirements to maintain the status of supervisor. | 74.    Disputed.  Supervisors requalify based on total volume, as explained in the Sales and Marketing Plan. <u>Moving Party's Evidence</u> Miller Depo. 38:13-39:8 (Dyer Decl., Ex. "A," p. 17-18). <u>Evidence Controverting the Fact</u> Gates Decl. Ex. B, pp. 10-11 (Sales & Marketing Plan) |
| 75.    Herbalife supervisors are entitled to receive a royalty override on up to three generations of "downline" supervisors. | 75.    Disputed.  As a Supervisor, with Fully Qualified or Qualifying Supervisors in your first three levels, you may qualify to receive Royalty Overrides if additional requirements are met.  A Royalty Override is a "payment ranging from 1% to 5% made to Fully Qualified Supervisors on |

36

la-1028190

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| | the Monthly Volume of their three levels of active downline Supervisors." |
| | <u>Moving Party's Evidence</u> |
| | Miller Depo. 36:22-37:14 (Dyer Decl., Ex. "A," p. 15-16). |
| | "Sales & Marketing Plan and Business Rules," p. 11 (Dyer Decl., Ex. "D," p. 64). |
| | <u>Evidence Controverting the Fact</u> |
| | Gates Decl. Ex. B, pp. 11, 18 (Sales and Marketing Plan) |
| 76.    The royalty override gives the Herbalife supervisor a percentage commission on orders placed by downline supervisors. | 76.    Disputed.  As a Supervisor, with Fully Qualified or Qualifying Supervisors in your first three levels, you may qualify to receive Royalty Overrides if additional requirements are met.  A Royalty Override is a "payment ranging from 1% to 5% made to Fully Qualified Supervisors on the Monthly Volume of their three levels of active downline Supervisors." |
| | <u>Moving Party's Evidence</u> |
| | Miller Depo. 73:3-20 (Dyer Decl., Ex. "A," p. 27). |
| | <u>Evidence Controverting the Fact</u> |

37

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| | Gates Decl. Ex. B, pp. 11, 18 (Sales and Marketing Plan) |
| 77.    Herbalife supervisors and those they recruit must continue to purchase a minimum amount of product each month from Herbalife to qualify the supervisor for the royalty override. | 77.    Disputed.  Qualification for Royalty Overrides is based on total volume, as specified in the Sales & Marketing Plan. |
| | Moving Party's Evidence |
| | Miller Depo. 73:3-20 (Dyer Decl., Ex. "A," p. 27). |
| | "Sales & Marketing Plan and Business Rules," p. 11 (Dyer Decl., Ex. "D," p. 64). |
| | Evidence Controverting the Fact |
| | Gates Decl. Ex. O (Miller Dep. Tr. 73:3-20), Ex. B, pp. 11, 18 (Sales and Marketing Plan) |
| 78.    Herbalife supervisors receive the right to sell the products and earn compensation based on product orders made by the supervisor's recruits. | 78.    Disputed. Herbalife supervisors have right to sell products without regard to orders placed by their supervisors, and have right to earn royalties if they meet the additional requirements (e.g., retail product sales). |
| | Moving Party's Evidence |
| | "Live the Good Life with Herbalife," |

38

la-1028190

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| | pp. 21-22 (Dyer Decl., Ex. "C," pp. 59-60). |
| | <u>Evidence Controverting the Fact</u> |
| | Gates Decl. Ex. B, pp. 9, 11 (Sales and Marketing Plan) |
| 79.   Advancement at Herbalife "is not based on retail. It's based on volume purchased from the company." | 79.   Disputed, in that retails sales are required for advancement. |
| | <u>Moving Party's Evidence</u> |
| | Deposition of Mike McKee ["McKee Depo."]) 90:22-91:15 (Dyer Decl., If 7, Ex. "F," pp. 109-110). |
| | <u>Evidence Controverting the Fact</u> |
| | Cited evidence does not support assertion. |
| | Deposition of Mike McKee ["McKee Depo."]) 90:22-91:15 (Dyer Decl., If 7, Ex. "F," pp. 109-110). |
| | Gates Decl. Ex. B pp. 6, 7, 59, 62 (Sales & Marketing Plan – citing to Rules 20-C, 20-D, & 24-B), Ex. C (McKee Dep. Tr. 12:2-23, 17:11-25, 51:13-24, 104:21-105:9, 133:1-9, 190:2-21), Ex. D (N. Roth Dep. Tr. 94:16-21, 95:8-11), Ex. E (L. Nix Dep. Tr. 168:23-169:14, 237:23-238:12), |

la-1028190

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| | Ex. F (J. Orr Dep. Tr. 23:16-24:12, 71:8-72:7, 81:21-82:10, 123:22-124:11), Ex. G (K. Orr Dep. Tr. 72:2-10), Ex. H (Johnson Dep. Tr. 80:25-81:23), Ex. I (J. Ford Dep. Tr. 30:9-12; 33:3-34:11; 34:25-35:21; 50:22-51:14; 79:15-80:4), Ex. J (J. Fisher Dep. Tr. 9:16-10:12; 39:24-40:3; 55:6-56:5), Ex. K (R. Ford Dep. Tr. 20:3-10; 46:3-7; 46:14-47:3), Ex. L (D. Schmaman Dep. Tr. 36:10-18; 53:2-12), Ex. M (S. Gratziani Dep. Tr. 40:1-20; 66:12-67:8; 96:1-9; 144:13-22), Ex. N (D. Thompson Dep. Tr. 26:15-27:21; 50:4-10); Gates Confid. Decl. Ex. F (Johnson Dep. Tr. 133:8-25); McKee Decl. ¶¶ 14, 15, 17, 18, 20-23; Hienrich Decl. ¶¶ 5, 7 |
| 80.    Herbalife does not keep track of retail sales. | 80.    Undisputed that Herbalife cannot and does not keep records of actual retail sales by distributors.  Disputed in that (1) HL does calculate retail sales figures as that phrase is commonly used in sales reporting and (2) Herbalife does know the names of |

40

la-1028190

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| | many of its retail customers which include, among others, Herbalife distributors. |
| | <u>Moving Party's Evidence</u> |
| | Greenberg Depo. 117:3-5 (Dyer Decl., ¶ 6, Ex. "E," pp. 80). |
| | <u>Evidence Controverting the Fact</u> |
| | Gates Decl. Ex. B, pp. 42, 59 (Sales and Marketing Plan, pp. 42, 59 – citing to Rules 20-C & 20-D), Ex. H (Johnson Dep. Tr. 175:6-176:9, 188:2-9), Ex. F (J. Orr Dep. Tr. 31:20-32:4, 95:17-96:3), Ex. G (K. Orr Dep. Tr. 67:17-68:22), Ex. I (J. Ford Dep. Tr. 74:8-11), Ex. E (L. Nix Dep. Tr. 247:3-15) |
| 81.    In Herbalife's Marketing Plan, which is shaped like a pyramid, retail sales are unrelated to advancement. | 81.    Disputed. |
| | <u>Moving Party's Evidence</u> |
| | "Live the Good Life with Herbalife," p. 22 (Dyer Decl., Ex. "C," p. 60). |
| | <u>Evidence Controverting the Fact</u> |
| | Gates Decl. Ex. A ("Living the Good Life with Herbalife"), Ex. B pp. 6, 7, 59, 62 (Sales & Marketing Plan – citing to Rules 20-C, 20-D, & 24-B), |

la-1028190

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| | Ex. C (McKee Dep. Tr. 12:2-23, 17:11-25, 51:13-24, 104:21-105:9, 133:1-9, 190:2-21), Ex. D (N. Roth Dep. Tr. 94:16-21, 95:8-11), Ex. E (L. Nix Dep. Tr. 168:23-169:14, 237:23-238:12), Ex. F (J. Orr Dep. Tr. 23:16-24:12, 71:8-72:7, 81:21-82:10, 123:22-124:11), Ex. G (K. Orr Dep. Tr. 72:2-10), Ex. H (Johnson Dep. Tr. 80:25-81:23), Ex. I (J. Ford Dep. Tr. 30:9-12; 33:3-34:11; 34:25-35:21; 50:22-51:14; 79:15-80:4), Ex. J (J. Fisher Dep. Tr. 9:16-10:12; 39:24-40:3; 55:6-56:5), Ex. K (R. Ford Dep. Tr. 20:3-10; 46:3-7; 46:14-47:3), Ex. L (D. Schmaman Dep. Tr. 36:10-18; 53:2-12), Ex. M (S. Gratziani Dep. Tr. 40:1-20; 66:12-67:8; 96:1-9; 144:13-22), Ex. N (D. Thompson Dep. Tr. 26:15-27:21; 50:4-10); Gates Confid. Decl. Ex. F (Johnson Dep. Tr. 133:8-25); McKee Decl. ¶¶ 14, 15, 17, 18, 20-23 ); Hienrich Decl. ¶¶ 5, 7 |
| 82.    Herbalife's Marketing Plan, which is shaped like a pyramid, does | 82.    Disputed. The evidence Defendants cite references retail |

la-1028190

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| not mention retail sales or retail customers in any way. | profits.<br><br>Moving Party's Evidence<br>"Live the Good Life with Herbalife," p. 22 (Dyer Decl., Ex. "C," p. 60).<br><br>Evidence Controverting the Fact<br>Gates Decl. Ex. A ("Living the Good Life with Herbalife"), Ex. B pp. 6, 7, 59, 62 (Sales & Marketing Plan – citing to Rules 20-C, 20-D, & 24-B), Ex. C (McKee Dep. Tr. 12:2-23, 17:11-25, 51:13-24, 104:21-105:9, 133:1-9, 190:2-21), Ex. D (N. Roth Dep. Tr. 94:16-21, 95:8-11), Ex. E (L. Nix Dep. Tr. 168:23-169:14, 237:23-238:12), Ex. F (J. Orr Dep. Tr. 23:16-24:12, 71:8-72:7, 81:21-82:10, 123:22-124:11), Ex. G (K. Orr Dep. Tr. 72:2-10), Ex. H (Johnson Dep. Tr. 80:25-81:23), Ex. I (J. Ford Dep. Tr. 30:9-12; 33:3-34:11; 34:25-35:21; 50:22-51:14; 79:15-80:4), Ex. J (J. Fisher Dep. Tr. 9:16-10:12; 39:24-40:3; 55:6-56:5), Ex. K (R. Ford Dep. Tr. 20:3-10; 46:3-7; 46:14-47:3), Ex. L (D. Schmaman Dep. Tr. 36:10-18; 53:2-12), Ex. M (S. |

