STEPHENS FRIEDLAND LLP
John B. Stephens, Bar No. 142718
4695 MacArthur Court, Suite 310
Newport Beach, CA 92660
Telephone: (949) 468-3200 / Facsimile (949) 468-3201
Email: john@sf-lawyers.com

Attorney for Defendants and Counterclaimants
ROBERT E. FORD, JULIA A. FORD,
BRUCE H. ROTH, NANCY A. ROTH,
DIANNA N. THOMPSON and JASON FISHER

MIXON JOLLY LLP
Cameron M. Jolly, Bar No. 132541
575 Anton Boulevard, Suite 670
Costa Mesa, CA 92626
Telephone: (714) 885-7000 / Facsimile (714) 885-7001
Email: CJolly@mixonjollylaw.com

Attorney for Defendants and Counterclaimants
JEFF ORR and KATHY ORR

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| HERBALIFE INTERNATIONAL OF AMERICA, INC., a Nevada corporation,<br><br>          Plaintiff,<br><br>     v.<br><br>ROBERT E. FORD and JULIA A. FORD, husband and wife; BRUCE H. ROTH and NANCY A. ROTH, husband and wife; JEFF ORR and KATHY ORR, husband and wife; DIANNA N. THOMPSON; and JASON FISHER,<br><br>          Defendants.<br><br>AND RELATED CROSSCLAIMS. | Case No.: CV 07 2529 GAF (FMOx)<br><br>**RESPONSE TO PLAINTIFF'S STATEMENT OF GENUINE ISSUES IN SUPPORT OF PLAINTIFF'S OPPOSITION TO MOTION OF DEFENDANTS AND COUNTERCLAIMANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Hearing Date:   June 1, 2009<br>Time:              9:30 a.m.<br>Courtroom:      740 – Roybal Crthse |

Pursuant to Local Rule 56-1, Defendants and Counterclaimants, Robert and Julia Ford, Bruce and Nancy Roth, Jeff and Kathy Orr, Dianna Thompson, and Jason Fisher ("Defendants" or "Counterclaimants") submit this separate statement of uncontroverted facts and conclusions of law, together with references to the supporting evidence, in support of their Reply in Support of Their Motions for Partial Summary Judgment:

| **UNCONTROVERTED FACTS** | **SUPPORTING EVIDENCE** |
| --- | --- |
| 1. Herbalife is a multi-level marketing company that sells nutritional supplements, vitamins, and skin care products. | 1. Deposition of Jacqueline A. Miller ["Miller Depo."] 30:24-31:4 (Declaration of J. Gregory Dyer[1] ["Dyer Decl."], ¶ 2, Ex. "A," pp. 12-13). |
| 2. Herbalife publishes a chart showing its marketing plan that does not mention customers or retail sales. | 2. "Live the Good Life with Herbalife," p. 22 (Dyer Decl., ¶ 4, Ex. "C," p. 60). This "stair step" chart was authenticated by Miller. Miller Depo. 71:2-15 (Dyer Decl., Ex. "A," p. 26).<br><br>"Sales & Marketing Plan and Business Rules," p. 4 (Dyer Decl., ¶ 5, Ex. "D," p. 63). This document was |

---

[1] References to "Dyer Decl." refer to the Declaration of J. Gregory Dyer In Support of Defendants' Motions for Partial Summary Judgment [Docket No. 230] and the corresponding exhibits to same, which are hereby incorporated by reference as part of this Separate Statement of Undisputed Facts.

| | **UNCONTROVERTED FACTS** | **SUPPORTING EVIDENCE** |
|---|---|---|
| | | authenticated by Paul Greenberg, Herbalife's Senior Vice President, Counsel.  Deposition of Paul Greenberg ["Greenberg Depo."]) 225:23-226:1 (Dyer Decl., Ex. "E," pp. 86-87.) |
| 3. | According to the Herbalife's Marketing Plan, royalties, bonuses and advancement at Herbalife are based exclusively on purchases from Herbalife. | 3. "Live the Good Life with Herbalife," p. 22 (Dyer Decl., Ex. "C," p. 60).  "Sales & Marketing Plan and Business Rules," p. 4 (Dyer Decl., Ex. "D," p. 63). |
| 4. | Herbalife does not keep records of retail sales. | 4. Greenberg Depo. 117:3-5 (Dyer Decl., ¶ 6, Ex. "E," p. 80). |
| 5. | Herbalife's sales force is composed of independent contractors who start as "distributors." | 5. "Live the Good Life with Herbalife," p. 22 (Dyer Decl., Ex. "C," p. 60).  "Sales & Marketing Plan and Business Rules," p. 3-4, 51-52 (Dyer Decl., Ex. "D," pp. 62-63, 68-69). |
| 6. | Distributors are not agents, employees, or legal representatives of Herbalife. | 6. "Sales & Marketing Plan and Business Rules," p. 3-4, 51-52 (Dyer Decl., Ex. "D," pp. 62-63, 68-69). |

| **UNCONTROVERTED FACTS** | **SUPPORTING EVIDENCE** |
|---|---|
| 7. Distributors have the right to buy products at a discount to use or resell and to recruit other distributors into the program. | 7. Miller Depo. 31:15-21, 33:6-10 (Dyer Decl., Ex. "A," pp. 13-14). |
| 8. Distributors qualify to become a "supervisor by ordering from Herbalife a minimum amount of product, costing thousands of dollars, for either one month or two consecutive months. | 8. "Sales & Marketing Plan and Business Rules," p. 4 (Dyer Decl., Ex. "D," p. 63). |
| 9. Supervisors must meet certain order quotas each year to retain their supervisor status. | 9. Miller Depo. 36:22-37:14, 38:13-39:8 (Dyer Decl., Ex. "A," pp. 15-18). |
| 10. Supervisors are entitled to receive a "Royalty Override" on up to three generations of "downline" supervisors. | 10. Miller Depo. 73:3-20 (Dyer Decl., Ex. "A," p. 27).<br><br>"Sales & Marketing Plan and Business Rules," p. 11 (Dyer Decl., Ex. "D," p. 64). |
| 11. The Royalty Override gives the supervisor a 1% to 5% commission on orders placed by downline supervisors. | 11. Miller Depo. 73:3-20 (Dyer Decl., Ex. "A," p. 27). |

| **UNCONTROVERTED FACTS** | **SUPPORTING EVIDENCE** |
|---|---|
| 12. Supervisors and those they recruit must continue to purchase a minimum amount of product each month from Herbalife to qualify the supervisor for the Royalty Override. | 12. Miller Depo. 73:3-20 (Dyer Decl., Ex. "A," p. 27). "Sales & Marketing Plan and Business Rules," p. 11 (Dyer Decl., Ex. "D," p. 64). |
| 13. Herbalife supervisors receive the right to sell the products and earn royalties based on product orders made by the supervisor's recruits. | 13. "Live the Good Life with Herbalife," pp. 21-22 (Dyer Decl., Ex. "C," pp. 59-60). |
| 14. Advancement within Herbalife "is not based on retail. It's based on volume purchased from the company." | 14. Deposition of Mike McKee ["McKee Depo."]) 90:22-91:15 (Dyer Decl., ¶ 7, Ex. "F," pp. 109-110). |
| 15. Counterclaimants signed Herbalife's Distributor Agreement (the "Agreement"). | 15. Complaint at ¶¶ 11-15. |
| 16. The Agreement contains a broad prohibition against post-termination use of "information" and a blanket 3-year non-compete. | 16. Herbalife Distributor Agreements (Dyer Decl., ¶ 8, Ex. "G," pp. 120-125). |

- 4 -

| **UNCONTROVERTED FACTS** | **SUPPORTING EVIDENCE** |
|---|---|
| 17.  Herbalife has not made any announcement to its independent distributors that the non-compete covenant was abandoned. | 17. Greenberg Depo. 104:14-20 (Dyer Decl., Ex. "E," p. 78). |
| 18.  Herbalife's in-house counsel maintains that the non-compete covenant is enforceable. | 18. Greenberg Depo. 106:4-9 (Dyer Decl., Ex. "E," p. 79). |
| 19.  Mike McKee, Herbalife's Vice President of Business Development (Sales) agrees that the non-compete covenant is enforceable. | 19. McKee Depo. 28:17-29:5 (Dyer Decl., Ex. "F," pp. 105-106). |
| 20.  McKee testified that the non-compete covenant prevents Counterclaimants from putting flyers on cars. | 20. McKee Depo. 35:16-36:6 (Dyer Decl., Ex. "F," pp. 107-108). |
| 21.  McKee testified that the non-compete provision is "in full force and effect." | 21. McKee Depo. 35:16-36:6 (Dyer Decl., Ex. "F," pp. 107-108). |
| 22.  Jacqueline Miller, Herbalife's top rules official, stated that Herbalife distributors are "not allowed to participate in a competing | 22. Miller Depo. 54:1-24 (Dyer Decl., Ex. "A," p. 20). |

| **UNCONTROVERTED FACTS** | **SUPPORTING EVIDENCE** |
|---|---|
| business" for 3 years after termination. | |
| 23.   Herbalife's Agreement also provides that distributors must follow Herbalife's rules, policies, and procedures. | 23.  Herbalife Distributor Agreements (Dyer Decl., ¶ 8, Ex. "G," pp. 120-125). |
| 24.   Herbalife enacted Rule 8-A, its restraint against post-termination solicitation, in September 2006— after Counterclaimants Robert and Julia Ford and Jason Fisher had resigned from Herbalife. | 24.  Herbalife Complaint Form (Dyer Decl., ¶ 9, Ex. "H").  This document was authenticated by Greenberg.  Greenberg Depo. 219:12-16 (Dyer Decl., Ex. "E," p. 83). <br><br> Greenberg Depo. 219:20-220:6 (Dyer Decl., Ex. "E," pp. 83-84). |
| 25.   Rule 8-A is a blanket non-solicitation restraint that does not reference the use of trade secrets. | 25.  "Sales & Marketing Plan and Business Rules," p. 51 (Dyer Decl., Ex. "D," p. 68). |

| **UNCONTROVERTED FACTS** | **SUPPORTING EVIDENCE** |
|---|---|
| 26.  Rule 8-A has the effect of continuously restraining former Herbalife distributors because it not only violates Rule 8-A to solicit Herbalife distributors for one year after termination, but also to sponsor others who do so. | 26. Greenberg Depo. 220:22-221:20 (Dyer Decl., Ex. "E," pp. 84-85). |
| 27.  Counterclaimants terminated their distributorships with Herbalife and signed up with Melaleuca, Inc. | 27. Complaint at ¶ 26, 29, 31-33. |
| 28.  After Ford and Fisher handed out business cards and put flyers on cars at a hotel during an Herbalife event, Herbalife responded with a publication stating that this conduct was unfair competition. | 28. February 6, 2007 Email from Herbalife's Tom Zimmer to TAB Team Members (Dyer Decl., ¶ 10, Ex. "I," pp. 126-129). |
| 29.  Herbalife's February 6, 2007 email contained a publication that claimed that, in 2006, Herbalife had over $3 billion in retail sales and paid $2.2 billion in commissions, royalties, and bonuses to its Supervisors. | 29. February 6, 2007 Email from Herbalife's Tom Zimmer to TAB Team Members (Dyer Decl., Ex. "I," p. 130). |

| **UNCONTROVERTED FACTS** | **SUPPORTING EVIDENCE** |
|---|---|
| 30. On April 20, 2007, Herbalife's CEO sent an "important announcement" to its distributors identifying each of the Counterclaimants and stating that they have been sued for unfair competition. | 30. April 20, 2007 Email From Michael Johnson (Dyer Decl., ¶ 11, Ex. "J," p. 131). |

**UNCONTROVERTED FACTS FROM SECTION III. HERBALIFE'S COUNTS 1, 2, 3, 4, 5 AND 7 SHOULD BE DISMISSED.**

| **UNCONTROVERTED FACTS** | **SUPPORTING EVIDENCE** |
|---|---|
| 31. Per Herbalife Rule 8-J, California law governs "all aspects of a Distributor's relationship with Herbalife." | 31. "Sales & Marketing Plan and Business Rules," p. 52 (Dyer Decl., Ex. "D," p. 69). |
| 32. On June 15, 2007, pursuant to California Code of Civil Procedure § 2019.210, Herbalife identified its trade secrets as "Herbalife Linage [sic] Documents," "Herbalife Passcode," and "Herbalife Trade Name and Mark." | 32. Plaintiff Herbalife International of America, Inc's Disclosure of Trade Secrets (Dyer Decl., ¶ 12, Ex. "K," p. 133). |

| UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 33.  In discovery, Counterclaimant and Defendant Jeff Orr asked Herbalife to produce its alleged trade secrets. | 33.  Defendant and Counterclaimant Jeff Orr's First Set of Request [sic] for Production to Plaintiff and Counterclaimant Herbalife of America, Inc. (Dyer Decl., ¶ 13, Ex. "L," p. 137). |
| 34.  Herbalife did not produce its trade secrets. | 34.  Herbalife's Responses to Defendant and Counterclaimant Jeff Orr's First Set of Requests for Production (Dyer Decl., ¶ 14, Ex. "M," p. 140). |
| 35.  In its response to Jeff Orr's request for production of the trade secrets that Herbalife alleged had been misappropriated, Herbalife stated: "Herbalife has no way to identify the particular trade secrets or documents reflecting those trade secrets Counterclaimants misappropriated and so has no responsive documents." | 35.  Herbalife's Responses to Defendant and Counterclaimant Jeff Orr's First Set of Requests for Production (Dyer Decl., Ex. "M," p. 140). |
| 36.  The Ninth Circuit ruled that the portion of the preliminary injunction that prohibited the Counterclaimants from "Using or disclosing for business related | 36.  Ninth Circuit Memorandum, filed July 22, 2008 (Dyer Decl., ¶ 15, Ex. "N," p. 143). |

