1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**LINK: 156, 219**

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| HERBALIFE INTERNATIONAL OF AMERICA, INC., ) | **Case No. CV 07-02529 GAF (FMOx)** |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | MEMORANDUM & ORDER |
| ROBERT E. FORD, JULIA A. FORD, ) | REGARDING CROSS-MOTIONS |
| BRUCE H. ROTH, NANCY A. ROTH, ) | FOR SUMMARY JUDGMENT |
| JEFF ORR, KATHY ORR, DIANNA ) | |
| N. THOMPSON, and JASON FISHER, ) | |
| ) | |
| Defendants. ) | |

## I. INTRODUCTION

Herbalife, a direct-sales, multi-level marketing company that markets nutritional, weight-management and personal care products, brought this suit against a group of former distributors who allegedly breached their distribution agreements, misappropriated trade secrets and engaged in unfair competition. In sum and substance, Herbalife contends that various company documents that contain contact and organizational information regarding Herbalife's distributors, and to which Defendants had access as Herbalife distributors, constitute protectable trade secrets. Herbalife alleges that Defendants used those trade secrets to recruit Herbalife distributors to join them at Melaleuca, Inc. ("Melaleuca"), a competing direct-sales company, in violation of a nonsolicitation covenant in Defendants' distributorship agreements.

1
2
3
4
5
6
7
8
9
10
11

In response to Herbalife's claims, Defendants asserted a number of counterclaims against Herbalife. Defendants allege that Herbalife operates an illegal pyramid scheme because it provides bonuses to qualified distributors based on the amount of inventory they purchase rather than the amount they sell to nonaffiliated retail customers, thus emphasizing and incentivizing the recruitment and retention of distributors instead of the retail sale of its products. In addition, Defendants aver that Herbalife intentionally interfered with Defendants' prospective economic advantage and engaged in unfair competition by preventing them from recruiting current Herbalife distributors to join Melaleuca. Defendants also claim that Herbalife made various misrepresentations to induce distributors who otherwise would have joined Melaleuca to remain with Herbalife.

12
13
14
15
16
17
18
19
20
21
22
23

After conducting extensive discovery, the parties have now filed cross-motions for summary judgment. Herbalife seeks summary judgment on all of Defendants' counterclaims; Defendants seek summary judgment on all of Herbalife's claims and on their affirmative endless-chain-scheme, unfair competition, and false advertising claims. For the reasons set forth below, the parties' respective motions are **DENIED IN PART** and **GRANTED IN PART**. Specifically, Herbalife's motion is denied as to the endless-chain-scheme counterclaim, but granted as to all other counterclaims. Defendants' motion is denied as to Defendants' endless-chain-scheme, unfair competition, and false advertising counterclaims, as well as Herbalife's breach-of-contract and misappropriation claims, but granted as to Herbalife's intentional interference and unfair competition claims.[1] The Court explains its reasoning in detail below.

24
25
26
27
28

---

[1] Herbalife voluntarily dismissed its fraud claim with prejudice in its opposition papers. (See Pl.'s Opp. Defs.' Mot. at 8 n.3.)

1

2

## II.  BACKGROUND

**A.  THE HERBALIFE BUSINESS PLAN**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

        Herbalife is a direct-sales multi-level marketing company that manufactures various nutritional, weight-management, and personal-care items such as vitamins, dietary supplements, and skincare products.  (Dyer Decl., Ex. A [Miller Depo. Tr. at 30:21–31:4].)  As a direct-sales company, Herbalife relies on individual distributors to sell and promote its products.  (Gates Mot. Decl., Ex. A [First Miller Prel. Inj. Decl. ¶ 12] at 7.)  Anyone can become an Herbalife distributor so long as she purchases an official distributor kit, fills out an application, and is sponsored by an existing Herbalife distributor.  (McKee Decl., Ex. A [Marketing Plan & Business Rules] at 8, 53, 58 (Rules 1, 10-A); Dyer Decl., Ex. A [Miller Depo. Tr. at 31:22–24, 33:12–16]; Gates Mot. Decl., Ex. A [First Miller Prel. Inj. Decl. ¶ 7] at 7.)  All distributors must sign Herbalife's "Agreement of Distributorship," which appears on the application.  (Gates Mot. Decl., Ex. C [Supp'l Miller Decl. ¶ 3] at 30; see Gates Opp. Decl., Ex. P [Distributorship Agreements].)  Herbalife distributors are independent contractors; they are not Herbalife employees and may not represent themselves as such to prospective distributors whom they recruit.  (McKee Decl., Ex. A [Marketing Plan & Business Rules] at 82 (Supp'l Rule 4-G); Dyer Decl., Ex. A [Miller Depo. Tr. at 132:3–133:20]; Gates Opp. Decl., Ex. P [Distributorship Agreements ¶ 2].)

20

21

22

23

24

25

26

        A first-level Herbalife distributor is aptly referred to as a "Distributor."[2]  (Dyer Decl., Ex. A [Miller Depo. Tr. at 31:12–14]; McKee Decl., Ex. B ["Live the Good Life" Publication] at 129.)  A Distributor can purchase Herbalife's products at a 25% discount, whether for personal use or resale.  (Dyer Decl., Ex. A [Miller Depo. Tr. at 31:15–21]; McKee Decl., Ex. A [Marketing Plan & Business Rules] at 13.)  Any distributor at any level may choose to sponsor new distributors, who in turn may themselves sponsor new distributors.  (Dyer Decl., Ex. A [Miller Depo. Tr. at 33:6–10];

27

28

_____

[2]Throughout this Order, the Court's use of lower-case "distributor" refers to all Herbalife distributors, regardless of level.

3

Gates Mot. Decl., Ex. A [First Miller Prel. Inj. Decl. ¶ 7] at 7.)  A distributor's "organization" of directly and indirectly sponsored distributors is known as her "downline," while her sponsor and the sponsor's predecessors constitute the distributor's "upline."  (McKee Decl., Ex. A [Marketing Plan & Business Rules] at 23; Gates Mot. Decl., Ex. A [First Miller Prel. Inj. Decl. ¶ 8] at 7.)  Distributors are responsible for training those whom they sponsor "on the products and their usage, the Sales and Marketing Plan, the Rules of Conduct, and other Company rules, regulations, and guidelines for Distributors."  (McKee Decl., Ex. A [Marketing Plan & Business Rules] at 58.)

Under Herbalife's "Sales & Marketing Plan," a distributor may be able to qualify for higher levels of compensation depending on the "Volume" of Herbalife products she purchases each month.  (Id. at 11; see also Gates Mot. Decl., Ex. A [First Miller Prel. Inj. Decl. ¶¶ 9–10] at 7; Dyer Decl., Ex. F [McKee Depo. Tr. at 91:1–15].)  A distributor's Volume is calculated using "Volume Points."  (McKee Decl., Ex. A [Marketing Plan & Business Rules] at 11.)  In the United States, a Volume Point is equivalent to one dollar.  (Dyer Decl., Ex. A [Miller Depo. Tr. at 37:3-1-16].)  Volume Points are calculated based on the suggested retail price of Herbalife's products.  (See id. [at 37:15–16]; see also Gates Opp. Decl., Ex. H [Johnson Depo. Tr. at 175–76, 188]; Dyer Decl., Ex. B [2006 Annual Report] at 55.)  As a distributor orders products, she "accumulate[s] credit for the amount of Volume Points that are applicable to the products ordered."  (McKee Decl., Ex. A [Marketing Plan & Business Rules] at 11.)  The Volume Points that a distributor accumulates thus "become [her] sales production and are used for purposes of qualifications and benefits."  (Id.)  In other words, "Volume is calculated on the accumulated Volume Point value of products *ordered* in a Volume Month."  (Id. (emphasis added).)