43

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| | Gratziani Dep. Tr. 40:1-20; 66:12-67:8; 96:1-9; 144:13-22), Ex. N (D. Thompson Dep. Tr. 26:15-27:21; 50:4-10); Gates Confid. Decl. Ex. F (Johnson Dep. Tr. 133:8-25); McKee Decl. ¶¶ 14, 15, 17, 18, 20-23; Hienrich Decl. ¶¶ 5, 7 |
| 83.    The bottom level of Herbalife's Marketing Plan is "Distributor"—not "customer." | 83.    Dispute the suggestion that Distributors are not also customers. Undisputed that Herbalife distributors are known as "Distributors." |
| | Moving Party's Evidence |
| | "Live the Good Life with Herbalife," p. 22 (Dyer Decl., Ex. "C," p. 60). |
| | Evidence Controverting the Fact |
| | Gates Decl. Ex. F (J. Orr Dep. Tr. 31:20-32:4; 95:17-96:3; 123:22-124:11), Ex. G (K. Orr Dep. Tr. 67:17-68:22; 82:12-83:3), Ex. I (J. Ford Dep. Tr. 72:10-19; 74:8-11), Ex. Q (B. Roth Dep. Tr. 21:18-22:4), Ex. E (L. Nix Dep. Tr. 204:13-205:2, 223:19-224:21, 247:3-15) |
| 84.    To earn royalty overrides on downline orders, Herbalife | 84.    Undisputed. |

la-1028190

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| supervisors must certify that they have made sales to ten retail customers in the past month. | |
| 85.    To receive a royalty override, Herbalife supervisors must certify that they have sold at least 70% of products "they retain for resale" to either other Herbalife distributors or retail customers. | 85.    Disputed, in that Defendants' assertion misstates the rule.<br><br>Moving Party's Evidence<br>Miller Depo. 41:14-21 (Dyer Decl., Ex. "A," p. 19).<br><br>Evidence Controverting the Fact<br>Gates Decl. Ex. B, p. 59 (Sales and Marketing Plan – citing to Rule 20-D) |
| 86.    In his deposition, McKee, Herbalife's Vice President of Business Development (Sales), admitted that he did not know what the "70% rule" was. | 86.    Disputed.<br><br>Moving Party's Evidence<br>McKee Depo. 127:16-20 (Dyer Decl., Ex. "F," p. 112).<br><br>Evidence Controverting the Fact<br>Cited evidence does not support Defendants' assertion.<br>McKee Depo. 127:16-20 (Dyer Decl., Ex. "F," p. 112). |
| 87.    McKee doesn't train on the 70% rule because he does not consider it to be "exciting stuff." | 87.    Undisputed that McKee does not train on the 70% rule.  Disputed the reason he does not do so is because he does not find it exciting (as he testified, he is on "the sales end"). |

45

la-1028190

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| | Moving Party's Evidence |
| | McKee Depo. 127:21-128:9 (Dyer Decl., Ex. "F," p. 112-113). |
| | Evidence Controverting the Fact |
| | McKee Decl. ¶ 6; Gates Decl. Ex. C (McKee Dep. Tr. 23:16-24:4, 28:24-29:24, 127:21-128:13) |
| 88.     Herbalife has a buyback policy. | 88.     Undisputed. |
| 89.     Herbalife allows mere certification by distributors and does not even request the names of the ten customers. | 89.     Disputed. |
| | Moving Party's Evidence |
| | Miller Depo. 63:5-9 (Dyer Decl., Ex. "A," p. 24). |
| | "Sales & Marketing Plan and Business Rules," p. 42 (Dyer Decl., Ex. "D," p. 65). |
| | Evidence Controverting the Fact |
| | Gates Decl. Ex. O (Miller Dep. Tr. 62:14-63:24), Ex. B, p. 42 (Sales and Marketing Plan); Hienrich Decl. ¶¶ 8-17 |
| 90.     Herbalife has distributors sign a "certification form" that contains no information whatsoever about the retail customer, the contact information of the customer, the | 90.     Undisputed that Certification form does not require distributors to reveal customer names, contact information, etc.  Disputed that Herbalife "has distributors sign" the |

46

la-1028190

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| products sold, or the price paid for the products. | Certification form.   They can only sign if they have in fact complied with the 10 retail customer and 70% rule and agree to furnish supporting information upon request. <u>Moving Party's Evidence</u> "Sales & Marketing Plan and Business Rules," p. 42 (Dyer Decl., Ex. "D," p. 65). <u>Evidence Controverting the Fact</u> Gates Decl. Ex. O (Miller Dep. Tr. 62:14-63:24), Ex. B, pp. 11, 42 (Sales and Marketing Plan) |
| 91.    Instead of random audits, Herbalife claims that it conducts a small number of audits by merely contacting distributors and requesting the names of the distributors' ten customers. | 91.    Disputed.  Herbalife conducts random audits. <u>Moving Party's Evidence</u> Miller Depo. 62:14-20, 69:10-14 (Dyer Decl., Ex. "A," p. 23, 25) (stating that Herbalife conducts about 100 10-customer audits per month, even though Herbalife claims to have over 1.5 million distributors. See Dyer Decl., Ex. "I," p. 130). <u>Evidence Controverting the Fact</u> Gates Decl. Ex. O (Miller Dep. Tr. |

la-1028190

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| | 22:16-24, 69:10-14); Hienrich Decl. ¶¶ 8-17 |
| 92.    McKee, who is the primary "link between Herbalife and its mid-level to top Supervisors" testified that he does not know the requirements of Herbalife's 10-customer rule. | 92.    Disputed, misstates the cited testimony. Moving Party's Evidence McKee Depo. 23:16-25:15, 107:1-6 (Dyer Decl., Ex. "F," p. 102-104, 111). Evidence Controverting the Fact Gates Decl. Ex. C (McKee Dep. Tr. 23:16-24:4) |
| 93.    The 10-customer rule is difficult to understand, even for the person at Herbalife who is responsible for enforcing it. | 93.    Disputed. Moving Party's Evidence Miller Depo. 12:4-17, 41:14-21 (Dyer Decl., Ex. "A," p. 7, 19). Evidence Controverting the Fact The cited evidence does not address the 10-customer rule. Gates Decl. Ex. O (Miller Dep. 7:7-12, 14:2-15, 41:14-21, 44:16-23); Hienrich Decl. ¶¶ 1-4, 8 |
| 94.    Herbalife leaves the training of the rules to the independent distributors who are not agents or employees of Herbalife and who themselves lack experience and | 94.    Disputed. Moving Party's Evidence Miller Depo. 62:14-20, 69:10-14 (Dyer Decl., Ex. "A," p. 23, 25). Evidence Controverting the Fact |

48

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
| --- | --- |
| training to train the members of this requirement. | The evidence cited does not support the assertion. Miller Depo. 62:14-20, 69:10-14 (Dyer Decl., Ex. "A," p. 23, 25). Gates Decl. Ex. B, pp. 53-54 (Sales and Marketing Plan – citing to Rule 10-C), Ex. C (McKee Dep. Tr. 31:19-23), Ex. R (Greenberg Dep. Tr. 66:4-24, 68:12-71:4), Ex. E (Nix Dep. Tr. 53:15-54:6, 160:6-161:5), Ex. M (Gratziani Dep. Tr. 60:17-61:22) |
| 95.    There are no educational or other requirements to be a Herbalife distributor. | 95.    Undisputed that there are no formal educational requirements. Disputed that there are no other requirements. Moving Party's Evidence Greenberg Depo. 63:12-14 (Dyer Decl., ¶ 6, Ex. "E," p. 74). Evidence Controverting the Fact Gates Decl. Ex. B, pp. 3, 32, & 47-93 (Sales and Marketing Plan), Ex. P (HL000001, HL000003, HL000005, Hl000007, HL000008, HL000009, HL000012) |
| 96.    Herbalife could require | 96.    Undisputed. |

49

la-1028190

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| customers to submit a monthly list of retail customers and make blind, random calls to corroborate the validity of the list. | |
| 97.    Herbalife's distributors simply "certify" that they have complied with the 70% rule. | 97.    Disputed. <br><br> <u>Moving Party's Evidence</u> <br> "Sales & Marketing Plan and Business Rules," p. 42 (Dyer Decl., Ex. "D," p. 65). <br><br> <u>Evidence Controverting the Fact</u> <br> Gates Decl. Ex. B, pp. 42, 59 (Sales and Marketing Plan – citing Rule 20-D), Ex. O (Miller Dep. Tr. 69:18-70:1); Hienrich Decl. ¶¶ 18-23 |
| 98.    Herbalife's distributors only certify that 70% of the product they "hold for resale" has been sold. | 98.    Undisputed that in order to obtain royalty overrides and bonuses, distributors who are supervisors must comply with the 70% rule (confirming that they have sold 70% of the total value of products they hold for resale each month) and certify such compliance.  Disputed as to the remainder of assertion because it is unclear what is meant by "only certify." |