| | **UNCONTROVERTED FACTS** | **SUPPORTING EVIDENCE** |
|---|---|---|
| 1 | | |
| 2 | purpose . . . contacts or business | |
| 3 | information acquired during | |
| 4 | [Counterclaimants'] work with | |
| 5 | Herbalife" was "overbroad." | |
| 6 | | |
| 7 | 37.  The Ninth Circuit narrowed the | 37.  Ninth Circuit Memorandum, filed July |
| 8 | preliminary injunction to "exempt | 22, 2008 (Dyer Decl., Ex. "N," pp. |
| 9 | from its coverage only customer | 143-144). |
| 10 | contact or business information | |
| 11 | that the defendants developed of | |
| 12 | their own accord." | |
| 13 | | |
| 14 | 38.  During oral arguments before the | 38.  Transcript of the Appeal from the |
| 15 | Ninth Circuit, Judge Silverman | United States District Court for the |
| 16 | stated that Rule 8-A, as | Central District of California, argued |
| 17 | incorporated into the preliminary | and submitted on July 15, 2008 (Dyer |
| 18 | injunction in this case, was a non- | Decl., ¶ 16, Ex. "O," p. 147). |
| 19 | compete clause and struck him as | |
| 20 | "overbroad." | |
| 21 | | |
| 22 | 39.  Herbalife independent distributors | 39.  Greenberg Depo. 72:12-73:13 (Dyer |
| 23 | own and operate their own | Decl., Ex. "E," pp. 75-76). |
| 24 | businesses. | |
| 25 | | Miller Depo. 132:3-133:20 (Dyer |
| 26 | | Decl., Ex. "A," pp. 34-35). |
| 27 | | |
| 28 | | McKee Depo. 7:10-8:5 (Dyer Decl., |

| **UNCONTROVERTED FACTS** | **SUPPORTING EVIDENCE** |
|---|---|
| | Ex. "F," pp. 98-99). |
| 40.  Herbalife independent distributors invest their own time and resources in developing customers and recruiting other distributors. | 40.  Greenberg Depo. 72:12-73:13 (Dyer Decl., Ex. "E," pp. 75-76).<br><br>Miller Depo. 132:3-133:20 (Dyer Decl., Ex. "A," pp. 34-35).<br><br>McKee Depo. 7:10-8:5 (Dyer Decl., Ex. "F," pp. 98-99). |
| 41.  Rule 8-A prevents former distributors from *soliciting, sponsoring, promoting or recruiting* anyone that the former distributor "became aware of in the course of their Herbalife distributorship." | 41.  "Sales & Marketing Plan and Business Rules," p. 51 (Dyer Decl., Ex. "D," p. 68). |
| 42.  As such, Rule 8-A requires former Herbalife distributors to throw out their own phone books and forget about every relationship that they made while in Herbalife, including friends and family. | 42.  Greenberg Depo. 178:13-179:2 (Dyer Decl., Ex. "E," pp. 81-82). |

| | **UNCONTROVERTED FACTS** | **SUPPORTING EVIDENCE** |
|---|---|---|
| 43. | Herbalife claims that the Counterclaimants violated their rules and regulations by putting flyers on cars in a parking lot. | 43. Greenberg Depo. 32:20-33:5 (Dyer Decl., Ex. "E," p. 72-73). |
| 44. | Herbalife also claims that a former distributor who asked his or her child to join him or her at a competing company would violate Herbalife's rules and regulations. | 44. Miller Depo. 171:23-172:12 (Dyer Decl., Ex. "A," pp. 36-37). |
| 45. | Miller claims that Herbalife distributors are required to refrain from competing for three years after their distributorship is over. | 45. Miller Depo. 54:1-24, 56:6-20 (Dyer Decl., Ex. "A," pp. 20-21). |
| 46. | Miller admitted that Rule 8-A is not tied to use of trade secrets or confidential information. | 46. Miller Depo. 57:9-15 (Dyer Decl., Ex. "A," p. 22). |
| 47. | Rule 8-A was enacted on September 1, 2006. | 47. Herbalife Complaint Form (Dyer Decl., Ex. "H").<br><br>Greenberg Depo. 219:20-220:6 (Dyer Decl., Ex. "E," pp. 83-84). |

| **UNCONTROVERTED FACTS** | **SUPPORTING EVIDENCE** |
|---|---|
| 48. Jason Fisher left Herbalife in January 2006. | 48. Complaint at ¶ 26. |
| 49. Robert and Julie Ford resigned from Herbalife on September 1, 2006. | 49. Complaint at ¶ 28. |
| 50. Herbalife has submitted different versions of the Confidential and Non-Disclosure Agreement ("CNDA") to which it contends Counterclaimants agreed. | 50. Versions of Herbalife's CNDA (Dyer Decl., ¶ 17, Ex. "P," pp. 149-159). |
| 51. Miller testified that she had no personal knowledge of the Defendants assent to the CNDA. | 51. Miller Depo. 200:15-207:1 (Dyer Decl., Ex. "A," pp. 42-49). |
| 52. Herbalife contends that Counterclaimants violated the following additional Herbalife rules:  8-B, 8-D, 8-G, and 8-H. | 52. Herbalife's Responses to Defendant and Counterclaimant Bruce H. Roth's First Set of Interrogatories (Nos. 1-23) (Dyer Decl., ¶ 18, Ex. "Q," p.161). |
| 53. Rule 8-B prohibits Herbalife distributors from promoting organizations other than Herbalife when training their organizations. | 53. "Sales & Marketing Plan and Business Rules," p. 51 (Dyer Decl., Ex. "D," p. 68). |

| | UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|---|
| 54. | Rule 8-B does not apply to former Herbalife distributors. | 54. Miller Depo. 174:22-175:1 (Dyer Decl., Ex. "A," pp. 38-39). |
| 55. | Rule 8-D, entitled "Comply with Laws," applies only to current Herbalife distributors. | 55. "Sales & Marketing Plan and Business Rules," p. 51 (Dyer Decl., Ex. "D," p. 68. |
| 56. | Rule 8-G prohibits providing "false and misleading" information, but applies only to current Herbalife distributors. | 56. "Sales & Marketing Plan and Business Rules," p. 52 (Dyer Decl., Ex. "D," p. 69). |
| 57. | Herbalife has not presented any evidence that Counterclaimants violated Rule 8-G. | 57. Miller Depo. 192:6-10 (Dyer Decl., Ex. "A," p. 40). |
| 58. | Rule 8-H relates to maintaining the reputation and image of Herbalife. It applies only to current Herbalife distributors. | 58. "Sales & Marketing Plan and Business Rules," p. 52 (Dyer Decl., Ex. "D," p. 69). |
| 59. | Herbalife's top rule official testified that she did not know why Counterclaimants have been accused of violating Rule 8-H. | 59. Miller Depo. 192:11-193:14 (Dyer Decl., Ex. "A," p. 40-41). |

| **UNCONTROVERTED FACTS** | **SUPPORTING EVIDENCE** |
|---|---|
| 60.  Herbalife has stated under oath that it cannot produce its trade secrets. | 60.  Herbalife's Responses to Defendant and Counterclaimant Jeff Orr's First Set of Requests for Production (Dyer Decl., Ex. "M," p. 140). |
| 61.  Herbalife has failed to produce the allegedly misappropriated trade secrets. | 61.  Herbalife's Responses to Defendant and Counterclaimant Jeff Orr's First Set of Requests for Production (Dyer Decl., Ex. "M," p. 140). |
| 62.  When Herbalife was asked to identify the Defendant's misrepresentations regarding Melaleuca's products being "safe and non-toxic," Herbalife could not identify a single statement made by Defendants. | 62.  Herbalife's Responses to Defendant and Counterclaimant Robert E. Ford's First Set of Interrogatories (Nos. 1-18) (Dyer Decl., ¶ 19, Ex. "R," p. 165-166). |
| 63.  Herbalife also could not set forth any admissible evidence to support its claim that Melaleuca's products are unsafe or toxic. | 63.  Herbalife's Responses to Defendant and Counterclaimant Robert E. Ford's First Set of Interrogatories (Nos. 1-18) (Dyer Decl., ¶ 19, Ex. "R," p. 165-166). |
| 64.  The sole fraud allegation in the Complaint is that Nancy Roth sent an email to Bob Bogard at | 64.  Complaint at ¶ 125. |

| UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| Herbalife on January 30, 2007 requesting data on her downline distributors. | |
| 65. All other fraud allegations have been dismissed. | 65. Memorandum and Order Regarding Defendants' Motion to Dismiss and to Strike (Dyer Decl., ¶ 20, Ex. "S," p. 170-172). |
| 66. Herbalife did not send Nancy Roth with her downline list in response to her January 30, 2007 e-mail. | 66. Declaration of Nancy Roth ["Roth Decl."], ¶ 2, Ex. "A," p. 2-3). |
| 67. Herbalife denied Nancy Roth's request for her downline information. | 67. Declaration of Nancy Roth ["Roth Decl."], ¶ 2, Ex. "A," p. 2-3).<br><br>Miller Depo. 105:5-16 (Dyer Decl., Ex. "A," p. 33. |

**UNCONTROVERTED FACTS FROM SECTION IV. SUMMARY
JUDGMENT SHOULD BE GRANTED
ON COUNTERCLAIMANTS'
THIRD, FOURTH AND FIFTH CLAIMS FOR RELIEF.**

| UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 68. Omnitrition's principals included former Herbalife distributors. | 68. Miller Depo. 99:24-100:6 (Dyer Decl., Ex. "A," p. 31-32). |

| UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 69.  Herbalife is a multi-level marketing program. | 69. Miller Depo. 30:21-23 (Dyer Decl., Ex. "A," p. 12). |
| 70.  Herbalife sells nutritional supplements, vitamins, and skin care products. | 70. Miller Depo. 30:24-31:4 (Dyer Decl., Ex. "A," p. 12-13). |
| 71.  Herbalife's sales force are "independent contractors" and the first level of independent contractors are referred to as "distributors." | 71. Miller Depo. 31:12-14 (Dyer Decl., Ex. "A," p. 13). |
| 72.  Herbalife distributors have the right to buy products at a discount for use or resale and to recruit others into the program. | 72. Miller Depo. 31:15-21, 33:6-10 (Dyer Decl., Ex. "A," p. 13, 14). |
| 73.  Herbalife distributors can qualify to become a "supervisor" by ordering a minimum amount (several thousand dollars) in products, measured by suggested retail price, from Herbalife in one or two (consecutive) months. | 73. Miller Depo. 36:22-37:14 (Dyer Decl., Ex. "A," p. 15-16). |

| **UNCONTROVERTED FACTS** | **SUPPORTING EVIDENCE** |
|---|---|
| 74. Herbalife supervisors must meet certain order requirements to maintain the status of supervisor. | 74. Miller Depo. 38:13-39:8 (Dyer Decl., Ex. "A," p. 17-18). |
| 75. Herbalife supervisors are entitled to receive a royalty override on up to three generations of "downline" supervisors. | 75. Miller Depo. 36:22-37:14 (Dyer Decl., Ex. "A," p. 15-16).<br><br>"Sales & Marketing Plan and Business Rules," p. 11 (Dyer Decl., Ex. "D," p. 64). |
| 76. The royalty override gives the Herbalife supervisor a percentage commission on orders placed by downline supervisors. | 76. Miller Depo. 73:3-20 (Dyer Decl., Ex. "A," p. 27). |
| 77. Herbalife supervisors and those they recruit must continue to purchase a minimum amount of product each month from Herbalife to qualify the supervisor for the royalty override. | 77. Miller Depo. 73:3-20 (Dyer Decl., Ex. "A," p. 27).<br><br>"Sales & Marketing Plan and Business Rules," p. 11 (Dyer Decl., Ex. "D," p. 64). |

| **UNCONTROVERTED FACTS** | **SUPPORTING EVIDENCE** |
|---|---|
| 78. Herbalife supervisors receive the right to sell the products and earn compensation based on product orders made by the supervisor's recruits. | 78. "Live the Good Life with Herbalife," p. 21-22 (Dyer Decl., Ex. "C," p. 59-60). |
| 79. Advancement at Herbalife "is not based on retail.  It's based on volume purchased from the company." | 79. McKee Depo. 90:22-91:15 (Dyer Decl., Ex. "F," p. 109-110). |
| 80. Herbalife does not keep track of retail sales. | 80. Greenberg Depo. 117:3-5 (Dyer Decl., ¶ 6, Ex. "E," p. 80). |
| 81. In Herbalife's Marketing Plan, which is shaped like a pyramid, retail sales are unrelated to advancement. | 81. "Live the Good Life with Herbalife," p. 22 (Dyer Decl., Ex. "C," p. 60). |
| 82. Herbalife's Marketing Plan, which is shaped like a pyramid, does not mention retail sales or retail customers in any way. | 82. "Live the Good Life with Herbalife," p. 22 (Dyer Decl., Ex. "C," p. 60). |
| 83. The bottom level of Herbalife's Marketing Plan is "Distributor"— not "customer." | 83. "Live the Good Life with Herbalife," p. 22 (Dyer Decl., Ex. "C," p. 60). |

| | **UNCONTROVERTED FACTS** | **SUPPORTING EVIDENCE** |
|---|---|---|
| 84. | To earn royalty overrides on downline orders, Herbalife supervisors must certify that they have made sales to ten retail customers in the past month. | 84. Greenberg Depo. 248:4-249:6 (Dyer Decl., ¶ 6, Ex. "E," p. 88-89).<br><br>"Sales & Marketing Plan and Business Rules," p. 42 (Dyer Decl., Ex. "D," p. 65). |
| 85. | To receive a royalty override, Herbalife supervisors must certify that they have sold at least 70% of products "they retain for resale" to either other Herbalife distributors or retail customers. | 85. Miller Depo. 41:14-21 (Dyer Decl., Ex. "A," p. 19). |
| 86. | In his deposition, McKee, Herbalife's Vice President of Business Development (Sales), admitted that he did not know what the "70% rule" was. | 86. McKee Depo. 127:16-20 (Dyer Decl., Ex. "F," p. 112). |
| 87. | McKee doesn't train on the 70% rule because he does not consider it to be "exciting stuff." | 87. McKee Depo. 127:21-128:9 (Dyer Decl., Ex. "F," p. 112-113). |
| 88. | Herbalife has a buyback policy. | 88. "Sales & Marketing Plan and Business Rules," p. 44 (Dyer Decl., Ex. "D," p. 66). |