## 2. BECOMING AN HERBALIFE SUPERVISOR

Any first-level Distributor who places a single order of 400 or more Volume Points, accumulates 800 or more Volume Points in a single month, or accumulates 400

or more Volume Points in each of two consecutive months is automatically promoted to the level of "Senior Consultant," which entitles her to an additional discount on orders. (McKee Decl., Ex. A [Marketing Plan & Business Rules] at 13.)  A Distributor or Senior Consultant may qualify to become a "Supervisor" by "achieving" 4,000 Volume Points in a given month or 2,500 Volume Points in each of two consecutive months. (Id. at 14.)  A minimum of 1,000 of these Volume Points must be "Unencumbered" under either scenario.  (Id.)  "Unencumbered Volume" is defined as "all volume produced by anyone in [a distributor's downline], down to the first qualified Supervisor who achieves less than 2,500 Volume Points in one Volume Month," plus all of the distributor's "Personal Volume," which in turn is defined as the volume purchased by the distributor and all non-Supervisors in her downline, up to the first qualified Supervisor and excluding Qualifying Supervisors.  (McKee Decl., Ex. A [Marketing Plan & Business Rules] at 11–12, 15, 23.)  "Encumbered Volume" is all volume produced by any downline distributor qualifying for Supervisor, down to the first qualified Supervisor, who achieves 2,500 Volume Points or more at a 25% to 42% discount in one Volume Month.  (Id. at 12, 15.)  The basic difference between the two forms of volume is that Unencumbered Volume is volume that no other distributor uses to qualify to become a Supervisor. (Id.)

A distributor who fails to attain the level of Supervisor before a Distributor whom she personally sponsored becomes a Supervisor has one year to herself qualify as a Supervisor.  (Id. at 59 (Rule 10-F).)  If she fails to do so, the sponsored Supervisor is permanently advanced upline to the first qualified Supervisor in the organization.  (Id.)

### 3. BENEFITS FOR SUPERVISORS

Supervisors enjoy certain forms of additional compensation to which ordinary distributors are not entitled.  First, Supervisors who accumulate 500 or more Volume Points in a given month may receive a "Royalty Override."  (McKee Decl., Ex. A [Marketing Plan & Business Rules] at 16.)  A Royalty Override is essentially a 1% to 5% commission that a Supervisor receives on the amount of products ordered by the

Supervisors in three active levels of her downline.  (See id. at 16, 23.)  The specific percentage of Royalty Overrides to which a Supervisor is entitled depends upon the number of Volume Points she accumulates during the month at issue.  (Id.)  A Supervisor who accumulates more than 2,500 Volume Points in a given month will receive a 5% Royalty Override on the Volume Points accumulated by up to three levels of her downline Supervisors.  (Id.)

In addition, leading Supervisors who are successful enough to become members of the "Top Achievers Business Team" ("TAB Team") may be entitled to a "Production Bonus."  (Id. at 17.)  The Production Bonus is a bonus payment ranging from 2% to 7% of the monthly Volume of all of the Supervisor's downline distributors, which Herbalife describes as a partial reward for the team member's "undivided loyalty" to the company.  (Id. at 17, 23.)  Supervisors may also be eligible to receive annual bonuses "in recognition of their outstanding performance in advancing sales of Herbalife products," as well as paid vacations and training events.  (Id.)  Supervisors also enjoy a flat-rate discount of 50%, meaning that Supervisors make a 50% profit on all retail sales and a 25% profit on all wholesale sales, i.e., sales made to Distributors in their respective downlines.[3]  (Id. at 14.)  Finally, Supervisors may become eligible to attend special workshops and training sessions and to qualify for special recognitions.  (Id.)

### 4. RETAINING SUPERVISOR STATUS

Supervisors must requalify annually to retain their elevated status and to continue to be entitled to receive Royalty Overrides and Production Bonuses.  (Id. at 15; McKee Decl., Ex. A [Marketing Plan & Business Rules] at 61 (Rule 15-A).)  Moreover, all Supervisors must comply with the "Matching Volume" requirement, which provides that "[w]henever a Fully Qualified Supervisor sponsors a Distributor(s) to the Supervisor position, the sponsoring Supervisor's Total Volume must be at least the

---

[3]Supervisors may not sell products wholesale to other Supervisors in their downlines; rather, Supervisors must purchase products directly from Herbalife. (McKee Decl., Ex. A [Marketing Plan & Business Rules] at 31.)

same amount as the Distributor's Volume within that same Volume Month." (Id. at 63 (Rule 18-A).)  "The definition of Matching Volume is the Total Volume a sponsoring Supervisor must achieve in any given Volume Month when [her] downline Distributor(s) are qualifying as Supervisor." (Id.)  Thus, pursuant to the Matching Volume rule, a Supervisor must order enough product "to match all orders submitted by [her] downline Distributors who are qualifying for Supervisor." (Id. (Rule 18-B).)  If a Supervisor fails to comply with this requirement, she "will permanently lose a Supervisor who qualified the month in question and that Supervisor's downline." (Id. (Rule 18-E).)

**B. HERBALIFE'S RULES OF CONDUCT**

### 1. ROYALTY OVERRIDES & PRODUCTION BONUSES

Pursuant to Herbalife's Sales and Marketing Plan, "[t]he purchase of products primarily as an attempt to qualify for advancement in the Marketing Plan is not permitted." (Id. at 64 (Rule 20-B).)  Thus, in addition to satisfying qualification and requalification requirements, a Supervisor must comply with two additional rules before she can receive Royalty Overrides, Production Bonuses, and any other bonuses and benefits to which she may otherwise be entitled.

First the Supervisor must comply with the "10-Retail Customers Rule," pursuant to which a Supervisor "must personally make sales to at least 10 separate retail customers each month to qualify for and receive Royalty Overrides and the Tab Team Production Bonus or other bonuses paid by Herbalife." (Id. (Rule 20-C).)  To show that she has satisfied the rule, a Supervisor must fill out an "Earnings Certification" form each month certifying that she made at least ten retail sales that month. (Id. at 47, 64 (Rule 20-F).)  In addition, all distributors "must maintain records of all their production distribution for a minimum of two (2) years," including retail customers' contact information and basic information regarding purchases, and submit those records to Herbalife upon request. (Id.)  To ensure compliance with the 10-Retail-Customers Rule and to verify purchases, Herbalife performs random audits of 100 Supervisors each

month.  (Dyer Decl., Ex. A [Miller Depo. Tr. at 69:10–14]; Gates Mot. Decl., Ex. A [Miller Depo. Tr. at 22:18–24]; Gates Opp. Decl., Exs. A–B [Internal Documents]; Hienrich Decl. ¶¶ 12–17.)  A distributor who fails to turn in an Earnings Certification form in a given month certifying compliance with the 10-Retail Customers Rule is not eligible to receive Royalty Overrides or the Production Bonus for that month.  (McKee Decl., Ex. A [Marketing Plan & Business Rules] at 47, 64 (Rule 20-C).)