50

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| | Moving Party's Evidence |
| | "Sales & Marketing Plan and Business Rules," p. 42 (Dyer Decl., Ex. "D," p. 65). |
| | Evidence Controverting the Fact |
| | Gates Decl. Ex. B, pp. 11, 42, & 59 (Sales & Marketing Plan – citing Rule 20-D) |
| 99.    Despite having attended 500 to 1,000 Herbalife trainings, McKee did not know what the 70% rule was and could not recall any training or explanation of the rule occurring at those 500 to 1,000 Herbalife events. | 99.    Disputed, misstates testimony.<br>Moving Party's Evidence<br>McKee Depo. 127:16-20, 129:10-13 (Dyer Decl., Ex. "F," pp. 112, 114).<br>Evidence Controverting the Fact<br>McKee Depo. 129:10-13 (Dyer Decl., Ex. "F," p. 114). |
| 100.   Herbalife's chief rule enforcer is uncertain as to the requirements of the "difficult" 70% rule. | 100.   Disputed, misstates testimony.<br>Moving Party's Evidence<br>Miller Depo. 14:21-15:4, 19:12-18, 41:14-21 (Dyer Decl., Ex. "A," p. 8-10, 19).<br>Evidence Controverting the Fact<br>Gates Decl. Ex. O (Miller Dep. Tr. 12:7-12, 14:2-15, 19:19-24, 41:14-23) |
| 101.   Herbalife does not conduct routine audits to ensure compliance | 101.   Undisputed that Herbalife does not conduct random audits for |

la-1028190

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
| --- | --- |
| with the 70% rule. | compliance with the 70% rule. But disputed to the extent assertion suggests Herbalife does not audit with regard to 70% rule. <u>Moving Party's Evidence</u> Miller Depo. 25:5-20 (Dyer Decl., Ex. "A," p. 11). <u>Evidence Controverting the Fact</u> Hienrich Decl. ¶¶ 18-23 |
| 102.   Current Herbalife distributors are not eligible for any buyback. | 102.   Disputed. Current Herbalife distributors are eligible for buybacks, but must resign their distributorship in connection with the repurchase. <u>Moving Party's Evidence</u> "Sales & Marketing Plan and Business Rules," p. 44 (Dyer Decl., Ex. "D," p. 66). <u>Evidence Controverting the Fact</u> Gates Decl. Ex. B, pp. 44, 53 (Sales & Marketing Plan – citing Rule 9-D); Hienrich Decl.  ¶¶ 24-26 |
| 103.   Herbalife distributors who request a buyback suffer a permanent loss of their distributorships. | 103.   Undisputed that buyback policy is for distributors who no longer want to be Herbalife distributors.  Disputed |

52

la-1028190

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| | that distributors who choose to take advantage of buyback policy "suffer" as a result of the rights given to them under the buyback policy. |
| | <u>Moving Party's Evidence</u> |
| | "Sales & Marketing Plan and Business Rules," p. 44 (Dyer Decl., Ex. "D," p. 66). |
| | <u>Evidence Controverting the Fact</u> |
| | Gates Decl. Ex. B, pp. 44, 53 (Sales and Marketing Plan – citing to Rule 9-D); Hienrich Decl. ¶¶ 24-26 |
| 104.   Herbalife will not buy back product from an active distributor or even an inactive distributor who has not "permanently" resigned. | 104.   Disputed. |
| | Current Herbalife distributors are eligible for buybacks, but must resign their distributorship in connection with the repurchase. |
| | <u>Moving Party's Evidence</u> |
| | "Sales & Marketing Plan and Business Rules," p. 44 (Dyer Decl., Ex. "D," p. 66). |
| | <u>Evidence Controverting the Fact</u> |
| | Gates Decl. Ex. B, pp. 44, 53 (Sales and Marketing Plan – citing to Rule 9-D); Hienrich Decl. ¶¶ 24-26 |

la-1028190

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| 105.   A distributor requesting a buyback must first permanently resign his/her distributorship in writing. | 105.   Disputed. Current Herbalife distributors are eligible for buybacks, but must resign their distributorship in connection with the repurchase. <u>Moving Party's Evidence</u> "Sales & Marketing Plan and Business Rules," p. 44 (Dyer Decl., Ex. "D," p. 66). <u>Evidence Controverting the Fact</u> Hienrich Decl. ¶¶ 24-26; Gates Decl. Ex. B, pp. 44 & 53 (Sales and Marketing Plan – citing to Rule 9-D) |
| 106.   A distributor that requests a buyback loses all royalties, commissions, bonuses, and discounts from Herbalife. | 106.   Disputed. <u>Moving Party's Evidence</u> Greenberg Depo. 264:11-21 (Dyer Decl., ¶ 6, Ex. "E," p. 92). <u>Evidence Controverting the Fact</u> Gates Decl. Ex. B, p. 53 (Sales and Marketing Plan – citing to Rule 9-D) |
| 107.   If a distributor asks for a buyback, the distributor and the distributor's upline are retroactively charged back on their royalty bonus checks. | 107.   Disputed. <u>Moving Party's Evidence</u> "Sales & Marketing Plan and Business Rules," p. 43 (Dyer Decl., Ex. "D," p. 65-66). |

54

la-1028190

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| | Evidence Controverting the Fact |
| | Gates Decl. Ex. B, p. 53 (Sales and Marketing Plan – citing to Rule 9-D) |
| 108.   Herbalife's agreements and rules state that a former distributor is subject to Herbalife's 3-year covenant not to compete and the 1-year non-solicitation provision. | 108.   Herbalife does not dispute that defendants' distributorship agreements include a 3 year non-compete provision (which is not enforced) and that Herbalife's Rule 8-A contains a 1 year non-solicitation provision.  Herbalife disputes that all Herbalife distributor agreements contain a 3 year non-compete provision. |
| | Moving Party's Evidence |
| | Herbalife Distributor Agreements (Dyer Decl., Ex. "G," pp. 120-125). "Sales & Marketing Plan and Business Rules," p. 44 (Dyer Decl., Ex. "D," p. 66). |
| | Evidence Controverting the Fact |
| | Herbalife Distributor Agreements (Dyer Decl., Ex. "G," pp. 120-125). Gates Decl. Ex. B, pp. 32-33 (Sales and Marketing Plan) |
| 109.   To obtain a buyback, the former Herbalife distributor must sign an | 109.   Disputed. No separate agreement is required; rather, a Distributor must |

55

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| agreement that states that the former distributor agrees to Herbalife's various buyback terms and rules. | submit an Inventory Repurchase Request Form. <br> <u>Moving Party's Evidence</u> <br> "Sales & Marketing Plan and Business Rules," p. 44 (Dyer Decl., Ex. "D," p. 66). <br> <u>Evidence Controverting the Fact</u> <br> Gates Decl. Ex. B, pp. 44-45 (Sales and Marketing Plan); Hienrich Decl. ¶¶ 24, 26 |
| 110.   To obtain a buyback, the former Herbalife distributor must also provide a complete, detailed written inventory of product to be returned. | 110.   Disputed. <br> <u>Moving Party's Evidence</u> <br> "Sales & Marketing Plan and Business Rules," p. 45 (Dyer Decl., Ex. "D," p. 66). <br> <u>Evidence Controverting the Fact</u> <br> Gates Decl. Ex. B, pp. 44-45 (Sales and Marketing Plan); Hienrich Decl. ¶¶ 24, 26 |
| 111.   To obtain a buyback, the former Herbalife distributor must also provide cancelled checks and credit card statements proving the purchase of each item on the inventory. | 111.   Undisputed, but subject to exception. *See* Hienrich Decl. ¶¶ 24, 26 |
| 112.   To obtain a buyback, the former | 112.   Undisputed, but subject to |

56

la-1028190

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| Herbalife distributor must also provide two years of records of sales to his/her retail customers and downline. | exception. *See* Hienrich Decl. ¶¶ 24, 26 |
| 113.   Herbalife's buyback offer is discretionary based on Herbalife's determinations of condition of the product and other factors. | 113.   Disputed. <u>Moving Party's Evidence</u> "Sales & Marketing Plan and Business Rules," p. 44 (Dyer Decl., Ex. "D," p. 66). <u>Evidence Controverting the Fact</u> Gates Decl. Ex. B, pp. 44-45, 53 (Sales and Marketing Plan - citing Rule 9-D) |
| 114.   When it provides its buyback refund, Herbalife does not return its 10-11% handling charges that were originally paid on the product and the former distributor must pay the shipping charges to return the product to Herbalife. | 114.   Undisputed that Herbalife does not return shipping or handling costs on purchase, or return shipping. |
| 115.   Herbalife's top official in charge of the department that enforces the 10-customer and 70% rules does not know whether Herbalife's policies | 115.   Disputed, misstates testimony. Ms. Miller was not asked whether policies are effective; just if she was aware of studies.  Further, Ms. Miller |

57

la-1028190

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| are effective and does not think that Herbalife has conducted any studies to determine whether the rules are effective to promote sales outside of Herbalife. | was not the "top official" responsible for rule compliance. <u>Moving Party's Evidence</u> Miller Depo. 14:21-15:4, 19:12-18, 94:23-95:13, 96:5-8 (Dyer Decl., Ex. "A," p. 8-10, 28-30). <u>Evidence Controverting the Fact</u> Gates Decl. Ex. O (Miller Dep. Tr. 11:14-23, 12:7-12, 14:2-15, 19:19-24, 94:23-95:2); Hienrich Decl. ¶¶ 1-4 |
| 116.   Herbalife does not keep any records relating to its distributors' retail sales and does not know the names of its retail customers. | 116.   Undisputed that Herbalife cannot and does not keep records of actual retail sales by distributors.  Disputed in that (1) HL does calculate retail sales figures as that phrase is commonly used in sales reporting and (2) Herbalife does know the names of many of its retail customers which include, among others, Herbalife distributors. <u>Moving Party's Evidence</u> Greenberg Depo. 117:3-5, 251:13-252:17 (Dyer Decl., ¶ 6, Ex. "E," pp. 80, 90-91). <u>Evidence Controverting the Fact</u> |

la-1028190

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| | Gates Decl. Ex. B, pp. 42, 59 (Sales and Marketing Plan – citing to Rules 20-C & 20-D), Ex. H (Johnson Dep. Tr. 175:6-176:9, 188:2-9), Ex. F (J. Orr Dep. Tr. 31:20-32:4, 95:17-96:3), Ex. G (K. Orr Dep. Tr. 67:17-68:22), Ex. I (J. Ford Dep. Tr. 74:8-11), Ex. E (L. Nix Dep. Tr. 247:3-15) |
| 117. Counterclaimants are in competition with Herbalife. | 117. Undisputed to the extent that Counterclaimants are distributors Melaleuca, which is in competition with Herbalife. |
| 118. In an email sent to all members of its "TAB Team" on February 6, 2007, Herbalife claimed that Herbalife had achieved a "record $3 Billion in retail sales in 2006." | 118. Undisputed. |
| 119. Herbalife also included a hyperlink in its February 6, 2007 email that invited its TAB Team members to download a document called: "Herbalife...A Proven Success." | 119. Undisputed. |
| 120. The document titled: Herbalife...A Proven Success" | 120. Undisputed. |

la-1028190

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| claimed that Herbalife had "record retail sales of $3 billion in 2006 and still growing." | |
| 121.   Herbalife does not keep records of its retail sales. | 121.   Undisputed that Herbalife cannot and does not keep records of actual retail sales by distributors.  Disputed in that (1) HL does calculate retail sales figures as that phrase is commonly used in sales reporting and (2) Herbalife does know the names of many of its retail customers which include, among others, Herbalife distributors.  Undisputed that Herbalife cannot and does not keep records of actual retail sales by distributors.  But disputed in that Herbalife does track and report "retail sales" as that phrase is commonly understood in reporting sales volume.