| | **UNCONTROVERTED FACTS** | **SUPPORTING EVIDENCE** |
|---|---|---|
| 89. | Herbalife allows mere certification by distributors and does not even request the names of the ten customers. | 89. Miller Depo. 63:5-9 (Dyer Decl., Ex. "A," p. 24).<br><br>"Sales & Marketing Plan and Business Rules," p. 42 (Dyer Decl., Ex. "D," p. 65). |
| 90. | Herbalife has distributors sign a "certification form" that contains no information whatsoever about the retail customer, the contact information of the customer, the products sold, or the price paid for the products. | 90. "Sales & Marketing Plan and Business Rules," p. 42 (Dyer Decl., Ex. "D," p. 65). |
| 91. | Instead of random audits, Herbalife claims that it conducts a small number of audits by merely contacting distributors and requesting the names of the distributors' ten customers. | 91. Miller Depo. 62:14-20, 69:10-14 (Dyer Decl., Ex. "A," p. 23, 25) (stating that Herbalife conducts about 100 10-customer audits per month, even though Herbalife claims to have over 1.5 million distributors.  *See* Dyer Decl., Ex. "I," p. 130). |
| 92. | McKee, who is the primary "link between Herbalife and its mid-level to top Supervisors" testified that he does not know the | 92. McKee Depo. 23:16-25:15, 107:1-6 (Dyer Decl., Ex. "F," p. 102-104, 111). |

| | **UNCONTROVERTED FACTS** | **SUPPORTING EVIDENCE** |
|---|---|---|
| | requirements of Herbalife's 10-customer rule. | |
| 93. | The 10-customer rule is difficult to understand, even for the person at Herbalife who is responsible for enforcing it. | 93. Miller Depo. 12:4-17, 41:14-21 (Dyer Decl., Ex. "A," p. 7, 19). |
| 94. | Herbalife leaves the training of the rules to the independent distributors who are not agents or employees of Herbalife and who themselves lack experience and training to train the members of this requirement. | 94. Miller Depo. 62:14-20, 69:10-14 (Dyer Decl., Ex. "A," p. 23, 25). |
| 95. | There are no educational or other requirements to be a Herbalife distributor. | 95. Greenberg Depo. 63:12-14 (Dyer Decl., ¶ 6, Ex. "E," p. 74). |
| 96. | Herbalife could require customers to submit a monthly list of retail customers and make blind, random calls to corroborate the validity of the list. | 96. "Sales & Marketing Plan and Business Rules," p. 42 (Dyer Decl., Ex. "D," p. 65). |

| **UNCONTROVERTED FACTS** | **SUPPORTING EVIDENCE** |
|---|---|
| 97.  Herbalife's distributors simply "certify" that they have complied with the 70% rule. | 97.  "Sales & Marketing Plan and Business Rules," p. 42 (Dyer Decl., Ex. "D," p. 65). |
| 98.  Herbalife's distributors only certify that 70% of the product they "hold for resale" has been sold. | 98.  "Sales & Marketing Plan and Business Rules," p. 42 (Dyer Decl., Ex. "D," p. 65). |
| 99.  Despite having attended 500 to 1,000 Herbalife trainings, McKee did not know what the 70% rule was and could not recall any training or explanation of the rule occurring at those 500-1,000 Herbalife events. | 99.  McKee Depo. 127:16-20, 129:10-13 (Dyer Decl., Ex. "F," pp. 112, 114). |
| 100.  Herbalife's chief rule enforcer is uncertain as to the requirements of the "difficult" 70% rule. | 100.  Miller Depo. 14:21-15:4, 19:12-18, 41:14-21 (Dyer Decl., Ex. "A," p. 8-10, 19). |
| 101.  Herbalife does not conduct routine audits to ensure compliance with the 70% rule. | 101.  Miller Depo. 25:5-20 (Dyer Decl., Ex. "A," p. 11). |
| 102.  Current Herbalife distributors are not eligible for any buyback. | 102.  "Sales & Marketing Plan and Business Rules," p. 44 (Dyer Decl., Ex. "D," p. 66). |

| UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 103. Herbalife distributors who request a buyback suffer a permanent loss of their distributorships. | 103. "Sales & Marketing Plan and Business Rules," p. 44 (Dyer Decl., Ex. "D," p. 66). |
| 104. Herbalife will not buy back product from an active distributor or even an inactive distributor who has not "permanently" resigned. | 104. "Sales & Marketing Plan and Business Rules," p. 44 (Dyer Decl., Ex. "D," p. 66). |
| 105. A distributor requesting a buyback must first permanently resign his/her distributorship in writing. | 105. "Sales & Marketing Plan and Business Rules," p. 44 (Dyer Decl., Ex. "D," p. 66). |
| 106. A distributor that requests a buyback loses all royalties, commissions, bonuses, and discounts from Herbalife. | 106. Greenberg Depo. 264:11-21 (Dyer Decl., ¶ 6, Ex. "E," p. 92). |
| 107. If a distributor asks for a buyback, the distributor and the distributor's upline are retroactively charged back on their royalty bonus checks. | 107. "Sales & Marketing Plan and Business Rules," p. 43 (Dyer Decl., Ex. "D," p. 65-66). |
| 108. Herbalife's agreements and rules state that a former distributor is subject to Herbalife's 3-year covenant not to compete and the 1-year non-solicitation provision. | 108. Herbalife Distributor Agreements (Dyer Decl., Ex. "G," pp. 120-125). "Sales & Marketing Plan and Business Rules," p. 44 (Dyer Decl., Ex. "D," |

| UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| | p. 66). |
| 109. To obtain a buyback, the former Herbalife distributor must sign an agreement that states that the former distributor agrees to Herbalife's various buyback terms and rules. | 109. "Sales & Marketing Plan and Business Rules," p. 44 (Dyer Decl., Ex. "D," p. 66). |
| 110. To obtain a buyback, the former Herbalife distributor must also provide a complete, detailed written inventory of product to be returned. | 110. "Sales & Marketing Plan and Business Rules," p. 45 (Dyer Decl., Ex. "D," p. 67). |
| 111. To obtain a buyback, the former Herbalife distributor must also provide cancelled checks and credit card statements proving the purchase of each item on the inventory. | 111. "Sales & Marketing Plan and Business Rules," p. 44 (Dyer Decl., Ex. "D," p. 66). |
| 112. To obtain a buyback, the former Herbalife distributor must also provide two years of records of sales to his/her retail customers and downline. | 112. "Sales & Marketing Plan and Business Rules," p. 44 (Dyer Decl., Ex. "D," p. 66). |

| **UNCONTROVERTED FACTS** | **SUPPORTING EVIDENCE** |
|---|---|
| 113. Herbalife's buyback offer is discretionary based on Herbalife's determinations of condition of the product and other factors. | 113. "Sales & Marketing Plan and Business Rules," p. 44 (Dyer Decl., Ex. "D," p. 66). |
| 114. When it provides its buyback refund, Herbalife does not return its 10-11% handling charges that were originally paid on the product and the former distributor must pay the shipping charges to return the product to Herbalife. | 114. "Sales & Marketing Plan and Business Rules," p. 44 (Dyer Decl., Ex. "D," p. 66).<br><br>Greenberg Depo. 264:11-265:10 (Dyer Decl., ¶ 6, Ex. "E," p. 92-93). |
| 115. Herbalife's top official in charge of the department that enforces the 10-customer and 70% rules does not know whether Herbalife's policies are effective and does not think that Herbalife has conducted any studies to determine whether the rules are effective to promote sales outside of Herbalife. | 115. Miller Depo. 14:21-15:4, 19:12-18, 94:23-95:13, 96:5-8 (Dyer Decl., Ex. "A," p. 8-10, 28-30). |
| 116. Herbalife does not keep any records relating to its distributors' retail sales and does not know the names of its retail customer. | 116. Greenberg Depo. 117:3-5, 251:13-252:17 (Dyer Decl., ¶ 6, Ex. "E," pp. 80, 90-91). |

| **UNCONTROVERTED FACTS** | **SUPPORTING EVIDENCE** |
|---|---|
| 117. Counterclaimants are in competition with Herbalife. | 117. Complaint at ¶¶ 25-35. |
| 118. In an email sent to all members of its "TAB Team" on February 6, 2007, Herbalife claimed that Herbalife had achieved a "record $3 Billion in retail sales in 2006." | 118. February 6, 2007 Email from Herbalife's Tom Zimmer to TAB Team Members (Dyer Decl., Ex. "I," p. 126). |
| 119. Herbalife also included a hyperlink in its February 6, 2007 email that invited its TAB Team members to download a document called: "Herbalife…A Proven Success." | 119. February 6, 2007 Email from Herbalife's Tom Zimmer to TAB Team Members (Dyer Decl., Ex. "I," p. 127). |
| 120. The document titled: Herbalife…A Proven Success" claimed that Herbalife had "record retail sales of $3 billion in 2006 and still growing." | 120. February 6, 2007 Email from Herbalife's Tom Zimmer to TAB Team Members (Dyer Decl., Ex. "I," p. 130). |
| 121. Herbalife does not keep records of its retail sales. | 121. Greenberg Depo. 117:3-5 (Dyer Decl., ¶ 6, Ex. "E," p. 80). |
| 122. Herbalife did not receive gross revenues or retail sales of $3 billion in 2006. | 122. Herbalife's 2006 Annual Report (Dyer Decl., Ex. "B," pp. 54-56). |

| UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 123. Herbalife's "product sales," which represent the purchase price paid to Herbalife by its distributors, were $1.627 billion in 2006. | 123. Herbalife's 2006 Annual Report (Dyer Decl., Ex. "B," p. 55). |
| 124. Herbalife's "net sales," which include Herbalife's income from shipping and handling on its products, were $1.885 billion in 2006. | 124. Herbalife's 2006 Annual Report (Dyer Decl., Ex. "B," p. 54). |
| 125. The document titled: Herbalife…A Proven Success" claimed that" [i]n 2006, Herbalife Supervisors were paid $2.2 billion in commissions, royalties, and bonuses." | 125. February 6, 2007 Email from Herbalife's Tom Zimmer to TAB Team Members (Dyer Decl., Ex. "I," p. 130). |
| 126. Herbalife's product sales in 2006 were $1.627 billion. | 126. Herbalife's 2006 Annual Report (Dyer Decl., Ex. "B," p. 55). |
| 127. Herbalife's 2006 10-K showed that "Royalty overrides" for 2006 were $675 million. | 127. Herbalife's 2006 Annual Report (Dyer Decl., Ex. "B," p. 54). |
| 128. Herbalife advertises that its business opportunity is "recession proof." | 128. December 22, 2008 Video titled: "Why Herbalife, Why Now?" (Dyer Decl., ¶ 21, Ex. "T"). |

| **UNCONTROVERTED FACTS** | **SUPPORTING EVIDENCE** |
|---|---|
| 129. The video states: "Why Herbalife? Herbal-nomics.  It's recession proof . . .  This opportunity can be your answer . . . ." | 129. December 22, 2008 Video titled: "Why Herbalife, Why Now?" (Dyer Decl., ¶ 21, Ex. "T"). |
| 130. Mike Mckee, Herbalife's Vice President of Business Development (Sales), testified that no company was recession proof, including Herbalife. | 130. McKee Depo. 12:24-13:1, 13:8-11 (Dyer Decl., Ex. "F," p. 100-101). |

| **HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS** | **SUPPORTING EVIDENCE AND OBJECTIONS** |
|---|---|
| 131. Herbalife is a direct sales company that sells its products through a network of independent distributors.[2] | 131. **Disputed, but immaterial to the instant motion.** Herbalife's Evidence: Gates Decl. Ex. U ¶ 5 (Miller Declaration). **Objection:** Irrelevant. |

---

[2]Please note that it appears as though Herbalife has inadvertently omitted the final three separate statements of undisputed fact.  Despite this error, Defendants and Counterclaimants have used the numbering as set forth in the Statement of Genuine Issues in Support of Herbalife's Opposition to Defendants' and Counterclaimants' Motion for Partial Summary Judgment [Docket No. 254] to avoid confusion.

| HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE AND OBJECTIONS |
|---|---|
| 132. Distributors purchase Herbalife products at wholesale prices for personal use and re-sale, and earn commissions on the sale of products for which they are directly or indirectly responsible. | 132. **Disputed.**<br>Herbalife's Evidence: Gates Decl. Ex. U ¶ 6 (Miller Declaration).<br><br>**Opposing Evidence:** Miller Depo. 38:13-39:8 (Declaration of John B. Stephens ["Stephens Decl."], Ex. "D," p. 38, 39).[3]<br><br>"Sales & Marketing Plan and Business Rules," p. 11 (Stephens Decl., Ex. "B," p.10).  This document was authenticated by Paul Greenberg, Herbalife's Senior Vice President, Counsel.  Greenberg Depo. 225:23-226:1 (Stephens Decl., Ex. "C," pp. 29-30.) |
| 133. To increase the profitability of participating in Herbalife, distributors may recruit and sponsor others to use and sell Herbalife products; those new | 133. **Undisputed.**<br>Gates Decl. Ex. U ¶ 7 (Miller Declaration). |

---

[3] References to "Stephens Decl." refer to the Declaration of John B. Stephens in Support of Defendants' and Counterclaimants' Opposition to Herbalife's Motion for Summary Judgment [Docket No. 260] and the corresponding exhibits to same, which are hereby incorporated by reference as part of this Separate Statement of Undisputed Facts.

| | HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE AND OBJECTIONS |
|---|---|---|
| 1 | | |
| 2 | | |
| 3 | distributors, in turn, may recruit | |
| 4 | and sponsor others. | |
| 5 | | |
| 6 | 134. Each distributor's organization of | 134. **Undisputed.** |
| 7 | directly and indirectly sponsored | Gates Decl. Ex. U ¶ 8 (Miller Declaration). |
| 8 | distributors is known as his | |
| 9 | "downline." The sponsor who | |
| 10 | recruited the distributor into | |
| 11 | Herbalife, as well as those above | |
| 12 | that sponsor, are known as the | |
| 13 | distributor's "upline." | |
| 14 | | |
| 15 | 135. Herbalife, like other direct sales | 135. **Disputed, based in part on** |
| 16 | companies, relies heavily on its | **evidentiary objections.** |
| 17 | distributor network to promote and | Herbalife's Evidence: Gates Decl. Ex. U ¶ |
| 18 | sell its products. | 12 (Miller Declaration). |
| 19 | | |
| 20 | | **Objection:** The evidence cited does not |
| 21 | | support the fact asserted. |
| 22 | | |
| 23 | | **Opposing Evidence:** Miller Depo. |
| 24 | | 38:13-39:8 (Stephens Decl., Ex. "D," |
| 25 | | p. 38, 39). |
| 26 | | |
| 27 | | "Sales & Marketing Plan and Business |
| 28 | | Rules," p. 11 (Stephens Decl., Ex. "B," |

| **HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS** | **SUPPORTING EVIDENCE AND OBJECTIONS** |
|---|---|
| | p.10).  This document was authenticated by Paul Greenberg, Herbalife's Senior Vice President, Counsel.  Greenberg Depo. 225:23-226:1 (Stephens Decl., Ex. "C," pp. 29-30). |
| | Gates Decl. Ex. U ¶ 12 (Miller Declaration). |
| 136. Herbalife maintains detailed information concerning the lineage and performance of its distributors (e.g., uplines and downlines), each distributor's performance and compensation-related statistics, the sales volume for which each distributor is directly or indirectly responsible, and compilations containing detailed contact information for each such distributor (the "Confidential Information"). | 136. **Disputed, based in part on evidentiary objections.** Herbalife's Evidence: Gates Decl. Ex. U ¶¶ 12-19 (Miller Declaration). **Objection:** The evidence cited does not support the fact asserted. **Opposing Evidence:**  Miller Depo. 38:13-39:8 (Stephens Decl., Ex. "D," p. 38, 39). "Sales & Marketing Plan and Business Rules," p. 11 (Stephens Decl., Ex. "B," p.10).  This document was authenticated by Paul Greenberg, Herbalife's Senior Vice President, Counsel.  Greenberg |

| HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE AND OBJECTIONS |
|---|---|
| | Depo. 225:23-226:1 (Stephens Decl., Ex. "C," pp. 29-30). |
| | Gates Decl. Ex. U ¶ 12 (Miller Declaration). |
| 137. This Confidential Information is treated by Herbalife as highly confidential and is critical to the company's survival. | 137. **Disputed.** Herbalife's Evidence: Gates Decl. Ex. U ¶¶ 12-19 (Miller Declaration). |
| | **Opposing Evidence:** K. Orr Decl., ¶¶ 3-5; J. Orr Decl., ¶¶ 3-5; J. Fisher Decl., ¶¶ 3-5; R. Ford Decl., ¶¶ 3-5; D.Thompson Decl., ¶¶ 3-5; B. Roth Decl., ¶¶ 4-5.[4] |
| 138. Other companies with multi-level marking structures, including Melaleuca, considers lineage information to be highly confidential.  Melaleuca President | 138. **Disputed based on evidentiary objections.** Herbalife's Evidence: Gates Decl. Ex. Z (Melaleuca Letter to Federal Trade Commission). |

[4] References to "K. Orr Decl.," "J. Orr Decl.," "J. Fisher Decl.," "R. Ford Decl.," "D. Thompson Decl." and "B. Roth Decl." refer to the Declarations of Kathy Orr, Jeffrey Allen Orr, Jason Fisher, Robert Ford, Dianna Thompson, and Bruce Roth in Support of Defendants' and Counterclaimants' Opposition to Herbalife's Motion for Summary Judgment [Docket Nos. 253, 252, 256, 255, 257, and 251], respectively, which are hereby incorporated by reference as part of this Separate Statement of Undisputed Facts.

| HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE AND OBJECTIONS |
|---|---|
| and CEO Frank Vandersloot explained to the FTC, "Melaleuca Executives and customers to be highly confidential and proprietary. This list literally is Melaleuca's most valuable asset.  Competitor companies and their distributors would love to get their hands on even a small portion of the list." | **Objections:** Gates Decl. Ex. Z: Hearsay, Lacks Foundation, Irrelevant, Failure to Authenticate Document. |
| 139. For business purposes, Herbalife distributors have access to "Indented Lineage Reports" that identify, for each person in a distributor's downline, (a) the name of the distributor's sponsor; (b) where in the downline organization the distributor is situated; (c) the bonus level applicable to each distributor (e.g., "Supervisor," "Global Expansion Team member," etc.); (d) the distributor's sales volume and sales trend statistics; (e) the number of new distributors recruited by each distributor; (f) other financial and | 139. **Undisputed.** Gates Decl. Ex. U ¶¶ 13-16 (Miller Declaration; Ex. B to Miller Declaration) |

| **HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS** | **SUPPORTING EVIDENCE AND OBJECTIONS** |
|---|---|
| performance-related information for downline distributors; and (g) detailed contact information for each such distributor, including Herbalife I.D. number, daytime and evening telephone numbers, email and postal addresses. | |
| 140. Herbalife distributors also have access, subject to non-disclosure obligations, to Royalty Override and Production Bonus statements containing Confidential Information such as each distributor's sales volume. | 140. **Disputed, but immaterial to the instant motion.** Herbalife's Evidence: Gates Dec. Ex U ¶¶ 18, 19 (Miller Declaration). **Objection:** Irrelevant. |
| 141. In their signed Distributor applications, each Defendant agreed that: For a period of three (3) years after termination of this agreement Distributor will hold in confidence any trade secrets, formulas, sales and distribution systems, business information, and literature which Distributor acquired during the term of this agreement and will not use directly | 141. **Undisputed.** Gates Decl. Ex. P (HL000001, HL000003, HL000005, HL000007, HL000008, HL000009, HL000012) |

| HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE AND OBJECTIONS |
|---|---|

1
2
3  or indirectly such items.

4

5  142. Confidential Information is made
6  available to current Herbalife
7  distributors subject to non-
8  disclosure agreements.  To access
9  Herbalife's website, which
10  contains confidential sales and
11  lineage information, a distributor
12  must agree (by "clicking through")
13  to a Confidentiality and Non-
14  Disclosure Agreement ("CDNA").

15

16
17
18
19

20

21
22
23
24
25
26

27

28

142. **Disputed, based on evidentiary objections.**

Herbalife's Evidence: Gates Decl. Ex. U ¶¶ 13-15 (Miller Declaration; Ex. A to Miller Declaration); Declaration of Terry Adams in Support of Plaintiff Herbalife International of America, Inc.'s Motion Opposition to Defendants' Motion for Partial Summary Judgment (Adams Decl.) ¶¶ 3-5.

**Objections:** Adams Decl. ¶¶ 3-5: Lacks Foundation, Irrelevant, Hearsay, Violates the Original Document Rule, and Opinion on Ultimate Issue.

Miller Declaration: Miller admitted in her deposition that she gave false testimony. Miller Depo. 202:11-203:18, 204:3-25, 205:1-17, 206:2-8 (Further Declaration of Cameron M. Jolly ["Further Jolly Decl."], Ex. "1," pgs.3-8).

| HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE AND OBJECTIONS |
|---|---|
| 143. The defendants are each subject to Herbalife's CNDA. | 143. **Disputed, based in part on evidentiary objections.** Herbalife's Evidence: Adams Decl. ¶¶ 6-9. Gates Decl. Ex. N (D. Thompson Dep. Tr. 100:22-102:10), Ex. V ¶¶ 13, 26-29 (Miller Declaration in Further Support; Ex. 1 to Miller Dec. in Further Support), Ex. P (HL000001, HL000003, HL00005, HL000007, HL000008, HL000009, HL000012). **Objections:** Adams Decl. ¶¶ 3-5: Lacks Foundation, Hearsay, Violates the Original Document Rule, and Opinion on Ultimate Issue. The evidence cited does not support the fact asserted. Miller Declaration: Miller admitted in her deposition that she gave false testimony. Miller Depo. 202:11-203:18, 204:3-25, 205:1-17, 206:2-8 ("Further Jolly Decl."), Ex. "1," pgs.3-8). |
| 144. Pursuant to the Herbalife | 144. **Undisputed in that Herbalife has** |

| HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE AND OBJECTIONS |
|---|---|
| Distributorship Agreement, each Herbalife Distributor must "abide by all of Herbalife's rules, regulations, policies and procedures as amended from time to time, including those set forth in . . . Herbalife publications which are hereby incorporated by reference." | **accurately quoted a portion of their distributorship agreement. Disputed in that under California Business & Professions Code section 16600, some of Herbalife's rules (including Rule 8-A) are illegal restraints on trade.**<br>Gates Decl. Ex. P (HL000001, HL000003, HL00005, HL000007, HL000008, HL000009, HL000012) |
| 145. Herbalife Rule 8-A provides as followings:<br>During the course of a Distributorship and for one year thereafter, neither the Distributor nor their spouse, nor any other person assisting in a Distributorship will, directly or indirectly (through or by means of any person, entity or artifice). [sic] solicit, promote, sponsor or recruit any Herbalife Distributor, or any Herbalife customer they became aware of in the course of their Herbalife Distributorship, to join, promote, sell or purchase products, of or participate in as | 145. **Undisputed in that Herbalife has attempted to accurately quote Rule 8-A.**<br>Gates Decl. Ex. B, 51 (Sales and Marketing Plan – citing to rule 8-A) |

| HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE AND OBJECTIONS |
|---|---|
| a salesperson or otherwise, any multi-level marketing or direct-sales company, nor will they encourage anyone to do what is prohibited under this rule." | |
| 146. Each of the Defendants left Herbalife to join Herbalife's competitor, Melaleuca.  Melaleuca distributors earn money based on the product sales of distributors they recruit to join the company. | 146. **Undisputed.** Dkt. No. 152, Answer to Amended Counterclaim ¶¶ 8-12; Gates Dcl. Ex. F (J. Orr Dep. Tr. 187:15-190:4), Ex. G (K. Orr Dep. Tr. 187:16-188:13), Ex. D (N. Roth Dep. Tr. 61:19-62:23). |
| 147. Defendants, after jointing Melaleuca, attempted to build their organizations at Melaleuca by trying to raid their former Herbalife organizations.  They used Herbalife's confidential information to do this. | 147. **Disputed, based in part on evidentiary objections.** Herbalife's Evidence: Gates Decl. Ex AA (D00703-D00760), Ex. D (N. Roth Dep. Tr. 106:18-24, 126:16-127:22.), Ex. RR (Dep. Ex. 47).  This document was authenticated by Nancy Roth N. Roth Dep. Tr. 105:19-25 (Gates Decl. Ex. D).  Gates Decl. Ex. TT (Dep. Ex. 48).  This document was authenticated by Nancy Roth. N. Roth Dep. Tr. 115:2-16 (Gates Decl. Ex. 49).  This document was authenticated by Nancy Roth. N. Roth Dep. Tr. 119:17-20 (Gates Decl. Ex. D). |

| HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE AND OBJECTIONS |
|---|---|
| | Gates Decl. Ex. J (Fisher Dep. Tr. 195:3-197:1), Ex. Q (B. Roth Dep. Tr. 153:18-154:17), Ex. N (D. Thompson Dep. Tr. 104:20-105:22; 236:20-237:24), Ex. F (J. Orr Dep. Tr. 218:17-221:3), Ex. I (J. Ford Dep. Tr. 144:13-16). |
| | **Objection to term "raid:"** Vague, Argumentative, and Conclusory. |
| | **Opposing Evidence:** K. Orr Decl., ¶ 1-16; J. Orr Decl., ¶ 1-16; J. Fisher Decl. ¶ 1-15; R. Ford Decl. ¶ 1-15; D. Thompson Decl., ¶ 1-13; B. Roth Decl., ¶ 1-15. |
| | Further Jolly Jolly Decl., Ex.2 (D. Thompson Depo. 89:7-11), Ex.3 (K.Orr Depo. 135:15-137:12), Ex.4 (B.Roth Depo. 163:2-5) |
| 148. In January 2007, defendants Jason Fisher and Robert Ford persuaded Bruce and Nancy Roth to leave Herbalife to join Melaleuca.  For the next month, while the Roths were still Herbalife distributors, | 148. **Disputed, but immaterial to the instant motion.** Herbalife's Evidence: Gates Decl. Ex. D (N. Roth dep. Tr. 73:10-74:6; 74:17-75:7; 81:4-20; 82:18-83:10; 98:5-101:9; 105:19-107:9, 115:2-116:9, 118:22-119:16, 122:7- |

| | HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE AND OBJECTIONS |
|---|---|---|

the Roths, Fisher and Ford made plans to recruit away Herbalife distributors using Herbalife's confidential information.  Fisher and Ford told the Roths how to obtain their historical Herbalife lineage reports to use in their Melaleuca recruiting efforts, as Fisher and Ford had done when they left Herbalife.

19; 126:16-127:11), Ex. QQ (Dep. Ex. 43), This document was authenticated by Nancy Roth. N. Roth Dep. Tr. 96:20-97:25 (Gates Decl. Ex. D). Ex. RR (Dep. Ex. 47), Ex. SS (Dep. Ex. 49), Ex. Q (B. Roth Dep. Tr. 152:13-154:21; 156:5-16), Ex. J (J. Fisher Dep. Tr. 195:3-24), Ex. K (R. Ford Dep. Tr. 148:9-15).

**Objection:** Irrelevant; Fails to comply with the Court's order to "address a single topic in as concise a manner as possible."

149. Nancy Roth later asked Fisher for help converting her Herbalife paper lineage reports into digital format; Fisher had "an ex-Herbalifer in [his] downline who had software that could transfer over paper lineage reports."  This was a hindrance to the Roths, because at their "peak with [Herbalife] we didn't have lineage reports in a digital format."

149. **Disputed, but immaterial to the instant motion.**
Herbalife's Evidence: Gates Decl. Ex. D (N. Roth Dep. Tr. 105:19-106:24), Ex. RR (Dep. Ex. 47).