The second main requirement for receipt of Royalty Overrides and Production Bonuses is the "70% Rule," which requires Supervisors to "sell to retail customers and/or sell at wholesale to downline Distributors, at least 70% of the total value of Herbalife products they retain for resale in order to receive Royalty Overrides or Production Bonuses for that month's activity."  (Id. (Rule 20-D).)  As the express language of the rule makes clear, a Supervisor need not make any retail sales to comply with the rule.  (See Dyer Decl., Ex. A [Miller Depo. Tr. at 95:18–20].)  A Supervisor must certify each month on the Earnings Certification form that she has complied with the 70% Rule to be eligible to receive her bonus compensation for that month.  (McKee Decl., Ex. A [Marketing Plan & Business Rules] at 47, 64 (Rule 20-D).)  Herbalife does not perform audits to determine compliance with the 70% Rule unless there is an ongoing "ethical investigation" of a Supervisor who is suspected of violating Herbalife's policies.  (See Dyer Decl., Ex. A [Miller Depo. Tr. at 25:5–20].)

## 2. NONCOMPETITION & NONSOLICITATION COVENANTS & NONDISCLOSURE AGREEMENTS

The distributorship agreements to which Defendants agreed when they applied to become Herbalife distributors provided:

> For a period of three (3) years after termination of this agreement Distributor will hold in confidence any trade secrets, formulas, sales and distribution systems, business information, and literature which Distributor acquired during the term of this agreement and will not use directly or indirectly such items.  For such period, Distributor also agrees not to enter or participate in a competing business or business activity.

(Gates Opp. Decl., Ex .P [Distributorship Agreements ¶ 4].)  The agreements incorporated by reference "the Herbalife Career Book and other Herbalife publications."  (Id. [¶ 1].)  Thus, the agreements incorporated Rule 8-A, Herbalife's nonsolicitation covenant, which provides:

> During the course of a Distributorship and for one year thereafter, neither the Distributor nor their spouse, nor any other person assisting in a Distributorship will, directly or indirectly, through or by means of any person, entity or artifice[], solicit, promote, sponsor or recruit any Herbalife Distributor, or any Herbalife customer they became aware of in the course of their Herbalife Distributorship, to join, promote, sell or purchase products of, or participate in as a salesperson or otherwise, any multi-level marketing or direct-sales company, nor will they encourage anyone to do what is prohibited under this rule.

(McKee Decl., Ex. A [Marketing Plan & Business Rules] at 56 (Rule 8-A).)  The purpose of Rule 8-A is to protect Herbalife and its distributors "from distributors taking the [downline] organizations of other distributors into another company, so that they lose income and they lose their organization."  (Stephens Decl., Ex. D [Miller Depo. Tr. at 58:16–20].)  Rule 8-A took effect on September 1, 2006. [Dyer Decl., Ex. H [Jarmoluk Complaint] at Bates HL 000370.)

All Herbalife distributors have access to Herbalife's website, through which they may access three sources of confidential information: Indented Lineage Reports, Royalty Override Statements, and Production Bonus Statements.  (Gates Mot. Decl., Ex. A [First Miller Prel. Inj. Decl. ¶ 14] at 8.)  A distributor's Lineage Report identifies downline distributors whose volume has resulted in bonuses for the distributor, and contains financial data about the distributors as well as information regarding their sponsors and respective distributor levels.  (Id. [¶ 16] at 8.)  A distributor's Royalty Override Statement and Production Bonus Statement identify those distributors whose purchases resulted in Royalty Overrides and Production Bonuses for the distributor, as well as information regarding those distributors' downlines and order volumes.  (Id. [¶¶ 18–19] at 9.)

The first time a distributor accesses this data, she must "click through" Herbalife's Confidentiality and Nondisclosure Agreement ("CNA").  (Id. [¶ 15] at 8; see Dyer Decl., Ex. P [CNA] at 157–159.)  The CNA provides, in pertinent part:

> I . . . understand and agree that during any term as a Distributor of [Herbalife], and for a period of three (3) years after termination or expiration of the Agreement of Distributorship, regardless of the basis for termination or expiration, I shall not, on my behalf, or on behalf of any other person, partnership, association, corporation or other entity: [(1)] use or disclose any Confidential Information, to any person, partnership, association, corporation or other entity, directly or indirectly; [(2)] use or disclose the Confidential Information for any purpose other than promoting Herbalife; or [(3)] use the Confidential Information to solicit any Distributor or Customer of Herbalife or in any manner attempt to influence or induce any Distributor or Customer to alter their business relationship with Herbalife.

(Dyer Decl., Ex. P [CNA] at 157.)  The CNA continues: "I understand that I am permitted to use the Confidential Information to instruct, motivate and train my downline.  I agree that, but for this [CNA], Herbalife would not provide Confidential Information to me."  (Id.)  Finally, the agreement ends: "This [CNA] shall survive the termination or expiration of the Agreement of Distributorship."  (Id.)  Distributors must "click through" the CNA annually to maintain access to the website.  (Gates Mot. Decl., Ex. A [First Miller Prel. Inj. Decl. ¶ 15] at 8.)

In addition, distributors have the right to purchase access to a set of online tools called "BizWorks."  (Id. [¶ 21] at 9.)  Those who pay for BizWorks gain real-time access to their downline distributors' sales volume, and may search through and organize data regarding their distributors.  (Id.)  Distributors who sign up for BizWorks must "click through" a "BizWorks Subscription Agreement," which also contains nondisclosure provisions.  (Dyer Decl., Ex. P [Subscription Agreement] at 152–53.)

**C. RETAIL SALES**

Herbalife's Sales & Marketing Plan states that "[t]he fundamental business of an Herbalife Distributor is the selling of Herbalife products."  (Dyer Decl., Ex. A [Marketing Plan & Business Rules] at 65 (Rule 22).)  Thus, Herbalife directs its distributors to "clearly indicate" to those whom they sponsor "that Royalty Overrides,

Production Bonuses or other earnings . . . may . . . be achieved [only] through the continuing sales of Herbalife products to retail customers by themselves and their sponsored Distributors." (Id. at 67 (Rule 24-D).)  Herbalife also prohibits distributors from implying or representing to those whom they recruit that eligibility for Royalty Overrides, Production Bonuses, and other benefits may be obtained solely by purchasing products and sponsoring new distributors rather than by selling the products to retail customers.  (Id. (Rules 24-B, 24-E).)  In short, Herbalife purports to teach its distributors that their "primary focus . . . must always be the promotion and sale of Herbalife products for consumption." (Id. at 78.)  Herbalife thus encourages its distributors to use the products they sell and to train those whom they sponsor to do the same.  (Id. at 31; e.g., Gates Mot. Decl., Ex. E [Jeffrey Orr Depo. Tr. at 93:18–25].)  Many distributors train their downline distributors on how to retail, both informally and at formal Herbalife training events.  (See, e.g., Gates Mot. Decl., Ex. E [Jeffrey Orr Depo. Tr. at 90–94], Ex. F [Kathy Orr Depo. Tr. at 94–95, 106–08].)  At least some Defendants in this case engaged in retail sales while at Herbalife.  For instance, defendant Thompson testified that, as an Herbalife distributor, 80% of her business involved retailing and 20% entailed recruiting.  (Gates Opp. Decl., Ex. N [Thompson Depo. Tr. at 27:7–21].)

Every retail sale must be memorialized by entering the customer's contact and purchase information on a Retail Order Form.  (Id. at 24, 41, 63 (Rule 19-A).)  A distributor must provide a copy of the Retail Order Form to each retail customer and retain a copy in her records for at least two years for purposes of following up with customers and producing them upon Herbalife's request.  (Id. at 24, 63–64 (Rules 19-A, 20-F).)  Although Herbalife purports to emphasize the importance of retail sales, the company does not maintain records of retail customers or transactions or keep track of the cumulative amount of the retail transactions into which its distributors enter.  (Gates Opp. Decl., Ex. E [Greenberg Depo. Tr. at 117:3–5], Ex. H [Johnson Depo. Tr. 175:18–22].)