Moving Party's Evidence
Greenberg Depo. 117:3-5 (Dyer Decl., ¶ 6, Ex. "E," p. 80).
Evidence Controverting the Fact
Gates Decl. Ex. B, pp. 42, 59 (Sales and Marketing Plan Rules – citing to |

la-1028190

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| | Rules 20-C & 20-D), Ex. H (Johnson Dep. Tr. 175:6-176:9, 188:2-9), Ex. F (J. Orr Dep. Tr. 31:20-32:4, 95:17-96:3), Ex. G (K. Orr Dep. Tr. 67:17-68:22), Ex. I (J. Ford Dep. Tr. 74:8-11), Ex. E (L. Nix Dep. Tr. 247:3-15) |
| 122.   Herbalife did not receive gross revenues or retail sales of $3 billion in 2006. | 122.   Undisputed that Herbalife did not receive gross revenues of $3 billion in 2006.  Disputed that Herbalife did not exceed $3 billion in retail sales in 2006, as defined in the Annual Report. Moving Party's Evidence Herbalife's 2006 Annual Report (Dyer Decl., Ex. "B," pp. 54-56). Evidence Controverting the Fact Herbalife's 2006 Annual Report (Dyer Decl., Ex. "B," pp. 54-56). Gates Decl. Ex. H (Johnson Dep. Tr. 175:6-176:9), Ex. R (Greenberg Dep. Tr. 162:6-14) |
| 123.   Herbalife's "product sales," which represent the purchase price paid to Herbalife by its distributors, were $1.627 billion in 2006. | 123.   Undisputed that Herbalife had $1.627 in "product sales" in 2006 as defined in its Annual Report. |

la-1028190

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| 124.   Herbalife's "net sales," which include Herbalife's income from shipping and handling on its products, were $1.885 billion in 2006. | 124.   Undisputed that Herbalife had $1.885 billion in "net sales" in 2006 as defined in its Annual Report. |
| 125.   The document titled: Herbalife...A Proven Success" claimed that" in 2006, Herbalife Supervisors were paid $2.2 billion in commissions, royalties, and bonuses." | 125.   Undisputed. |
| 126.   Herbalife's product sales in 2006 were $1.627 billion. | 126.   Undisputed that Herbalife had $1.627 in "product sales" in 2006 as defined in its Annual Report. |
| 127.   Herbalife's 2006 10-K showed that "Royalty overrides" for 2006 were $675 million. | 127.   Undisputed. |
| 128.   Herbalife advertises that its business opportunity is "recession proof" | 128.   Disputed, in that cited evidence does not support the assertion.  In context, the video does not advertise that the Herbalife business opportunity is recession proof.  Moving Party's Evidence December 22, 2008 Video titled: "Why Herbalife, Why Now?" (Dyer |

| COUNTERCLAIMANTS' ASSERTION | HERBALIFE'S RESPONSE |
|---|---|
| | Decl., ¶ 21, Ex. "T"). |
| | <u>Evidence Controverting the Fact</u> |
| | December 22, 2008 Video titled: |
| | "Why Herbalife, Why Now?" (Dyer |
| | Decl., ¶ 21, Ex. "T"). |
| | Gates Decl. Ex. Y (transcript of "Why |
| | Herbalife – Why Now" Video). |
| 129.   The video states: "Why Herbalife? Herbal-nomics. It's recession proof ... This opportunity can be your answer . . . ." | 129.   Disputed, in that the factual assertion is incomplete and misleading because it does not include relevant portions from the video. |
| | <u>Moving Party's Evidence</u> |
| | December 22, 2008 Video titled: |
| | "Why Herbalife, Why Now?" (Dyer |
| | Decl., ¶ 21, Ex. "T"). |
| | <u>Evidence Controverting the Fact</u> |
| | December 22, 2008 Video titled: |
| | "Why Herbalife, Why Now?" (Dyer |
| | Decl., ¶ 21, Ex. "T"). |
| | Gates Decl. Ex. Y (transcript of "Why Herbalife – Why Now" Video) |
| 130.   Mike Mckee, Herbalife's Vice President of Business Development (Sales), testified that no company was recession proof, including Herbalife. | 130.   Undisputed. |

63

la-1028190

## II.  HERBALIFE'S ADDITIONAL MATERIAL FACTS IN SUPPORT OF ITS OPPOSITION

| HERBALIFE'S ADDITIONAL MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 131.  Herbalife is a direct sales company that sells its products through a network of independent distributors. | Gates Decl. Ex. U ¶ 5 (Miller Declaration) |
| 132.  Distributors purchase Herbalife products at wholesale prices for personal use and re-sale, and earn commissions on the sale of products for which they are directly or indirectly responsible. | Gates Decl. Ex. U ¶ 6 (Miller Declaration). |
| 133.  To increase the profitability of participating in Herbalife, distributors may recruit and sponsor others to use and sell Herbalife products; those new distributors, in turn, may recruit and sponsor others. | Gates Decl. Ex. U ¶ 7 (Miller Declaration). |
| 134.  Each distributor's organization of directly and indirectly sponsored distributors is known as his "downline." The sponsor who recruited the distributor into Herbalife, as well as those above | Gates Decl. Ex. U ¶ 8 (Miller Declaration). |

la-1028190

| HERBALIFE'S ADDITIONAL MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| that sponsor, are known as the distributor's "upline." | |
| 135.   Herbalife, like other direct sales companies, relies heavily on its distributor network to promote and sell its products. | Gates Decl. Ex. U ¶ 12 (Miller Declaration). |
| 136.   Herbalife maintains detailed information concerning the lineage and performance of its distributor network, including the relationships among distributors (e.g., uplines and downlines), each distributor's performance and compensation-related statistics, the sales volume for which each distributor is directly or indirectly responsible, and compilations containing detailed contact information for each such distributor (the "Confidential Information"). | Gates Decl. Ex. U ¶¶ 12-19 (Miller Declaration). |
| 137.   This Confidential Information is treated by Herbalife as highly confidential and is critical to the | Gates Decl. Ex. U ¶¶ 12-19 (Miller Declaration) |

| HERBALIFE'S ADDITIONAL MATERIAL FACTS: | SUPPORTING EVIDENCE: |
| --- | --- |
| company's survival | |
| 138. Other companies with multi-level marketing structures, including Melaleuca, considers lineage information to be highly confidential.  Melaleuca President and CEO Frank VanderSloot explained to the FTC, "Melaleuca considers its list of Marketing Executives and customers to be highly confidential and proprietary. This list literally is Melaleuca's most valuable asset. Competitor companies and their distributors would love to get their hands on even a small portion of the list." | Gates Decl. Ex. Z (Melaleuca Letter to Federal Trade Commission). |
| 139. For business purposes, Herbalife distributors have access to "Indented Lineage Reports" that identify, for each person in a distributor's downline, (a) the name of the distributor's sponsor; (b) where in the downline organization the | Gates Decl. Ex. U ¶¶ 13-16 (Miller Declaration; Ex. B to Miller Declaration) |

66

| HERBALIFE'S ADDITIONAL MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| distributor is situated; (c) the bonus level applicable to each distributor (e.g., "Supervisor," "Global Expansion Team member," etc.); (d) the distributor's sales volume and sales trend statistics; (e) the number of new distributors recruited by each distributor; (f) other financial and performance-related information for downline distributors; and (g) detailed contact information for each such distributor, including Herbalife I.D. number, daytime and evening telephone numbers, email and postal addresses. | |
| 140.   Herbalife distributors also have access, subject to non-disclosure obligations, to Royalty Override and Production Bonus statements containing Confidential Information such as each distributor's sales volume. | Gates Decl. Ex. U ¶¶ 18, 19 (Miller Declaration) |
| 141.   In their signed Distributor | Gates Decl. Ex. P (HL000001, |

67

la-1028190

| HERBALIFE'S ADDITIONAL MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| applications, each Defendant agreed that: | HL000003, HL000005, Hl000007, HL000008, HL000009, HL000012) |
| For a period of three (3) years after termination of this agreement Distributor will hold in confidence any trade secrets, formulas, sales and distribution systems, business information, and literature which Distributor acquired during the term of this agreement and will not use directly or indirectly such items. | |
| 142.  Confidential Information is made available to current Herbalife distributors subject to non-disclosure agreements.  To access Herbalife's website, which contains confidential sales and lineage information, a distributor must agree (by "clicking through") to a Confidentiality and Non-Disclosure Agreement ("CDNA"). | Gates Decl. Ex. U ¶¶ 13-15 (Miller Declaration; Ex. A to Miller Declaration); Declaration of Terry Adams in Support of Plaintiff Herbalife International of America, Inc.'s Motion Opposition to Defendants' Motion for Partial Summary Judgment (Adams Decl.) ¶¶ 3-5. |
| 143.  The defendants are each subject to Herbalife's CDNA. | Adams Decl.  ¶¶ 6-9. Gates Decl. Ex. N (D. Thompson Dep. |