**Objection:** Irrelevant.

150. That same day, Ms. Roth asked

150. **Disputed, but immaterial to the**

| | HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE AND OBJECTIONS |
|---|---|---|
| 1 | | |
| 2 | | |
| 3 | Robert Ford if he had been "able to | **instant motion.** |
| 4 | get [his] Distributor reports from | Herbalife's Evidence: Gates Decl. Ex. D |
| 5 | Herbalife for years past," and he | (N. Roth Dep. Tr. 115:2-116:9), Ex. TT |
| 6 | responded that "he had them in his | (Dep. Ex. 48). |
| 7 | tax files." Ms. Roth also asked | |
| 8 | Mr. Ford if he knew of a way to get | **Objection:** Irrelevant. |
| 9 | lineage reports from Herbalife in | |
| 10 | digital format prior to May 2003, | |
| 11 | because "Herbalife Central only | |
| 12 | [went] back that far" in January | |
| 13 | 2007. Ford, who had accessed | |
| 14 | Herbalife Central for the same | |
| 15 | reason, stated that he did "not | |
| 16 | believe you can go father back than | |
| 17 | 2003." | |
| 18 | | |
| 19 | 151. Then, on the eve of their departure | 151. **Disputed, but immaterial to the** |
| 20 | from Herbalife to Melaleuca, | **instant motion.** |
| 21 | Nancy Roth e-mailed Herbalife to | Herbalife's Evidence: Gates Decl. Ex. D |
| 22 | ask for copies of all of the Roths' | (N. Roth Dep. Tr. 119:12-18, 122:20- |
| 23 | lineage reports from the beginning | 126:12), Ex. SS Dep. Ex. 49). |
| 24 | of their association with Herbalife | |
| 25 | in 1995. She constructed an | **Objection to phrase "elaborate lie"** as |
| 26 | elaborate lie to convince Herbalife | being argumentative, conclusory, and |
| 27 | that it was "crucial" that she | irrelevant. |
| 28 | receive the reports by e-mail the | |

| **HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS** | **SUPPORTING EVIDENCE AND OBJECTIONS** |
|---|---|
| following morning. | |
| 152. The Roths resigned from Herbalife on February 1, 2007. They joined Jason Fisher and Robert Ford for a ten-day recruiting blitz, working continuously to solicit Herbalife distributors in the Roths' former downline. | 152. **Disputed.** Herbalife's Evidence: Gates Decl. Ex. J (Fisher Dep. Tr. 195:3-197:1), Ex. D (N. Roth Dep. Tr. 122:1-19, 126:16-127:11), Ex. BB ¶ 8 (Declaration of David Schmaman in Further Support of Herbalife's Motion for Preliminary Injunction (Schmaman Declaration)). **Objection:** Fails to comply with the Court's order to "address a single topic in as concise a manner as possible." **Opposing Evidence:** B. Roth Decl, ¶¶ 6-7. |
| 153. Defendants also engaged in various coercive and deceptive recruiting tactics in an effort to convert Herbalife distributors to Melaleuca. | 153. **Disputed.** Herbalife's Evidence: Gates Decl. Ex. CC ¶¶ 4-7 (Declaration of Richard Palmer in Support of Plaintiff Herbalife International of America, Inc.'s Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment (Palmer Declaration)), Ex. DD ¶¶ 8, 10 & 11 (Declaration of Lilith Nix in Support of Motion for |

| HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE AND OBJECTIONS |
|---|---|
| | Preliminary Injunction (Nix Declaration)), Ex. BB ¶¶ 5, 6 (Schmaman Declaration). |
| | **Objection to terms "coercive" and "deceptive:"** Vague; Argumentative; Conclusory, Irrelevant. |
| | Fails to comply with the Court's order to "address a single topic in as concise a manner as possible." |
| | **Opposing Evidence:** K. Orr Decl., ¶ 11; J. Orr Decl., ¶ 11; J. Fisher Decl., ¶ 10; R. Ford Decl., ¶ 11; D. Thompson Decl., ¶ 10; B. Roth Decl., ¶ 11. |
| 154. Defendants have repeatedly sought to recruit Herbalife distributors to Melaleuca by threatening to "take [the distributor's] entire downliine to Melaleuca" if the distributor would not convert to Melaleuca – a credible threat given the information they gained through their Herbalife distributorships and a practice that some Herbalife | 154. **Disputed, based in part on evidentiary objections.** Herbalife's Evidence: Gates Decl. Ex. EE ¶ 4, Ex. F (Greenberg Declaration), Ex. CC ¶¶ 4-6 (Palmer Declaration), Ex. BB ¶ 5 (Schmaman Declaration), Ex. DD ¶ 11 (Nix Declaration), Ex. FF ¶ 12 (Declaration of Elizabeth Klucken in Support of Herbalife's Motion for Preliminary Injunction (Klucken |

| HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE AND OBJECTIONS |
|---|---|
| distributors describe as "blackmail." | Declaration)), Ex. L (Schmaman Dep. Tr. 83:2-90:1).

**Objections:** Greenberg Declaration. ¶ 4: Lacks Foundation, Irrelevant, Hearsay.

**Opposing Evidence:** K. Orr Decl., ¶ 11; J. Orr Decl., ¶ 11; J. Fisher Decl., ¶ 10; R. Ford Decl., ¶ 11; D. Thompson Decl., ¶ 10; B. Roth Decl., ¶ 11. |
| 155. Defendants threatened to destroy the organizations that they distributors (not Defendants) had built unless they agreed to join Melaleuca, which Herbalife distributors decried as "unethical" and sleazy." | 155. **Disputed, based in part on evidentiary objections.**
Herbalife's Evidence: Gates Decl. Ex. EE ¶ 3, Ex. A, B (Greenberg Declaration).

**Objections:** Greenberg Declaration. ¶ 4: Lacks Foundation; Irrelevant; Hearsay.

**Opposing Evidence:** K. Orr Decl., ¶ 11; J. Orr Decl., ¶ 11; J. Fisher Decl., ¶ 10; R. Ford Decl., ¶ 11; D. Thompson Decl., ¶ 10; B. Roth Decl., ¶ 11. |
| 156. Defendants have told distributors that people in their downline have already agreed to join Melaleuca – | 156. **Disputed, but immaterial to the instant motion.**
Herbalife's Evidence: Gates Decl. Ex. E |

| **HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS** | **SUPPORTING EVIDENCE AND OBJECTIONS** |
|---|---|
| again a credible tale given their position as former distributors | (L. Nix Dep. Tr. 24:23-27:14), Ex. BB ¶ 5 (Schmaman Declaration). **Objection:** Irrelevant. |
| 157. Mr. Ford even told an Herbalife distributor that she should leave Herbalife because her upline supervisor would now "lose his house' because Ford left Herbalife. | 157. **Disputed, but immaterial to the instant motion.** Herbalife's Evidence: Gates Decl. Ex. E (Nix Dep. Tr. 20:10-21:16). **Objection:** Irrelevant. |
| 158. Defendants have solicited Herbalife distributors to not only leave Herbalife for Melaleuca, but to bring their downlines to Melaleuca as well (in breach of their contracts with Herbalife), increasing the pressure on upline Herbalife distributors. | 158. **Disputed, but immaterial to the instant motion.** Herbalife's Evidence: Gates Decl. Ex. Q (B. Roth Dep. Tr. 175:18-177:7), Ex. E (L. Nix Dep. Tr. 268:12-269:21), Ex. V ¶¶ 3-12 (Miller Declaration), Ex. GG (HL000055-56). **Objections:** Miller Declaration ¶¶ 3-12: Lacks Foundation, Irrelevant, Hearsay. |
| 159. Defendants gained an entrée by falsely representing they were still with Herbalife, used Herbalife | 159. **Disputed, but immaterial to the instant motion.** Herbalife's Evidence: Gates Decl. Ex. EE |

| HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE AND OBJECTIONS |
|---|---|
| records to contact their downlines, and were "saying horrible things about . . . Herbalife." | ¶¶ 5, 6, 7; Ex. B, C (Greenberg Declaration), Ex. HH ¶¶ 1-3 (Declaration of Potato Richardson in Support of Plaintiff Herbalife Inter-National of America, Inc.'s Motion for Summary Judgment or, in the Alternative Partial Summary Judgment (Richardson Declaration)), Ex. II ¶¶ 1-4, Ex. Q, N (Declaration of Caryle Justesen in Support of Motion for Preliminary Injunction (Justesen Declaration)). |
| | **Objection:** Irrelevant. |
| | **Opposing Evidence:**  R. Ford Decl., ¶ 11, 21-35.  K. Orr Decl., ¶ 11; J. Orr Decl., ¶ 11; J. Fisher Decl., ¶ 10; R.; D. Thompson Decl., ¶ 10; B. Roth Decl., ¶ 11. |
| 160. Through Defendants' distributor agreements, each agreed to be bound by all of Herbalife's rules and regulations | 160. **Undisputed in that Herbalife's distributorship agreements so provide.  Disputed in that under California Business & Professions Code section 16600, some of Herbalife's rules (including Rule 8-** |

- 47 -

| HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE AND OBJECTIONS |
|---|---|
| | **A) are illegal restraints on trade.** Herbalife's Evidence: Gates Decl. Ex. P (HL000001, HL000003, HL000005, HL000007, HL000008, HL000009, HL000012.). |
| 161. Jason Fisher and the Fords induced others to breach Rule 8-A and their distributor agreements. | 161. **Disputed, but immaterial to the instant motion.  Also disputed in that under California Business & Professions Code section 16600, some of Herbalife's rules (including Rule 8-A) are illegal restraints on trade.** Herbalife's Evidence: Gates Decl. Ex. D (N. Roth Dep. Tr. 73:10-74:6; 74:17-75:7; 81:4-20; 82:18-83:10; 98:5-101:9; 122:7-19; 126:16-127:11), Ex. QQ (Dep. Ex. 43), Ex. Q (B. Roth Dep. Tr. 152:13-154:21; 156:5-16), Ex. J (J. Fisher Dep. Tr. 195:3-24), Ex. K (R. Ford Dep. Tr. 142:6-143:20; 146:23-147:16; 148:9-15), Ex. I (J. Ford Dep. Tr. 128:16-129:10; 130:1-25; 138:11-22). **Objection:** Irrelevant. |

| | **HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS** | **SUPPORTING EVIDENCE AND OBJECTIONS** |
|---|---|---|
| | 162. All Defendants except Fisher consented to the CNDA before accessing Herbalife's trade secrets on Herbalife's distributor website. | 162. **Disputed, based in part on evidentiary objections.** Herbalife's Evidence: Adams Decl. ¶¶ 7-9; Gates Decl. Ex. N (D. Thompson Dep. Tr. 100:22-102:10). |
| | | **Objections:** Adams Decl. ¶¶ 7-9: Lacks Foundation, Hearsay, Violates the Original Document Rule, and Opinion on Ultimate Issue. |
| | 163. Dianna Thompson was contacting Herbalife distributors to recruit for Melaleuca while still an Herbalife distributor.  Herbalife's Tab Team Agreement and her Distributor Agreement provided she is bound by Rules 8B and 8G.  Those rules provide: <br> 8-B – "The Herbalife business is an equal opportunity, regardless of gender, race, religious beliefs or political affiliations.  It is our philosophy that everyone has a personal right to their individual beliefs and the freedom to choose.  Therefore, when training their | 163. **Disputed.** Herbalife's Evidence: Gates Decl. Ex. B, p. 51, 52 (Sales and Marketing Plan – citing Rules 8-B & 8-G), Ex. N (D. Thompson Dep. Tr. 84:14-17), Ex. E (L. Nix Dep. Tr. 22:14-23:20). <br> **Opposing Evidence:** D. Thompson Depo. 84:20-85:11 144:14-148:4 (Further Jolly Decl., Ex.2, pgs. 13-24. |

| **HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS** | **SUPPORTING EVIDENCE AND OBJECTIONS** |
|---|---|
| organization or other Distributors, or selling products or offering the business opportunity, Distributors are not permitted to promote, discuss or offer, any company, organization or individual other than Herbalife, its staff and its Distributors.  Likewise, Distributors may not include literature or other material that promotes any other organizations or individuals, whether religious, political, business or social or that implies any association between Herbalife and any other organization. Herbalife meetings may not be used as a forum to express personal beliefs or promote any other organization, company, event or individual. 8-G – "No Distributor shall submit false or misleading information to the Company." | |
| 164. Nancy Roth admits she lied to Herbalife to try to obtain lineage information, which violates Rule 8G and their Tab Team Agreement. Bruce Roth admits he knew all | 164. **Disputed, based in part on evidentiary objections.** Herbalife's Evidence: Gates Decl. Ex. D (N. Roth Dep. Tr. 125:2-126:12.), Ex. Q (B. Roth Dep. Tr. 160:13-161:7). |

| **HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS** | **SUPPORTING EVIDENCE AND OBJECTIONS** |
|---|---|
| about his wife's deceit. | |
| | **Objections:** Argumentative; Misstates Testimony. |
| 165. In response to Jeff Orr's First Set of Requests for Production, No. 21, in which he requested Herbalife produce "All trade secrets that YOU contend were misappropriated by COUNTERCLAIMANTS," Herbalife contends Defendants misappropriated, 'among other things, the Lineage Reports and downline information. . .Herbalife's prospective product lines and marketing mateials, confidential business and financial information concerning Herbalife's products, prices and pricing schedules, profitability considerations, marketing techniques and/or other market considerations,' as stated in Paragraphs 83 of the Complaint. As Distributors, Defendants had | 165. **Undisputed.** Gates Decl. Ex. JJ (Herbalife's Responses to Defendant and Counterclaimant Jeff Orr's First Set of Requests for Production, No. 1) |

| HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE AND OBJECTIONS |
|---|---|

access to the above-mentioned information and received it in a variety of ways, including by mail and on Bizworks.  Herbalife has no way to identify the particular trade secrets or documents reflecting those trade secrets Defendants misappropriated and so has no responsive documents."