11

**D.  THE PRESENT DISPUTE**

On January 27, 2006, defendant Fisher resigned from Herbalife and joined Melaleuca, a multi-level marketing company that competes directly with Herbalife. (Fisher Decl. ¶¶ 2, 7.)  The record indicates that, soon thereafter, Fisher recruited Herbalife distributors to join him at Melaleuca.  (Gates Mot. Decl., Ex. A [First Miller Prel. Inj. Decl. ¶ 27] at 10.)  The Fords resigned from Herbalife on September 1, 2006. (Ford Decl. ¶ 2.)  Robert Ford and Fisher then combined their efforts to recruit Herbalife distributors to join them at Melaleuca.  (See, e.g., Michaels Decl. ¶¶ 4–7.)  On September 16, 2006, Robert Ford and Fisher traveled to Atlanta, Georgia and handed out Melaleuca cards and flyers at an Herbalife training event and placed flyers on cars in the parking lot where the event was being held.  (Gates Mot. Decl., Ex. A [First Miller Prel. Inj. Decl. ¶ 29] at 10–11.)

Other Defendants who left Herbalife also attempted to recruit Herbalife distributors, including those in their respective downlines.  (Id. [¶¶ 33, 37] at 11–12; see, e.g., Katz Decl. ¶¶ 4–6.)  It is undisputed that, to recruit distributors, some Defendants used personal information regarding downline distributors that Defendants had collected.  It is also undisputed that at least some Defendants used Herbalife's confidential documents, such as Lineage Reports and Royalty Override Statements, to recruit distributors.  (Gates Opp. Decl., Ex. I [Julia Ford Depo. Tr. at 144:13–16], Ex. J [Fisher Depo. Tr. at 196:7–197:1], Ex. N [Thompson Depo. Tr. at 236:20–237:24].)

While Fisher, Ford, and others were recruiting current Herbalife distributors to join Melaleuca, active Herbalife distributors lodged complaints with management. (See, e.g., Dyer Decl., Ex. H [Jarmoluk Complaint] at Bates HL 000370; Jolly Reply Decl., Ex. 6 at 36–54.)  Herbalife responded by sending Defendants cease-and-desist letters and, eventually, filing the present lawsuit.  (See, e.g., Gates Opp. Decl., Ex. EE [9/25/2006 Greenberg Letter] at 777–78.)  In addition, Herbalife disseminated a number of announcements that informed Herbalife distributors about the lawsuit and assured distributors that the company was working to protect them.

First, on February 6, 2007, Herbalife e-mailed a message to Tab Team members in the United States in which it referred to "Melaleuca distributors who are misleading, blackmailing and misrepresenting Melaleuca incomes to Herbalife distributors," and assured distributors that "we have taken steps to help safeguard your Herbalife Distributorship."  (Dyer Decl., Ex. I [2/6/2007 E-Mail] at 126–27.)  The e-mail also indicated that Herbalife had achieved $3 billion in retail sales in 2006, and touted the company's "strength in the marketplace."  (Id. at 126–27.)  Attached to the e-mail was a summary of a letter Herbalife submitted to the Direct Sales Association ("DSA") "regarding Herbalife's diligent efforts to stop Melaleuca distributors' repeated violations."  (Id. at 127.)  In that letter, Herbalife stated that "Melaleuca and its Distributors are engaged in deceptive and unlawful consumer and recruiting practices, earnings misrepresentations, and violations of DSA's guidelines concerning unfair competition."  (Id. at 128.)  Herbalife also accused Melaleuca of "mislead[ing] the public by promoting its products as safe and non-toxic, while not disclosing evidence to the contrary or providing any substantiation for such claims."  (Id.)

Subsequently, on April 20, 2007, Herbalife executives disseminated an announcement in which they indicated that they had filed the present lawsuit against Defendants.  (Dyer Decl., Ex. J [4/20/2007 Announcement] at 131.)  The announcement stated that "[t]he company will take steps to prevent others from competing unfairly with our Independent Directors," and would "not allow our company and the businesses and livelihood of our Distributors to be damaged by what we believe to be unlawful activities."  (Id.)

## III.  DISCUSSION

### A.  SUMMARY JUDGMENT LEGAL STANDARD

A party may move for summary judgment on all or part of a claim.  Fed. R. Civ. P. 56(a).  On a summary judgment motion, a court must presume that the nonmovant's evidence is true, and draw all justifiable inferences in the nonmovant's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Summary judgment is appropriate

where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). There is no genuine issue of fact "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Liberty Lobby, 477 U.S. at 248. The moving party bears the burden of demonstrating the absence of genuine issues of material fact. Id. at 256. Once the moving party has carried its burden, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Fed. R. Civ. P. 56(e)(2).

**B. CROSS-MOTIONS FOR SUMMARY JUDGMENT ON DEFENDANTS' COUNTERCLAIMS**

Although Herbalife filed this lawsuit, Defendants, by virtue of asserting a counterclaim under California's "endless chain scheme" statute, have made the central question in this case whether Herbalife constitutes an illegal pyramid scheme. If no genuine issues of material fact preclude the Court from answering this question in the affirmative, Defendants are entitled to summary judgment not only on their endless-chain-scheme claim, but on all of Herbalife's claims as well, because such a finding would effectively render the operative distributorship agreements void and unenforceable as a matter of law. Accordingly, the Court first addresses the threshold question of whether Herbalife constitutes a pyramid scheme.

**1. ENDLESS-CHAIN-SCHEME CLAIM**

Section 327 of the California Penal Code defines an "endless chain" as "any scheme for the disposal or distribution of property whereby a participant pays a valuable consideration for the chance to receive compensation for introducing one or more additional persons into participation in the scheme or for the chance to receive compensation when a person introduced by the participant introduces a new participant." Cal. Penal Code § 327. "A participant in an endless chain scheme . . .

1   may rescind the contract upon which the scheme is based, and may recover all

2   consideration paid pursuant to the scheme, less any amounts paid or consideration

3   provided to the participant pursuant to the scheme."  Cal. Civ. Code § 1689.2.

4         In <u>Webster v. Omnitrition Int'l, Inc.</u>, 79 F.3d 776 (9th Cir. 1996), a case with

5   facts very similar to the facts in issue here, the Ninth Circuit explained that the

6   definition of "endless chain" under section 327 "is equivalent, if not identical, to" the

7   test for illegal pyramid schemes established in <u>In re Koscot Interplanetary, Inc.</u>, 86

8   F.T.C. 1106, 1181 (1975), <u>aff'd mem. sub nom.</u>, <u>Turner v. F.T.C.</u>, 580 F.2d 701 (D.C.

9   Cir. 1978).  <u>Omnitrition</u>, 79 F.3d at 787.  In <u>Koscot</u>, the Federal Trade Commission

10   found that pyramid schemes "are characterized by the payment by participants of

11   money to the company in return for which they receive (1) the right to sell a product

12   and (2) the right to receive in return for recruiting other participants into the program

13   rewards which are unrelated to [the] sale of the product to ultimate users."  86 F.T.C. at

14   1180 (emphasis omitted).  <u>Omnitrition</u> teaches that

15         [t]he satisfaction of the second element of the <u>Koscot</u> test is the <u>sine qua non</u>
16         of a pyramid scheme: "As is apparent, the presence of this second element, recruitment with rewards unrelated to product sales, is nothing more than
17         an elaborate chain letter device in which individuals who pay a valuable consideration with the expectation of recouping it to some degree via
18         recruitment are bound to be disappointed."