68

la-1028190

| HERBALIFE'S ADDITIONAL MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| | Tr. 100:22-102:10), Ex. V ¶¶ 13, 26-29 (Miller Declaration in Further Support; Ex. 1 to Miller Dec. in Further Support), Ex. P (HL000001, HL000003, HL000005, Hl000007, HL000008, HL000009, HL000012) |
| 144.  Pursuant to the Herbalife Distributorship Agreement, each Herbalife Distributor must "abide by all of Herbalife's rules, regulations, policies and procedures as amended from time to time, including those set forth in … Herbalife publications which are hereby incorporated by reference." | Gates Decl. Ex. P (HL000001, HL000003, HL000005, Hl000007, HL000008, HL000009, HL000012) |
| 145.  Herbalife Rule 8-A provides as follows: "During the course of a Distributorship and for one year thereafter, neither the Distributor nor their spouse, nor any other person assisting in a Distributorship will, directly or indirectly (through or by means of any person, entity or artifice). solicit, | Gates Decl. Ex. B, 51 (Sales and Marketing Plan – citing to Rule 8-A) |

69

la-1028190

| HERBALIFE'S ADDITIONAL MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| promote, sponsor or recruit any Herbalife Distributor, or any Herbalife customer they became aware of in the course of their Herbalife Distributorship, to join, promote, sell or purchase products of, or participate in as a salesperson or otherwise, any multi-level marketing or direct-sales company, nor will they encourage anyone to do what is prohibited under this rule." | |
| 146.  Each of the Defendants left Herbalife to join Herbalife's competitor, Melaleuca. Melaleuca distributors earn money based on the product sales of distributors they recruit to join the company. | Dkt. No. 152, Answer to Amended Counterclaim ¶¶ 8-12; Gates Decl. Ex. F (J. Orr Dep. Tr. 187:15-190:4), Ex. G (K. Orr Dep. Tr. 187:16-188:13), Ex. D (N. Roth Dep. Tr. 61:19-62:23) |
| 147.  Defendants, after joining Melaleuca, attempted to build their organizations at Melaleuca by trying to raid their former Herbalife organizations.  They used Herbalife's confidential information to do this. | Gates Decl. Ex. AA (D00703-D00760), Ex. D (N. Roth Dep. Tr. 106:18-24, 126:16-127:22.), Ex. RR (Dep. Ex. 47). This document was authenticated by Nancy Roth. N. Roth Dep. Tr. 105:19-25 (Gates Decl. Ex. D). Gates Decl. Ex. TT (Dep. Ex. 48). |

la-1028190

| HERBALIFE'S ADDITIONAL MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| | This document was authenticated by Nancy Roth. N. Roth Dep. Tr. 115:2-16 (Gates Decl. Ex. D). Gates Decl. Ex. SS (Dep. Ex. 49). This document was authenticated by Nancy Roth. N. Roth Dep. Tr. 119:17-20 (Gates Decl. Ex. D). Gates Decl. Ex. J (Fisher Dep. Tr. 195:3-197:1), Ex. Q (B. Roth Dep. Tr. 153:18-154:17), Ex. N (D. Thompson Dep. Tr. 104:20-105:22; 236:20-237:24), Ex. F (J. Orr Dep. Tr. 218:17-221:3), Ex. I (J. Ford Dep. Tr. 144:13-16) |
| 148. In January 2007, defendants Jason Fisher and Robert Ford persuaded Bruce and Nancy Roth to leave Herbalife to join Melaleuca. For the next month, while the Roths were still Herbalife distributors, the Roths, Fisher and Ford made plans to recruit away Herbalife distributors using Herbalife's confidential information. Fisher and Ford told the Roths how to | Gates Decl. Ex. D (N. Roth Dep. Tr. 73:10-74:6; 74:17-75:7; 81:4-20; 82:18-83:10; 98:5-101:9; 105:19-107:9, 115:2-116:9, 118:22-119:16, 122:7-19; 126:16-127:11), Ex. QQ (Dep. Ex. 43), This document was authenticated by Nancy Roth. N. Roth Dep. Tr. 96:20-97:25 (Gates Decl. Ex. D). Ex. RR (Dep. Ex. 47), Ex. SS (Dep. Ex. 49), Ex. Q (B. Roth Dep. Tr. 152:13-154:21; 156:5-16), Ex. J (J. Fisher Dep. Tr. 195:3-24), Ex. K (R. |

la-1028190

| HERBALIFE'S ADDITIONAL MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| obtain their historical Herbalife lineage reports to use in their Melaleuca recruiting efforts, as Fisher and Ford had done when they left Herbalife. | Ford Dep. Tr. 148:9-15) |
| 149. Nancy Roth later asked Fisher for help converting her Herbalife paper lineage reports into digital format; Fisher had "an ex-Herbalifer in [his] downline who had software that could transfer over paper lineage reports." This was a hindrance to the Roths, because at their "peak with [Herbalife] we didn't have lineage reports in a digital format." | Gates Decl. Ex. D (N. Roth Dep. Tr. 105:19-106:24), Ex. RR (Dep. Ex. 47) |
| 150. That same day, Ms. Roth asked Robert Ford if he had been "able to get [his] Distributor reports from Herbalife for years past," and he responded that "he had them in his tax files."  Ms. Roth also asked Mr. Ford if he knew of a way to get lineage reports | Gates Decl. Ex. D (N. Roth Dep. Tr. 115:2-116:9), Ex. TT (Dep. Ex. 48) |

la-1028190

| HERBALIFE'S ADDITIONAL MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| from Herbalife in digital format prior to May 2003, because "Herbalife Central only [went] back that far" in January 2007. Ford, who had accessed Herbalife Central for the same reason, stated that he did "not believe you can go farther back than 2003." | |
| 151.  Then, on the eve of their departure from Herbalife to Melaleuca, Nancy Roth e-mailed Herbalife to ask for copies of all of the Roths' lineage reports from the beginning of their association with Herbalife in 1995.  She constructed an elaborate lie to convince Herbalife that it was "crucial" that she receive the reports by e-mail the following morning. | Gates Decl. Ex. D (N. Roth Dep. Tr. 119:12-18, 122:20-126:12), Ex. SS Dep. Ex. 49) |
| 152.  The Roths resigned from Herbalife on February 1, 2007. They joined Jason Fisher and Robert Ford for a ten-day | Gates Decl. Ex. J (Fisher Dep. Tr. 195:3-197:1), Ex. D (N. Roth Dep. Tr. 122:1-19, 126:16-127:11), Ex. BB ¶ 8 (Declaration of David Schmaman in |

73

| HERBALIFE'S ADDITIONAL MATERIAL FACTS: | SUPPORTING EVIDENCE: |
| --- | --- |
| recruiting blitz, working continuously to solicit Herbalife distributors in the Roths' former downline. | Further Support of Herbalife's Motion for Preliminary Injunction (Schmaman Declaration)) |
| 153. Defendants also engaged in various coercive and deceptive recruiting tactics in an effort to convert Herbalife distributors to Melaleuca. | Gates Decl. Ex. CC ¶¶ 4-7 (Declaration of Richard Palmer in Support of Plaintiff Herbalife International of America, Inc.'s Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment (Palmer Declaration)), Ex. DD ¶¶ 8, 10 & 11 (Declaration of Lilith Nix in Support of Motion for Preliminary Injunction (Nix Declaration)), Ex. BB ¶¶ 5, 6 (Schmaman Declaration) |
| 154. Defendants have repeatedly sought to recruit Herbalife distributors to Melaleuca by threatening to "take [the distributor's] entire downline to Melaleuca" if the distributor would not convert to Melaleuca – a credible threat given the information they gained through | Gates Decl. Ex. EE ¶ 4, Ex. F (Greenberg Declaration), Ex. CC ¶¶ 4-6 (Palmer Declaration), Ex. BB ¶ 5 (Schmaman Declaration), Ex. DD ¶ 11 (Nix Declaration), Ex. FF ¶ 12 (Declaration of Elizabeth Klucken in Support of Herbalife's Motion for Preliminary Injunction (Klucken Declaration)), Ex. L (Schmaman Dep. |

la-1028190

| HERBALIFE'S ADDITIONAL MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| their Herbalife distributorships and a practice that some Herbalife distributors describe as "blackmail." | Tr. 83:2-90:1) |
| 155. Defendants threatened to destroy the organizations that these distributors (not Defendants) had built unless they agreed to join Melaleuca, which Herbalife distributors decried as "unethical" and sleazy." | Gates Decl. Ex. EE ¶ 3, Ex. A, B (Greenberg Declaration) |
| 156. Defendants have told distributors that people in their downline have already agreed to join Melaleuca – again a credible tale given their position as former distributors. | Gates Decl. Ex. E (L. Nix Dep. Tr. 24:23-27:14), Ex. BB ¶ 5 (Schmaman Declaration) |
| 157. Mr. Ford even told an Herbalife distributor that she should leave Herbalife because her upline supervisor would now "lose his house" because Ford left Herbalife. | Gates Decl. Ex. E (Nix Dep. Tr. 20:10-21:16) |
| 158. Defendants have solicited Herbalife distributors to not only | Gates Decl. Ex. Q (B. Roth Dep. Tr. 175:18-177:7), Ex. E (L. Nix Dep. |