166. In response to Dianna Thompson's Interrogatory No. 8, in which she requested that Herbalife "state all facts that support YOUR contention that information regarding the identity of YOUR distributors is a trade secret," Herbalife identified those documents which it considered among its trade secrets: "Herbalife Lineage Reports, Royalty Override Statements, Production Bonus Statements, information obtained through Bizworks and confidential business information acquired by Herbalife distributors, including at

166. **Undisputed.**

Gates Decl. Ex. KK (Herbalife's Responses to Defendant and Counterclaimant Dianna Thompson's First Set of Interrogatories, No. 8).

| HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE AND OBJECTIONS |
|---|---|
| Herbalife events, to build their business (such as their customer databases) are trade secrets because they have economic value to competitors." | |
| 167. Defendants used Herbalife's confidential information – lineage and sales information concerning Herbalife distributors' downline organizations as reflected in Lineage Reports, Royalty Override Statements, and Production Bonus Statements. | 167. **Disputed, but immaterial to the instant motion.** Herbalife's Evidence: Gates Decl. Ex. D (N. Roth Dep. Tr. 106:18-24, 126:16-127:22), Ex. Q (B. Roth Dep. Tr. 153:18-154:17), Ex. N (D. Thompson Dep. Tr. 104:20-105:22; 236:20-237:24), Ex. F (J. Orr Dep. Tr. 218:17-221:3), Ex. J (J. Fisher Dep. Tr. 195:3-197:1), Ex. I (J. Ford Dep. Tr. 144:13-16). **Objections:** Irrelevant; The evidence cited does not support the fact asserted. **Opposing Evidence:** K. Orr Decl., ¶¶ 1-16; J. Orr Decl., ¶¶ 1-16; J. Fisher Decl., ¶¶ 1-15; R. Ford Decl., ¶ 1-15; D. Thompson Decl., ¶¶ 1-13; B. Roth Decl., ¶¶ 1-15. |

| | **HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS** | **SUPPORTING EVIDENCE AND OBJECTIONS** |
|---|---|---|
| 168. | Improper use of Herbalife lineage information is detrimental to Herbalife because it could allow former distributors to target key Herbalife distributors and their downlines, as Defendants have done.  Rule 8-A is justified by the need to prevent this type of misuse. | 168. **Disputed, but immaterial to the instant motion.** Herbalife's Evidence: Gates Decl. Ex. U ¶¶ 12, 38 (Miller Declaration), Ex. M (Gratziani Dep. Tr. 108:24-109:13); Dkt. No. 77, December 11, 2007 Minute Order, pp. 2 & 4. **Objection:**  The Minute Order is not binding or relevant. *University of Texas v. Camenisch,* (1981) 451 U.S. 390, 395, 101 S.Ct. 1830, 1834. **Opposing Evidence:** K. Orr Decl., ¶¶ 1-16; J. Orr Decl., ¶¶ 1-16; J. Fisher Decl., ¶¶ 1-15; R. Ford Decl., ¶ 1-15; D. Thompson Decl., ¶¶ 1-13; B. Roth Decl., ¶¶ 1-15. |
| 169. | All users must agree to the CNDA by clicking through it in order to access the password-protected trade secrets maintained there by Herbalife. | 169. **Disputed, based in part on evidentiary objections.** Herbalife's Evidence: Adams Decl. ¶¶ 3-5; Gates Decl. Ex. V ¶¶ 21-23 (Miller Declaration in Further Support), Ex. U ¶ 15 (Miller Declaration) **Objections:** Adams Decl. ¶¶ 3-5: Lacks |

| HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE AND OBJECTIONS |
|---|---|
| | Foundation, Irrelevant, Hearsay, Violates the Best Evidence Rule. |
| | Miller Declaration: Miller admitted in her deposition that she gave false testimony. Miller Depo. 202:11-203:18, 204:3-25, 205:1-17, 206:2-8 (Further Declaration of Cameron M. Jolly ["Further Jolly Decl."], Ex. "1," pgs.3-8). |
| | The evidence cited does not support the fact asserted. |
| 170. Information from Herbalife's information technology departments shows that Robert Ford, Nancy Roth and Kathy Orr all agreed to be bound by the CNDA.  These Defendants and their spouses therefore agreed to maintain the confidentiality of Herbalife's lineage information. And Dianna Thompson has conceded that she agreed to the terms of the CNDA. | 170. **Disputed, based in part on evidentiary objections.** Herbalife's Evidence: Adams Decl. ¶¶ 7-9; Gates Decl. Ex. N (D. Thompson Dep. Tr. 100:22-102:10). **Objections:** Adams Decl. ¶¶ 3-5: Lacks Foundation, Hearsay, Violates the Original Document Rule. The evidence cited does not support the fact asserted. |

| HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE AND OBJECTIONS |
|---|---|
| | Miller Declaration: Miller admitted in her deposition that she gave false testimony. Miller Depo. 202:11-203:18, 204:3-25, 205:1-17, 206:2-8 (Further Declaration of Cameron M. Jolly ["Further Jolly Decl."], Ex. "1," pgs.3-8). |
| 171. Defendants have represented that Melaleuca products are safe and non-toxic. | 171. **Disputed, based on evidentiary objections.** Herbalife's Evidence: Gates Decl. Ex. EE (Greenberg Declaration), Ex. X (FORD0010701-FORD0010706)<br><br>**Objection:** The evidence cited does not support the fact asserted. |
| 172. Representations that Melaleuca products are safe and non-toxic are false. | 172. **Disputed, based on evidentiary objections.** Herbalife's Evidence: Henig Decl. ¶¶ 4, 5.<br><br>**Objections:** Henig Decl. ¶¶ 4, 5: Lacks Foundation, Hearsay, Undisclosed Expert Opinion, Irrelevant. |

| HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE AND OBJECTIONS |
|---|---|
| 173. Herbalife spends millions of dollars each year on research and development of those products, and employs exceptionally qualified physicians and nutritional experts to help develop its products. | 173. **Disputed, based on evidentiary objections.** Herbalife's Evidence: Henig Decl. ¶3. **Objections:** Henig Decl. ¶¶ 4, 5: Lacks Foundation, Hearsay, Undisclosed Expert Opinion, Irrelevant. |
| 174. Herbalife invests in extensive advertising and branding to raise its profile and that of its products among consumers. For example, Herbalife sponsors the LA Galaxy, youth soccer programs, Indy car drivers, and local athletes, all in a bid to raise its public profile and increase demand for the company's products. | 174. **Disputed, based on evidentiary objections.** Herbalife's Evidence: McKee Decl. ¶9 **Objections:** Henig Decl. ¶¶ 4, 5: Lacks Foundation, Hearsay, Undisclosed Expert Opinion, Irrelevant. |
| 175. The actual use of Herbalife products is the primary focus of Herbalife's business. Herbalife distributors believe strongly in the efficacy of Herbalife's products, because they are extremely effective. This strong belief in | 175. **Disputed.** Herbalife's Evidence: McKee Decl. ¶¶ 15, 18, & 20-22; Gates Decl. Ex. C (McKee Dep. Tr. 15:11-17:10; 190:8-21), Ex. F (J. Orr Dep. Tr. 25:15-21; 185:4-6), Ex. G (K. Orr Dep. Tr. 123:6-12), Ex. Q (B. Roth Dep. Tr. 15:8-21), Ex. D (N. Roth Dep. Tr. |

| HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE AND OBJECTIONS |
|---|---|
| Herbalife's products allows distributors to sell the products effectively. | 11:14-12:11), Ex. I (J. Ford Dep. Tr. 24:16-26:10).<br><br>**Objection:** Fails to comply with the Court's order to "address a single topic in as concise a manner as possible."<br><br>**Opposing Evidence:** "Live the Good Life with Herbalife," p. 22 (Dyer Decl., ¶ 4, Ex. "C," p. 60).  This chart was authenticated by Miller.  Miller Depo. 71:2-15 (Dyer Decl., Ex. "A," p. 26).<br><br>"Sales & Marketing Plan and Business Rules," p. 4, 11 (Dyer Decl., ¶ 5, Ex. "D," p. 63-64).  This document was authenticated by Paul Greenberg, Herbalife's Senior Vice President, Counsel.  Deposition of Paul Greenberg ["Greenberg Depo."]) 225:23-226:1 (Dyer Decl., Ex. "E," pp. 86-87.)<br><br>Greenberg Depo. 117:3-5 (Dyer Decl., ¶ 6, Ex. "E," p. 80).<br><br>Miller Depo. 36:22-37:14, 38:13-39:8, |

| HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE AND OBJECTIONS |
|---|---|
| | 73:3-20 (Dyer Decl., Ex. "A," pp. 15-18, 27). |
| | Deposition of Mike McKee ["McKee Depo."]) 90:22-91:15 (Dyer Decl., ¶ 7, Ex. "F," pp. 109-110). |
| 176. The defendants and third-party witnesses testified that they believed in Herbalife's products and used them.  Several defendants, in fact, continue to use Herbalife products. | 176. **Undisputed.** Gates Decl. Ex. F (J. Orr Dep. Tr. 25:15-21; 185:4-6), Ex. G (K. Orr Dep. Tr. 123:6-12), Ex. Q (B. Roth Dep. Tr. 15:8-21), Ex. D (N. Roth Dep. Tr. 11:14-12:11, Ex. I (J. Ford Dep. Tr. 24:16-26:10), Ex. N. (D. Thompson Dep. Tr. 21:9-22:11; 23:1-3; 24:11-14), Ex. J (J. Fisher Dep. Tr. 37:22-38:5), Ex. L (D. Schmaman Dep. Tr. 18:1-19:6), Ex. E (L. Nix Dep. Tr. 137:19-24) |
| 177. Retail sales are the core and primary focus of the Herbalife business opportunity. | 177. **Disputed.** Herbalife's Evidence: Gates Decl. Ex. B pp. 6, 7, 59, 62 (Sales & Marketing Plan – citing to Rules 20-C, 20-D, & 24-B), Ex. C (McKee Dep. Tr. 12:2-23, 17:11-25, 51:13-24, 104:21-105:9, 133:1-9, 190:2-21), Ex. D (N. Roth Dep. Tr. 94:16-21, |

| HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE AND OBJECTIONS |
|---|---|
| | 95:8-11), Ex. E (L. Nix Dep. Tr. 168:23-169:14, 237:23-238:12), Ex. F (J. Orr Dep. Tr. 23;16-24:12, 71:8-72:7, 81:21-82:10, 123:22-124:11), Ex. G (K. Orr Dep. Tr. 72:2-10), Ex. H (Johnson Dep. Tr. 80:25-81:23), Ex. I (J. Ford Dep. Tr. 30:9-12; 33:3-34:11; 34:25-35:21; 50:22-51:14; 79:15-80:4), Ex. J (J. Fisher Dep. Tr. 9:16-10:12; 39:24-40:3; 55:6-56:5), Ex. K (R. Ford Dep. Tr. 20:3-10; 46:3-7; 46:14-47:3), Ex. L (D. Schmaman Dep. Tr. 36:10-18; 53:2-12), Ex. M (S. Gratziani Dep. Tr. 40:1-20; 66:12-67:8; 96:1-9; 144:13-22), Ex. N (D. Thompson Dep. Tr. 26:15-27:21; 50:4-10); Gates Confid. Decl. Ex. F (Johnson Dep. Tr. 133:8-25); McKee Decl. ¶¶ 14, 15, 17, 18, 20-23; Hienrich Decl. ¶¶ 5, 7. |
| | **Opposing Evidence:** "Live the Good Life with Herbalife," p. 22 (Dyer Decl., ¶ 4, Ex. "C," p. 60).  This chart was authenticated by Miller.  Miller Depo. 71:2-15 (Dyer Decl., Ex. "A," p. 26). |
| | "Sales & Marketing Plan and Business |

| HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE AND OBJECTIONS |
|---|---|
| | Rules," p. 4, 11 (Dyer Decl., ¶ 5, Ex. "D," p. 63-64).  This document was authenticated by Paul Greenberg, Herbalife's Senior Vice President, Counsel.  Deposition of Paul Greenberg ["Greenberg Depo."]) 225:23-226:1 (Dyer Decl., Ex. "E," pp. 86-87.) |
| | Greenberg Depo. 117:3-5 (Dyer Decl., ¶ 6, Ex. "E," p. 80). |
| | Miller Depo. 36:22-37:14, 38:13-39:8, 73:3-20 (Dyer Decl., Ex. "A," pp. 15-18, 27). |
| | Deposition of Mike McKee ["McKee Depo."]) 90:22-91:15 (Dyer Decl., ¶ 7, Ex. "F," pp. 109-110). |
| 178. The principal focus of Herbalife's Sales & Marketing Plan is use of Herbalife products and retail sales. | 178. **Disputed.** Herbalife's Evidence: Gates Decl. Ex. B pp. 6, 7, 59, 62 (Sales & Marketing Plan – citing to Rules 20-C, 20-D, & 24-B), Ex. C (McKee Dep. Tr. 12:2-23, 17:11-25, 51:13-24, 104:21-105:9, 133:1-9, 190:2-21), Ex. D (N. Roth Dep. Tr. 94:16-21, |

| HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE AND OBJECTIONS |
|---|---|
| | 95:8-11), Ex. E (L. Nix Dep. Tr. 168:23-169:14, 237:23-238:12), Ex. F (J. Orr Dep. Tr. 23:16-24:12, 71:8-72:7, 81:21-82:10, 123:22-124:11), Ex. G (K. Orr Dep. Tr. 72:2-10), Ex. H (Johnson Dep. Tr. 80:25-81:23), Ex. I (J. Ford Dep. Tr. 30:9-12; 33:3-34:11; 34:25-35:21; 50:22-51:14; 79:15-80:4), Ex. J (J. Fisher Dep. Tr. 9:16-10:12; 39:24-40:3; 55:6-56:5), Ex. K (R. Ford Dep. Tr. 20:3-10; 46:3-7; 46:14-47:3), Ex. L (D. Schmaman Dep. Tr. 36;10-18; 53:2-12), Ex. M (S. Gratziani Dep. Tr. 40;1-20; 66:12-67:8; 96:1-9; 144:13-22), Ex. N (D. Thompson Dep. Tr. 26:15-27:21; 50:4-10); Gates confide. Decl. Ex. F (Johnson Dep. Tr. 133:8-25); McKee Decl. ¶¶ 14, 15, 17, 18, 20-23; Hienrich Decl. ¶¶ 5, 7. |
| | **Objection:** The evidence cited does not support the fact asserted. |
| | **Opposing Evidence:** "Live the Good Life with Herbalife," p. 22 (Dyer Decl., ¶ 4, Ex. "C," p. 60). This chart was authenticated by Miller. Miller Depo. 71:2-15 (Dyer Decl., Ex. "A," p. 26). |

| HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE AND OBJECTIONS |
|---|---|
| | "Sales & Marketing Plan and Business Rules," p. 4, 11 (Dyer Decl., ¶ 5, Ex. "D," p. 63-64).  This document was authenticated by Paul Greenberg, Herbalife's Senior Vice President, Counsel.  Deposition of Paul Greenberg ["Greenberg Depo."]) 225:23-226:1 (Dyer Decl., Ex. "E," pp. 86-87.) |
| | Greenberg Depo. 117:3-5 (Dyer Decl., ¶ 6, Ex. "E," p. 80). |
| | Miller Depo. 36:22-37:14, 38:13-39:8, 73:3-20 (Dyer Decl., Ex. "A," pp. 15-18, 27). |
| | McKee Depo. 90:22-91:15 (Dyer Decl., ¶ 7, Ex. "F," pp. 109-110). |
| 179. The Overview on the very first page Herbalife's Sales & Marketing Plan explains: The Herbalife opportunity and the Marketing Plan is identical for every Distributor.  Each | 179. **Undisputed that the document contains those words.** Gates Decl. Ex. B, p. 3 (Sales and Marketing Plan). |

| | |
|---|---|
| **HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS** | **SUPPORTING EVIDENCE AND OBJECTIONS** |

Distributor's success is dependent on two primary factors:

• The time, effort and commitment a Distributor puts into their Herbalife business and

• The product sales made by a Distributor and their downline organization.