19   79 F.3d at 781 (quoting <u>Koscot</u>, 86 F.T.C. at 1181).  In other words, the central inquiry

20   under the second element of the <u>Koscot</u> test is whether there is a sufficient nexus

21   between retail sales and the bonus compensation Supervisors are eligible to receive.

22         The California Court of Appeal similarly has recognized that "compensation for

23   recruitment based upon sales to the recruits . . . is what makes [a marketing plan] a

24   chain scheme under California law." <u>People v. Bestline Prods., Inc.</u>, 132 Cal. Rptr.

25   767, 789 (Ct. App. 1976).  Thus, a sales and marketing plan may be found to violate

26   section 327 if it offers compensation for recruitment based upon sales to downline

27   recruits, because such a plan "increase[s] the certainty of deception by diverting"

28   distributors' focus from retail sales to the recruitment of new distributors.  <u>Id.</u>  By

contrast, "[a] pyramid sales plan under which the compensation for recruitment is *limited to* payment based upon sales made to persons who are not participants in the scheme and who are not purchasing in order to participate in the scheme, does not come within the definition of endless chain schemes set forth in Penal Code section 327." Id. (emphasis added) (internal quotation marks omitted).

Despite the Court's tentative ruling at the June 1, 2009 motion hearing, upon further examination and careful consideration of all of the parties' arguments and evidentiary materials, the Court concludes that a genuine issue as to whether Herbalife distributors must pay Herbalife to become supervisors—a threshold requirement under the Koscot analysis—precludes the Court from granting summary judgment for either side on the endless-chain-scheme claim.  As noted above, Herbalife's Sales and Marketing Plan provides that a distributor may qualify to become a Supervisor by achieving 4,000 Volume Points in a given month or 2,500 Volume Points in each of two consecutive months.  A minimum of 1,000 of these Volume Points must consist of Unencumbered Volume, while the rest may consist of Encumbered Volume.  Because both Unencumbered Volume and Encumbered Volume may consist of volume purchased not by the distributor herself but those in her downline, a distributor could qualify to become a Supervisor without purchasing anything.  Whether this occurs in reality is another thing, but one that cannot be resolved on this motion.  For example, it is telling that Herbalife's former vice president of distributor compliance defined Unencumbered Volume as "volume product *that the qualifying supervisor has purchased*, but does not sell to his [downline] who is qualifying for supervisor.  He can sell it to customers or other distributors who are not qualified, or use it for his own personal use."  (Dyer Decl., Ex. A [Miller Depo. Tr. at 37:18–23].)  Moreover, in the Court's view, Herbalife's entire business model appears to incentivize primarily the payment of compensation that is "facially unrelated to the sale of the product to ultimate users because it is paid based on the suggested retail price of the amount ordered from [Herbalife], rather than based on actual sales to consumers."  Omnitrition,

16

79 F.3d at 782 (emphasis and internal quotation marks omitted).  Nevertheless, the conflicting evidence before the Court is sufficient to create a triable issue regarding the "payment of money" element of the <u>Koscot</u> analysis that only the trier of fact may resolve.  Accordingly, the parties' cross-motions for summary judgment are **DENIED** as to the endless-chain-scheme claim.[4]

### 2. UNFAIR COMPETITION & FALSE ADVERTISING CLAIMS

California's Unfair Competition Law ("UCL") prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."  Cal. Bus. & Prof. Code § 17200.  Similarly, California's False Advertising Law ("FAL") proscribes the dissemination of "untrue or misleading" statements made in connection with the disposition of property or the performance of services.  <u>Id.</u> § 17500.  Defendants may seek only restitution or injunctive relief for violations of the UCL and FAL.  <u>Korea Supply Co. v. Lockheed Martin Corp.</u>, 63 P.3d 937, 943 (Cal. 2003); <u>Buckland v. Threshold Enters., Ltd.</u>, 66 Cal. Rptr. 3d 543, 558 (Ct. App. 2007).  To have standing to proceed under either statute, a plaintiff must be able to show that she "has suffered injury in fact and has lost money or property as a result of the unfair competition."  Cal. Bus. & Prof. Code §§ 17204, 17535; <u>Colgan v. Leatherman Tool Group, Inc.</u>, 38 Cal. Rptr. 3d 36, 64 & n.26 (Ct. App. 2006).

In the present action, Defendants premise their UCL claim on the allegations that the nonsolicitation covenant set forth in Rule 8-A of Herbalife's Rules of Conduct (McKee Decl., Ex. A [Marketing Plan & Business Rules] at 56) is unlawful, and that Herbalife constitutes an endless chain scheme.  Defendants' FAL claim is based on the allegations that Herbalife made various misrepresentations to induce Herbalife

---

[4]Herbalife's contentions regarding the unavailability of injunctive relief under section 1689.2 do not warrant granting Herbalife's motion.  Even if Defendants are not entitled to injunctive relief under the statute—an issue the Court need not now address—Defendants could raise their endless-chain-scheme claim as an affirmative defense to Herbalife's breach-of-contract and misappropriation claims.  Thus, the facts pertaining to the endless-chain-scheme claim are relevant and must be resolved by the trier of fact irrespective of remedy.  Moreover, Herbalife's standing argument is unpersuasive; section 1689.2 provides litigants with standing to enforce section 327 even though the latter is a criminal statute.

distributors to remain with the organization instead of joining Melaleuca, to Defendants' detriment.  Herbalife contends that Defendants lack standing to proceed with their prosecution of these claims.  The Court agrees.

"Because remedies for individuals under the UCL are restricted to injunctive relief and restitution, the import of the requirement is to limit standing to individuals who suffer losses of money or property that are eligible for restitution."  Buckland, 66 Cal. Rptr. 3d at 817.  The California Supreme Court has previously explained that "an order for restitution is one 'compelling a UCL defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property or those claiming through that person.'"  Korea Supply, 63 P.3d at 947 (quoting Kraus v. Trinity Mgmt. Servs., Inc., 999 P.2d 718, 725 (Cal. 2000), superseded by statute on other grounds, Cal. Bus. & Prof. Code §§ 17203–17204, as recognized in Arias v. Superior Court, 209 P.3d 923, 927 (Cal. 2009)).  Thus, to have standing under the UCL or FAL, the remedy sought by the plaintiff must be restitutionary, i.e., the plaintiff must be able to show an ownership or vested interest in the money it seeks to recover.  Id.  In other words, the plaintiff must seek to replace money or property that the defendant "took directly from [the] plaintiff."  Id.

The California Supreme Court's holding and reasoning in Korea Supply directly forecloses Defendants in this case from proceeding under the UCL and FAL.  There, the Republic of Korea wished to purchase military equipment and solicited competing bids from manufacturers.  63 P.3d at 941.  The plaintiff, Korea Supply Co. ("KSC"), stood to receive a $30 million commission payment if the Korean government approved a bid submitted by MacDonald, Dettwiler, and Associates Ltd. ("Macdonald Dettwiler"), a manufacturer that KSC was representing.  Id.  Ultimately, the contract was awarded to the predecessor-in-interest of the defendant, Lockheed Martin Corp. ("Lockheed").  Id.  KSC sued Lockheed under the UCL on the ground that, even though MacDonald Dettwiler's bid was lower and its equipment superior, Lockheed's predecessor was

awarded the contract because it had offered bribes and sexual favors to key Korean officials.  Id.