75

| HERBALIFE'S ADDITIONAL MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| leave Herbalife for Melaleuca, but to bring their downlines to Melaleuca as well (in breach of their contracts with Herbalife), increasing the pressure on upline Herbalife distributors. | Tr. 268:12-269:21), Ex. V ¶¶ 3-12 (Miller Declaration in Further Support), Ex. BB ¶¶ 3-5 (Schmaman Declaration), Ex. GG (HL000055-56). |
| 159. Defendants gained an entrée by falsely representing they were still with Herbalife, used Herbalife records to contact their downlines, and were "saying horrible things about . . . Herbalife." | Gates Decl. Ex. EE ¶¶ 5, 6, 7; Ex. B, C (Greenberg Declaration), Ex. HH ¶¶ 1-3 (Declaration of Potato Richardson in Support of Plaintiff Herbalife International of America, Inc.'s Motion for Summary Judgment or, in the Alternative Partial Summary Judgment (Richardson Declaration)), Ex. II ¶¶ 1-4, Ex. Q, N (Declaration of Caryle Justesen in Support of Motion for Preliminary Injunction (Justesen Declaration)) |
| 160. Through Defendants' distributor agreements, each agreed to be bound by all of Herbalife's rules and regulations | Gates Decl. Ex. P (HL000001, HL000003, HL000005, Hl000007, HL000008, HL000009, HL000012.) |
| 161. Jason Fisher and the Fords induced others to breach Rule 8-A and their distributor | Gates Decl. Ex. D (N. Roth Dep. Tr. 73:10-74:6; 74:17-75:7; 81:4-20; 82:18-83:10; 98:5-101:9; 122:7-19; |

76

la-1028190

| HERBALIFE'S ADDITIONAL MATERIAL FACTS: | SUPPORTING EVIDENCE: |
| --- | --- |
| agreements. | 126:16-127:11), Ex. QQ (Dep. Ex. 43), Ex. Q (B. Roth Dep. Tr. 152:13-154:21; 156:5-16), Ex. J (J. Fisher Dep. Tr. 195:3-24), Ex. K (R. Ford Dep. Tr. 142:6-143:20; 146:23-147:16; 148:9-15), Ex. I (J. Ford Dep. Tr. 128:16-129:10; 130:1-25; 138:11-22) |
| 162.   All Defendants except Fisher consented to the CNDA before accessing Herbalife's trade secrets on Herbalife's distributor website. | Adams Decl. ¶¶ 7-9; Gates Decl. Ex. N (D. Thompson Dep. Tr. 100:22-102:10) |
| 163.   Dianna Thompson was contacting Herbalife distributors to recruit for Melaleuca while still an Herbalife distributor. Herbalife's Tab Team Agreement and her Distributor Agreement provide she is bound by Rules 8B and 8G.  Those rules provide:<br><br>8-B - "The Herbalife business is an equal opportunity, regardless of gender, race, religious beliefs or | Gates Decl. Ex. B, p. 51, 52 (Sales and Marketing Plan – citing Rules 8-B & 8-G), Ex. N (D. Thompson Dep. Tr. 144:14-17), Ex. E (L. Nix Dep. Tr. 22:14-23:20) |

la-1028190

| HERBALIFE'S ADDITIONAL MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| political affiliations. It is our philosophy that everyone has a personal right to their individual beliefs and the freedom to choose. Therefore, when training their organization or other Distributors, or selling products or offering the business opportunity, Distributors are not permitted to promote, discuss or offer, any company, organization or individual other than Herbalife, its staff and its Distributors. Likewise, Distributors may not include literature or other material that promotes any other organizations or individuals, whether religious, political, business or social or that implies any association between Herbalife and any other organization. Herbalife meetings may not be used as a forum to express personal beliefs or promote any other organization, company, event or individual. 8-G – "No Distributor shall submit false or misleading information to the Company." | |

78

| HERBALIFE'S ADDITIONAL MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 164.  Nancy Roth admits she lied to Herbalife to try to obtain lineage information, which violates Rule 8G and their Tab Team Agreement.  Bruce Roth admits he knew all about his wife's deceit. | Gates Decl. Ex. D (N. Roth Dep. Tr. 125:2-126:12.), Ex. Q (B. Roth Dep. Tr. 160:13-161:7) |
| 165.  In response to Jeff Orr's First Set of Requests for Production, No. 1,  in which he requested Herbalife produce "All trade secrets that YOU contend were misappropriated by COUNTERCLAIMANTS," Herbalife responded that, "Herbalife contends Defendants misappropriated, 'among other things, the Lineage Reports and downline information. . .Herbalife's prospective product lines and marketing materials, confidential business and financial information concerning Herbalife's products, prices and pricing schedules, profitability | Gates Decl. Ex. JJ (Herbalife's Responses to Defendant and Counterclaimant Jeff Orr's First Set of Requests for Production, No. 1) |

la-1028190

| HERBALIFE'S ADDITIONAL MATERIAL FACTS: | SUPPORTING EVIDENCE: |
| --- | --- |
| considerations, marketing techniques and/or other market considerations,' as stated in Paragraphs 83 of the Complaint. As Distributors, Defendants had access to the above-mentioned information and received it in a variety of ways, including by mail and on Bizworks. Herbalife has no way to identify the particular trade secrets or documents reflecting those trade secrets Defendants misappropriated and so has no responsive documents." | |
| 166.  In response to Dianna Thompson's Interrogatory No. 8, in which she requested that Herbalife "state all facts that support YOUR contention that information regarding the identity of YOUR distributors is a trade secret," Herbalife identified those documents which it considered among its | Gates Decl. Ex. KK (Herbalife's Responses to Defendant and Counterclaimant Dianna Thompson's First Set of Interrogatories, No. 8) |

la-1028190

| HERBALIFE'S ADDITIONAL MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| trade secrets: "Herbalife Lineage Reports, Royalty Override Statements, Production Bonus Statements, information obtained through Bizworks and confidential business information acquired by Herbalife distributors, including at Herbalife events, to build their business (such as their customer databases) are trade secrets because they have economic value to competitors." | |
| 167.  Defendants used Herbalife's confidential information – lineage and sales information concerning Herbalife distributors' downline organizations as reflected in Lineage Reports, Royalty Override Statements, and Production Bonus Statements. | Gates Decl. Ex. D (N. Roth Dep. Tr. 106:18-24, 126:16-127:22), Ex. Q (B. Roth Dep. Tr. 153:18-154:17), Ex. N (D. Thompson Dep. Tr. 104:20-105:22; 236:20-237:24), Ex. F (J. Orr Dep. Tr. 218:17-221:3), Ex. J (J. Fisher Dep. Tr. 195:3-197:1), Ex. I (J. Ford Dep. Tr. 144:13-16) |
| 168.  Improper use of Herbalife lineage information is detrimental to Herbalife because | Gates Decl. Ex. U ¶¶ 12, 38 (Miller Declaration), Ex. M (Gratziani Dep. Tr. 108:24-109:13); Dkt. No. 77, |

la-1028190

| HERBALIFE'S ADDITIONAL MATERIAL FACTS: | SUPPORTING EVIDENCE: |
| --- | --- |
| it could allow former distributors to target key Herbalife distributors and their downlines, as Defendants have done.  Rule 8-A is justified by the need to prevent this type of misuse. | December 11, 2007 Minute Order, pp. 2 & 4 |
| 169.   All users must agree to the CNDA by clicking through it in order to access the password-protected trade secrets maintained there by Herbalife. | Adams Decl. ¶¶ 3-5; Gates Decl. Ex. V ¶¶ 21-23 (Miller Declaration in Further Support), Ex. U ¶ 15 (Miller Declaration) |
| 170.   Information from Herbalife's information technology department shows that Robert Ford, Nancy Roth and Kathy Orr all agreed to be bound by the CNDA.  These Defendants and their spouses therefore agreed to maintain the confidentiality of Herbalife's lineage information. And Dianna Thompson has conceded that she agreed to the terms of the CNDA. | Adams Decl. ¶¶ 7-9; Gates Decl. Ex. N (D. Thompson Dep. Tr. 100:22-102:10) |
| 171.   Defendants have represented that Melaleuca products are safe and | Gates Decl. Ex. EE (Greenberg Declaration), Ex. X (FORD0010701- |

82

la-1028190

| HERBALIFE'S ADDITIONAL MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| non-toxic. | FORD0010706) |
| 172. Representations that Melaleuca products are safe and non-toxic are false. | Henig Decl. ¶¶ 4, 5 |
| 173. Herbalife spends millions of dollars each year on research and development of those products, and employs exceptionally qualified physicians and nutritional experts to help develop its products. | Henig Decl. ¶ 3 |
| 174. Herbalife invests in extensive advertising and branding to raise its profile and that of its products among consumers.  For example, Herbalife sponsors the LA Galaxy, youth soccer programs, Indy car drivers, and local athletes, all in a bid to raise its public profile and increase demand for the company's products. | McKee Decl. ¶ 9 |
| 175. The actual use of Herbalife products is the primary focus of Herbalife's business.  Herbalife | McKee Decl. ¶¶ 15, 18, & 20- 22; Gates Decl. Ex. C (McKee Dep. Tr. 15:11- 17:10; 190:8-21), Ex. F (J. Orr |