180. Herbalife teaches its distributors that use of the products is the best way to successfully sell the products. Herbalife urges its Distributors to "tell a story" of how use of Herbalife products improved their lives to create demand for the products. Julia Ford and Kathy Orr, who were successful Herbalife distributors, acknowledge this model as key, and also acknowledge using and believing in the products themselves.

180. **Disputed.**

Herbalife's Evidence: Gates Decl. Ex. G (K. Orr Dep. Tr. 56:4-57:7; 92:4-93:9; 94:20-95:21; 126:6-12), Ex. I (J. Ford Dep. Tr. 22:19-24:6; 24:16-26:23), Ex. E (L. Nix Dep. Tr. 43:21-44:7; 91:22-92:10; 296:9-20), Ex. C (McKee Dep. Tr. 15:11-16:12), Ex. O (J. Miller Dep. Tr. 149:15-150:4), Ex. F (J. Orr Dep. Tr. 93:18-25), Ex. D N. Roth Dep. Tr. 14:8-15:19), Ex. Q (B. Roth Dep. Tr. 40:22-41:3).

**Opposing Evidence:** "Sales & Marketing Plan and Business Rules," p. 52 (Dyer Decl., Ex. "D," p. 69). This document was authenticated by Paul Greenberg, Herbalife's Senior Vice President,

| HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE AND OBJECTIONS |
|---|---|
| | Counsel.  Greenberg Depo. 225:23-226:1 (Dyer Decl., Ex. "E," pp. 86-87.) |
| | K. Orr Decl., ¶¶ 6-7; J. Orr Decl., ¶¶ 6-7; J. Fisher Decl., ¶ 7; R. Ford Decl. ¶ 6-7; D. Thompson Decl., ¶¶ 6-7; B. Roth Decl., ¶¶ 6-7. |
| 181. Herbalife distributors and supervisors do not make money when they sign up new distributors; they make money when those new recruits *sell products.* | 181. **Disputed, based in part on evidentiary objections.** Herbalife's Evidence: McKee Decl. ¶ 17; Hienrich Decl. ¶ 5. |
| | **Objections:** The evidence cited does not support the fact asserted; Lacks Foundation, Improper Expert Opinion. |
| | **Opposing Evidence:** "Live the Good Life with Herbalife," p. 22 (Dyer Decl., ¶ 4, Ex. "C," p. 60).  This chart was authenticated by Miller.  Miller Depo. 71:2-15 (Dyer Decl., Ex. "A," p. 26). |
| | "Sales & Marketing Plan and Business Rules," p. 4, 11, 44 (Dyer Decl., ¶ 5, Ex. "D," p. 63-64, 66).  This document was |

| HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE AND OBJECTIONS |
|---|---|
| | authenticated by Paul Greenberg, Herbalife's Senior Vice President, Counsel.  Deposition of Paul Greenberg ["Greenberg Depo."]) 225:23-226:1 (Dyer Decl., Ex. "E," pp. 86-87.) |
| | Greenberg Depo. 117:3-5 (Dyer Decl., ¶ 6, Ex. "E," p. 80). |
| | Miller Depo. 36:22-37:14, 38:13-39:8, 73:3-20 (Dyer Decl., Ex. "A," pp. 15-18, 27). |
| | McKee Depo. 90:22-91:15 (Dyer Decl., ¶ 7, Ex. "F," pp. 109-110). |
| 182. All of the Defendants had substantial retail sales focus while they were affiliated with Herbalife. The Orrs, Julia Ford and Diana Thompson focused nearly exclusively on retail sales. | 182.  **Disputed, but immaterial to the instant motion.** Herbalife's Evidence: Gates Decl., Ex. K (R. Ford Dep. Tr. 46:3-7), Ex. I (J. Ford Dep. Tr. 66:13-17, 118:10-119:5), Ex. N (D. Thompson Dep. Tr. 27:15-19), Ex. F (J. Orr Dep. Tr. 23:16-24:12, 71:8-72:7, 81:21-82:10, 123:22-124:11), Ex. G (K. Orr Dep. Tr. 72:2-10). |

| HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE AND OBJECTIONS |
|---|---|
| | **Objection:** Irrelevant; The evidence cited does not support the fact asserted. |
| | **Opposing Evidence:** K. Orr Decl., ¶¶ 6-7; J. Orr Decl., ¶¶ 6-7; J. Fisher Decl., ¶ 7; R. Ford Decl. ¶ 6-7; D. Thompson Decl., ¶¶ 6-7; B. Roth Decl., ¶¶ 6-7. |
| 183. The defendants also taught their downline supervisors to focus on retail sales.  For example, Kathy Orr explained succinctly why she did so: "Because for me, that [retail sales] was the foundation of Herbalife's business or my business." | 183. **Disputed, but immaterial to the instant motion.** Herbalife's Evidence: Gates Decl. Ex. G (K. Orr Dep. Tr. 95:1-5), Ex. I (J. Ford Dep. Tr. 23:7-24:2), Ex. D (N. Roth Dep. Tr. 94:16-21; 95:8-11.), Ex. N (D. Thompson Dep. Tr. 31:15-18), Ex. F (J. Orr Dep. Tr. 71:8-21, 118:10-119:5). |
| | **Objection:** Irrelevant. |
| 184. In order to ensure compliance with the Marketing Plan, each Distributor is required to make sales to at least 10 retail customers a month and to provide certification of those sales in order to receive Royalty Override or | 184. **Disputed, based in part on evidentiary objections.** Herbalife's Evidence: Hienrich Decl. ¶¶ 8-9, 18; Gates Decl. Ex. B, p. 42 (Sales and Marketing Plan). |
| | **Objections:** Hienrich Decl. ¶¶ 8-9, 18: |

| HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE AND OBJECTIONS |
|---|---|
| Production Bonus payments. Distributors must also certify that they sold at least 70% of the products that they retain for sale in order to Royalty Override or Production Bonus payments. | Lacks Foundation, Irrelevant.<br><br>**Opposing Evidence:** Miller Depo. 25:5-20, 41:14-21 (Dyer Decl., Ex. "A," pp. 11, 19). |
| 185. Distributors who fail to provide certification of compliance with the 10 customer rule and 705 rule are subject to the withholding of their payments. | 185.  **Undisputed.**<br>Hienrich Decl. ¶ 11; Gates Confid. Decl. Ex. A (HL015376-HL015382); Gates Decl. Ex. B, p. 42 (Sales and Marketing Plan |
| 186. Herbalife ensures compliance with the 10 Customer Rule through its rule requiring certification of compliance, by requiring distributors to maintain documentation of retail sales, and through random audits of compliance by Herbalife's ethics and business practices department. | 186. **Disputed, based in part on evidentiary objections.**<br>Herbalife's Evidence: Hienrich Decl. ¶¶ 8-17; Gates Decl. Ex. O, (J. Miller Dep. Tr. 62:14-20, 69:10-14), Ex. B, p. 42 (Sales and Marketing Plan).<br><br>**Objections:** Hienrich Decl. ¶¶ 8-17: Lacks Foundation, Irrelevant, Improper Expert Opinion. |
| 187. Defendants submitted these forms themselves. | 187.  **Undisputed.**<br>Gates Decl. Ex. LL (HL08663-HL008736 |

| HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE AND OBJECTIONS |
|---|---|
| | – Defendants' submitted 10 customer forms). |
| 188. In addition to conditioning payment upon fulfillment of the rule, Herbalife also conducts random monthly audits to ensure compliance with the 10 customer rule. | 188. **Disputed.** Herbalife's Evidence: Hienrich Decl. ¶¶ 12-17; Gates Conf. Decl. Ex. B (HL034591-HL034596). |
| | **Opposing Evidence:** Miller Depo. 62:14-20, 69:10-14 (Dyer Decl., Ex. "A," p. 23, 25) (stating that Herbalife conducts about 100 10-customer audits per month, even though Herbalife claims to have 1.5 to 1.9 million distributors.  (*See* Dyer Decl., Ex. "I," p. 130)). |
| | "Sales & Marketing Plan and Business Rules," p. 42 (Dyer Decl., Ex. "D," p. 65). This document was authenticated by Paul Greenberg, Herbalife's Senior Vice President, Counsel.  Greenberg Depo. 225:23-226:1 (Dyer Decl., Ex. "E," pp. 86-87.) |
| 189. Herbalife has detailed procedures for conducting the audits, which | 189.  **Disputed, based in part on evidentiary objections.** |

| HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE AND OBJECTIONS |
|---|---|
| includes contact the customers on the Distributor's retail order forms to verify the purchases. | Herbalife's Evidence: Hienrich Decl. ¶¶ 12-17; Gates Confid. Decl. Ex. B (HL034591-HL034596). |
| | **Objections:** Hienrich Decl. ¶¶ 12-17: Lacks Foundation, Irrelevant, Improper Expert Opinion. |
| | **Opposing Evidence:** Miller Depo. 62:14-20, 69:10-14 (Dyer Decl., Ex. "A," p. 23, 25) (stating that Herbalife conducts about 100 10-customer audits per month, even though Herbalife claims to have 1.5 to 1.9 million distributors.  (*See* Dyer Decl., Ex. "I," p. 130)). |
| | "Sales & Marketing Plan and Business Rules," p. 42 (Dyer Decl., Ex. "D," p. 65). This document was authenticated by Paul Greenberg, Herbalife's Senior Vice President, Counsel.  Greenberg Depo. 225:23-226:1 (Dyer Decl., Ex. "E," pp. 86-87.) |
| | Jolly Further Decl. ¶ 7, Ex.5. |

| HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE AND OBJECTIONS |
|---|---|
| 190. Some of the defendants and members of their downline organizations have been audited for compliance with the 10 customer rule. | **190.   Undisputed that Robert Ford has been so audited.** Gates Decl., Ex. D (N. Roth Dep. Tr. 181:23-182:2), Ex. Q (B. roth Dep. Tr. 31:10-18), Ex. E (L. Nix Dep. Tr. 117:10-13, 242:8-243:1), Ex. P (HL000005 – Ford's Distribution Agmt., evidencing his Distributor ID as 10411549); Gates Confid. Decl. Ex. C (HL017506-HL017507, evidencing audit of Distributor ID 10411549) . |
| 191. Stephan Gratziani, one of Herbalife's most successful distributors (who was deposed in this case), also testified that he has been audited under the 10 customer and 70 percent rules. | **191.   Undisputed.** Herbalife's Evidence: Gates Decl., Ex. M (Gratziani Dep. Tr. 144:23-145:1) |
| 192. David Schmaman, a former member of the Roths' downline, testified that he currently does not receive Royalty Overrides or Bonus Payments from Herbalife only because he cannot truthfully certify compliance with the 10 | **192. Disputed in that the witness testified that he was not in compliance at the time he met with Bruce Roth.** Herbalife's Evidence: Gates Decl. Ex. L (Schmaman Dep. Tr. 93:17-94:13) |

| HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE AND OBJECTIONS |
|---|---|
| customer rule. | |
| 193. Herbalife's rules and regulations expressly state that its products "are intended to be sold and distributed to retail customers and downline Distributors" or used for personal consumption. | 193. **Undisputed that Rule 20-B states this in part.** Gates Decl., Ex. B, p. 59 (Sales and Marketing Plan – citing to Rule 20-B) |
| 194. The practice of purchasing products primarily to qualify for advancement in the Marketing Plan is prohibited by Herbalife and can result in sanctions ranging from probation to termination of a Distributorship. | 194. **Disputed, based in part on evidentiary objections.** Herbalife's Evidence: Hienrich Decl. ¶¶ 18-22; Gates Decl. Ex. B, pp. 52, 53, & 59 (Sales and Marketing Plan – citing to Rules 8-M & 20-B). **Objection:** Hienrich Decl. ¶¶ 18-22: Lacks Foundation. |
| 195. Herbalife's rules are clear that products are to be sold for retail use, not primarily for advancement, and that any such misuse of sales is sanctionable. | 195. **Undisputed that Rule 20-B states this in part.** Gates Decl., Ex. B, p. 59 (Sales and Marketing Plan – citing Rule 20-B). |
| 196. Furthermore, distributors are prohibited from representing that | 196. **Disputed, based in part on evidentiary objections.** |

| HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE AND OBJECTIONS |
|---|---|
| overrides and bonuses may be obtained solely from the purchase of products rather than from the sale of products. | Herbalife's Evidence: Gates Decl. Ex. B, p. 62 (Sales and Marketing Plan – citing to Rules 24-D and 24-E).<br><br>**Objections:** Vague and unsupported by Herbalife's rules. |
| 197. Herbalife's rules track the company's purpose: to sell products.  Herbalife spends millions of dollars every year on research and development of new products, employing top doctors and nutritional experts to create exceptional products that help its customers get healthier. | 197. **Disputed, based on evidentiary objections.**<br>Herbalife's Evidence: Henig Decl. ¶ 3; Hienrich Decl. ¶¶ 6, 7.<br><br>**Objections:** Henig Decl. ¶¶ 3: Lacks Foundation, Hearsay, Undisclosed Expert Opinion, Argumentative.<br><br>Hienrich Decl. ¶¶ 6, 7: Lacks Foundation, Argumentative. |
| 198. Many people become Herbalife distributors and supervisors to have the ability to purchase the product at a discount for personal consumption.  Stephan Gratziani noted that 9 times out of 10, individuals who signed up as | 198. **Disputed, but immaterial to the instant motion.**<br>Herbalife's Evidence: Gates Decl. Ex. F (J. Orr Dep. Tr. 31:20-32:4; 95:17-96:3; 123:22-124:11), Ex. G (K. Orr Dep. Tr. 67:17-68:22; 82:12-83:3), Ex. I (J. Ford Dep. Tr. 72:10-19; 74:8-11), Ex. Q (B. |

| HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE AND OBJECTIONS |
|---|---|
| Herbalife distributors do not intend to "build a business long term with the company" because they were interested in a distributorship for other reasons; for example, because "they want[ed] to get a discount on the products."  Thus, it is not surprising that Jeff Orr testified that over 50% of the distributors in the Orrs' extensive downline did not sell the products. | Roth Dep. Tr. 21:18-22:4), Ex. E (L. Nix Dep. At 227:16-20, 247:3-15), Ex. M (S. Gratziani Dep. 71:18-72:12).<br><br>**Objections:** Irrelevant; Conclusory; Argumentative; Fails to comply with the Court's order to "address a single topic in as concise a manner as possible." |
| 199. The vast majority of the individuals who purchase an IBP never become supervisors and simply become distributors who buy the products for retail and/or personal use. | 199. **Disputed, based in part on evidentiary objections.**<br>Herbalife's Evidence: McKee Decl. ¶¶ 10, 12; Gates Decl. Ex. F (J. Orr Dep. Tr. 95:17-96:3), Ex. M (Gratziani Dep. Tr. 71:18-72:12, 76:16-22); Gates Confid. Decl. Ex. D (HL037405-HL037411).<br><br>**Objections:**  McKee Decl. ¶¶ 10, 12: Lacks Foundation, Irrelevant, Hearsay.<br><br>**Opposing Evidence:** K. Orr Decl., ¶ 6; J. Orr Decl., ¶ 6; J. Fisher Decl., ¶ 6; R. Ford Decl. ¶ 6; D. Thompson Decl., ¶ 6; B. Roth |

| HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE AND OBJECTIONS |
|---|---|
| | Decl., ¶ 6. |
| 200. Herbalife's rules specifically provide for the return of unsold products.  For those who join Herbalife and find themselves to be a poor fit with the plan for whatever reason (lack of sales ability, lack of time to devote to the business, dislike of the product, etc.), under Rule 10-A, a new enrollee may return the IBP within 90 days for a complete refund of products. | 200. **Disputed in that the refund is paid by the distributor.** Herbalife's Evidence: Hienrich Decl. ¶¶ 24-26; Gates Decl. Ex. B, pp. 44, 46, & 53 (Sales and Marketing Plan – citing to Rules 9-D & 10-A). **Opposing Evidence:** D. Thompson Decl., ¶ 14. |
| 201. Moreover, the rules state that *any* distributor may return products to Herbalife for a 90 percent refund within a 12-month period. | 201. **Undisputed that Rule 9-D states this in part.** Hienrich Decl. ¶¶ 24-26; Gates Decl. Ex. B, pp. 44, 45, & 53 (Sales and Marketing Plan – citing to Rule 9-D). |
| 202. Herbalife honors almost all buyback claims and repurchases product from many Herbalife distributors each year. | 202. **Disputed, based on evidentiary objections.** Herbalife's Evidence: Hienrich Decl. ¶ 26. **Objections:**  Heinrich Decl. ¶¶ 26: Lacks |

| HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE AND OBJECTIONS |
|---|---|
| | Foundation, Irrelevant, Hearsay. |
| 203. Testimony from some Defendants indicates that the buyback program was quite effective; Dianna Thompson testified that only once in 23 years with Herbalife did she fail to process a return from an unsatisfied customer. Nancy Roth testified she was not aware of any instance in which a customer requested a buyback and Herbalife did not provide one. | 203. **Disputed, based on evidentiary objections.**<br>Herbalife's Evidence: Gates Decl. Ex. N (D. Thompson Dep. Tr. 29:20-23), Ex. D (N. Roth Dep. Tr. 47:23-48:3.).<br><br>**Objection:** The evidence cited does not support the conclusion that the buyback program is effective and it misstates testimony. |
| 204. It is unsurprising that the Fords and Fisher broke Herbalife's rules since all three individuals admitted to never having read them in the first place. | 204. **Disputed, based on evidentiary objections.**<br>Herbalife's Evidence: Gates Decl. Ex. I (J. Ford Dep. Tr. 108:9-11; 120:21-121:19), Ex. J (J. Fisher Dep. Tr. 13:14-16:16; 18:5-10), Ex. K (R. Ford Dep. Tr. 25:25-29:21).<br><br>**Objection:** Argumentative; Conclusory. |
| 205. Robert Ford, who claims to have run one of the largest retailing | 205. **Disputed, but immaterial to the instant motion.** |

| HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE AND OBJECTIONS |
|---|---|
| Herbalife operations in the United States, testified that he never spoke about the rules to anyone he signed up, much less encouraged them to read the rules or the distributor agreement. | Herbalife's Evidence: Gates Decl. Ex. K (R. Ford Dep. Tr. 28:17-29:21, 46:3-7). **Objection:** Irrelevant. |
| 206. This failure to train constitutes a violation of Herbalife Rule 10-C, which specifically requires: A sponsor is responsible for properly training their personally sponsored distributors on the products and their usage, the sales and marketing plan, the rules of conduct and other company rules, regulations and guidelines for distributors. | 206. **Undisputed that Rule 10-C states this in part.** Gates Decl., Ex. B, p. 53-54 (Sales and Marketing Plan – citing Rule 10C). |
| 207. The California Attorney General and the Direct Selling Association both found that Herbalife does not reward recruitment rather than retail sales. | 207. **Disputed, but immaterial to the instant motion.** Herbalife's Evidence: Gates Decl. Ex. MM (HL035588-HL035592); Gates Confid. Decl. Ex. E (HL035618-HL035621). **Objection:** Gates Decl. ¶ 40, Ex. MM |

| HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE AND OBJECTIONS |
|---|---|
| | Irrelevant; Hearsay; Lacks Foundation.; Gates Confidential Decl. Ex. E. Irrelvant, Lacks Foundation, Hearsay. |
| 208. Herbalife had over $3 billion in retail sales in 2006, as that term is commonly understood and as it is defined in Herbalife's annual report. | 208.  **Disputed.** Herbalife's Evidence: Gates Decl. Ex. H (Johnson Dep. Tr. 175:6-176:9, 188:2-9), Ex. PP (Dep. Ex. 27) This document was authenticated by Paul Greenberg. P. Greenberg Dep. Tr. 161:20-162:14 (Gates Decl. Ex. R). **Objection:**  False and Irrelevant.  The cited evidence does not support the claim. **Opposing Evidence:** Greenberg Depo. 117:3-5 (Dyer Decl., ¶ 6, Ex. "E," p. 80). Herbalife's 2006 Annual Report (Dyer Decl., Ex. "B," pp. 54-56). February 6, 2007 Email from Herbalife's Tom Zimmer to TAB Team Members (Stephens Decl., Ex. "K," p. 98). |
| 209. Herbalife distributors uniformly | 209.  **Disputed.** |

| | HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE AND OBJECTIONS |
|---|---|---|
| 1 | | |
| 2 | | |
| 3 | testified that they did not rely on | Herbalife's Evidence: Gates Decl. Ex. S |
| 4 | the statements Herbalife sent to | (Klucken Dep. Tr. 122:2-9), Ex. L |
| 5 | some of its distributors that in | (Schmaman Dep. Tr. 43:9-11, 103:6- |
| 6 | 2006 Herbalife made $3 billion in | 105:3), Ex. I (J. Ford Dep. Tr. 107:13-25), |
| 7 | retail sales and paid Herbalife | Ex. E (L. Nix Dep. Tr. 322:5-19, 323:8- |
| 8 | supervisors $2.2 billion in | 11). |
| 9 | commissions, royalties, and | |
| 10 | bonuses.  For instance, distributor | **Objection:**  Irrelevant.  *California* |
| 11 | Lilith Nix testified that she had no | *Business and Professions Code* § 17500 |
| 12 | idea as to whether Herbalife's | does not require reliance. |
| 13 | claim distributors received $2.2 | |
| 14 | billion in commissions, royalties | **Opposing Evidence:** Greenberg Depo. |
| 15 | and bonuses was accurate, and that | 117:3-5 (Dyer Decl., ¶ 6, Ex. "E," p. 80). |
| 16 | she did not pass this statement on | |
| 17 | to anyone. | Herbalife's 2006 Annual Report (Dyer |
| 18 | | Decl., Ex. "B," pp. 54-56). |
| 19 | | |
| 20 | | February 6, 2007 Email from Herbalife's |
| 21 | | Tom Zimmer to TAB Team Members |
| 22 | | (Stephens Decl., Ex. "K," p. 98). |
| 23 | | |
| 24 | 210. Regarding the "recession-proof" | 210. **Disputed, based in part on** |
| 25 | statement, the Defendants take this | **evidentiary objections.** |
| 26 | statement made by an Herbalife | Herbalife's Evidence: Gates Decl. Ex. X |
| 27 | distributor in a promotional video | (transcript of "Why Herbalife – Why |
| 28 | out of context.  The video makes | Now" Video), Ex. NN (USA Today |

| HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE AND OBJECTIONS |
|---|---|
| the point, which is absolutely true, that Herbalife provides a great money-making opportunity in the midst of a deep recession, when businesses are faltering and laying off workers (not hiring). Independent sources have recognized that this is the case. | Article), Ex. OO (Business Week Article). **Objections:** Gates Decl. Ex. X: Hearsay, Best Evidence Rule.  Gates Decl. Ex. NN, OO: Hearsay. **Opposing Evidence:** Gates Decl. Ex. B, p. 50 (Sales and Marketing Plan) (stating that 85% of Herbalife's active leaders make $440 per year). |
| 211. Herbalife's statement that it reached $3 billion in "retail sales" in 2006 is also true.  Defendants contend that Herbalife cannot claim "retail sales" of $3 billion because Herbalife does not track actual retail sales.  But Herbalife reports retail sales in its annual 10K using the same accepted measure of "retail sales" that is used throughout the financial community, disclosing the manner in which it is calculated.  David Schmaman testified he had never even heard that Herbalife had $3 | 211. **Disputed.** Herbalife's Evidence: Gates Decl. Ex. H (Johnson Dep. Tr. 175:25-176:9, 188:2-9), Ex. PP (Dep. Ex. 27), Ex. S (Klucken Dep. Tr. 122:2-9), Ex. L (Schmaman Dep. Tr. 43:9-11, 103:6-105:3), Ex. I (J. Ford Dep. Tr. 107:13-25). **Opposing Evidence:** Greenberg Depo. 117:3-5 (Dyer Decl., ¶ 6, Ex. "E," p. 80). Herbalife's 2006 Annual Report (Dyer Decl., Ex. "B," pp. 54-56). |

| **HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS** | **SUPPORTING EVIDENCE AND OBJECTIONS** |
|---|---|
| billion in retail sales.  Distributor Libby Klucken testified likewise. Even Defendants could not affirmatively sate that they had either heard or relied upon the $3 billion sales figure. | |
| 212. Through its changes to the Tab Team Agreement and its Confidentiality and Non-disclosure Agreements, Herbalife replaced its original provision containing a non-competition covenant with more narrowly tailored provisions. | 212. **Disputed, based on evidentiary objections.** Herbalife's Evidence: Gates Decl. Ex. B, p. 38 (Sales and Marketing Plan), Ex. V ¶ 12 (Miller Declaration in Further Support), Ex. R (P. Greenberg Dep. Tr. 104:6-16). **Objections:** Hearsay; Argumentative. The evidence cited does not support the fact asserted. |
| 213. Defendants have conceded that Herbalife has never attempted to enforce the 3 year non-compete provision contained in the form of Distributor Agreements formerly used by Herbalife.  And they have presented no evidence to the | 213. **Disputed, but immaterial to the instant motion.** Herbalife's Evidence: Gates Decl. Ex. Q (B. Roth Dep. Tr. 79:3-22), Ex. R (P. Greenberg Dep. Tr. 104:3-16), Ex. D (N. Roth Dep. Tr. 19:3-9), Ex. I (J. Ford Dep. Tr. 108:12-109:4; 109:16-21; 100:20-24), |

| HERBALIFE'S ALLEGED ADDITIONAL MATERIAL FACTS | SUPPORTING EVIDENCE AND OBJECTIONS |
|---|---|
| contrary. | Ex. S (E. Klucken Dep. Tr. 125:8-16), Ex. N (D. Thompson Dep. Tr. 158:18-25). |
| | **Objection:** Irrelevant. |
| | **Opposing Evidence:** Greenberg Depo. 104:14-20, 106:4-9,   (Dyer Decl., Ex. "E," p. 78-79). |
| | McKee Depo. 28:17-29:5, 35:16-36:6 (Dyer Decl., Ex. "F," pp. 105-108). |
| | Miller Depo. 54:1-24 (Dyer Decl., Ex. "A," p. 20). |
| | Deposition of Stephan Gratziani ["Gratziani Depo."] 89:20-90:1 (Stephens Decl., Ex. "M," p. 108-109). |

| ADDITIONAL UNCONTROVERTED FACTS | SUPPORTING EVIDENCE AND OBJECTIONS |
| --- | --- |
| 214. In her deposition, Jackie Miller admitted that she her declaration was false because she had not, in fact, "reviewed the information in Herbalife's computer system" regarding the Defendants' agreement to be bound by the CNDA. | 214. Miller Depo. 202:11-203:18, 204:3-25, 205:1-17, 206:2-8 (Further Jolly Decl., Ex. "1," p. 4-8). |
| 215. In her deposition, Dianna Thompson testified that she did not know one way or another whether she agreed to any of the three CNDA documents shown to her. | 215. Thompson Depo.  243:10-244:12 (Further Jolly Decl., Ex. "2," p. 22-23). |
| 216. Herbalife claims to have over 1.9 million distributors. | 216. Further Jolly Decl., Ex. "5," p. 35. |

| | |
|---|---|
| 1 | 217. In response to Robert Ford's | 217. Further Jolly Decl., Ex. "6," p. 36-55. |
| 2 | Interrogatory No. 8 about the |
| 3 | safety and toxicity of Melaleuca's |
| 4 | products, Herbalife stated: |
| 5 | "Herbalife is producing documents |
| 6 | from which the answer to this |
| 7 | Interrogatory may be derived or |
| 8 | ascertained, including but not |
| 9 | limited to documents bearing |
| 10 | production numbers HL000088-94, |
| 11 | HL 000114-126." |

Dated:  May 22, 2009


STEPHENS FRIEDLAND LLP                    MIXON JOLLY LLP


By: /s/John B. Stephens                          By: /s/Cameron M. Jolly
    Todd G. Friedland                              Cameron M. Jolly
    J. Gregory Dyer                                    Attorney for Defendants and
    Attorney for Defendants and                Counterclaimants Jeff Orr and
    Counterclaimants Robert E. Ford,        Nancy Orr
    Julia A. Ford,Bruce H. Roth,
    Nancy A. Roth, Dianna N.
    Thompson and Jason Fisher