The California Supreme Court viewed KSC's claim as essentially seeking "nonrestitutionary disgorgement of profits," and held that the UCL does not support any such remedy.  Id. at 945–47.  The court explained that KSC lacked standing because it did not have an ownership interest in the $30 million commission:

> The remedy sought by plaintiff in this case is not restitutionary because plaintiff does not have an ownership interest in the money it seeks to recover from defendants.  First, it is clear that plaintiff is not seeking the return of money or property that was once in its possession.  KSC has not given any money to Lockheed Martin; instead, it was from the Republic of Korea that Lockheed Martin received its profits.  Any award that plaintiff would recover from defendants would not be restitutionary as it would not replace any money or property that defendants took directly from plaintiff.

Id. at 947.  In addition, the Court rejected KSC's contention that it had a vested interest in the commission:

> KSC's expected commission is merely a contingent interest since KSC only expected payment if MacDonald Dettwiler was awarded the SAR contract.  Such an attenuated expectancy cannot, as KSC contends, be likened to "property" converted by Lockheed Martin that can now be the subject of a constructive trust. . . .  The recovery requested in this case cannot be traced to any particular funds in Lockheed Martin's possession and therefore is not the proper subject of a constructive trust.

Id. at 947–48 (citation omitted).  The Court went on to explain that

> KSC's expectancy in this case is further attenuated since KSC never anticipated payment directly from Lockheed Martin.  Instead, it expected the Republic of Korea to pay MacDonald Dettwiler, which would then pay a commission to KSC. . . .  Therefore, . . . the monetary relief requested by KSC does not represent a quantifiable sum owed by defendants to plaintiff.  Instead, it is a contingent expectancy of payment from a third party.

Id. at 948 (citation omitted).  Finally, the court noted that the nonrestitutionary disgorgement remedy sought by KSC "closely resembles a claim for damages, something that is not permitted under the UCL."  Id.

In the present action, Defendants base their UCL and FAL claims on the underlying theory that Herbalife's alleged wrongdoing hindered Defendants' ability to

19

recruit additional Herbalife distributors in Defendants' downlines to join them at Melaleuca, thereby causing Defendants to earn fewer profits than they otherwise would have achieved.  _Korea Supply_ makes clear that any such claim is for nonrestitutionary disgorgement of profits, and therefore, nonremediable under the UCL or FAL. Defendants plainly did not have an ownership interest in the profits they may have obtained had they recruited additional Herbalife distributors to Melaleuca.  Moreover, irrespective of whether Defendants acquired a property interest in their personal organizations during their Herbalife distributorships, any future profits Defendants may have obtained by recruiting distributors to Melaleuca were mere contingent expectancies of payments from third parties.  _See_ _id._ ("Compensation for a lost business opportunity is a measure of damages and not restitution to the alleged victims." (internal quotation marks omitted)).  Finally, Defendants' contention that the standing rules for UCL and FAL claims apply only to non-representative claims by direct competitors is illogical and finds no support in the relevant case law.  Although cases such as _Korea Supply_ construed the "lost money or property" language under section 17203 instead of 17204, the Ninth Circuit has confirmed that the identical language appearing in section 17204 should be construed in like manner.  _Walker v. Geico Gen. Ins. Co._, 558 F.3d 1025, 1027 (9th Cir. 2009), _aff'g sub nom._ _Walker v. USAA Cas. Ins. Co._, 474 F. Supp. 2d 1168 (E.D. Cal. 2007).

Accordingly, for the foregoing reasons, the Court concludes that Defendants lack standing to proceed with their UCL and FAL claims.  To hold otherwise would be tantamount to permitting Defendants to seek a nonrestitutionary tort remedy pursuant to the UCL and FAL.  Herbalife's motion for summary judgment is therefore **GRANTED**, and Defendants' motion is **DENIED**, with regard to Defendants' UCL and FAL claims.

### 3. INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE CLAIM

To prove intentional interference with prospective economic advantage, a plaintiff must prove the following elements:

1

2

> (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant.

3

4

5   Korea Supply, 63 P.3d at 950 (internal quotation marks omitted).  The plaintiff must

6   also show that the act of interference was independently wrongful, Della Penna v.

7   Toyota Motor Sales, U.S.A., Inc., 902 P.2d 740, 751 (Cal. 1995), i.e., "proscribed by

8   some constitutional, statutory, regulatory, common law, or other determinable legal

9   standard," Korea Supply, 63 P.3d at 954.

10       "[A]s a broader application of the principles underlying the tort of interference

11   with contract," the tort of interference with prospective economic advantage rests on the

12   notion that "it is possible to estimate with some fair amount of success both the value of

13   what has been lost and the likelihood that the plaintiff would have received it if the

14   defendant had not interfered."  Westside Ctr. Assocs. v. Safeway Stores 23, Inc., 49

15   Cal. Rptr. 2d 793, 801, 803 (Ct. App. 1996) (internal quotation marks omitted).  Thus,

16   although "the chance the expectancy otherwise would have occurred is necessarily a

17   matter of some uncertainty . . . [t]he law precludes recovery for overly speculative

18   expectancies by initially requiring proof [that] the business relationship contained "'the

19   *probability* of future economic benefit to the plaintiff.'"  Id. at 803 (emphasis in

20   original) (quoting Youst v. Longo, 729 P.2d 728, 733 (Cal. 1987)).  "'Although varying

21   language has been used to express this threshold requirement, the cases generally agree

22   it must be reasonably probable that the prospective economic advantage would have

23   been realized but for defendant's interference.'"  Id. (quoting Youst, 729 P.2d at 733).

24       Here, Defendants contend that Herbalife's filing of this lawsuit and its

25   representatives' publication of various communications describing Defendants' conduct

26   and Herbalife's response thereto interfered with Defendants' prospective economic

27   advantage by chilling Herbalife distributors from joining Melaleuca or from actively

28   developing their businesses upon joining.  In short, Defendants assert that they were

1    successfully recruiting Herbalife distributors to join Melaleuca before the publication of

2    these communications and that, but for those announcements and the present lawsuit,

3    they would have made more money at Melaleuca.

4        The evidence that Defendants have produced in support of their intentional

5    interference claim, however, fails as a matter of law to establish a reasonable certainty

6    of prospective economic advantage.  Defendants's deposition testimony regarding their

7    efforts to recruit and train downline distributors and to develop business relationships

8    with those individuals does nothing more than show an attenuated ***possibility*** of future

9    economic advantage.  Likewise, the late-filed declarations of five Melaleuca

10   distributors, all of whom testify that Herbalife's attempts to enforce the nonsolicitation

11   provision set forth in Rule 8-A have caused them to cease developing their Melaleuca

12   distributorships lest they also be sued by Herbalife, fail to go beyond mere speculation

13   because they do not account for the myriad variables that might affect the declarants'

14   ability to garner profits at Melaleuca.  (See Janoulis Decl. ¶¶ 5–8; Martin Decl. ¶¶ 5–7;

15   Tyson Decl. ¶¶ 5–12; Heap Decl. ¶¶ 5–8; Andrus Decl. ¶¶ 5–9.)  The same defect

16   plagues Defendants' deposition testimony regarding their inability to recruit additional

17   distributors as a result of Herbalife's conduct.  (See, e.g., Stephens Decl., Ex. H [Orr

18   Dep. Tr. 215–19, 274].)  Defendants cannot create a genuine issue of material fact

19   regarding the probability of future economic advantage simply by stating, without

20   support, that they are "certain" they would have recruited additional business but for

21   Herbalife's actions.  As a result, the Court concludes that nothing set forth in the record

22   of undisputed facts or facts without substantial controversy describes actionable

23   conduct on the part of Herbalife in response to Defendants' efforts to compete.