83

| HERBALIFE'S ADDITIONAL MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| distributors believe strongly in the efficacy of Herbalife's products, because they are extremely effective.  This strong belief in Herbalife's products allows distributors to sell the products effectively. | Dep. Tr. 25:15-21; 185:4-6), Ex. G (K. Orr Dep. Tr. 123:6-12), Ex. Q (B. Roth Dep. Tr. 15:8-21), Ex. D (N. Roth Dep. Tr. 11:14-12:11), Ex. I (J. Ford Dep. Tr. 24:16-26:10) |
| 176.   The defendants and third-party witnesses testified that they believed in Herbalife's products and used them.  Several defendants, in fact, continue to use Herbalife products. | Gates Decl. Ex. F (J. Orr Dep. Tr. 25:15-21; 185:4-6), Ex. G (K. Orr Dep. Tr. 123:6-12), Ex. Q (B. Roth Dep. Tr. 15:8-21), Ex. D (N. Roth Dep. Tr. 11:14-12:11), Ex. I (J. Ford Dep. Tr. 24:16-26:10), Ex. N (D. Thompson Dep. Tr. 21:9-22:11; 23:1-3; 24:11-14), Ex. J (J. Fisher Dep. Tr. 37:22-38:5), Ex. L (D. Schmaman Dep. Tr. 18:1-19:6), Ex. E (L. Nix Dep. Tr. 137:19-24) |
| 177.   Retail sales are the core and primary focus of the Herbalife business opportunity. | Gates Decl. Ex. B pp. 6, 7, 59, 62 (Sales & Marketing Plan – citing to Rules 20-C, 20-D, & 24-B), Ex. C (McKee Dep. Tr. 12:2-23, 17:11-25, 51:13-24, 104:21-105:9, 133:1-9, 190:2-21), Ex. D (N. Roth Dep. Tr. 94:16-21, 95:8-11), Ex. E (L. Nix Dep. |

la-1028190

| HERBALIFE'S ADDITIONAL MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| | Tr. 168:23-169:14, 237:23-238:12), Ex. F (J. Orr Dep. Tr. 23:16-24:12, 71:8-72:7, 81:21-82:10, 123:22-124:11), Ex. G (K. Orr Dep. Tr. 72:2-10), Ex. H (Johnson Dep. Tr. 80:25-81:23), Ex. I (J. Ford Dep. Tr. 30:9-12; 33:3-34:11; 34:25-35:21; 50:22-51:14; 79:15-80:4), Ex. J (J. Fisher Dep. Tr. 9:16-10:12; 39:24-40:3; 55:6-56:5), Ex. K (R. Ford Dep. Tr. 20:3-10; 46:3-7; 46:14-47:3), Ex. L (D. Schmaman Dep. Tr. 36:10-18; 53:2-12), Ex. M (S. Gratziani Dep. Tr. 40:1-20; 66:12-67:8; 96:1-9; 144:13-22), Ex. N (D. Thompson Dep. Tr. 26:15-27:21; 50:4-10); Gates Confid. Decl. Ex. F (Johnson Dep. Tr. 133:8-25); McKee Decl. ¶¶ 14, 15, 17, 18, 20-23; Hienrich Decl. ¶¶ 5, 7 |
| 178.   The principal focus of Herbalife's Sales & Marketing Plan is use of Herbalife products and retail sales. | Gates Decl. Ex. B pp. 6, 7, 59, 62 (Sales & Marketing Plan – citing to Rules 20-C, 20-D, & 24-B), Ex. C (McKee Dep. Tr. 12:2-23, 17:11-25, 51:13-24, 104:21-105:9, 133:1-9, 190:2-21), Ex. D (N. Roth Dep. Tr. 94:16-21, 95:8-11), Ex. E (L. Nix |

la-1028190

| HERBALIFE'S ADDITIONAL MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| | Dep. Tr. 168:23-169:14, 237:23-238:12), Ex. F (J. Orr Dep. Tr. 23:16-24:12, 71:8-72:7, 81:21-82:10, 123:22-124:11), Ex. G (K. Orr Dep. Tr. 72:2-10), Ex. H (Johnson Dep. Tr. 80:25-81:23), Ex. I (J. Ford Dep. Tr. 30:9-12; 33:3-34:11; 34:25-35:21; 50:22-51:14; 79:15-80:4), Ex. J (J. Fisher Dep. Tr. 9:16-10:12; 39:24-40:3; 55:6-56:5), Ex. K (R. Ford Dep. Tr. 20:3-10; 46:3-7; 46:14-47:3), Ex. L (D. Schmaman Dep. Tr. 36:10-18; 53:2-12), Ex. M (S. Gratziani Dep. Tr. 40:1-20; 66:12-67:8; 96:1-9; 144:13-22), Ex. N (D. Thompson Dep. Tr. 26:15-27:21; 50:4-10); Gates Confid. Decl. Ex. F (Johnson Dep. Tr. 133:8-25); McKee Decl. ¶¶ 14, 15, 17, 18, 20-23; Hienrich Decl. ¶¶ 5, 7 |
| 179.  The Overview on the very first page Herbalife's Sales & Marketing Plan explains:  The Herbalife opportunity and the Marketing Plan is identical for every Distributor.  Each | Gates Decl. Ex. B, p. 3 (Sales and Marketing Plan) |

86

| HERBALIFE'S ADDITIONAL MATERIAL FACTS: | SUPPORTING EVIDENCE: |
| --- | --- |
| Distributor's success is dependent on two primary factors:<br>● The time, effort and commitment a Distributor puts into their Herbalife business and<br>● The product sales made by a Distributor and their downline organization. | |
| 180.   Herbalife teaches its distributors that use of the products is the best way to successfully sell the products.  Herbalife urges its Distributors to "tell a story" of how use of Herbalife products improved their lives to create demand for the products.  Julia Ford and Kathy Orr, who were successful Herbalife distributors, acknowledge this model as key, and also acknowledge using and believing in the products themselves. | Gates Decl. Ex. G (K. Orr Dep. Tr. 56:4-57:7; 92:4-93:9; 94:20-95:21; 126:6-12), Ex. I (J. Ford Dep. Tr. 22:19-24:6; 24:16-26:23), Ex. E (L. Nix Dep. Tr. 43:21-44:7; 91:22-92:10; 296:9-20), Ex. C (McKee Dep. Tr. 15:11-16:12), Ex. O (J. Miller Dep. Tr. 149:15-150:4), Ex. F (J. Orr Dep. Tr. 93:18-25), Ex. D N. Roth Dep. Tr. 14:8-15:19), Ex. Q (B. Roth Dep. Tr. 40:22-41:3) |
| 181.   Herbalife distributors and supervisors do not make money | McKee Decl. ¶ 17; Hienrich Decl. ¶ 5 |

la-1028190

| HERBALIFE'S ADDITIONAL MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| when they sign up new distributors; they make money when those new recruits *sell products*. | |
| 182. All of the Defendants had substantial retail sales focus while they were affiliated with Herbalife.  The Orrs, Julia Ford and Diana Thompson focused nearly exclusively on retail sales. | Gates Decl., Ex. K (R. Ford Dep. Tr. 46:3-7), Ex. I (J. Ford Dep. Tr. 66:13-17, 118:10-119:5), Ex. N (D. Thompson Dep. Tr. 27:15-19), Ex. F (J. Orr Dep. Tr. 23:16-24:12, 71:8-72:7, 81:21-82:10, 123:22-124:11), Ex. G (K. Orr Dep. Tr. 72:2-10) |
| 183. The defendants also taught their downline supervisors to focus on retail sales.  For example, Kathy Orr explained succinctly why she did so: "Because for me, that [retail sales] was the foundation of Herbalife's business or my business." | Gates Decl., Ex. G (K. Orr Dep. Tr. 95: 1-5), Ex. I (J. Ford Dep. Tr. 23:7-24:2.), Ex. D (N. Roth Dep. Tr. 94:16-21; 95:8-11.), Ex. N (D. Thompson Dep. Tr. 31:15-18), Ex. F (J. Orr Dep. Tr. 71:8-21, 118:10-119:5) |
| 184. In order to ensure compliance with the Marketing Plan, each Distributor is required to make sales to at least 10 retail customers a month and to provide certification of those | Hienrich Decl. ¶¶ 8-9, 18; Gates Decl. Ex. B, p. 42 (Sales and Marketing Plan) |

la-1028190

| HERBALIFE'S ADDITIONAL MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| sales in order to receive Royalty Override or Production Bonus payments.  Distributors must also certify that they sold at least 70% of the products that they retain for sale in order to Royalty Override or Production Bonus payments. | |
| 185.  Distributors who fail to provide certification of compliance with the 10 customer rule and 70% rule are subject to the withholding of their payments. | Hienrich Decl. ¶ 11; Gates Confid. Decl. Ex. A (HL015376-HL015382); Gates Decl. Ex. B, p. 42 (Sales and Marketing Plan) |
| 186.  Herbalife ensures compliance with the 10 Customer Rule through its rule requiring certification of compliance, by requiring distributors to maintain documentation of retail sales, and through random audits of compliance by Herbalife's ethics and business practices department. | Hienrich Decl. ¶¶ 8-17; Gates Decl. Ex. O, (J. Miller Dep. Tr. 62:14-20, 69:10-14), Ex. B, p. 42 (Sales and Marketing Plan) |
| 187.  Defendants submitted these forms themselves. | Gates Decl. Ex. LL (HL008663 – HL008736 - Defendants' submitted 10 |

89

| HERBALIFE'S ADDITIONAL MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| | customer forms). |
| 188. In addition to conditioning payment upon fulfillment of the rule, Herbalife also conducts random monthly audits to ensure compliance with the 10 customer rule. | Hienrich Decl. ¶¶ 12-17; Gates Confid. Decl. Ex. B (HL034591-HL034596) |
| 189. Herbalife has detailed procedures for conducting the audits, which includes contact the customers on the Distributor's retail order forms to verify the purchases. | Hienrich Decl. ¶¶ 12-17; Gates Confid. Decl. Ex. B (HL034591-HL034596) |
| 190. Some of the defendants and members of their downline organizations have been audited for compliance with the 10 customer rule. | Gates Decl., Ex. D (N. Roth Dep. Tr. 181:23-182:2), Ex. Q ( B. Roth Dep. Tr. 31:10-18), Ex. E (L. Nix Dep. Tr. 117: 10-13, 242:8-243:1), Ex. P (HL000001 - Ford's Distributorship Agmt., evidencing his Distributor ID as 10411549); Gates Confid. Decl. Ex. C (HL017506-HL017507, evidencing audit of Distributor ID 10411549) |
| 191. Stephan Gratziani, one of Herbalife's most successful distributors (who was deposed in | Gates Decl., Ex. M (Gratziani Dep. Tr. 144:23-145:1) |