24       In addition, the litigation privilege set forth in section 47 of the California Civil

25   Code precludes Defendants from basing their intentional interference claim on acts and

26   events that are directly related to the present lawsuit.[5]  Under section 47(b), any

27   _____

28   [5]The Court rejects Defendants' contention that Herbalife waived the litigation privilege by failing to assert it at the pleading stage because Defendants have not adequately shown that they suffered any resulting

publication or broadcast made in, or in connection with, a judicial proceeding is privileged, subject to various exceptions not applicable here.  Cal. Civ. Code. § 47(b).  The so-called "litigation privilege" set forth in section 47(b)(2) applies to claims of intentional interference with prospective economic advantage.  Asia Inv. Co. v. Borowski, 184 Cal. Rptr. 317, 324 (Ct. App. 1982).  The general purpose of the privilege is to assure free access to the courts and other official proceedings.  Hagberg v. Cal. Fed. Bank FSB, 81 P.3d 244, 249 (Cal. 2004).  Moreover, the scope of the privilege "is not limited to statements made in a courtroom," but extends to "statements made prior to the filing of a lawsuit, whether in preparation for anticipated litigation or to investigate the feasibility of filing a lawsuit."  Id.  In other words, "the privilege applies to 'any publication required or permitted by law in the course of a judicial proceeding to achieve the objects of the litigation, even though the publication is made outside the courtroom [when] no function of the court or its officers is involved.'"  Id. (alteration in original) (quoting Silberg v. Anderson, 786 P.2d 365, 369 (Cal. 1990)). "The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action."  Silberg, 786 P.2d at 369.

Defendants cannot argue that Herbalife's commencement of this lawsuit caused them harm because "[t]he filing of a complaint or petition is in itself a publication which is privileged because it is required by law to initiate the judicial proceeding." Borowski, 184 Cal. Rptr. at 323 (citing Albertson v. Raboff, 295 P.2d 405, 409 (Cal. 1956)).  Furthermore, the undisputed facts establish that the communications and publications at issue were made in connection with this proceeding because they were intended to notify Herbalife distributors of the lawsuit, to assure them that Herbalife was acting to protect their businesses, to mitigate any injury caused by Defendants'

prejudice.  See Healy Tibbitts Constr. Co. v. Ins. Co. of N. Am., 679 F.2d 803, 804 (9th Cir. 1982).

conduct, and to prevent future injury.  Defendants' contention that Herbalife's communications and its representations regarding the safety of Melaleuca's products were made with malice finds no support in law, logic, or the evidence before the Court, and is therefore summarily rejected.

Accordingly, for the reasons set forth above, the Court holds that Defendants have failed to establish a triable issue regarding the probability of a future economic advantage.  Herbalife's motion for summary judgment is therefore **GRANTED** as to Defendants' claim of intentional interference with prospective economic advantage.

## C. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON HERBALIFE'S CLAIMS

### 1. VALIDITY OF RULE 8-A OF HERBALIFE'S RULES OF CONDUCT

In its Order regarding Herbalife's motion to dismiss the first amended counterclaim, the Court construed Defendants' first amended counterclaim as alleging an independent claim under section 16600 of the California Business and Professions Code.  (See 1/12/2009 Order (Docket No. 125) at 4–5.)  The parties' motion papers make clear, however, that Defendants' position regarding the invalidity of Rule 8-A is more accurately classified as a basis of Defendants' unfair competition, false advertising, and intentional interference counterclaims and an affirmative defense to Herbalife's claims.  Moreover, Defendants no longer may affirmatively seek to enjoin the enforcement of Rule 8-A because none of them remains bound by the rule; Rule 8-A remains relevant only to the extent that Herbalife seeks damages for Defendants' previous violations thereof.  For these reasons, the Court addresses Herbalife's arguments regarding the validity of Rule 8-A in its discussion of Herbalife's claims.  Moreover, because the validity of Rule 8-A is a question pertinent to many of Herbalife's claims, the Court addresses the issue of validity first before discussing Herbalife's specific claims.

As summarized above, Rule 8-A is a nonsolicitation covenant that was incorporated into the distributorship agreements at issue in this case.  The rule, which was enacted as of September 1, 2006, provides:

> During the course of a Distributorship and for one year thereafter, neither the Distributor nor their spouse, nor any other person assisting in a Distributorship will, directly or indirectly, through or by means of any person, entity or artifice[], solicit, promote, sponsor or recruit any Herbalife Distributor, or any Herbalife customer they became aware of in the course of their Herbalife Distributorship, to join, promote, sell or purchase products of, or participate in as a salesperson or otherwise, any multi-level marketing or direct-sales company, nor will they encourage anyone to do what is prohibited under this rule.

(McKee Decl., Ex. A [Marketing Plan & Business Rules] at 56 (Rule 8-A).)

Defendants contend that Rule 8-A violates section 16600 of the California Business & Professions Code because it is an unlawful restraint on trade. Herbalife responds that Rule 8-A is lawful because it protects Herbalife's trade secrets, such as Lineage Reports, which this Court has previously identified as possessing economic value.

Section 16600 provides that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Cal. Bus. & Prof. Code § 16600. The California Legislature has enacted three statutory exceptions to section 16600 that involve the sale or dissolution of corporations, partnerships, and limited liability corporations. See id. §§ 16601–16602.5. In the recent case of Edwards v. Arthur Andersen LLP, 189 P.3d 285 (Cal. 2008), the California Supreme Court clarified that "[n]oncompetition agreements are invalid under section 16600 in California even if narrowly drawn, unless they fall within the applicable statutory exceptions of sections 16601, 16602, or 16602.5." Id. at 297. There, a noncompetition agreement that was a condition to the plaintiff's employment prohibited him from working for or soliciting the defendant's clients for limited periods following his termination. Id. at 288. The trial court held that the noncompetition agreement did not violate section 16600 because it was narrowly tailored and did not deprive the plaintiff of the right to pursue his profession. Id. at 289. The California Court of Appeal reversed the trial court's ruling, and the California Supreme Court upheld the reversal, rejecting the defendant's construction of section 16600 as prohibiting only broad restraints that prohibit an employee from engaging in her

profession, trade, or business altogether.  Id. at 291–92.  The court reasoned that the noncompetition agreement prohibited the plaintiff from performing work for the defendant's clients, "and therefore restricted his ability to practice his accounting profession."  Id. at 292.  In so doing, the court expressly rejected the "narrow-restraint" exception to section 16600 adopted by the Ninth Circuit in Campbell v. Bd. of Trustees, 817 F.2d 499, 502–03 (9th Cir. 1987).

In a footnote, however, the Edwards court indicated that its analysis did not extend to "the applicability of the so-called trade secret exception to section 16600." 189 P.3d at 291 n.4.  Thus, Edwards did not overturn the long line of cases that have held that "[a] former employee may be barred from soliciting existing customers to redirect their business away from the former employer and to the employee's new business *if the employee is utilizing trade secret information to solicit those customers*."  Retirement Group v. Galante, ___ Cal. Rptr. 3d ___, 2009 WL 2332008, at *6 (Ct. App. 2009) (emphasis in original).  In other words, "it is not the *solicitation* of the former employer's customers, but instead the *misuse of trade secret information*, that may be enjoined" without violating section 16600.  Id. (emphases in original).