90

| HERBALIFE'S ADDITIONAL MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| this case), also testified that he has been audited under the 10 customer and 70 percent rules. | |
| 192. David Schmaman, a former member of the Roths' downline, testified that he currently does not receive Royalty Overrides or Bonus Payments from Herbalife only because he cannot truthfully certify compliance with the 10 customer rule. | Gates Decl. Ex. L (Schmaman Dep. Tr. 93:17-94:13) |
| 193. Herbalife's rules and regulations expressly state that its products "are intended to be sold and distributed to retail customers and downline Distributors" or used for personal consumption. | Gates Decl., Ex. B, p. 59 (Sales and Marketing Plan – citing to Rule 20-B) |
| 194. The practice of purchasing products primarily to qualify for advancement in the Marketing Plan is prohibited by Herbalife and can result in sanctions ranging from probation to termination of a Distributorship. | Hienrich Decl. ¶¶ 18-22; Gates Decl. Ex. B, pp. 52, 53, & 59 (Sales and Marketing Plan – citing to Rules 8-M & 20-B) |
| 195. Herbalife's rules are clear that | Gates Decl., Ex. B, p. 59 (Sales and |

la-1028190

| HERBALIFE'S ADDITIONAL MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| products are to be sold for retail use, not primarily for advancement, and that any such misuse of sales is sanctionable. | Marketing Plan – citing Rule 20-B) |
| 196. Furthermore, distributors are prohibited from representing that overrides and bonuses may be obtained solely from the purchase of products rather than from the sale of products. | Gates Decl. Ex. B, p. 62 (Sales and Marketing Plan – citing to Rules 24-D and 24-E) |
| 197. Herbalife's rules track the company's purpose: to sell products.  Herbalife spends millions of dollars every year on research and development of new products, employing top doctors and nutritional experts to create exceptional products that help its customers get healthier. | Henig Decl. ¶ 3; Hienrich Decl. ¶¶ 6, 7 |
| 198. Many people become Herbalife distributors and supervisors to have the ability to purchase the product at a discount for personal consumption.  Stephan Gratziani noted that 9 times out | Gates Decl. Ex. F (J. Orr Dep. Tr. 31:20-32:4; 95:17-96:3; 123:22-124:11), Ex. G (K. Orr Dep. Tr. 67:17-68:22; 82:12-83:3), Ex. I (J. Ford Dep. Tr. 72:10-19; 74:8-11), Ex. Q (B. Roth Dep. Tr. 21:18-22:4), Ex. |

la-1028190

| HERBALIFE'S ADDITIONAL MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| of 10, individuals who signed up as Herbalife distributors do not intend to "build a business long term with the company" because they were interested in a distributorship for other reasons; for example, because "they want[ed] to get a discount on the products." Thus, it is not surprising that Jeff Orr testified that over 50% of the distributors in the Orrs' extensive downline did not sell the products. | E (L. Nix Dep. at 227:16-20, 247:3-15), Ex. M (S. Gratziani Dep. 71:18-72:12) |
| 199.  The vast majority of the individuals who purchase an IBP never become supervisors and simply become distributors who buy the products for retail and/or personal use. | McKee Decl. ¶¶ 10, 12 ; Gates Decl. Ex. F (J. Orr Dep. Tr. 95:17-96:3) , Ex. M (Gratziani Dep. Tr. 71:18-72:12, 76:16-22); Gates Confid. Decl. Ex. D (HL037405-HL037411) |
| 200.  Herbalife's rules specifically provide for the return of unsold products.  For those who join Herbalife and find themselves to be a poor fit with the plan for whatever reason (lack of sales | Hienrich Decl. ¶¶ 24-26; Gates Decl. Ex. B, pp. 44, 45, & 53 (Sales and Marketing Plan – citing to Rules 9-D & 10-A) |

93

| HERBALIFE'S ADDITIONAL MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| ability, lack of time to devote to the business, dislike of the product, etc.), under Rule 10-A, a new enrollee may return the IBP within 90 days for a complete refund of products. | |
| 201. Moreover, the rules state that *any* distributor may return products to Herbalife for a 90 percent refund within a 12-month period. | Hienrich Decl. ¶¶ 24-26; Gates Decl. Ex. B, pp. 44, 45, & 53 (Sales and Marketing Plan – citing to Rule 9-D) |
| 202. Herbalife honors almost all buyback claims and repurchases product from many Herbalife distributors each year. | Hienrich Decl. ¶ 26 |
| 203. Testimony from some Defendants indicates that the buyback program was quite effective; Dianna Thompson testified that only once in 23 years with Herbalife did she fail to process a return from an unsatisfied customer.  Nancy Roth testified she was not aware of any instance in which a | Gates Decl. Ex. N (D. Thompson Dep. Tr. 29:20-23), Ex. D (N. Roth Dep. Tr. 47:23-48:3.) |

| HERBALIFE'S ADDITIONAL MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| customer requested a buyback and Herbalife did not provide one. | |
| 204. It is unsurprising that the Fords and Fisher broke Herbalife's rules since all three individuals admitted to never having read them in the first place. | Gates Decl. Ex. I (J. Ford Dep. Tr. 108:9-11; 120:21-121:19), Ex. J (J. Fisher Dep. Tr. 13:14-16:16; 18:5-10), Ex. K (R. Ford Dep. Tr. 25:25-29:21) |
| 205. Robert Ford, who claims to have run one of the largest retailing Herbalife operations in the United States, testified that he never spoke about the rules to anyone he signed up, much less encouraged them to read the rules or the distributor agreement. | Gates Decl. Ex. K (R. Ford Dep. Tr. 28:17-29:21, 46:3-7) |
| 206. This failure to train constitutes a violation of Herbalife Rule 10-C, which specifically requires: A sponsor is responsible for properly training their personally sponsored distributors on the products and their usage, the sales and marketing plan, the | Gates Decl., Ex. B, p. 53-54 (Sales and Marketing Plan – citing Rule 10C) |

95

la-1028190

| HERBALIFE'S ADDITIONAL MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| rules of conduct and other company rules, regulations and guidelines for distributors. | |
| 207.   The California Attorney General and the Direct Selling Association both found that Herbalife does not reward recruitment rather than retail sales. | Gates Decl. Ex. MM (HL035588-HL035592); Gates Confid. Decl. Ex. E (HL035618-HL035621) |
| 208.   Herbalife had over $3 billion in retail sales in 2006, as that term is commonly understood and as it is defined in Herbalife's annual report. | Gates Decl. Ex. H (Johnson Dep. Tr. 175:6-176:9, 188:2-9), Ex. PP (Dep. Ex. 27) This document was authenticated by Paul Greenberg. P. Greenberg Dep. Tr. 161:20-162:14 (Gates Decl. Ex. R). |
| 209.   Herbalife distributors uniformly testified that they did not rely on the statements Herbalife sent to some of its distributors that in 2006 Herbalife made $3 billion in retail sales and paid Herbalife supervisors $2.2 billion in commissions, royalties, and bonuses.  For instance, distributor Lilith Nix testified | Gates Decl. Ex. S (Klucken Dep. Tr. 122:2-9), Ex. L (Schmaman Dep. Tr. 43:9-11, 103:6-105:3), Ex. I (J. Ford Dep. Tr. 107:13-25), Ex. E (L. Nix Dep. Tr. 322:5-19, 323:8-11) |

la-1028190

| HERBALIFE'S ADDITIONAL MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| that she had no idea as to whether Herbalife's claim distributors received $2.2 billion in commissions, royalties and bonuses was accurate, and that she did not pass this statement on to anyone. | |
| 210. Regarding the "recession-proof" statement, the Defendants take this statement made by an Herbalife distributor in a promotional video out of context.  The video makes the point, which is absolutely true, that Herbalife provides a great money-making opportunity in the midst of a deep recession, when businesses are faltering and laying off workers (not hiring).  Independent sources have recognized that this is the case. | Gates Decl. Ex. X (transcript of "Why Herbalife – Why Now" Video), Ex. NN (USA Today Article), Ex. OO (Business Week Article) |
| 211. Herbalife's statement that it reached $3 billion in "retail sales" in 2006 is also true. | Gates Decl. Ex. H (Johnson Dep. Tr. 175:25-176:9, 188:2-9), Ex. PP (Dep. Ex. 27), Ex. S (Klucken Dep. Tr. |

97

| HERBALIFE'S ADDITIONAL MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| Defendants contend that Herbalife cannot claim "retail sales" of $3 billion because Herbalife does not track actual retail sales.  But Herbalife reports retail sales in its annual 10K using the same accepted measure of "retail sales" that is used throughout the financial community, disclosing the manner in which it is calculated.  David Schmaman testified he had never even heard that Herbalife had $3 billion in retail sales.  Distributor Libby Klucken testified likewise.  Even Defendants could not affirmatively state that they had either heard or relied upon the $3 billion sales figure. | 122:2-9), Ex. L (Schmaman Dep. Tr. 43:9-11, 103:6-105:3), Ex. I (J. Ford Dep. Tr. 107:13-25) |
| 212.  Through its changes to the Tab Team Agreement and its Confidentiality and Non-disclosure Agreements, Herbalife replaced its original | Gates Decl. Ex. B, p. 38 (Sales and Marketing Plan), Ex. V ¶ 12 (Miller Declaration in Further Support), Ex. R (P. Greenberg Dep. Tr. 104:6-16) |

la-1028190

| HERBALIFE'S ADDITIONAL MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| provision containing a non-competition covenant with more narrowly tailored provisions. | |
| 213.  Defendants have conceded that Herbalife has never attempted to enforce the 3 year non-compete provision contained in the form of Distributor Agreements formerly used by Herbalife. And they have presented no evidence to the contrary. | Gates Decl. Ex. Q (B. Roth Dep. Tr. 79:3-22), Ex. R (P. Greenberg Dep. Tr. 104:3-16), Ex. D (N. Roth Dep. Tr. 19:3-9), Ex. I (J. Ford Dep. Tr. 108:12-109:4; 109:16-21; 110:20-24), Ex. S (E. Klucken Dep. Tr. 125:8-16), Ex. N (D. Thompson Dep. Tr. 158:18-25) |

Dated:    May 18, 2009                    MORRISON & FOERSTER LLP


                                          /s/ Sean P. Gates
                                          Charles E. Patterson
                                          Nancy R. Thomas
                                          Sean P. Gates

                                          Attorneys for Plaintiff and
                                          Counterclaim Defendant
                                          HERBALIFE
                                          INTERNATIONAL OF
                                          AMERICA, INC.

99

la-1028190