Thus, the operative question regarding the validity of Rule 8-A is whether enforcement of the rule is necessary to protect Herbalife's trade secrets.  Upon careful reflection, the Court answers this question in the negative.  As a matter of contractual interpretation, Rule 8-A is overbroad and constitutes a blanket prohibition on solicitation, in contravention of section 16600.  Section 16600 does not even mention trade secrets.  Moreover, Herbalife's contention that Edwards does not apply to reasonable nonsolicitation provisions is contradicted not only by the tenor of that decision, but also the specific facts at issue in that case.  The agreement in Edwards restricted competition as follows:

> If you leave the Firm, for eighteen months after release or resignation, you agree not to perform professional services of the type you provided for any client on which you worked during the eighteen months prior to release or resignation.  This does not prohibit you from accepting employment with

a client.  [¶]  *For twelve months after you leave the Firm, you agree not to solicit (to perform professional services of the type you provided) any client of the office(s) to which you were assigned during the eighteen months preceding release or resignation*.  [¶]  *You agree not to solicit away from the Firm any of its professional personnel for eighteen months after release or resignation*.

189 P.3d at 288 (emphasis added) (internal quotation marks omitted).  In concluding that this provision violated section 16600, Edwards did not distinguish between the noncompetition and nonsolicitation covenants contained in the agreement, but held that the entire agreement was invalid because it restrained the plaintiff's ability to practice his profession.  Id. at 292.  Thus, Edwards clarified that a broadly worded nonsolicitation provision such as Rule 8-A plainly falls within the ambit of section 16600, regardless of whether it is reasonable in temporal and geographic scope.  To the extent that the cases cited by Herbalife in its papers conflict with this ruling, it is the Court's view that those cases were implicitly overruled by Edwards.

The Court notes, however, that it is not necessary for Herbalife to enforce Rule 8-A to pursue its breach-of-contract and misappropriation claims.  The first sentence of paragraph 4 of the distributorship agreements provides: "[f]or a period of three (3) years after termination of this agreement Distributor will hold in confidence any trade secrets, formulas, sales and distribution systems, business information, and literature which Distributor acquired during the term of this agreement and will not use directly or indirectly such items."  (Gates Opp. Decl., Ex .P [Distributorship Agreements ¶ 4].)  The second sentence under paragraph 4 purports to prohibit Defendants from participating in a "competing business or business activity."  (Id.)  Plainly, the second sentence violates section 16600.  The first sentence, however, is much narrower and appears to be limited only to the use of Herbalife's trade secrets.  Furthermore, to the extent that paragraph 4's reference to "business information" and "literature" might run afoul of section 16600, Defendants have offered no reason why the specific reference to Herbalife's "trade secrets" is also invalid.  Thus, to the extent that Herbalife seeks to enforce its trade secrets under paragraph 4, it may do so without violating section

27

16600.  But Rule 8-A violates section 16600, thereby precluding Herbalife from basing any of its claims thereon.[6]

### 2. BREACH-OF-CONTRACT & MISAPPROPRIATION CLAIMS

As a threshold issue, Defendants argue that Herbalife may not proceed on its breach-of-contract or misappropriation claims because Herbalife did not "produce" during discovery "the documents it contends are trade secrets." (Defs.' Mot. at 1, 7–8.) Section 2019.210 of the California Code of Civil Procedure requires a party claiming misappropriation of its trade secret to *identify* the trade secret with reasonable particularity before the commencement of discovery.  Cal. Code Civ. Proc. § 2019.210. The purpose of the rule is "to limit the permissible scope of discovery by distinguishing the trade secret[] from matters of general knowledge in the trade or of special knowledge of those persons skilled in the trade."  Advanced Modular Sputtering, Inc. v. Superior Court, 33 Cal. Rptr. 3d 901, 907 (Ct. App. 2005) (alterations and internal quotation marks omitted).

As Defendants admit, Herbalife identified its trade secrets on June 15, 2007, in accordance with section 2019.210 of the California Code of Civil Procedure.  (See Dyer Decl., Ex. K [Disclosure of Trade Secrets] at 132–35.)  Moreover, Defendants do not cite, and the Court has not found, any authority that would support Defendants' dubious proposition that Herbalife must "produce" the trade secrets it contends Defendants misused.  (Mot. at 8.)  Thus the Court proceeds to address the merits of Herbalife's claims.

This Court has already held, and the Ninth Circuit has affirmed, that customer information and reports that Defendants did not themselves develop are protectable trade secrets.  (See 12/11/2007 Order (Docket No. 77) at 2–3; Ninth Circuit Mem. (Docket No. 115) at 2–3.)  Further, the California Court of Appeal recently confirmed

---

[6]Because there is a genuine issue of material fact with respect to whether Defendants breached the first sentence of paragraph 4, the Court need not address at this time whether any other Rules of Conduct or the CNA may serve as the basis for Herbalife's breach-of-contract and misappropriation claims.

that a former employee may be held liable for "using trade secret information to identify existing customers, to facilitate the solicitation of such customers, or to otherwise unfairly compete with the former employer." <u>Retirement Group</u>, 2009 WL 2332008, at *7.  Because there is sufficient evidence in the record from which a reasonable juror might conclude that Defendants misappropriated trade secrets such as Lineage Reports and Royalty Override Statements for purposes of recruiting Herbalife distributors to join Melaleuca (<u>see, e.g.</u>, Gates Opp. Decl., Ex. I [Julia Ford Depo. Tr. at 144:13–16], Ex. J [Fisher Depo. Tr. at 196:7–197:1], Ex. N [Thompson Depo. Tr. at 236:20–237:24], Ex. FF [Klucken Decl. ¶ 6] at 783), Defendants' motion for summary judgment is **DENIED** as to Herbalife's breach-of-contract and misappropriation claims.

### 3. INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS & PROSPECTIVE ECONOMIC ADVANTAGE CLAIMS

To the extent that Herbalife seeks to hold Defendants liable for soliciting and recruiting Herbalife distributors via its claims of intentional interference with contractual relations and intentional interference with prospective economic advantage claims, those claims constitute an attempt to enforce Rule 8-A, and must be rejected on that basis.  Insofar as the claims are based on the allegation that Defendants' interfered with Herbalife's business relations by misappropriating its trade secrets, the claims are duplicative of the breach-of-contract and misappropriation claims and, therefore, are superfluous.  Finally, to the extent that Herbalife bases its intentional interference claims on the allegation that Defendants made various representations to Herbalife distributors in an effort to induce them to join Melaleuca, Herbalife has failed to produce sufficient evidence of reliance on any such misrepresentations.  Thus, Herbalife has failed to show the existence a triable issue regarding the "actual disruption" element of both claims.  Accordingly, Defendants' motion for summary judgment is **GRANTED** as to Herbalife's intentional interference claims.

### 4. UNFAIR COMPETITION CLAIM

As explained in detail above, standing under the UCL is limited "to individuals

who suffer losses of money or property that are eligible for restitution." <u>Buckland</u>, 66 Cal. Rptr. 3d at 817.  Here, Herbalife lacks standing to proceed under the UCL for the same reasons that Defendants lack standing to proceed with their UCL and FAL claims, i.e., because Herbalife did not own or have a vested interest in the money it seeks to recover.  Moreover, Herbalife may seek to enjoin any continuing misappropriation of Herbalife's trade secrets by Defendants through its tort claims.  Accordingly, Defendants' motion for summary judgment is **GRANTED** as to Herbalife's UCL claim.

## IV.  CONCLUSION

For the foregoing reasons, Herbalife's motion is **DENIED** as to the endless-chain-scheme counterclaim, but **GRANTED** as to all remaining counterclaims.  Defendants' motion is **GRANTED** as to Herbalife's intentional interference and unfair competition claims, but **DENIED** in all other respects.  All evidentiary objections that are inconsistent with the Court's ruling are **OVERRULED**.

**IT IS SO ORDERED.**

DATED: August 25, 2009

_____
Judge Gary Allen Feess
United States District Court

30